UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THOMAS A. SHIELDS, et al.,
                Plaintiffs,

        v.

FEDERATION INTERNATIONALE DE
NATION,
                Defendant.

Case No. 18-cv-07393-JSC
Case No. 18-cv-07394-JSC

**ORDER RE: DEFENDANT'S
MOTIONS TO DISMISS
FOLLOWING
SUPPLEMENTAL BRIEFING
ON PERSONAL
JURISDICTION**

INTERNATIONAL SWIMMING LEAGUE,
LTD,
                Plaintiff,
        v.

FEDERATION INTERNATIONALE DE
NATION,
                Defendant.

Three world-class swimmers ("Class-Action Plaintiffs") bring a putative class action

against the Federation Internationale de Natation ("Defendant" or "FINA"), alleging federal

antitrust violations and a state law tort claim arising out of FINA's control over international

swimming competitions. (Dkt. No. 1 (18-cv-07393).)[1] International Swimming League, Ltd.

("ISL") also sues FINA alleging the same claims arising out of the same conduct.[2] (Dkt. No. 1

(18-cv-07394).) Now before the Court are Defendant's motions to dismiss both complaints

pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). (Dkt. Nos. 19 (18-cv-07393)

& 18 (18-cv-07394).) On June 4, 2019, the Court issued an order that deferred ruling on

Defendant's motions pending jurisdictional discovery and supplemental briefing. (Dkt. No. 37

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the
ECF-generated page numbers at the top of the documents.
[2] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. §
636(c). (Dkt. Nos. 7 & 14 (18-cv-07393; 18-cv-07394).)

(18-cv-07394).)[3]  The parties have completed their discovery and submitted their supplemental briefing.  (*See* Dkt. Nos. 67 & 76.)  The parties have also submitted several administrative motions to seal in conjunction with their supplemental briefing.  (Dkt. Nos. 66; 74; 80.)  After careful consideration of the parties' briefing and having had the benefit of oral argument on December 12, 2019, the Court DENIES Defendant's motions to dismiss and DENIES the parties' administrative motions to file under seal.

## BACKGROUND

### I.    The Parties

#### A.    Class Action

Thomas A. Shields is a professional swimmer and Olympic gold medalist who resides in Berkeley, California.  (Dkt. No. 1 at ¶ 22 (18-cv-07393).)  Michael C. Andrew resides in Encitas, California, and "has been swimming professionally since 2013."  (*Id.* at ¶ 23.)  He has set multiple world records and won a gold medal "at the 2016 FINA Short Course World Championships." (*Id.*)  Katinka Hosszu resides in Hungary, and "is a three-time Olympic gold medalist who has set or holds multiple world records."  (*Id.* at ¶ 24.)  She is also "[a] three-time FINA Swimmer of the Year."  (*Id.*)

The Class-Action Plaintiffs bring their action on behalf of themselves and other "swimmers who comprise the input market of top-tier swimmers who have competed on the sport's highest stages or have otherwise performed at a high-enough level that they can earn invitations to premiere competitions and draw lucrative sponsorships."  (*Id.* at ¶ 25.)

#### B.    ISL

Plaintiff ISL[4] "is a corporation organized and existing under the laws of Switzerland," whose "primary goal is to promote swimming around the world by organizing and promoting competitions featuring an innovative team-based format at events around the world."  (Dkt. No. 1

---

[3] The parties' submissions in both cases following the Court's June 2019 Order are identical; thus, the Court cites only to the docket in 18-cv-07394 unless otherwise noted.

[4] ISL's "chief sponsor and promoter is Konstantin Grigorishin, a Ukrainian businessman who is a leading shareholder of the Energy Standard Group" ("ESG"), "which maintains its own swimming club . . . and remains active in supporting ISL and seeking to get the league up and running." (Dkt. No. 1 at ¶ 53 (18-cv-07394).)

at ¶¶ 50-51 (18-cv-07394).)  To accomplish its goal, ISL "intends to create a worldwide, club-based swimming league and thereby expand the competitive and financial opportunities for the world's best swimmers." (*Id.* at ¶ 50.)  ISL's plans for 2019 included holding "a 15-match, team-based series of meets featuring more than 300 top-tier swimmers."  (*Id.* at ¶ 4.)

**C.      FINA**

Defendant FINA "is an association organized and existing in accordance with the laws of Switzerland" that is recognized by the International Olympic Committee as the governing body for "Olympic swimming, diving, high diving, water polo, artistic swimming, masters and open-water swimming." (*Id.* at ¶¶ 22, 24, 27 (Dkt. No. 18-cv-07394).)  It is one of "dozens" of international federations recognized by the International Olympic Committee that are charged with "administer[ing] their respective sports and establish[ing] and organiz[ing] the types and rules of competitions held at the Olympic Games."  (*Id.* at ¶ 26.)  Thus, FINA sets the "qualifying criteria" for swimmers to participate in the Olympics and "will recognize only those qualifying times that are met at FINA-approved qualifying events."  (*Id.* at ¶ 27.)

FINA "comprises 209 member federations" that "are themselves national umbrella groups involving representatives of the various aquatic-sports disciplines."  (*Id.* at ¶ 28.)  These national federations can "delegate sub-group entities to manage the FINA relationship as it pertains to the disciplines."  (*Id.*)  The United States' member federation (United States Aquatic Sports, Inc.) has designated USA Swimming, Inc. ("USA Swimming") as the "'national governing body' of swimming" in the country.  (*Id.*)  The member federations "exist primarily, if not exclusively, to prepare and present swimmers for competition in the Olympic Games."  (*Id.* at ¶ 87.)

"FINA and its 209 member federations are governed primarily by a 25-member Bureau. The Bureau's day-to-day power, in turn, is vested in an eight-member executive committee."  (*Id.* at ¶ 30.)  Member federations can sometimes appeal Bureau decisions and rule interpretations to the FINA General Congress, which is recognized under FINA's governing rules as "the highest authority of FINA."  (*Id.*)  The General Congress meets every two years and its voting members "comprise two delegates from each member federation."  (*Id.* at ¶¶ 30-31.)

Outside of the Olympic Games, FINA "and other entities that FINA approves organize and

promote international competitions featuring the world's top swimmers." (*Id.* at ¶ 102.) "FINA grants itself complete authority under its rules to ban a swimmer from participating in events that serve as the Olympic Games qualifying events for no reason other than the swimmer competed in a top-tier international swimming event that FINA did not itself organize or approve." (*Id.* at ¶ 111.)

## II.     Complaint Allegations[5]

### A.     Allegations Underlying Both Actions

The gravamen of the complaints is that FINA uses its control over Olympic aquatic sports to determine the terms of compensation and competition for international swimming events outside of the Olympic games and FINA's own competitions. In doing so, FINA engages in anticompetitive conduct "to maintain its grip on both its monopoly power in the market for top-tier international swimming competitions and its monopsony power in the market for the supply of top-tier swimmers." (Dkt. Nos. 1 at ¶ 11 (18-cv-07393; 18-cv-07394).)

From September 2017 through December 2017, ISL and FINA negotiated regarding ISL's plan to host an international swimming competition in 2018. (Dkt. No. 1 at ¶ 62 (18-cv-07394).)[6] Those negotiations were unsuccessful. (*Id.*) Thus, in the spring of 2018, ISL turned to FINA's member federations and began direct "discussions with USA Swimming for that national governing body to host, manage, and organize the ISL event in December 2018." (*Id.* at ¶ 63.) ISL and USA Swimming considered "Las Vegas's Mandalay Bay Resort and Casino or the University of Southern California as potential venues." (*Id.* at ¶ 8.) "As a result of these negotiations, ISL began planning to host its event in Las Vegas" and "work[ing] to obtain the support of FINA's member federations." (*Id.* at ¶¶ 63, 65.) In May 2018, "ISL entered into a memorandum of understanding with . . . the FINA-recognized 'continental federation' comprising

---

[5] The parties addressed Plaintiffs' proposed amended complaints in both actions at a hearing on October 13, 2019, and the Court determined that the operative complaints for purposes of Defendant's motions to dismiss are the original complaints. (*See* Dkt. No. 63 at 10:6-7 ("So we're in agreement then we should [resolve the motions to dismiss] without the amended complaint first.").)

[6] The complaints in both actions set forth identical substantive allegations; thus, the Court cites to ISL's complaint in 18-cv-07394 unless otherwise noted.

the European national federations." (*Id.* at ¶ 65.) ISL then "presented its plans to representatives of the federations from the United States, Australia, United Kingdom, Brazil, France, Russia, and Ukraine." (*Id.*)

ISL's outreach to FINA's member federations drew a response from FINA Executive Director Cornel Marculescu, who sent a letter to all FINA members "on or about June 5, 2018," stating that ISL "is neither recognized by nor affiliated [with] FINA." (*Id.* at ¶ 66 (internal quotation marks omitted).) Mr. Marculescu warned the member federations that "FINA would monitor the matter closely, . . . and sanction anyone who violated FINA's rule on unauthorized relations."[7] (*Id.*) Mr. Marculescu closed the letter by "express[ing] his hope that all who received it would come away from his message with a clear understanding of FINA's competence and jurisdiction in respect to international competitions." (*Id.* (internal quotation marks omitted).)

Roughly a week after Mr. Marculescu's letter, USA Swimming sent ISL a letter dated June 13, 2018, "express[ing] its deep concern that a December 2018 event without FINA's direct blessing would put U.S. swimmers at risk—especially if FINA sees th[e] December event as a challenge." (*Id.* at ¶ 67 (internal quotation marks omitted).) The letter stated that USA Swimming "could not help ISL organize any competition until it received assurance . . . that FINA is on board with the concept of the ISL and approves of the concept." (*Id.* at ¶ 67 (internal quotation marks omitted).) USA Swimming thus "pulled out of negotiations for hosting the December 2018 competition in either [Las Vegas or the University of Southern California], or anywhere else." (*Id.* at ¶ 8.)

ISL then "tried to pair with British Swimming to host the [December 2018] competition in London." (*Id.* at ¶ 9.) However, "within weeks, and in direct response to Mr. Marculescu's June 5 letter, British Swimming likewise distanced itself from ISL's planned December 2018

---

[7] The relevant FINA rule in effect at the time prohibited member federations from "hav[ing] any kind of relationship with a non-affiliated or suspended body." (*See* Dkt. No. 20-2, Ex. B at 5.) Defendant's motions to dismiss assert that FINA clarified on January 15, 2019 (after the actions were filed) "that swimmers who participate in competitions or events staged by independent organizers such as ISL will not be found to have violated that rule." (*See* Dkt. Nos. 19 at 10 n.3 (18-cv-07393) & 18 at 10 n.1 (18-cv-07394).) As such, Defendant asserts that Plaintiffs' claims are moot; however, Defendant "ignore[s] that development and assume[s] the truth of all well-pleaded facts" given the procedural posture of the actions. (*Id.*) The Court does the same.

competition." (*Id.* at ¶ 68.)  ISL and FINA resumed direct negotiations in mid-summer 2018 to discuss the December 2018 competition and how the two organizations could co-exist.  (*Id.* at ¶¶ 14, 69.)  As part of these negotiations, FINA insisted on "event ownership and FINA-naming rights, plus payment of $50 million to FINA from ISL over 10 years."  (*Id.* at ¶ 71.)  ISL refused those terms and negotiations ended in October 2018.  (*Id.*)

Following the breakdown of its negotiations with FINA, ISL "teamed up with the Italian Swimming Federation," who "agreed to host the December competition in Turin, Italy."  (*Id.* at ¶ 10.)  On or around October 17, 2018, the Italian Swimming Federation notified FINA of its plans to host the competition in Turin (the "Turin Event").  As Plaintiffs allege, however:

> Despite the extensive planning and expenditure of resources by ISL and the Italian Swimming Federation, and despite their having entered into participation and appearance-fee agreements with more than 50 swimmers from around the world, FINA coerced its member federations into agreeing to, and participating in, an overt effort to shut down the Turin Event by threatening the swimmers with a ban from FINA events—including the competitions that would serve as the qualifying meets for the 2020 Olympic Games—if swimmers participated in the Turin Event.

(*Id.* at ¶ 11.)  FINA issued its threats "to prevent competition and to maintain its grip on both its monopoly power in the market for top-tier international swimming competitions and its monopsony power in the market for the supply of top-tier swimmers."  (*Id.*)  Despite warnings from ISL that its conduct "was both contrary to the letter and spirit of the FINA rules and, independently, in obvious violation of U.S. and EU competition law," Mr. Marculescu emailed the Italian Swimming Federation on October 30, 2018, notifying it that the Turin Event could not proceed without FINA approval.  (*Id.* at ¶¶ 80-81.)  Ultimately, given FINA's threat of suspension to participating swimmers, "the Italian Swimming Federation and ISL canceled the Turin Event on November 15, 2018, under protest."  (*Id.* at ¶ 96.)  Plaintiffs filed the instant actions less than one month later.

**B.     Class Allegations**

As previously discussed, the complaints in both actions set forth identical factual allegations.  The gravamen of the class action is that FINA has harmed the Class-Action Plaintiffs and those similarly situated by preventing them from participating in ISL events, like the Turin

6

Event, and other non-FINA approved international swimming competitions. The Class-Action Plaintiffs propose the following class definition:

> All natural persons who are eligible to compete in swimming world championship and Olympic Game competitions. Excluded from this class are members of the boards of directors, boards of trustees, boards of governors, and senior executives of FINA and its member federations, and any and all judges and justices, and chambers' staff, assigned to hear or adjudicate any aspect of this litigation.

(Dkt. No. 1 at ¶ 129 (18-cv-07393).)

### C.      Claims and Requested Relief

The Class-Action Plaintiffs and ISL bring the same three causes of action: (1) violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; and (3) a state law claim for "tortious interference with prospective economic relations." (Dkt. Nos. 1 at ¶¶ 137-160 (18-cv-07393) & 1 at ¶¶ 128-150 (18-cv-07394).) Likewise, Plaintiffs in both actions seek monetary and injunctive relief, as well as attorneys' fees and costs. The Class Action-Plaintiffs also seek "equitable relief; including a judicial determination of the rights and responsibilities of the parties." (Dkt. No. 1 at 45 (18-cv-07393).)

## III.      Procedural History

The Class-Action Plaintiffs and ISL filed their respective complaints on December 7, 2018. Defendant filed the instant motions to dismiss on March 1, 2019. ISL filed its opposition on April 25, 2019. (Dkt. No. 32 (18-cv-07394).) The Class-Action Plaintiffs filed their opposition the same day, offering no substantive arguments; instead, the opposition states, in pertinent part: "[G]iven that FINA asserts no basis for dismissal of this action independent from its arguments against the ISL case, Plaintiffs incorporate by reference ISL's Opposition brief and reassert the arguments as if they were Plaintiffs' own." (Dkt. No. 34 at 2 (18-cv-07393).) Thus, the Class-Action Plaintiffs' opposition asserts no arguments specific to their own action and does not respond to Defendant's class action-specific arguments in support of its motion to dismiss. (*See id.* ("For the reasons set forth in ISL's Opposition, attached here as Exhibit A, the Court should deny FINA's motion in its entirety.").) Defendant argues that such incorporation by reference is improper, and in failing to respond to Defendant's class-action specific arguments, the

Class-Action Plaintiffs have effectively failed to oppose dismissal. (*See* Dkt. No. 35 at 2-5 (18-cv-07393).)

As noted in the Court's June 2019 Order, given that the complaints assert the same core allegations and both actions are before the undersigned, the Court does not consider Defendant's motion to dismiss the class action as unopposed. (*See* Dkt. No. 37 at 7-8.) Further, Defendant's motions to dismiss set forth nearly verbatim arguments in support of dismissal of both actions. Thus, when discussing the arguments set forth in opposition to the motions to dismiss, the Court refers to the Class-Action Plaintiffs and ISL collectively as "Plaintiffs" and cites only to ISL's opposition briefing, (Dkt. No. 32).

The Court heard oral argument on Defendant's motions on May 23, 2019, and issued its Order permitting jurisdictional discovery on June 4, 2019. In pertinent part, the Court's Order allowed for "limited jurisdictional discovery regarding the impetus for FINA's June 2018 letter and its knowledge of ISL's negotiations with USA Swimming regarding the planned December 2018 [competition] in the United States." (Dkt. No. 37 at 17.) The parties appeared before the undersigned at case management conferences on June 20, 2019 and July 11, 2019, (Dkt. Nos. 41 & 46), and the Court issued a scheduling order regarding jurisdictional discovery on July 18, 2019, (Dkt. No. 49). The Court held another case management conference on August 22, 2019 and resolved several discovery-related issues. (Dkt. No. 54.) On October 8, 2019, the parties filed a joint status report regarding jurisdictional discovery and indicated that discovery was "fundamentally complete." (Dkt. No. 58 at 2.) The Court held a case management conference on October 10, 2019 and issued an order thereafter setting a briefing schedule for the parties' supplemental submissions regarding personal jurisdiction and the parties' dispute regarding Defendant's confidentiality designations. (Dkt. No. 60.)

The parties timely filed their supplemental briefing regarding jurisdiction, (*see* Dkt. Nos. 67 & 76), and their briefing regarding Defendant's confidentiality designations, (*see* Dkt. Nos. 66; 69; 70; 72; 73). The Court heard oral argument on December 12, 2019.

## DISCUSSION

Defendant argues that dismissal is warranted in both cases because this Court lacks

personal jurisdiction over FINA.  (Dkt. Nos. 19 at 8 (18-cv-07393) & 18 at 8 (18-cv-07394).)

Defendant further argues that dismissal is warranted under Rule 12(b)(6).  (*Id.* at 9.)  The Court

addresses the asserted bases for dismissal in turn.

## I.     Dismissal under 12(b)(2)[8]

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears

the burden of demonstrating that the court has jurisdiction over the defendant.  *See Harris Rutsky*

*& Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1128-29 (9th Cir. 2003).  Where,

as here, the court permits discovery to assist in determining whether it has personal jurisdiction

but does not hold an evidentiary hearing, the "plaintiff must make only a prima facie showing of

jurisdictional facts through the submitted materials in order to avoid [dismissal]."  *Data Disc, Inc.*

*v. Sys. Tech. Ass'n, Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977); *see also Am. Tel. & Tel. Co. v.*

*Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996) ("[B]ecause the trial court ruled

on the issue relying on affidavits and discovery materials without holding an evidentiary hearing,

dismissal is appropriate only if the plaintiff has not made a prima facie showing of personal

jurisdiction.") (internal quotation marks and citation omitted).  Courts must "resolve[ ] all disputed

facts in favor of the plaintiff" in determining "whether a prima facie showing has been made."  *In*

*re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 741 (9th Cir. 2013).

There are two types of personal jurisdiction: general and specific.  *Goodyear Dunlop Tires*

*Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  Here, Plaintiffs assert that the Court has

specific jurisdiction over Defendant, which is a nonresident.  The Due Process Clause of the Fifth

Amendment requires that nonresident defendants have "minimum contacts" with the forum such

that the exercise of personal jurisdiction "does not offend traditional notions of fair play and

---

[8] The Court incorporates by reference its analysis and conclusions set forth in the June 2019 Order concerning Plaintiffs' initial showing regarding jurisdiction, (*see* Dkt. No. 27 at 8-17).  In pertinent part, the Court has concluded that the long-arm statute for federal antitrust suits, Section 12 of the Clayton Act, 15 U.S.C. § 22, which provides for worldwide service of process, applies and potentially confers jurisdiction.  (*See id.* at 9.)  Thus, this Order addresses only  "constitutional aspects of the exercise of personal jurisdiction."  *See Go-Video, Inc. v. Akai Elec. Co., Ltd.*, 885 F.2d 1406, 1413 (9th Cir. 1989) ("To exercise personal jurisdiction over a non-resident defendant in a federal question case, the district court [must first] determine that a rule or statute potentially confers jurisdiction over the defendant and then conclude that asserting jurisdiction does not offend the principles of Fifth Amendment due process.").

substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

"The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 283-84 (2014) (internal quotation marks and citation omitted). The specific-jurisdiction analysis is a "defendant-focused inquiry" that considers both the "the contacts that the defendant himself creates with the forum State" and "the defendant's contacts with the forum State itself, not the defendant's knowledge of a plaintiff's connections to a forum." *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017) (citing *Walden*, 571 U.S. at 284) (internal quotation marks omitted). There is no dispute that the relevant forum for the Court's jurisdictional analysis in these antitrust actions is the United States as a whole, and not merely California. *See Go-Video*, 885 F.2d at 1415 (applying "national contacts analysis" to suit against foreign defendant brought under the Clayton Act, 15 U.S.C. § 22, alleging violation of the Sherman Act, 15 U.S.C. § 1); *see also Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1177 (9th Cir. 2004) (same).

The Ninth Circuit utilizes a three-prong test for determining specific jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). The plaintiff has "the burden of satisfying the first two prongs"; if it does so, the defendant must demonstrate that the court's exercise of personal jurisdiction would be unreasonable. *Id.* "If any of the three requirements is not satisfied, jurisdiction in the forum would deprive the defendant of due process of law." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1155 (9th Cir. 2006) (internal quotation marks and citation omitted).

//

## A.     Purposeful Direction

The parties do not dispute that courts in this circuit apply the "purposeful direction" test to antitrust actions. *See Schwarzenegger*, 374 F.3d at 802-03 (noting that "[a] purposeful availment analysis is most often used in suits sounding in contract," while the purposeful direction or "effects" test "is most often used in suits sounding in tort.") (citing *Calder v. Jones*, 465 U.S. 783 (1984)); *see also In re W. States*, 715 F.3d at 743 (applying effects test in antitrust action). To establish purposeful direction, a plaintiff must show that the defendant: "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Axiom*, 874 F.3d at 1069 (internal quotation marks and citation omitted).

Plaintiffs have met their burden. The following evidence obtained by Plaintiffs through discovery, when viewed as a whole, demonstrates FINA's purposeful direction of allegedly anticompetitive conduct at the United States:

- February 2018 meeting between representatives of USA Swimming and FINA during which the parties discussed USA Swimming's participation in ISL events. (Dkt. No. 66-4, Ex. 27 (filed under seal).)

- Deposition testimony of USA Swimming Chief Operating Officer Mike Unger attesting that after the February 2018 meeting FINA Executive Director Cornel Marculescu asked "to be kept abreast of what was going on" regarding "the potential event" between ISL and USA Swimming," and that Mr. Unger did as Mr. Marculescu requested. (Dkt. No. 67-2, Ex. 26A at 141:5-21.)

- March 16, 208 email from Mr. Unger to FINA Vice President and USA Swimming Ex-officio Board Member Dale Neuburger regarding the ISL event stating, in pertinent part:

    We have been working with them. We also spoke with Cornel [Marculescu] about this at length. The idea is a world club swimming championships. USA would have two clubs of the eight total that would be competing. Late December time-frame. Possible site Singapore . . . though they have asked us about the USA hosting.

    We have told them that if FINA says "no" to this, that the USA would have a hard time taking part.

11

(Dkt. No. 66-4, Ex. 31 at 30 (filed under seal).)

- March 21, 2018 email from Mr. Unger to Mr. Neuburger stating, in pertinent part: "I'm slightly confused about the ISL, and we've said all along to them that for us to participate, it had to be either approved/supported by FINA . . . or at the very least, FINA was 'ok' with it taking place." (Dkt. No. 66-4, Ex. 30 at 26 (filed under seal).)

- March 29, 2018 email from Mr. Neuburger to Mr. Marculescu regarding proposed ISL event: "I now know that they seek a site in the USA or Australia." (Dkt. No. 66-4, Ex. 34 at 37 (filed under seal).)

- Deposition testimony of Mr. Marculescu indicating that he was in contact with Mr. Neuburger and Mr. Unger regarding USA Swimming's relationship with ISL and aware of an ISL event being planned in the United States. (Dkt. No. 66-4, Ex. 45 at 100-03, 107-08 (filed under seal).)

- April 4, 2018 email from Mr. Unger to Mr. Grigorishin of ISL in which Mr. Unger states that USA Swimming would be interested in hosting the inaugural ISL swimming competition in December 2018. (Dkt. No. 67-2, Ex. 3 at 8.)

- Draft minutes of May 11, 2018 meeting of the USA Swimming International Relations Committee, noting that both Mr. Neuburger and Mr. Unger were in attendance and that the committee discussed "the International Swim League through Energy Standard taking place in either London or Las Vegas this December." (Dkt. No. 67-2, Ex. 5 at 14-15.)

- May 14, 2018 email from Mr. Unger to Sid Greenfeig, VP of Arena Booking for MGM Resorts, stating that the location of the December 2018 ISL event "was down to London and Las Vegas." (Dkt. No. 67-2, Ex. 4 at 10.)

- May 15, 2018 email from Mr. Unger to Mr. Neuburger requesting guidance regarding FINA's rules on legalized gambling and stating that he is "[j]ust trying to get some clarity . . . especially if the ISL meet ends up in Las Vegas." (Dkt. No. 67-2, Ex. 6 at 21-22.)

- Deposition testimony of Mr. Unger:

    Q. Okay. Let's put it this way: You were making it clear to everyone you were speaking to [following a May 23, 2018 meeting with ISL in Turkey] that you would not proceed with the Las Vegas event with

12

ISL unless Cornel [Marculescu] approved it?  Weren't you telling people that, everyone you spoke with about this?

A.  Yes.

(Dkt. No. 67-2, Ex. 26A at 107:20-25.)

- May 25, 2018 email from Mr. Unger to Mr. Greenfeig stating, in pertinent part: "Still working with the folks from ISL.  Just returning from a stakeholders meeting in Turkey.  They really want to come to Las Vegas, but the only hold up is some international political wrangling that is currently causing some stress."  (Dkt. No. 67-2, Ex. 4 at 10.)

- May 25, 2018 email from Mr. Marculescu to Mr. Neuburger regarding the May 2018 meeting in Turkey between ISL (identified as "Energy Standard Club"), USA Swimming, and other member federations.  Mr. Marculescu notes that "Mike [Unger] proposed the event to be organized in Las Vegas by this Club and people."  (Dkt. No. 67-2, Ex. 7 at 25.)

- May 25, 2018 reply email from Mr. Neuburger to Mr. Marculescu stating that Mr. Neuburger "talked with Mike [Unger] yesterday" and "USA Swimming will respect FINA and not take part in an 'unauthorized' competition."  Mr. Neuburger emphasized that "USA Swimming will not go against FINA, but there were statements made yesterday that FINA may be involved (if the price is right) and that the event does not violate FINA rules."  (Dkt. No. 67-2, Ex. 7 at 25.)

- May 28, 2018 email from Mr. Unger to a USA Swimming colleague: "We are being asked to host in Las Vegas.  But FINA doesn't like it.  ISL had an organizers meeting in Turkey . . . and we attended.  Right now . . . turning into a battle between ISL and FINA."  (Dkt. No. 67-2, Ex. 9 at 36.)

- May 28, 2018 email from Mr. Unger to USA Swimming colleague:

  Meetings went well in Turkey . . . but the big obstacle still remains the ISL relationship with FINA.

  We will not do anything to upset the FINA relationship.  Spent 30 minutes on the phone this morning with Cornel [Marculescu].  Oh boy . . . this is a tough topic.

(Dkt. No. 67-2, Ex. 8 at 32.)

- Deposition testimony of Mr. Unger stating that ISL "told us that Las Vegas was very much

13

what they wanted to do," and that "Las Vegas was the site in the U.S. that we were working towards."  (Dkt. No. 67-2, Ex. 26A at 125:2-3, 126:5-6.)

- May 31, 2018 email from Mr. Unger to Mr. Neuburger stating, in pertinent part:

> I have been nothing but transparent and open on this topic with both Cornel and ISL.  We are not playing one side against the other.  We have said all along . . . "what FINA thinks about this event matters . . . and we are not going to take part if this is against FINA rules."

(Dkt. No. 67-2, Ex. 12 at 47.)

- June 4, 2018 email from Ali Khan, Chief Executive Officer of ISL, to Mr. Unger and Tim Hinchey, Chief Executive Officer of USA Swimming, referencing USA Swimming's April 2018 letter to ISL and stating, in pertinent part: ***"[W]e are delighted to learn about your Federation's desire to host, manage and run the proposed event in Las Vegas during December 2018."***  The email goes on to discuss terms of a memorandum of understanding between USA Swimming and ISL regarding the event that would include the following points: (1) "USA Swim commitment to a USA-hosted ISL event by inserting the ISL event into the USA calendar by 16th June, 2018"; (2) "USA Swim continued desire to host, manage and run the proposed event; and (3) "USA Swim intentions to submit 3 teams to the event."  (Dkt. No. 67-2, Ex. 2 at 6 (emphasis added).)

- June 4, 2018 reply email from Mr. Unger to Mr. Khan, stating, in pertinent part:

> USA Swimming remains very interested in participating in the ISL, however we are aware that FINA is potentially concerned about this relationship.  Are you able to give an update to us on your discussions with FINA?  That would be most helpful.  As we have stated many times, we care about our relationship with FINA and want to make sure it approves of this competition/series.

(Dkt. No. 67-2, Ex. 2 at 5.)

- June 4, 2018 email from Mr. Unger to Jack Buckner of British Swimming and Chris Forbes of Swimming Australia stating, in pertinent part:

> USA Swimming, like British Swimming and Swimming Australia, is very interested in this project.  We plan on participating, however there is one catch (and it's a major one right now).  FINA is apparently not happy with ISL, and is intent on derailing the ISL efforts.  I have spoken with both Cornel Marculescu of FINA, along with ISL, to explain that they need to come together to work out some compromise or remedy for the potential conflict.  FINA is using GR 4

14

1      (Unauthorized Relations – page 146 of new FINA Handbook) as the
     basis for this challenge.

2      If GR 4 is violated, FINA can issue penalties against the national
3      federation and its athletes, including suspensions (GR 4.5). This can
     be quite harsh.

4 (Dkt. No. 67-2, Ex. 11 at 42.)

5 •   June 5, 2018 email from Mr. Marculescu to Mr. Unger containing the June 5 letter that

6      FINA would send later that day to all FINA member federations. (Dkt. No. 67-2, Ex. 18 at

7      72-73.)

8      The evidence demonstrates that between February 2018 and June 5, 2018: (1) FINA was in

9 communication with USA Swimming regarding the proposed December 2018 ISL event; (2) USA

10 Swimming was in discussions with ISL to host the event in the United States and Las Vegas was

11 the preferred venue for the event; (3) FINA had direct knowledge of those discussions through Mr.

12 Marculescu and Mr. Neuburger; (4) USA Swimming knew—prior to the June 5 letter—that FINA

13 viewed participation in any ISL event as a violation of FINA's rules; and (5) FINA knew that

14 USA Swimming would not go forward with the December 2018 event without FINA approval.

15 Further, FINA provided USA Swimming with advance notice of the June 5 letter, indicating that

16 USA Swimming's attention to the letter was of particular importance to FINA.

17      On June 5, 2018, FINA issued the letter to its 209 member federations listing FINA's

18 governing rules, including that "[n]o affiliated Member shall have any kind of relationship with a

19 non-affiliated or suspended body." (Dkt. No. 67-2, Ex. 17 at 69.) The memorandum further

20 states, in pertinent part:

21          For the sake of clarification, the "International Swimming League" is
22          neither recognised by nor affiliated [with] FINA. Further, FINA has
         neither sanctioned the competitions organised by this entity, nor
23          approved their sanction by other FINA bodies (Continental, Regional
         and National bodies).

24          Consequently, the competitions of the "International Swimming
25          League" are not FINA sanctioned nor FINA approved. They are not
         part of the international calendar. The results and records achieved in
26          these competitions are not and will not be recognised.

27          FINA will assess the development of this matter and will consider
         potential measures in application [of its governing rules], as and
28          where appropriate.

(*Id.* at 70.)  Mr. Unger testified that at the time of the June 5 letter "there was one planned event for 2018."  (Dkt. No. 67-2, Ex. 26A at 124:11-12.)  After FINA issued the letter, Mr. Unger emailed members of United States Aquatic Sports, Inc. detailing the risks of suspension under FINA's rules and stating, in pertinent part:

> This is serious, not just for swimmers, and not just for USA Swimming . . . but for [United States Aquatic Sports, Inc.], meaning all five constituent organizations.
>
> I have continued to counsel FINA to act with restraint and moderation, as has Rich Young, but this is not a situation to take lightly.  The potential ramifications are severe, and we all need to have our eyes wide open.

(Dkt. No. 67-2, Ex. 16 at 65.)

Mr. Unger then emailed ISL principals on June 13, 2018 regarding holding the December event in London, stating, in pertinent part:

> A small group of USA Swimming leadership met this morning to discuss the opportunity related to USA Swimming's participation with the ISL and the competition in London (with invitation from British Swimming).
>
> Ultimately, we came to the conclusion that before USA Swimming can commit to taking part, we need to get an assurance from ISL and from FINA (in writing) that FINA is on board with the concept of the ISL and approves of the concept.  Holding the event in December 2018, with British Swimming as the host, is postponing the important decision of whether the ISL can actually exist alongside FINA.  We strongly suggest that ISL leadership meet with FINA directly to get this resolved.

(Dkt. No. 67-2, Ex. 22 at 82.)  Mr. Unger's June 13 email suggests that London was always an *alternative* location in the event USA Swimming bowed out from hosting in the United States, further supporting a reasonable inference that the June 5 letter had the intended effect of scuttling the proposed U.S.-based event.  Indeed, Defendant submits other emails also dated after the June 5 letter that indicate that British Swimming and ISL were moving ahead with plans to hold the December 2018 event in London.  (*See* Dkt. Nos. 76-13, Ex. 42 at 6 (June 11, 2018 email from Mr. Unger to Mr. Hinchey (both of USA Swimming) stating, in pertinent part: "FYI . . . so . . . British Swimming will be the host (likely in London).") & 76-13, Ex. 43 at 8 (June 13, 2018 email from Mr. Khan (ISL) to Mr. Buckner (British Swimming) stating, in pertinent part: "I will request

USA & Australia to sign MOUs confirming their intention (again not legally binding) to send in their respective teams to our London event which is supported by UK Swim.").)

In sum, Plaintiffs have made a prima facie showing that Defendant purposefully directed its anticompetitive conduct at the United States by knowingly interfering with USA Swimming and ISL's plans to host a competition in the United States. Defendant's characterization of the evidence fails to counsel a different result.

First, the Court is not persuaded by Defendant's assertion that the June 5 letter "was not motivated by any specific ISL event." (*See* Dkt. No. 76 at 11.) The evidence cited above supports an inference that ISL's proposed December 2018 event in the United States was a motivating factor in FINA issuing the letter. The deposition testimony of Mr. Marculescu and Mr. Neuburger cited by Defendant fails to convince the Court otherwise in light of the contemporaneous email exchanges noted above. *See In re W. States*, 715 F.3d at 741 ("For the purposes of deciding whether a prima facie showing has been made, the court resolves all disputed facts in favor of the plaintiff.") (internal quotation marks and citation omitted).

Second, Defendant's assertion that a Las Vegas "event was never in fact 'planned'" misses the point. (*See* Dkt. No. 76 at 13.) Although plans for the Las Vegas event were never *finalized*, the evidence cited above demonstrates that USA Swimming and ISL engaged in discussions regarding the Las Vegas event as late as June 4, 2018. (*See* Dkt. No. 67-2, Ex. 2 at 6.) Further, FINA knew as of May 25, 2018 at the latest that USA Swimming proposed hosting the event in Las Vegas. (*See* Dkt. No. 67-2, Ex. 7 at 25).

Third, Defendant argues that FINA "had indications of as many of five potential venues for ISL's inaugural event." (*See* Dkt. No. 76 at 14.) Defendant cites a May 23, 2018 email from Paolo Barelli, president of the Italian Federation and member of FINA's Executive Committee, addressed to Mr. Marculescu that states that the European continental swimming federation ("LEN") "'has embraced the will of the so-called "International Swimming League Association" to organise a swimming event which would have to be organised at the end of December of this year.'" (Dkt. No. 74-5 at 15 (filed under seal) (quoting Dkt. No. 74-27, Ex. 27 at 3 (filed under seal)).) Defendant asserts that "Mr. Barelli's express declaration that LEN would be organizing an

17

ISL [event] meant the event would likely take place in Europe, LEN's territory." (Dkt. No. 76 at 15.) Two days after receiving that email, however, Mr. Marculescu emailed Mr. Neuburger regarding the meeting in Turkey between ISL, USA Swimming, and member federations from Australia, Brazil, England, France, Germany, Russia, and the Ukraine, and noted that "Mike [Unger] proposed the event to be organized in Las Vegas by this Club and people." (Dkt. No. 67-2, Ex. 7 at 25.) Mr. Marculescu's May 25 email does not discuss other proposed event sites. Defendant attempts to minimize the May 25 email by arguing that "Mr. Marculescu also learned that other European countries were discussed as potential venues." (Dkt. No. 76 at 15.) In support, Defendant cites the following testimony from Mr. Marculescu:

> Q. So the only thing that was known in late May [2018] by you is that there was going to be a meet between—there was going to be a meet put on by ISL and [USA Swimming]?
>
> A. Not only [USA Swimming]. After [the meeting in] Turkey, they discussed to have another events in Europe.
>
> Q. Where?
>
> A. In Italy. In Great Britain.
>
> Q. Who - -
>
> A. In France.

(Dkt. No. 74-5 at 15 (filed under seal) (citing Dkt. No. 75-25, Ex. 26 at 9:24-10:8 (filed under seal)).) Again, however, the contemporaneous emails and regular communications between USA Swimming, Mr. Marculescu, and Mr. Neuburger give rise to a reasonable inference that at the time FINA issued the June 5 letter it was concerned with USA Swimming and ISL's ongoing plans to host the December 2018 event *in the United States*. Indeed, such concern is indicated by Mr. Marculescu sending Mr. Unger a copy of the June 5 letter *before* sending it to the other FINA member federations. An inference that FINA was concerned with USA Swimming's proposal to host an ISL event in the United States is also supported by the deposition testimony of Mr. Marculescu acknowledging the prominence of USA Swimming among the 209 member federations; specifically:

> Q. Did you consider USA Swimming to be a significant voice in

18

international swimming?

A.  U.S. Swimming, they have probably the best athletes today.

Q.  But in 2018, did they have the best athletes?

A.  And also in 2018, they have the best athletes.

Q.  Okay.  And --

A.  And -- and it's one of the federations with greatest success.  Number of medals.  And, of course, is very important their -- their -- their point of view.

(Dkt. No. 66-4, Ex. 45 at 114:3-15 (filed under seal).)  Further:

Q.  But do you think because of that, because of the quality of their athletes and their success, that they were a leader among federations?

A.  I don't know if leader, but they are in the top of the FINA federations.

(*Id.* at 115:19-23 (filed under seal).)  Mr. Marculescu's testimony indicates that FINA viewed USA Swimming, and by logical extension the swimming market in the United States, as being especially important.  It follows that USA Swimming's relationship with ISL was of specific concern to FINA.  While the proposed events in Britain and Italy may have also been of specific concern, that does not eliminate the inference that FINA was aware of the proposed United States event hosted by USA Swimming and engaged in conduct to ensure that it did not occur in the United States or elsewhere.

Further, and more importantly, Plaintiffs allege a global antitrust conspiracy.  Thus, that the June 5 letter *also* served to "advise all 209 federations" of relations between FINA and ISL, (*see* Dkt. No. 74-5 at 22 (filed under seal)), does not mean that it was not "expressly aimed" at the United States because FINA knew of USA Swimming and ISL's intentions to organize a U.S.-based event and also knew that USA Swimming would not go forward with that event if FINA did not approve.  By issuing the June 5 letter, which noted that ISL's competitions were not approved by FINA and warned of potential sanctions for member federations that participated in such competitions, FINA "knew and intended that the consequences of their [conduct] would be felt in [the United States]."  *See In re W. States*, 715 F.3d at 744 (applying in antitrust case the test set forth in *Calder* and finding conduct "expressly aimed" at the forum where defendants "knew and

19

intended that the consequences of their [anticompetitive conduct] would be felt in [the forum]").

***

Plaintiffs have satisfied their burden of making a prima facie showing that Defendant purposefully directed its allegedly anticompetitive conduct at the United States. The Court turns to the remaining prongs of the specific jurisdiction inquiry and concludes that they similarly support the exercise of specific jurisdiction over Defendant.

**B.     Plaintiffs' Claims are Related to Defendant's Forum-Related Activities**

Plaintiffs must next show that their claims arise out of or relate to FINA's forum-related conduct. *See Schwarzenegger*, 374 F.3d at 802. The Ninth Circuit uses a "but for" test, under which a lawsuit arises out of a defendant's contacts with the forum state if a direct nexus exists between those contacts and the cause of action. *In re Western States*, 715 F.3d at 742.

Defendant argues that Plaintiffs' claims do not arise from its alleged blocking of the United States event and instead stem solely "from the events leading to the cancellation of the Turin Event." (Dkt. No. 76 at 24.) The Court disagrees. Both complaints allege that:

> FINA . . . has flexed its muscles to block ISL from hosting—and swimmers from participating in—a competing event. In early 2018, ISL began planning a top-tier international competition that would feature a version of its team-based competition, ideally to take place in the United States, home to many of the world's best swimmers. ISL had enjoyed early and enthusiastic support of USA Swimming, the sport's governing body for the United States. Thus, USA Swimming worked closely with ISL in spring 2018 to plan a competition for December 2018, with both ISL and USA Swimming considering Las Vegas's Mandalay Bay Resort and Casino or the University of Southern California as potential venues. But, in response to pressure from FINA, USA Swimming pulled out of negotiations for hosting the December 2018 competition in either location, or anywhere else.

(Dkt. No. 1 at ¶ 8 (18-cv-07393; 18-cv-07394).) Viewing the operative complaints in light of the more fulsome record obtained through jurisdictional discovery, Plaintiffs have demonstrated that their claims are related to Defendant's forum-related activity; specifically, Defendant's explicit or implicit threat to sanction USA Swimming if it partnered with ISL for the proposed U.S.-based December 2018 event. And again, Plaintiffs allege a global antitrust conspiracy that includes anticompetitive conduct aimed at preventing ISL from holding swimming competitions in the United States. That Plaintiffs *also* allege anticompetitive conduct aimed at interfering with ISL's

ability to stage events outside the United States does not mean that Defendant's efforts to interfere with an event in the United States do not have a direct nexus to Plaintiffs' claims; such efforts are instead intimately a part of Plaintiffs' claims.

Defendant's belated reliance on *Mehr v. Federation Internationale de Football Association*, 115 F. Supp. 3d 1035 (N.D. Cal. 2015), does not persuade the Court that personal jurisdiction is lacking. The *Mehr* plaintiffs sued Federation Internationale de Football Association ("FIFA"), a Swiss organization, for negligence, "breach of voluntary undertaking," and "medical monitoring," arising out of FIFA's alleged failure "to adopt the consensus guidelines promulgated by the international conferences on concussion in sport." 115 F. Supp. 3d at 1045-46. The plaintiffs' claims were "center[ed] on the theory that they are subject to a risk of concussions from playing soccer." *Id.* at 1053. The court determined that the plaintiffs did not satisfy the "arise out of" prong because FIFA's commercial contacts with California (the relevant forum) had nothing to do with the plaintiffs' claim. *Id.* at 1052. Here, in contrast, Defendant's purposeful direction of its anticompetitive conduct at the United States is directly related to Plaintiffs' claims: the record supports an inference that "but for" that conduct ISL would have hosted an event with USA Swimming in the United States obviating the need to look for alternative venues in Britain or Italy.

## C. The Court's Exercise of Jurisdiction Over Defendant is Reasonable

Because Plaintiffs have met their burden as to the first two prongs of the test for specific jurisdiction, Defendant must "present a compelling case" that the Court's exercise of jurisdiction would be unreasonable. *See Schwarzenegger*, 374 F.3d at 802; *see also Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1117 (9th Cir. 2002) (noting that both domestic and foreign defendants face a "heavy burden" once a plaintiff satisfies the first two prongs of specific jurisdiction and must prove "a compelling case of unreasonableness to defeat jurisdiction").

Courts consider seven factors in weighing whether the exercise of jurisdiction is reasonable:

> (1) the extent of the defendants' purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy;

(6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Harris Rutsky*, 328 F.3d at 1132. No single factor is dispositive, courts must instead "balance all seven." *Id.*

### 1. The Extent of Defendant's Purposeful Interjection into the Forum

The first factor considers the degree of Defendant's purposeful interjection into the United States. The June 5 letter FINA sent to USA Swimming in the United States with the motivation, at least in part, to scuttle the negotiations between USA Swimming and ISL regarding a Las Vegas event is evidence of purposeful injection. Plaintiffs' supplemental briefing asserts additional, continuing contacts with the forum; specifically, that FINA pursued a strategy "to be in the U.S. market place" using anticompetitive conduct following the June 5 letter, and "wanted USA Swimming to host in the United States" a "copycat event[ ]" that was "modeled on ISL's innovative meet structure." (Dkt. No. 67 at 20.) In support, Plaintiff cites email communications—that were obtained through discovery and that post-date the filing of the complaints—discussing FINA's plans to hold a swimming competition in the United States with support from USA Swimming. (*See id.* (citing Dkt. Nos. 67-2, Exs. 19, 23, 25, 26 & 66-4, Exs. 40, 42-44 (filed under seal).) Those communications show that FINA engaged in multiple contacts with U.S.-based parties to organize a swimming competition in the United States. Indeed, Mr. Neuburger testified that in 2019 FINA conducted "an event as part of its Champion Series in . . . Indianapolis in the United States." (*See* Dkt. No. 66-4, Ex. 46 at 140:1-6 (filed under seal).)

The operative complaints reference the "copycat event" and allege that beginning in December 2018 FINA "intended to add its own additional contests to the race calendar—and, on information and belief—in a format that will closely follow, if not outright copy, the team-based, short-course innovations that ISL and its affiliates have developed for years." (Dkt. Nos. 1 at ¶ 100 (18-cv-07393) & 1 at ¶ 99 (18-cv-07394).) The complaints do not, however, allege that such conduct was directed at the United States. As previously discussed, after completion of jurisdictional discovery Plaintiffs indicated that they "are prepared, and will eventually need, to amend their complaints to more fully allege the Court's jurisdiction, more specifically detail

22

FINA's unlawful conduct and to explain how FINA's post-suit conduct, including its copycat Champions Swim Series, relates to FINA's anticompetitive scheme." (*See* Dkt. No. 58 at 7.)

Based on the extent of Defendant's contacts reflected in the record, this factor weighs in favor of this Court's exercise of personal jurisdiction over Defendant.

### 2. The Burden on Defendant

"The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Asahi Metal Indus. Co., Ltd. v. Sup. Ct. of California, Solano Cty.*, 480 U.S. 102, 114 (1987). Defendant asserts that "[b]ecause FINA is domiciled in Switzerland . . ., having to defend this action in a forum 5,000 miles away where FINA has no physical presence would be a significant burden." (Dkt. No. 18 at 19.) The Court agrees that this factor weighs against jurisdiction. *See Asahi*, 480 U.S. at 114; *see also Dole Food Co.*, 303 F.3d at 1115 ("The fact that [defendants] live in Europe weighs against jurisdiction."). However, the factor does not weigh heavily for several reasons.

First, there is no language barrier, as evidenced by the depositions of Mr. Marculescu and Mr. Neuburger (who is American), and the internal FINA email communications obtained through discovery. *See Harris Rutsky*, 328 F.3d at 1133 (noting that defendant "does not face the additional burden of overcoming a language barrier") (citing *Dole Food Co.*, 303 F.3d at 1115 (finding defendants' ability "to speak, read, and write English with ease" acted as a mitigating factor). Second, Defendant is represented by a top-tier international law firm with multiple offices in Europe, and "modern advances in communications and transportation have significantly reduced the burden of litigating in another country." *See Dole Food Co.*, 303 F.3d at 1115 (internal quotation marks and citation omitted). In sum, the burden on Defendant in litigating this action may weigh against the exercise of jurisdiction but it does not weigh heavily.

### 3. The Extent of Conflict with the Sovereignty of Switzerland

"Litigation against an alien defendant creates a higher jurisdictional barrier than litigation against a citizen from a sister state because important sovereignty concerns exist." *Harris Rutsky*, 328 F.3d at 1133 (internal quotation marks and citation omitted). That said, this factor is not

United States District Court
Northern District of California

dispositive. *See Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1333 (9th Cir. 1984) (noting that "this factor is not dispositive because, if given controlling weight, it would always prevent suit against a foreign national in a United States court"). Defendant provides no substantive argument on this score, and merely asserts that "exercising personal jurisdiction over an entity organized under the laws of a foreign country—here, Switzerland—raises substantial sovereignty concerns." (Dkt. No. 18 (citing *Harris Rutsky*, 328 F.3d at 1133).)

As with the burden on Defendant, this factor weighs in favor of FINA but it does not weigh heavily. The record reflects FINA's intent "to benefit from the United States market" by holding swimming competitions in this country; thus, the "sovereignty considerations weigh less heavily." *See Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1200 (9th Cir. 1988) (finding weight of sovereignty considerations lessened where defendant (a Swiss corporation) "manifested an intent to serve and to benefit from the United States market").

### 4. The United States' Interest in Adjudicating the Case

Defendant does not address this factor, and it is beyond dispute that the United States has a strong interest in enforcing the antitrust policies underlying the Sherman Act. Thus, this factor weighs in favor of exercising jurisdiction given that Plaintiffs have made a prima facie showing that Defendant purposefully directed its anticompetitive conduct at the United States.

### 5. The Most Efficient Judicial Resolution of the Case

Defendant also does not address this factor, which "focus[es] on the location of the evidence and witnesses" but "is no longer weighed heavily given the modern advances in communication and transportation." *See Harris Rutsky*, 328 F.3d at 1133 (internal quotation marks and citation omitted). Given that FINA and ISL are Swiss entities, some evidence and witnesses are obviously located outside the United States. That said, Mr. Neuburger of FINA is located in the United States, as is USA Swimming and two of the three named Plaintiffs in the class action. Further, the parties have already completed a substantial amount of jurisdictional discovery and the evidence obtained bears on the merits of Plaintiffs' claims. This factor is thus neutral, if not slightly in favor of jurisdiction in the United States. *See Caruth v. Int'l Psychoanalytical Ass'n*, 59 F.3d 126, 129 (9th Cir. 1995) (finding factor favored exercise of

jurisdiction in California where "evidence and witnesses for th[e] litigation [were] split between California and several other locations").

### 6. Plaintiffs' Interest in Convenient and Effective Relief

The convenience to plaintiffs of litigating in their chosen forum "is not of paramount importance." *Dole Food Co.*, 303 F.3d at 1115. Thus, this factor "does not significantly influence [the Court's] analysis," *see Caruth*, 59 F.3d at 129 (providing no substantive analysis regarding this factor); especially given that Plaintiff ISL is a Swiss corporation, one of the named Class-Action Plaintiffs is located in Hungary, and the scope of the requested relief extends beyond the United States. Accordingly, this factor is neutral.

### 7. The Existence of an Alternative Forum

Although Defendant bears the ultimate burden of showing that the exercise of jurisdiction would be unreasonable, it is Plaintiffs who "bear[ ] the burden of proving the unavailability of an alternative forum." *See Harris Rutsky*, 328 F.3d at 1133-34. Plaintiffs fail to show that they would be precluded from suing FINA in Switzerland, beyond asserting in their opposition to Defendant's motion to dismiss that the complaints do "not raise any questions under Swiss law." (*See* Dkt. No. 32 at 18.) This factor thus favors Defendant.

***

In sum, three of the seven factors weigh in Defendant's favor, two favor Plaintiffs, and two are neutral. Thus, "given the closeness of the factors," Defendant fails to present a "compelling case" that the exercise of personal jurisdiction over FINA would be unreasonable. *See Caruth*, 59 F.3d at 129; *see also Harris Rutsky*, 328 F.3d at 1134 (finding no compelling case where "[t]he balance [was] essentially a wash, since some of the reasonableness factors weigh in favor of [defendant], but others weigh against it"); *Roth v. Garcia Marquez*, 942 F.2d 617, 625 (9th Cir. 1991) (finding exercise of jurisdiction reasonable where three factors favored defendant and only two favored plaintiff because "the closeness of the question" demonstrated that defendants could not make a compelling case). Further, the evidence shows that FINA views USA Swimming, and by extension the United States swimming market, as one of the most—if not *the* most—important member federations and that FINA engaged in extensive discussions with USA Swimming to hold

1   swimming events in the United States and did so in 2019. Given those facts, the reasonableness

2   factors would have to weigh strongly in Defendant's favor to present a "compelling case." They

3   do not.

4       Accordingly, the Court denies Defendant's motions to dismiss for lack of personal

5   jurisdiction because the requirements for the exercise of specific jurisdiction are satisfied.

6   **II.    Dismissal under 12(b)(6)**

7       A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of a complaint as

8   failing to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl.*

9   *Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In deciding a motion to dismiss, courts must accept

10  all well-pleaded "factual allegations in the complaint as true and construe the pleadings in the light

11  most favorable to the non-moving party." *Manzarek v. St. Paul Fire & Mar. Ins. Co.*, 519 F.3d

12  1025, 1031 (9th Cir. 2008). The same assumption of truth does not apply, however, to legal

13  conclusions or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556

14  U.S. 662, 678 (2009).

15      As previously discussed, ISL and the Class-Action Plaintiffs bring the same three causes of

16  action: (1) violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) violation of Section 2 of

17  the Sherman Act, 15 U.S.C. § 2; and (3) a state law claim for "tortious interference with

18  prospective economic relations." (Dkt. Nos. 1 at ¶¶ 137-160 (18-cv-07393) & 1 at ¶¶ 128-150

19  (18-cv-07394).)

20      Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of

21  trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or

22  with foreign nations, is declared to be illegal." 15 U.S.C. § 1. A Section 1 claim requires: (1) "an

23  agreement, conspiracy, or combination between two or more entities"; (2) constituting "an

24  unreasonable restraint of trade under either a per se or rule of reason analysis"; (3) that "affected

25  interstate commerce."[9] *GTE Corp.*, 92 F.3d at 784. Section 1 "does not prohibit all unreasonable

---

[9] "A per se rule is applied when the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output." *American Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 784 (9th Cir. 1996) (internal quotation marks and citation omitted). The rule of reason, on the other hand, "distinguishes between restraints with anticompetitive effect that are

26

restraints of trade but only restraints effected by a contract, combination, or conspiracy," thus, "the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *name.space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1129 (9th Cir. 2015) (quoting *Twombly*, 550 U.S. at 553).

Section 2 of the Sherman Act "concerns unilateral activity," and prohibits monopolization or attempted monopolization of trade or commerce. *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 541 (9th Cir. 1991). Plaintiffs here allege both monopolization and attempted monopolization. "The traditional claim for monopolization has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Id.* (internal quotation marks and citation omitted). An attempted monopolization claim requires: (1) "a specific intent to monopolize a relevant market"; (2) anticompetitive conduct; and (3) "a dangerous probability of success." *Id.* at 542.

The state law claim for tortious interference with prospective economic relations requires Plaintiffs to show:

> (1) the existence of a prospective business relationship containing the probability of future economic rewards for plaintiff; (2) knowledge by defendant of the existence of the relationship; (3) intentional acts by defendant designed to disrupt the relationship; (4) actual causation; and (5) damages to plaintiff proximately caused by defendant's conduct.

*Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*, 360 F. Supp. 3d 994, 1015 (N.D. Cal. 2018).

Defendant moves to dismiss all claims in both actions on the following grounds: (1) the alleged conduct is protected under the Ted Stevens Olympic Amateur Sports Act ("ASA"), 36 U.S.C. § 22050, *et seq.*; (2) Plaintiff's claims are barred by the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a; and (3) "FINA and its members share a complete unity of

---

harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012) ("We generally evaluate whether a practice unreasonably restrains trade in violation of Section 1 under the 'rule of reason."). Here, both complaints allege a *per se* violation of Section 1. (*See* Dkt. Nos. 1 at ¶ 142 (18-cv-07393) & 1 at ¶ 133 (18-cv-07394).) The distinction is immaterial to the grounds for Defendant's motion to dismiss.

economic interest" and thus "are not independent economic actors capable of conspiring to violate Section 1" of the Sherman Act.  (Dkt. Nos. 19 at 8-9 (18-cv-07393) & 18 at 9 (18-cv-07394).)  The Court addresses each basis for dismissal in turn.

### A.  Implied Immunity under the ASA

Implied immunity in the antitrust context is "strongly disfavored."  *Carnation Co. v. Pac. Westbound Conference*, 383 U.S. 213, 217-18 (1966) ("Repeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust and regulatory provisions.").  Thus, a finding of implied immunity from antitrust liability is appropriate "only if necessary to make the [other statute] work, and even then only to the minimum extent necessary."  *Silver v. New York Stock Exch.*, 373 U.S. 341, 357 (1963).  Defendant argues that implied immunity is warranted here because Plaintiffs' challenge to FINA's allegedly anticompetitive conduct constitutes an implicit challenge to USA Swimming's "Congressionally-mandated monolithic control" over international amateur swimming, which is protected under the ASA.  (*See* Dkt. Nos. 19 at 20 (18-cv-07393) & 18 at 20 (18-cv-07394).)  The Court disagrees.

### 1.  The ASA generally

The ASA was "devised by Congress in support of the mission of national sports governing bodies to promote and finance participation of American athletes in 'international amateur athletic competition.'"  *Gold Medal LLC v. USA Track & Field*, 899 F.3d 712, 713 (9th Cir. 2018) (quoting 36 U.S.C. § 220503).  The statute grants the U.S. Olympic Committee exclusive jurisdiction over "all matters pertaining to United States participation in the Olympic Games, the Paralympic Games, and the Pan-American Games, including representation of the United States in the games," 36 U.S.C. § 220503(3), and authority to "recognize eligible amateur sports organizations as national governing bodies" for any sport included in those games, *id.* at § 220505(c)(4).  Under the ASA, a national governing body has control over its respective sport and may, in pertinent part:

> (1)  represent the United States in the appropriate international sports federation;

(2) establish national goals and encourage the attainment of those goals;

(3) serve as the coordinating body for amateur athletic activity in the United States;

(4) exercise jurisdiction over international amateur athletic activities and sanction international amateur athletic competition held in the United States and sanction sponsorship of international amateur athletic competition held outside the United States;

(5) conduct amateur athletic competition, including national championships, and international amateur athletic competition in the United States, and establish procedures for determining eligibility standards for participation in competition[;]

(6) recommend to the [U.S. Olympic Committee] individuals and teams to represent the United States in the Olympic Games, the Paralympic Games, and the Pan-American Games; and

(7) designate individuals and teams to represent the United States in international amateur athletic competition (other than the Olympic Games, the Paralympic Games, and the Pan-American Games) and certify, in accordance with applicable international rules, the amateur eligibility of those individuals and teams.

36 U.S.C. § 220523(a)(1)-(7). The Ninth Circuit has recognized implied antitrust immunity under the ASA where a plaintiff challenges the conduct of a national governing body acting under its statutory authority. *See Gold Medal LLC*, 899 F.3d at 718.

### 2. Implied immunity is not necessary here for operation of the ASA

Defendant argues that FINA's allegedly anticompetitive conduct is immunized from antitrust liability under the ASA; specifically, Defendant asserts that *USA Swimming's* conduct—not FINA's—is really at issue in both actions, and as the national governing body for amateur swimming in the United States, USA Swimming was merely acting in compliance with rules mandated by FINA. Defendant's argument is fatally flawed, however, because USA Swimming is *not* a defendant in this action and Plaintiffs are *not* challenging USA Swimming's rules for "international amateur athletic competitions" imposed pursuant to rules set forth by FINA. Indeed, Plaintiffs allege that USA Swimming actively worked with ISL to stage a swimming competition in the United States but dropped out of those negotiations following FINA's threats that it would ban from the Olympic games any swimmers who participated in ISL's event. (*See* Dkt. Nos. 1 at ¶¶ 8-12 (18-cv-07393) & 1 at ¶¶ 8-12 (18-cv-07394) (alleging that "USA

1    Swimming worked closely with ISL in spring 2018 to plan a competition for December 2018,"

2    and following cancellation of the Turin Event, USA Swimming "still expressed support for ISL's

3    efforts").  Plaintiffs instead challenge *FINA's* conduct in allegedly using its control over Olympic

4    swimming to improperly threaten its member federations to prevent ISL from competing in the

5    market for international, non-Olympic swimming events.

6         For Defendant's argument to prevail the Court would necessarily have to find that the ASA

7    protects FINA—an international federation, not a national governing body sanctioned by the U.S.

8    Olympic Committee—from antitrust liability for conduct unrelated to a national governing body's

9    governance of international amateur competitions.  Defendant points to no case where a court

10   extended implied antitrust immunity under the ASA to cover such entities in similar

11   circumstances.[10]  Simply put, the ASA is inapplicable because this action does not challenge a

12   national governing body's compliance with an international federation's rules to effectuate its

13   governance of international amateur sports.  It instead involves allegations of an international

14   federation's improper use of its authority over the national governing bodies below it to foreclose

15   competition in the market for international sports, outside of the Olympics and related events.  An

16   antitrust exemption is thus not warranted in this case because it is not necessary to make the ASA

17   work.  *See Silver*, 373 U.S. at 357.

18        Defendant's reliance on *Gold Medal LLC* is unavailing.  That case involved a national

19   governing body (USA Track & Field ("USATF")) and the U.S. Olympic Committee as

20   defendants, and the plaintiff was directly challenging conduct involving "international amateur

21

22   _____

     [10] Defendant argues in a footnote that "[c]ourts have been willing to extend antitrust immunity to
     non-NGBs so long as they are sanctioned by the supervising Olympic body and 'necessary' to the
23   management of the sport."  (Dkt. No. 18 at 23 n.9 (18-cv-07394).)  In support, Defendant cites
     dicta from the Fifth Circuit's decision in *Eleven Line, Inc. v. North Texas State Soccer Ass'n*, 213
24   F.3d 198, 204 (5th Cir. 2000) (declining to extend implied immunity under the ASA to a state
     soccer association but explaining that "an implied exemption would be appropriate in many other
25   situations," such as "if national state associations all over the country had a similar rule, one could
     infer that the rule was necessary to the management of the sport.").  That language fails to
26   persuade this Court to take the unprecedented step of extending implied immunity under the ASA
     to the alleged antitrust violations of an international association like FINA absent any allegations
27   of wrongdoing against the national governing body itself.  Indeed, as here, the *Eleven Line*
     court distinguished that case from the Tenth Circuit's decision in *Behagen v. Amateur Basketball Ass'n*
28   *of the United States*, 884 F.2d 524 (10th Cir. 1989) because the *Eleven Line* plaintiff had not "sued
     the NGB itself."  *Id.* at 204.

athletic competition" under the ASA; specifically, USATF's conduct in enforcing rules set forth by the U.S. Olympic Committee that restricted advertising on the athletic apparel worn by athletes competing in USATF's Olympic Trials, a competition in which Olympic hopefuls compete to earn a spot on the U.S. Olympic team. 899 F.3d at 713-14. The Ninth Circuit affirmed the district court's dismissal of the plaintiff's antitrust claims based on implied antitrust immunity under the ASA. *Id.* at 718 (concluding that the advertising restrictions applied by "the Olympic Committee and USATF to sponsorship of individual athletes during the Olympic Trials should be afforded implied antitrust immunity under the ASA.").

In *Gold Medal LLC*, the ASA clearly applied to the defendants (a national governing body and the U.S. Olympic Committee) and the underlying amateur sports competition (the Olympic Trials). The court had only to decide whether there was implied immunity under the ASA for the challenged conduct. Conversely here, Plaintiffs challenge conduct by an *international federation* as it pertains to events outside the Olympics or Olympic-qualifying events, not a national governing body's enforcement of that federation's rules regarding international amateur sports. *Gold Medal LLC* does not help Defendant.

Defendant's reliance on out-of-circuit authority is similarly flawed because those cases involved direct challenges to rules promulgated by national governing bodies. In *JES Properties, Inc. v. USA Equestrian, Inc.*, the plaintiffs sued defendants—one of which was the sole national governing body for amateur equestrianism in the United States (United States Equestrian Federation, Inc.) ("USEF")—alleging that the USEF's application of a rule regarding equestrian competitions violated the Sherman Act. 458 F.3d 1224 (11th Cir. 2006). The court affirmed the district court's finding that the USEF's promulgation of the challenged rule was immunized from antitrust liability because—as the national governing body for the sport—the USEF's conduct was necessary for it to perform its functions under the ASA. *Id.* at 1229-33 (noting that "when properly exercised, the 'monolithic control' a [national governing body] has over its particular sport may excuse actions that would otherwise violate antitrust laws."). In doing so, the court rejected the plaintiffs' argument that the rule was not "necessary" to the USEF's role as national governing body, stating that it would "not substitute its own judgment for that of the USEF

31

regarding the optimum way to fulfill its obligations." *Id.* at 1232.

In *Behagen v. Amateur Basketball Ass'n of the United States*, the plaintiff challenged amateur eligibility requirements imposed by the defendant—a national governing body (the Amateur Basketball Association of the United States)—pursuant to the rules of the international federation to which it belonged (Federation Internationale de Basketball Amateur). 884 F.2d 524 (10th Cir. 1989). The court held that the national governing body's eligibility rules were protected from the application of the federal antitrust laws by implied immunity under the ASA. *Behagen*, 884 F.2d at 529-30 (noting that the ASA provides for "the monolithic control of an amateur sport by the NGB for that sport and by the appropriate sports federation of which the NGB is a member."). As in *Gold Medal LLC*, however, the defendants in *JES Properties* and *Behagen* included national governing bodies. Not so here.

Defendant addresses this distinction and asserts that "allowing ISL to circumvent the implied antitrust immunity because it deliberately named FINA and not USA Swimming as a defendant would undermine the purpose of the ASA." (*See* Dkt. No. 34 at 15 (18-cv-07394).) In support, Defendant argues that "ISL explicitly challenges the way in which FINA (and by extension USA Swimming) has enforced its Olympic-eligibility rules." (*Id.* at 16.) The Court disagrees.

Construing the complaints in the light most favorable to Plaintiffs, these actions do not involve a direct challenge to FINA's IOC-granted authority over Olympic aquatic sports, its Olympic eligibility rules, or USA Swimming's enforcement of those rules. (*See* Dkt. Nos. 1 at ¶ 48 (18-cv-07393) & 1 at ¶ 43 (18-cv-07394) ("Regardless of any exclusivity that FINA may enjoy over aquatic sports in the Olympics, nothing gives FINA exclusive rights to control non-Olympic swimming for the entire world.").) To the extent the complaints challenge FINA's enforcement of its "unauthorized relations" rule, *(see id.* at ¶¶ 5-7), the Court construes that challenge in the context of international swimming competitions outside the Olympic games or other "international amateur athletic competitions" covered under the ASA. *See Gold Medal LLC*, 899 F.3d at 713 (noting that the ASA was "devised by Congress in support of the mission of national sports governing bodies to promote and finance participation of American athletes in 'international

32

amateur athletic competition.'") (quoting 36 U.S.C. § 220503).

Further, and most importantly, the complaints do not challenge any action taken by USA Swimming, much less its eligibility rules for amateur swimming events outside of the Olympic games. *See* 36 U.S.C. § 220523(a)(7) (granting national governing bodies authority to "designate individuals and teams to represent the United States in international amateur athletic competition (other than the Olympic Games, the Paralympic Games, and the Pan-American Games) and certify, in accordance with applicable international rules, the amateur eligibility of those individuals and teams."). Plaintiffs instead challenge FINA's allegedly improper use of its "rights to organize Olympic swimming—rights which Plaintiffs do not here challenge—to dictate the terms on which *any* international swimming competition must be based." (Dkt. No. 1 at ¶ 48 (18-cv-07393) (emphasis added).) Absent a challenge to the conduct of a national governing body that is covered under the ASA, the Court cannot find implied immunity for the antitrust violations alleged here.

### B.     The Foreign Trade Antitrust Improvements Act ("FTAIA")

The FTAIA limits the reach of the federal antitrust laws by "establishing a general rule that the Sherman Act 'shall not apply to conduct involving trade or commerce . . . with foreign nations.'" *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 985 (9th Cir. 2008) (quoting 15 U.S.C. § 6a). "It then provides an exception to that general rule, making the Sherman Act applicable if foreign conduct (1) has a direct, substantial, and reasonably foreseeable effect on domestic commerce, and (2) such effect gives rise to a [Sherman Act] claim." *Id.* (alteration in original) (internal quotation marks and citation omitted). Defendant argues that the FTAIA bars the Sherman Act claims in both actions because the complaints "expressly challenge[ ] foreign conduct undertaken by a foreign entity with little, if any, resultant effect on U.S. commerce"; specifically, Defendant asserts that the complaints fail to adequately plead that FINA's alleged conduct resulted in "direct" U.S.-based effects. (Dkt. Nos. 19 at 24-25 (18-cv-07393) & 18 at 26-28 (18-cv-07394).) Defendant further argues that Plaintiffs fail to show that the alleged conduct gives rise to their Sherman Act claims. The Court addresses each argument in turn.

33

### 1. Direct domestic effect

"Conduct has a 'direct' effect for purposes of the domestic effects exception to the FTAIA if it follows as an immediate consequence of the defendant['s] activity." *United States v. Hui Hsiung*, 778 F.3d 738, 758 (9th Cir. 2015) (noting that "[a]n effect cannot be 'direct' where it depends on . . . uncertain intervening developments.") (internal quotation marks and citation omitted). Defendant asserts that any U.S.-based effects in either action "are indirect at best" because FINA's alleged conduct was not directed at the United States but rather globally, and any subsequent U.S. effects were "at most 'ripple effects.'" (Dkt. No. 19 at 24-25 (18-cv-07393) & 18 at 27-28 (18-cv-07394).) The Court disagrees.

Plaintiffs allege that at the time of the letter, ISL and USA Swimming planned to hold the event at either "Las Vegas's Mandalay Bay Resort and Casino or the University of Southern California." (Dkt. Nos. 1 at ¶ 8 (18-cv-07393) & 1 at ¶ 8 (18-cv-07394).) USA Swimming then "pulled out of negotiations for hosting the December 2018 competition" a week later, "in response to pressure by FINA." (*Id.*) As a result, ISL "had to seek other partners" outside the United States. (*Id.* at ¶ 9.) In other words, both complaints allege that FINA pressured USA Swimming to scuttle the U.S.-based event by dropping out of negotiations with ISL.

Construing the complaints in the light most favorable to Plaintiffs, those allegations are sufficient to show that FINA's conduct had "a direct, substantial, and reasonably foreseeable effect on domestic commerce." FINA's alleged conduct in pressuring USA Swimming to drop out of negotiations with ISL had the requisite effect because it was direct (the U.S.-based event was scuttled as an immediate consequence), likely substantial (the event would generate revenue from sponsors, licensees, and broadcasters), and reasonably foreseeable (FINA knew that ISL planned to hold the event in the United States).

### 2. Domestic effect giving rise to Sherman Act claims

The "gives rise to" language of the FTAIA's domestic effects exception "requires a direct or proximate causal relationship" between the alleged anticompetitive conduct and the plaintiff's injury. *In re DRAM*, 546 F.3d at 988. Defendant argues that any "direct" effect on U.S. commerce caused by FINA's alleged conduct fails to give rise to the Sherman Act claims in both

actions because the conduct was "effectuated through USA Swimming and immunized from antitrust scrutiny pursuant to the ASA." (Dkt. Nos. 19 at 25 (18-cv-07393) & 18 at 28 (18-cv-07394).) Defendant further argues as to the class action that FINA's conduct was "otherwise derivative of the alleged injury to ISL," and thus, fails to "'give rise' to a Sherman Act claim." (Dkt. No. 19 at 25 (18-cv-07393).) The Court has already determined that the ASA does not immunize the alleged conduct from antitrust scrutiny; thus, Defendant's argument on those grounds fails. Accordingly, the Court concludes that the alleged conduct falls within the domestic effects exception to the FTAIA. Because the FTAIA does not bar Plaintiffs' antitrust claims, the Court need not reach Defendant's arguments regarding its application to the state law claims. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 822 F. Supp. 2d at 967-68 (declining to address "defendants' contention that the FTAIA bars plaintiffs' state law claims" where domestic effect exception to the FTAIA applied to federal antitrust claims).

## C. Unity of Economic Interest Between FINA and Member Federations

Section 1 of the Sherman Act "applies only to *concerted* action that restrains trade." *American Needle, Inc. v. National Football League*, 560 U.S. 183, 190 (2010) (emphasis). As the Supreme court explained in *American Needle*:

> The key is whether the alleged "contract, combination . . ., or conspiracy" is concerted action—that is, whether it joins together separate decisionmakers. The relevant inquiry, therefore, is whether there is a "contract, combination . . ., or conspiracy" amongst separate economic actors pursuing separate economic interests[.]

*Id.* at 195 (quoting 15 U.S.C. § 1). Because the inquiry is a functional one that considers "competitive reality, it is not determinative" that the parties to the alleged violation "are legally distinct entities" or that such "legally distinct entities have organized themselves under a single umbrella or into a structured joint venture." *Id.* at 196. The question instead "is whether the agreement joins together independent centers of decisionmaking." *Id.* (internal quotation marks and citation omitted); *see also Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1034 (9th Cir. 2005) ("The crucial question is whether the entities alleged to have conspired maintain an 'economic unity,' and whether the entities were either actual or potential competitors.").

The thrust of Plaintiffs' Section 1 claims is that FINA compelled its member federations to agree among themselves and with FINA—"through promulgation and interpretation of FINA rules and FINA's threats to [the member federations]"—to restrain trade in the market for top-tier international swimming competitions. (*See* Dkt. Nos. 1 at ¶¶ 137-148 (18-cv-07393) & 1 at ¶¶ 128-139 (18-cv-07394).) Defendant argues that Plaintiffs' claims under Section 1 of the Sherman Act fail because "FINA and its member federations are not distinct entities" and instead "share a complete unity of economic interest," making them "legally incapable of conspiring for purposes of Section 1." (Dkt. Nos. 19 at 26-27 (18-cv-07393) & 18 at 28-30 (18-cv-07394).) The Court disagrees. Drawing all inferences in Plaintiffs' favor, the complaints adequately allege that FINA and its member federations are distinct entities and at least *potential* competitors. Thus, they are capable of conspiring under Section 1.

The complaints allege that "FINA comprises 209 member federations" and is "technically a collection of national member federations"; however, Plaintiffs also allege that the member federations "actually compete horizontally with one another and with FINA itself, in that individual federations and FINA separately organize and promote top-tier international swimming competitions." (Dkt. Nos. 1 at ¶¶ 33-34 (18-cv-07393) & 1 at ¶¶ 28-29 (18-cv-07394).) The complaints provide examples and descriptions of such "member-federation events":

> Member federations (or their specific-sport designees) . . . frequently host their own events, sometimes including top-tier international competitions. For example, USA Swimming organized a biennial series called Duel in Pool from 2003 through 2015, a competition that pitted U.S. swimmers against their Australian or European counterparts. Likewise, the Luxembourg federation organizes the yearly Euro Meet series. And the Italian federation hosts the yearly Sette Colli Trophy. FINA allows such events to exist, but the members organize them and, on information and belief, reap all (or most) of the financial benefit from putting them on.

(*Id.* at ¶ 43 (18-cv-07393); ¶ 38 (18-cv-07394).) Plaintiffs further allege that "member federations frequently disagree among themselves and with FINA on various rules and scheduling relating to the Olympic Games, FINA competitions, and/or member-federation events." (*Id.* at ¶ 44 (18-cv-07393); ¶ 39 (18-cv-07394).) The distinction between FINA's own competitions where member federations merely participate and "member-federation events" organized and conducted by the

individual member federations themselves—and where the member federations "reap all (or most) of the financial benefit"—is critical because it indicates that FINA and its individual member federations are not a single "economic unit" and at least have the potential to compete in the relevant market. *See Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1149 (9th Cir. 2003) ("[W]here firms are not an economic unit and are at least potential competitors, they are usually not a single entity for antitrust purposes.") (internal quotation marks and citation omitted).

The allegations regarding ISL's negotiations with the member federations concerning the December 2018 event further support an inference that the member federations and FINA are not a single entity with a "complete unity of economic interest"; instead, the member federations can function independently and partner with non-FINA entities. Certain member federations, and USA Swimming in particular, acted independently in engaging in direct negotiations with ISL to hold a non-FINA international swimming competition. USA Swimming did not clear those negotiations with FINA beforehand, and as alleged, only dropped out of the event after FINA issued its June 2018 letter warning its member federations that it would sanction members who violated FINA's rule against "unauthorised relations." Similarly, there is no inference from the complaints' allegations that the European member federations required FINA approval before entering into the May 2018 memorandum of understanding with ISL. These allegations suggest that the member federations can operate independent of FINA, at least on some level. *See Am. Needle*, 560 U.S. at 191 (noting that inquiry into "concerted action" for Section 1 purposes requires "a functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate").

Given Plaintiffs' allegations regarding the member-federation events and the member federations' dealings with ISL, the Court cannot conclude at this stage that Plaintiffs' Section 1 claims fail as a matter of law based on a "complete unity of economic interest." In the absence of economic unity as a matter of law, Defendant's argument that FINA and its member federations are incapable of conspiracy because they share a common interest—the promotion and organization of top-tier international and Olympic swimming—fails. In such cases, "the fact that joint venturers pursue the common interests of the whole is generally not enough, by itself, to

render them a single entity," because such "commonality of interest exists in every cartel." *Freeman*, 322 F.3d at 1148; *see also Am. Needle*, 560 U.S. at 198 ("[I]llegal restraints often are in the common interests of the parties to the restraint, at the expense of those who are not parties.").

Although it is a close call, Defendant's reliance on *Jack Russell* is unavailing. The plaintiffs in that case were three individual dog owners and breeders and a former regional affiliate of the defendant national club. The plaintiffs sued the national club based on the club's rule providing that "regional affiliates and members [would] recognize only the [national club's] registry of Jack Russell Terriers, and [would] not register their dogs with conflicting organizations such as the American Kennel Club." 407 F.3d at 1029. The plaintiffs alleged that enforcement of that rule by the national club and its regional affiliates constituted "an illegal group boycott" of AKC dog breeders and owners in violation of Section 1. *Id.* at 1032. The district court granted the national club's motion to dismiss the third amended complaint, concluding that the plaintiffs failed to allege that the regional affiliates and the national clubs "pursued different economic goals"; thus, the Section 1 claim failed for lack of concerted action. *Id.*

On appeal, the court affirmed the dismissal because the national club and its regional affiliates were not "separate entities pursuing different economic goals, capable of conspiring for Sherman Act purposes." 407 F.3d at 1035. In reaching that conclusion, the court found that nothing in the plaintiffs' allegations suggested that the regional affiliates "acted as independent, self-sufficient agents that could have conspired with the national club"; the plaintiffs instead "articulated a claim that only involves activity occurring within a *single enterprise*." *Id.* at 1036 (emphasis added).

*Jack Russell* is not on all fours with this case and is instead distinguishable based on the allegations here involving the non-FINA, member-federation events. Those allegations give rise to a reasonable inference that the member federations can act as separate entities with the potential to compete in the relevant market. There were no such allegations in *Jack Russell*. *See id.* at 1035 ("[R]egarding the parties' unity of economic interest, the [plaintiffs] did not allege in what manner the [national club] and the [regional affiliates] . . . had divergent economic interests, or what goals the affiliates pursued other than those of the [national club]."). Indeed, in *Jack Russell* the

regional dog shows and trials hosted by the regional affiliates were qualifying events for the national club's annual national show. *Id.* at 1030 ("The club affiliates host regional Jack Russell shows and trials for which the [national club] provides certified judges. The winners of the regional shows are eligible for the annual [national club] Jack Russell Terrier show.") In other words, the shows hosted by the club affiliates were essentially national club events. Conversely here, Plaintiffs adequately allege that the member federations regularly staged their own, non-FINA events. Further, the *Jack Russell* court limited its holding to that case's "particular circumstances," and "express[ed] no opinion on whether other national clubs and their regional or local affiliates could be considered a 'single entity' for Sherman Act purposes in other factual and competitive settings." *Id.* at 1036 n.17. Thus, despite Defendant's argument to the contrary, *Jack Russell* does not doom Plaintiffs' complaints.[11]

\*\*\*

In sum, accepting the complaints' allegations as true and drawing all reasonable inferences in Plaintiffs' favor, the complaints state plausible claims for relief. Accordingly, the Court denies Defendant's motion to dismiss under Rule 12(b)(6).

//

---

[11] Defendant also argues in a footnote that "[e]ven if . . . FINA and its members are independent economic actors, [both complaints] plead[ ] no facts beyond the actions of a sports association 'monitor[ing] the everyday administration of [its] sport.'" (Dkt. Nos. 19 at 27 n.9 (18-cv-07393) & 18 n.12 (18-cv-07394) (quoting the complaints). Defendant argues that such facts do not establish the existence of an unlawful agreement between FINA and its member federations to restrain trade. (*Id.* ("[The Class-Action Plaintiffs and ISL] must plead that 'association members, in their individual capacities, consciously committed themselves to a common scheme designed to achieve an unlawful objection, as sports associations, like trade associations, are not by their nature 'walking conspiracy[ies].'"") (quoting *Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 293-94 (5th Cir. 1988) (alteration in original) (internal citation omitted)).) Plaintiffs do not directly address this argument but appear to respond indirectly (also in a footnote). (*See* Dkt. No. 32 at 30 n.5 (18-cv-07394) ("That FINA coerced USA Swimming and the other federations into agreement also precludes FINA's defense.") (citing *MCM Partners, Inc. v. Andrews-Bartlett & Assocs.*, 62 F.3d 967, 973 (7th Cir. 1995) ("A 'combination or conspiracy' may still exist even if 'one or more of the co-conspirators acted unwillingly, reluctantly, or only in response to coercion.'")).) Defendant's replies do not save their argument, and Plaintiffs' assertion has support in this Circuit. *See City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1371 (9th Cir. 1992) ("We agree with [the appellant] that a conspiracy to monopolize [under Section 1] may exist even where one of the conspirators participates involuntarily or under coercion."). Here, both complaints allege that the agreement to boycott ISL was induced by FINA's threats to ban swimmers from the Olympic Games.

Pursuant to Civil Local Rule 79-5(d)-(e), Plaintiffs move to file under seal certain documents submitted in support of its supplemental brief regarding jurisdiction that it obtained from Defendant through discovery, and that Defendant designated as "confidential" under the parties' stipulated Protective Order.  Plaintiffs also move to file under seal certain portions of its supplemental brief that reference the documents at issue.  Plaintiffs submit the declaration of counsel Matthew S.L. Cate, who attests that Plaintiffs were required to file the material under seal pursuant to "Paragraph 13.3 of the Protective Order" because Defendant designated the material as "confidential" and "would not agree to all the documents to be filed publicly."  (Dkt. No. 66-1 at ¶ 4 (moving to file under seal highlighted portions of its supplemental brief and exhibits 27-46).)

Defendant timely filed a declaration in support of sealing in accordance with Civil Local Rule 79-5(e)(1), (Dkt. Nos. 72-1), as well as general arguments in support of sealing, (Dkt. No. 72).  Defendant also filed its own administrative motion to seal documents submitted in support of its supplemental brief regarding jurisdiction.  (*See* Dkt. Nos. 74-1 at ¶ 2 (declaration of Aaron T. Chiu in support of sealing exhibits 35, 36, 62, 63, 71, 72, which were designated as "confidential" by non-party USA Swimming under the parties' Protective Order) and 74-2 at ¶ 3 (declaration of Jean-Pierre Morand in support of sealing exhibits 1-15, 17-21, 26, 27, 29-31, 39, 46-59, 61, 64-70, 73-77, and portions of Defendant's supplemental brief that quote those exhibits).)

Underlying the parties' administrative motions to seal is a dispute over Defendant's confidentiality designations.  According to the Protective Order, the confidentiality of the documents at issue is governed by "Federal Rule of Civil Procedure 26(c), the European Union General Data Protection Regulation . . ., [and] the Swiss Federal Data Protection Act."  (*See* Dkt. No. 52 at ¶ 2.2.)  Plaintiff thus submitted its administrative motions to seal in accordance with the Protective Order and with this Court's instructions "to save their objections [to the Protective Order] for later to allow discovery to proceed."  (*See* Dkt. No. 66 at n.2. (asserting that "Plaintiffs

---

[12] The parties' submissions concerning their respective administrative motions to file documents under seal are identical in both cases.  Thus, for purposes of this section the Court cites only to the parties' submissions in 18-cv-07394 unless otherwise noted.

take issue, not only with FINA's designations, but with portions of the Protective Order itself).)

However, Plaintiffs have not submitted a motion to modify the Protective Order or remove

Defendant's confidentiality designations.  Thus, the Court addresses the Protective Order and

Defendant's confidentiality designations only as they relate to the instant administrative motions

to seal.

Rule 26(c) provides, in pertinent part, that "[t]he court may, for good cause, issue an order

. . . to protect a party or person from annoyance, embarrassment, oppression, or undue burden or

expense." Fed. R. Civ. P. 26(c)(1)(G).  "A party asserting good cause bears the burden, for each

particular document it seeks to protect, of showing that specific prejudice or harm will result if no

protective order is granted." *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1130 (9th

Cir. 2003).  Where, as here, an existing "protective order was a stipulated order and no party ha[s]

made a 'good cause' showing, then the burden of proof . . . remain[s] with the party seeking

protection." *In re Roman Catholic Archbishop of Portland in Oregon*, 661 F.3d 417, 424 (9th Cir.

2011) (internal quotation marks and citation omitted) (alterations in original).

The Ninth Circuit recognizes "a strong presumption in favor of access to court records."

*Ctr. For Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016).   When a party

requests to file under seal a document it produced through discovery and designated as

"confidential" it can overcome the strong presumption to public access only if it presents

"compelling reasons" for doing so.  *Kamakana v. City and Cty. of Honolulu*, 447 F.3d 1172, 1178-

80 (9th Cir. 2006).  The "compelling reasons" standard for sealing is more stringent than the good

cause standard under Rule 26(c).  *Id.* at 1180.  The designating party is "required to present

articulable facts identifying the interests favoring continued secrecy, and to show that these

specific interests over[come] the presumption of access by outweighing the public interest in the

judicial process." *Id.* at 1191 (internal quotation marks and citations omitted).  Courts have

discretion in determining "[w]hat constitutes a 'compelling reason'" to seal a judicial record. *Ctr.

For Auto Safety*, 809 F.3d at 1097.  "Examples include when a court record might be used to

'gratify private spite or promote public scandal,' to circulate 'libelous' statements, or 'as sources

of business information that might harm a litigant's competitive standing.'" *Id.* (quoting *Nixon v.*

*Warner Commc'n*, Inc., 435 U.S. 589, 598 (1978)).

The Court addresses each motion in turn and concludes that Defendant fails to satisfy the "compelling reasons" standard.

### A.    Plaintiffs' Motion to Seal

Defendant concedes "that certain of the material produced as part of the Court-ordered jurisdictional discovery that it has designated confidential likely would not satisfy the normal 'compelling reason' standard for sealing." (Dkt. No. 72 at 2.)  Defendant argues, however, that a compelling reason exists to seal the material submitted by Plaintiff because the Court has not yet made "a determination on jurisdiction," and "requests that the Court maintain under seal the documents and evidence produced as part of th[e] jurisdictional discovery process until a decision is made on jurisdiction." (*Id.* at 2-3.)  Defendant submits in support the declaration of Swiss attorney Jean-Pierre Morand, "longtime counsel for Defendant," who provides a broad assertion that FINA disclosure of the material submitted by Plaintiff "could harm FINA's interests, particularly because much of [the] material relates to the inner workings and deliberations of FINA" and is "normally not made public by FINA." (Dkt. No. 72-1 at ¶ 4.)  Mr. Morand also attests to general concerns that disclosure would violate "Swiss and EU laws" and that Plaintiff ISL would use the evidence obtained "to pursue a European legal proceeding against FINA." (*Id.* at ¶¶ 5, 8.)

As with Defendant's brief in support of sealing, Mr. Morand "requests that, during the pendency of its outstanding motion to dismiss for lack of personal jurisdiction, that the Court maintain confidentiality over all of the documents and testimony provided for purposes of determining jurisdiction." (Dkt. No. 72-1 at ¶ 11 (emphasis added).)  In other words, Defendant's arguments in support of sealing are primarily concerned with the *stage of litigation*, not the content of the material.  Indeed, Defendant asserts that "[t]he unsealing of any documents or deposition transcripts at this stage of the litigation—before jurisdiction has been found over FINA—presents a substantial risk of irreparable harm to FINA, particularly if the Court ultimately decides the jurisdiction is lacking." (Dkt. No. 72 at 6 (requesting that the material "remain sealed at the very least until the Court renders a decision on jurisdiction")).)

In sum, Defendant fails to provide specific "compelling reasons" to file under seal the documents it designated as "confidential" and that Plaintiff submitted in support of its supplemental brief regarding jurisdiction. Mr. Morand's general reference to Swiss and EU law and concerns over other litigation in Europe are not sufficient. *See Foltz*, 331 F.3d at 1137 ("[Public] disclosure might harm [the defendant] by exposing it to additional liability and litigation, . . . but a litigant is not entitled to the court's protection from this type of harm."). Further, Defendant's primary argument, which asserts that it risks "irreparable harm" if the material obtained through jurisdictional discovery is unsealed *prior* to the Court's determination on personal jurisdiction, is moot because the Court has determined that it has personal jurisdiction over FINA.[13] (*See generally* Dkt. No. 72.)

## B. Defendant's Motion to Seal

Defendant's motion is similarly defective. First, the material identified in Mr. Chiu's declaration, which was designated as "confidential" by USA Swimming under the parties' Protective Order, requires a declaration by USA Swimming in support of sealing. *See* Civ. L.R. 79-5(e) (providing that if the submitting party (here, Defendant) "is seeking to file under seal a document designated as confidential by the opposing party or a non-party pursuant to a protective order," the designating party (here, USA Swimming) must file within four days of the submitting party's motion "a declaration as required by subsection 79-5(d)(1)(A) establishing that all of the designated material is sealable"). USA Swimming did not submit a declaration in support of sealing, and Mr. Chiu provides no other bases for sealing the material. Second, Defendant fails to provide "compelling reasons" to seal the material identified in Mr. Morand's declaration, (*see* Dkt. No. 74-2 at ¶ 3); instead, Mr. Morand merely repeats the arguments set forth in his previous declaration regarding concerns over Swiss and EU law and other litigation, (*see* Dkt. No. 72-1).

---

[13] Defendant also fails to make a showing that the material falls within the scope of the Protective Order under the good cause standard and qualifies for protection under Federal Rule Civil Procedure 26(c), the European Union General Data Protection Regulation, or the Swiss Federal Data Protection Act. *See Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1130 (9th Cir. 2003) ("A party asserting good cause bears the burden, for *each particular document* it seeks to protect, of showing that *specific* prejudice or harm will result if no protective order is granted.") (emphasis added).

1    Such concerns do not constitute "compelling reasons" to maintain sealing. *See Foltz*, 331 F.3d at

2    1137.  Further, Mr. Morand again "respectfully requests that, *during the pendency* of its

3    outstanding motion to dismiss for lack of personal jurisdiction, . . . the Court maintain

4    confidentiality over the documents and testimony provided for the purposes of determining

5    jurisdiction."  (Dkt. No. 74-2 at ¶ 11 (emphasis added).)  That request is moot because the Court

6    has determined that it has jurisdiction over Defendant.

                                          ***

7    
8    Accordingly, the Court denies Plaintiffs' administrative motion to seal because the Court

9    has determined that it has personal jurisdiction over FINA and Defendant fails to provide

10   compelling reasons why the strong presumption of public access to materials filed with the Court

11   otherwise does not apply.  For the same reason, the Court denies Defendant's motion to seal the

12   material it submitted in support of its supplemental briefing.  Finally, the Court denies

13   Defendant's motion to seal the material designated as "confidential" by non-party USA

14   Swimming because USA Swimming failed to submit a declaration establishing that the material

15   warrants sealing.

16                                   **CONCLUSION**

17   For the reasons stated above, the Court DENIES Defendant's motions to dismiss, DENIES

18   Plaintiffs' administrative motions to seal, and DENIES Defendant's administrative motions to

19   seal.  The Court will hold an initial case management conference on Friday, January 17, 2020 at

20   10:00 a.m.  A joint case management conference statement is due one week in advance.

21   This Order disposes of Docket Nos. 19, 54, and 62 in 18-cv-07393.  This Order also

22   disposes of Docket Nos. 18, 66, and 74 in 18-cv-07394.

23   **IT IS SO ORDERED.**

24   Dated: December 16, 2019

25   
26   
27   JACQUELINE SCOTT CORLEY
     United States Magistrate Judge

28