1  Neil A. Goteiner (State Bar No. 083524)
   ngoteiner@fbm.com
2  C. Brandon Wisoff (State Bar No. 121930)
   bwisoff@fbm.com
3  Joshua W. Malone (State Bar No. 301836)
   jmalone@fbm.com
4  Hilary C. Krase (State Bar No. 318762)
   hkrase@fbm.com
5  FARELLA BRAUN + MARTEL LLP
   235 Montgomery Street, 17th Floor
6  San Francisco, California 94104
   Telephone: (415) 954-4400
7  Facsimile: (415) 954-4480

8
   Richard M. Heimann (State Bar No. 063607)
9  rheimann@lchb.com
   Eric B. Fastiff (State Bar No. 182260)
10 efastiff@lchb.com
   Valerie D. Comenencia Ortiz (State Bar No.322379)
11 vcomenenciaortiz@lchb.com
   LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
12 275 Battery Street, 29th Floor
   San Francisco, California 94111
13 Telephone: (415) 956-1000
   Facsimile: (415) 956-1008
14
   Attorneys for Plaintiffs and the Proposed Class
15

16                   UNITED STATES DISTRICT COURT

17                 NORTHERN DISTRICT OF CALIFORNIA

18

19 THOMAS A. SHEILDS, MICHAEL C.            CASE NO. 3:18-cv-7393-JSC
   ANDREW, AND KATINKA HOSSZÚ, on
20 behalf of themselves and all others similarly   **FIRST AMENDED CLASS ACTION
   situated,                                   COMPLAINT FOR VIOLATIONS OF
21                                             THE SHERMAN ACT, 15 U.S.C. §§ 1, 2,
                  Plaintiff,                   AND THE COMMON LAW**
22
           vs.                                 **JURY DEMAND**
23
   FÉDÉRATION INTERNATIONALE DE
24 NATATION,                                   Judge:      Hon. Jacqueline Scott Corley
                                               Trial Date: January 10, 2022
25                Defendant.

26

27

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

# <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ................................................................................................1

II.   JURISDICTIONAL STATEMENT .....................................................................8

III.  PARTIES ............................................................................................................10

    A.    Plaintiffs ...................................................................................................10

    B.    FINA .........................................................................................................11

        1.    FINA Derives Its Power From The Structure Of The Modern
            Olympiad. ......................................................................................11

        2.    FINA Leverages Its Market Dominance To Extract And Enjoy—
            And Largely Keep For Itself—Substantial Revenues From The
            Labor Of The World's Best Swimmers. .......................................15

IV.   FINA'S UNLAWFUL COLLUSION TO UNREASONABLY RESTRICT
    COMPETITION ................................................................................................18

    A.    ISL Principals And Their Innovative League Idea, In Talks To Host An
        Event With USA Swimming, Emerge As Threats To FINA Dominance. ..............18

    B.    FINA Threatens USA Swimming With Sanctions For Participating in the
        Las Vegas Event. .......................................................................................22

    C.    FINA Offers To Drop Opposition To ISL In Exchange For $50 Million And
        Works To Undermine ISL Promotional Efforts. ......................................24

    D.    ISL And Italian Swimming Federation Develop Plan For December 2018
        Event, and In Response FINA Maintains Its Pressure on USA Swimming. ............25

    E.    FINA Threatens Swimmers And Compels The Aid Of Member Federations
        To Boycott The Turin Event And Thereby To Force Its Cancellation. ..................27

    F.    FINA Threatens USA Swimming From Any Future Affiliation With ISL. ............34

    G.    FINA, Having Dispatched The ISL Threat, Misappropriates Its Innovations
        With Its Own Imitation Events. .................................................................34

V.    FINA'S UNLAWFUL MONOPOLY AND MONOPSONY .............................36

    A.    FINA's Unlawful Monopoly Power In The Market For Top-Tier
        International Swimming Competitions ......................................................36

        1.    The Organization And Promotion Of Top-Tier International
            Swimming Competition Constitutes The Relevant Product Market. ..........36

        2.    FINA Has Unlawfully Monopolized Or Attempted To Monopolize
            The Market For Top-Tier International Swimming Competitions. ...............38

    B.    FINA's Unlawful Monopsony Power In The Market For The Services Of

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT
– CASE NO. 3:18-cv-7393-JSC

i

36144\12874754.1

Top-Tier Swimmers .............................................................40

    1.    The Services Of Top-Tier Swimmers Constitutes The Relevant Input Market. ...............................................................40

    2.    FINA Has Unlawfully Monopsonized Or Attempted To Monopsonize The Market For The Services Of Top-Tier Swimmers. ........41

CLASS ALLEGATIONS...........................................................................43

    A.    Numerosity .........................................................................44

    B.    Commonality .......................................................................44

    C.    Typicality ...........................................................................45

    D.    Adequacy of Representation ...............................................45

    E.    Superiority ..........................................................................46

FIRST CAUSE OF ACTION_VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1 ...............................................................................46

SECOND CAUSE OF ACTION_VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2 ..........................................................................49

THIRD CAUSE OF ACTION TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS..............................................................................................50

PRAYER FOR RELIEF............................................................................50

JURY DEMAND ......................................................................................53

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT
– CASE NO. 3:18-cv-7393-JSC

ii

36144\12874754.1

1    Thomas A. Shields, Michael C. Andrew, and Katinka Hosszú, on behalf of themselves and

2  all others similarly situated, allege as follows:

3  **I.    INTRODUCTION**

4        1.    Plaintiffs bring this action against Fédération Internationale de Natation ("FINA")

5  to prevent and address clear antitrust violations arising from FINA's complete control, by

6  unlawful means, over the promotion and organization of international swimming competitions and

7  its efforts to ensure that FINA, and only FINA, can determine what swimming athletes will be

8  paid for their efforts.

9        2.    FINA calls itself the world's governing body for all aquatic sports.  As the

10  authorized gatekeeper to the Olympic Games' aquatic events, there can be no doubt that, as it

11  boasts on its own website, FINA "controls the development" of competitive swimming and diving

12  disciplines.

13        3.    This case is specifically about swimming.  It is about whether FINA's control over

14  swimming opportunities—at least as exercised outside of the Olympic Games and FINA's own

15  competitions—amounts to an unlawful restraint of the ability of the athletes, on whose bodies

16  FINA's income and power depend, to earn what they would command in a market free of FINA's

17  iron grip.  This case is also about whether FINA—entrenched in and fearful of losing total control

18  over lucrative swimming competitions—unlawfully wields its dominant influence to prevent

19  outside organizations from expanding opportunities for hundreds of world-class swimmers and

20  their millions of fans across the world.  FINA does so in a manner that not only restricts FINA's

21  competitors in the market for the promotion of top-tier international swimming competitions from

22  entering the market, but also restricts opportunities for sponsors, event broadcasters, licensees, and

23  other related ancillary businesses that would benefit from an increased number of top-tier

24  international swimming competitions.  And this case is about whether FINA's unreasonable

25  market restraints and consolidated market power have unlawfully restricted the ability of the

26  world's top-tier swimmers from enjoying expanded opportunities to exploit their own hard work,

27  rather than having to continue to suffer the FINA-controlled exploitation of their lifetimes' worth

28  of training and labor.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT      1
– CASE NO. 3:18-cv-7393-JSC

36144\12874754.1

4.      Until Plaintiffs' filing of this lawsuit in December 2018 forced FINA to abandon certain of its anticompetitive conduct, FINA has enjoyed total control, or nearly total control, of the market for the promotion and organization of top-tier international swimming competitions.  It also has enjoyed total control, or nearly total control, of the market for the purchase of top-tier swimmer services, rendering it, in effect, the sole buyer of the market supply.  The International Swimming League ("ISL") has sought to enter both markets, as an organizer, innovator, and promoter of top-tier international swimming competitions and as a buyer of the swimmer services necessary to put on such events.  ISL seeks to expand these market opportunities in order to provide the world's top-tier swimmers more opportunities to compete against each other and for increased pay for their services.

5.      As described more fully herein, FINA originally threatened swimmers and their national governing bodies with sanctions, including disqualification from Olympic competition, if they participated in any ISL swimming events in the United States or elsewhere.  With these unlawful efforts, in 2018, FINA disrupted planned ISL events in the United States, and then in Britain and Italy.  It was only after ISL filed this action that FINA backed down and announced that it was withdrawing its threat of sanctions against swimmers and their national governing bodies for associating with ISL.  Then, in 2019, despite FINA's ongoing efforts to prevent ISL from obtaining a foothold in the market, ISL rolled out its inaugural series of events: seven meets that took place across seven cities around the world, where eight teams, together comprised of more than 200 top-tier swimmers, competed for points and prizes.  ISL has plans for, and has taken significant steps toward establishing, a permanent league that would feature similar competitions.  The league also offers, among other things, higher potential compensation for the world's top-tier swimmers.

6.      FINA, however, was determined to prevent ISL from entering the market.  FINA understands that a free market for top-tier international swimming competitions would preclude it from continuing to keep for itself the lion's share of profits earned from the swimmers' skills and efforts and from the entertainment value it provides to spectators.  And FINA's power over the swimming world is so strong that FINA  retains the ability to crush ISL, and destroy the careers of

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT          2
– CASE NO. 3:18-cv-7393-JSC

36144\12874754.1

swimmers who want to compete in ISL meets, absent the relief that ISL seeks in its own lawsuit against FINA and that Plaintiffs seek in this action.  FINA's source of power derives predominantly from its control over access to competition in the Olympic Games, which FINA has lorded over member national federations and the world's swimmers by implementing rules that: (1) prohibited athletes and member federations from having "any kind of relationship"—including "unauthorised relations" with other swimming events and organizers—with any entity FINA does not approve, and (2) threaten rule-breakers with a ban of up to two years from participation in FINA or FINA-approved events, including events used to qualify for the Olympic Games.  *See* FINA Rule GR 4.1; FINA Rule GR 4.5.

7.      FINA's insistence that the world's best swimmers may compete only on FINA's terms and FINA's efforts to enforce that rule were nakedly anti-competitive.  The European Commission has already found that a similar "unauthorised relations" rule wielded by FINA's counterpart for ice skating violates the European Union's competition laws.  Such rules, the Commission ruled in its Commission Decision of December 8, 2017, "inherently aim at preventing athletes from participating in events not authorised [by the rulemakers], resulting in the foreclosure of competing event organisers . . . [who] could potentially harm the economic interests" of the entrenched governing body.  *See* Provisional Non-Confidential Version of Decision ¶¶ 168-69 (available at

http://ec.europa.eu/competition/antitrust/cases/dec_docs/40208/40208_1384_5.pdf).

8.      The same reasoning applies in this case, where FINA has implemented and enforced rules in a manner that served FINA's intent to foreclose competitors like ISL from entering the market and prevent swimmers from effectively selling their services to entities other than FINA or those that FINA explicitly approves.

9.      Indeed, FINA already has flexed its muscles to block ISL from hosting—and swimmers like Plaintiffs from participating in—a competing event.  In early 2018, ISL began planning a top-tier international competition that would feature a version of its team-based competition, ideally to take place in the United States, home to many of the world's best swimmers.  ISL had enjoyed early and enthusiastic support of USA Swimming, the sport's

3                    36144\12874754.1

governing body for the United States.  Thus, USA Swimming worked closely with ISL in spring 2018 to plan a competition for December 2018, with both ISL and USA Swimming deciding that they would host the event in Las Vegas's Mandalay Bay Resort and Casino.  ISL was around the same time working to obtain support from FINA's other member federations to participate in the event.  But FINA – which viewed ISL as competitively "very dangerous" to FINA's existence – knew of the potential cooperation and in May 2018, through FINA Executive Director Cornel Marculescu  and FINA Vice President Dale Neuburger, continued to pressure USA Swimming through threats and intimidation to break ties with ISL.  FINA's threats culminated in Marculescu's June 5, 2018, letter sent to USA Swimming and other member federations, warning that FINA would sanction any federation that violated FINA's rule on "unauthorized relations" by affiliating with ISL. FINA stated that such sanctions  would have disqualified U.S. swimmers from competing in the Olympic Games.  FINA's Neuburger also on June 5 sent a separate additional  email only to USA Swimming and to all U.S. aquatic sports further and explicitly threatening such sanctions were USA Swimming to work with ISL.   FINA's enforcement of its "unauthorized relations" rule was a pretext to pressure its member federations to do what FINA wanted.  In response to FINA's program of pressure and intimidation through Marculescu  and Neuburger, USA Swimming pulled out of negotiations for hosting the December 2018 competition in Las Vegas or anywhere else.

10.     ISL accordingly had to seek other partners.  First it tried to pair with British Swimming to host the competition in London.  But, like its American counterpart, British Swimming folded under pressure from FINA to stop coordinating with ISL.  As explained by USA Swimming's chief operating officer in a letter dated June 13, 2018, FINA "sees this December event as a challenge."  As a result, he concluded, USA Swimming could not commit to taking any part in ISL's plans, even as a non-host, passive participant, until it received "assurance from ISL and FINA (in writing) that FINA is on board with the concept of the ISL and approves of the concept" and, in short, "whether the ISL can actually exist alongside FINA."

11.     ISL then teamed up with the Italian Swimming Federation.  The Italian federation had previously worked with Energy Standard Group, whose president is the driving force behind

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT        4
– CASE NO. 3:18-cv-7393-JSC

36144\12874754.1

1   ISL, to host junior meets in 2017 and in April 2018.  Given its support for ISL's proposed format

2   and dedication to expanding opportunities for the world's swimmers, the Italian Swimming

3   Federation agreed to host the December competition in Turin, Italy (the "Turin Event").

4         12.    Even after FINA shut down the Las Vegas event, FINA continued to deter USA

5   Swimming from participating in ISL events anywhere, including in the United States and the

6   Turin Event.  Despite the extensive planning and expenditure of resources by ISL and the Italian

7   Swimming Federation, and despite their having entered into participation and appearance-fee

8   agreements with more than 50 swimmers from around the world, FINA coerced its member

9   federations – most prominently USA Swimming, which FINA recognized as being the "key"

10  member federation and influential in the international swimming community – into agreeing to,

11  and participating in, an overt effort to shut down the Turin Event.  Specifically, despite knowing

12  that the European Commission had already found such conduct unlawful in its ice skating

13  decision, FINA  threatened the swimmers with a ban from FINA events—including the

14  competitions that would serve as the qualifying meets for the 2020 Olympic Games—if swimmers

15  participated in the Turin Event.  Other federations were predictably unwilling to buck FINA and to

16  partner with ISL without USA Swimming leading the charge; indeed, once USA Swimming

17  dropped its support for Turin, the event became unsalvageable for ISL.  FINA made its threats

18  only to prevent competition and to maintain its grip on both its monopoly power in the market for

19  top-tier international swimming competitions and its monopsony power in the market for the

20  supply of top-tier swimmer services.  FINA has never offered, and cannot truthfully offer, any

21  legitimate pro-competitive justification for its actions.

22        13.    Some of the world's top swimmers openly criticized FINA for its crackdown on the

23  Turin Event, and some of FINA's national swimming federation partners, including USA

24  Swimming, still expressed support for ISL's efforts.  *See, e.g.*, *Adam Peaty criticises decision to*

25  *scrap International Swimming League*, BBC, Nov. 15, 2018,

26  https://www.bbc.com/sport/swimming/46224766; Julian Linden, *Our golden girls unite for*

27  *swimmers' rights*, Daily Telegraph, Dec. 4, 2018.  But after discussing among and between

28  themselves, the federations reluctantly warned their respective swimmers that they risked

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT
– CASE NO. 3:18-cv-7393-JSC
5
36144\12874754.1

1    sanctions by FINA and/or by the federations themselves if the swimmers participated in the ISL

2    event.  The Italian Swimming Federation and ISL were thus forced to cancel the Turin Event, for

3    which swimmers from all over the world had already signed up, and ISL lost its investment.

4         14.    FINA tried to explain to the world that its conduct was necessary to safeguard

5    FINA's own schedule of competitions.  That explanation itself is proof of FINA's anti-competitive

6    motive.  But the circumstances leading up to its threatened swimmer ban, and FINA's internal

7    correspondence  including  of  Executive Director Marculescu's correspondence with FINA's

8    executive committee, laid bare a more disturbing picture of its naked anti-competitive aims.

9         15.    Specifically, FINA had been in direct negotiations with ISL for much of 2018 over

10   how FINA might allow ISL to co-exist.  FINA made it clear, however, that such co-existence—

11   *i.e.*, FINA's agreement not to threaten the world's swimmers against participating in ISL events—

12   would come only at a steep price: FINA demanded $50 million from ISL and complete control

13   over most of the facets of the ISL league, including its name.  Not once during the negotiations

14   with ISL did FINA express concerns that, as it later claimed, that ISL's events would "add[] a

15   layer of complexity" to the calendar of swimming competitions such that the calendar could not

16   both allow for the Turin Event and also remain "coherent" and "healthy."  *See FINA Statement*,

17   Nov. 16, 2018, at http://www.fina.org/news/fina-statement-2.  Nor did it express to ISL any

18   concern over "[t]he harmonious development of the calendar," as FINA did in a December 3,

19   2018, letter to its member federations seeking further to justify its unlawful conduct. Rather,

20   Marculescu's and FINA's internal October 2018 documents demonstrated that FINA did not want

21   competition from ISL, and that its conduct leading up to Marculescu's and Neuberger's June 5

22   threats to USA Swimming evidenced FINA's unalloyed anti-competitive strategy. Thus,  it is quite

23   obvious that FINA's primary concern, as it explained in that December 3 letter, was over any

24   "challenges to its status."  FINA's purported "complexity" justification is precisely the type of

25   excuse that courts properly view with suspicion as nothing more than anti-competitive pretext;

26   here FINA's internal documents demonstrate its anti-competitive strategy and exposes as false

27   FINA's supposed justification.

28        16.    ISL refused to give in to FINA's extortionate demands that ISL pay FINA not to

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT        6
– CASE NO. 3:18-cv-7393-JSC

36144\12874754.1

1   engage in unlawful conduct.  FINA accordingly again as with Las Vegas leveraged its

2   overwhelming and absolute power to impose, through its control over the Olympics, a group

3   boycott of the Turin Event.  That episode, along with FINA's earlier shutdown of the Las Vegas

4   event, not only showcased FINA's complete power over the relevant markets, it also caused

5   significant financial harm, and threatened additional future harm, to ISL and the swimmers with

6   whom ISL and/or its affiliates had contracts, as well as co-hosting organizations (*e.g.*, allied

7   federations such as the Italian Swimming Federation), potential event sponsors, broadcast-rights

8   holders, and other business and licensing partners.  It also harmed the markets for both the

9   organization of top-tier international swimming competitions and for the provision of top-tier

10  swimmer services.  And by its explicit anti-competitive conduct, FINA clarified to the entire

11  swimming community that FINA will continue to do whatever it takes to protect its stranglehold

12  on non-Olympic events.

13        17.      Recognizing the damage its actions caused to the swimmers that FINA depends

14  upon and apparently attempting to assuage swimmers' anger, FINA suddenly announced it would

15  increase prize money available to swimmers competing in the FINA World Swimming

16  Championships (25 meters), a short-course competition set for December 11-16, 2018, featuring

17  top-tier swimmers competing in the type of races most similar to those planned by ISL.  In other

18  words, the mere threat of ISL's market entry has already increased pay for swimmers in the

19  market in which FINA has been unlawfully suppressing competition, which demonstrates one

20  element of anti-competitive harm— depressed swimmer compensation—that FINA's illegal

21  stranglehold has imposed on the market.

22        18.      Then, having successfully halted ISL's momentum by scuttling its events in Las

23  Vegas, London, and finally Italy,  FINA stepped into ISL's void and scheduled its own copycat

24  events, including one held in May-June 2019 in Indianapolis, that looked almost exactly like ISL's

25  planned, innovative format.  Desiring the legitimacy that USA Swimming's support would

26  immediately provide, FINA Vice-President Neuburger described to his boss Marculescu  how, in

27  Neuburger's own words, he  repeatedly "pressured" USA Swimming to host the inaugural

28  Indianapolis event.  FINA would offer increased prize money that copied almost precisely the

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT          7
– CASE NO. 3:18-cv-7393-JSC

36144\12874754.1

1   amounts that ISL had announced for its competing, now-quashed event.  FINA had effectively

2   shut down a competitive threat by unfairly and without justification wielding its exclusive control

3   over access to the Olympic Games, only to then misappropriate its would-be competitor's

4   innovations.

5          19.     Only after Plaintiffs filed their original Complaint did FINA, in January 2019,

6   change course and concede that swimmers were free to compete in events staged by "independent

7   organisers" like ISL without FINA's threat of Olympic disqualification.  But by that point the

8   damage was done:  Plaintiffs accordingly file this Amended Complaint, seeking both injunctive

9   relief against FINA's enforcement of its anti-competitive "unauthorised relations" (sic) rules and

10  damages to compensate them for the real financial harm FINA's efforts caused.

11  **II.      JURISDICTIONAL STATEMENT**

12         20.     This Court has subject-matter jurisdiction over this case under section 4 of the

13  Sherman Act, 15 U.S.C. § 4, and under 28 U.S.C. §§ 1331, 1337.

14         21.     This Court has personal jurisdiction over FINA pursuant to section 12 of the

15  Clayton Act, 15 U.S.C. § 22 and *Go-Video, Inc. v. Akai Electric Company, Limited*, 885 F.2d 1406

16  (9th Cir. 1989). In particular, FINA's contacts with the United States are deep and wide.  On

17  information and belief, FINA has registered multiple trademarks with the U.S. Patent and

18  Trademark Office.  It regularly organizes major international aquatics competitions in the United

19  States.  Since January 2017, FINA has hosted the following multi-day competitions: the FINA

20  Artistic Swimming World Series 2018 (Los Angeles), the Women's Intercontinental Tournament

21  2018 (Davis, California), the Synchro America Open Long Island (New York), the 6th FINA

22  World Junior Swimming Championships (Indianapolis), and FINA's Champions Swim Series

23  (Indianapolis).  Meanwhile, on information and belief, FINA has entered into multiple agreements

24  with U.S. swimwear manufacturers by which those manufacturers must adhere to FINA's strict

25  regulations governing the design and manufacture of swimwear and related accessories in

26  exchange for the right to be deemed FINA-approved articles.  U.S. companies that have entered

27  into such agreements include TYR Sport, Inc., of Huntington Beach, California, and AgonSwim

28  of Nashville, Tennessee.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT        8
– CASE NO. 3:18-cv-7393-JSC

36144\12874754.1

22.      FINA promulgates various rules and regulations governing the conduct of its membership, which includes national federations such as United States Aquatic Sports, Inc. ("USAS"), members of those national federations such as USA Swimming, and all U.S. swimmers who seek to compete in FINA-sanctioned competitions.  Thus FINA has, for example, controlled the conduct of Plaintiff Thomas Shields, who lives in Berkeley, California.  Specifically, as discussed herein, FINA knew that ISL and USA Swimming were planning to host a competing event in Las Vegas, which caused FINA to directly and intentionally threaten USA Swimming and U.S. swimmers with sanctions if they participated in the event.  FINA's threats caused USA Swimming to abandon the Las Vegas event and then to abstain from participating in any ISL event anywhere, including in London and Turin.  FINA then, after having cleared the US market of ISL's competition, pressured USA Swimming to host at least one FINA event which copied ISL's innovative format.

23.      Further, on information and belief and as further described below, FINA specifically and purposefully availed itself of the benefits and protections provided in this state and district when it ordered, in October 2018 and in furtherance of its anti-competitive conduct, the submission of a false Digital Millennium Copyright Act ("DMCA") copyright-infringement notice to YouTube, LLC, an entity located in this district.  On information and belief, the false submission asserted that three ISL-produced videos featuring only ISL material, interviews, and information somehow infringed on FINA's copyright.  So FINA improperly leveraged U.S. law to prevent further ISL promotion by demanding that YouTube pull down the material.  YouTube, at least temporarily, did so.

24.      In addition, FINA improperly interfered with ISL's relationship with its Los Angeles-based sports marketing company Wasserman. Shortly before FINA sent to its member federations the December 3, 2018 letter justifying its shutdown of the Turin Event, ISL and Wasserman were in active discussions regarding their marketing plans.  Two days after FINA sent its letter, Wasserman abruptly wrote to ISL that it "will not be able to continue [its] relationship with ISL."  Casey Wasserman is a Wasserman principal and chairman of the Los Angeles Olympic Committee.  On information and belief, FINA either directly, or through the International

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT          9                                    36144\12874754.1
– CASE NO. 3:18-cv-7393-JSC

1    Olympic Committee, directed these actions.

2        25.    Venue is proper in this district under 28 U.S.C. § 1391(c)(3) because FINA is not a

3    resident in the United States and therefore may be sued in any judicial district.

4    **III.    PARTIES**

5        **A.    Plaintiffs**

6        26.    Thomas A. Shields is a world-champion swimmer and Olympic gold medalist. He

7    remains a professional swimmer and lives in Berkeley, California.

8        27.    Michael C. Andrew has been swimming professionally since 2013, when at 14

9    years old he became the youngest swimmer to do so. He has set more than 100 national age-group

10   records, and he won the gold medal in the 100-meter individual medley at the 2016 FINA Short

11   Course World Championships. He lives in Encinitas, California.

12       28.    Katinka Hosszú is a three-time Olympic gold medalist who has set or holds

13   multiple world records. A three-time FINA Swimmer of the Year, Ms. Hosszú is a resident of

14   Hungary.

15       29.    Plaintiffs bring this case on behalf of themselves and other swimmers similarly

16   situated. These are swimmers who comprise the input market of top-tier swimmers who have

17   competed on the sport's highest stages or have otherwise performed at a high-enough level that

18   they can earn invitations to premiere competitions and draw lucrative sponsorships. The Proposed

19   Class is defined below.

20       30.    As alleged in more detail below, this case arises from FINA's efforts to thwart the

21   ability of ISL to enter and expand the market for the type of competitions that draw Plaintiffs and

22   the Proposed Class to enter and compete, including FINA's successful measures to scuttle the

23   Turin Event, and FINA's ongoing effort to prevent ISL from organizing and promoting its 2019

24   competitions. These efforts impacted the United States which is a potential host to these events,

25   and which is home to many of the world's best swimmers and the residence of numerous top-tier

26   swimmers who had signed up for the Turin Event before FINA forced its cancellation.

27

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT                10
– CASE NO. 3:18-cv-7393-JSC

36144\12874754.1

**B.**     **FINA**

        **1.**     **FINA Derives Its Power From The Structure Of The Modern Olympiad.**

31.     FINA is an association organized and existing in accordance with the laws of Switzerland, and more particularly under article 60, *et seq.*, of the Swiss Civil Code.

32.     FINA traces its founding from the beginnings of the modern Olympic Movement, and its role in international aquatics competition today depends on its connection with how the Olympic Games are structured and governed.

33.     At the top of that structure stands the International Olympic Committee ("IOC"), a not-for-profit organization based in Lausanne, Switzerland.  In short, the IOC puts on and promotes the Olympic Games.  It does so primarily through coordination with two technically separate groups of entities.

34.     The first group is nation-focused, comprising 209  National Olympic Committees ("NOCs").  The IOC has exclusive authority to recognize NOCs, including the U.S. Olympic Committee.  The NOCs are tasked generally with promoting the Olympics and identifying and recommending host cities for the games.  They retain exclusive authority for representing their respective nations at the Olympic Games and any other competitions sanctioned by the IOC.

35.     The second group is sport-focused, made up of dozens of International Sports Federations.  As with NOCs, only the IOC has the authority to recognize these federations.  And the federations, like the NOCs, must comply with the IOC's governing Olympic Charter.  The International Sports Federations administer their respective sports and establish and organize the types and rules of competitions held at the Olympic Games.  Accordingly, these federations "monitor the everyday administration of their sports and guarantee the regular organization of competitions as well as respect for the rules of fair play." *See* The International Olympic Committee, "International Sports Federations," accessible at https://www.olympic.org/ioc-governance-international-sports-federations.  Among many others, IOC-recognized international federations include the likes of Fédération Internationale de Football Association ("FIFA"), the International Basketball Federation ("FIBA"), the International Skating Union, and FINA.

36.     Accordingly, and as far as the IOC is concerned, FINA governs *Olympic* swimming, diving, high diving, water polo, artistic swimming, masters and open-water swimming. More particularly, athletes in those disciplines can compete in the Olympic Games only if they meet or beat qualifying criteria that FINA sets for the athletes.  And, in the cases of swimmers, FINA will recognize only those qualifying times that are met at FINA-approved qualifying events.

37.     Formed in 1908 as a collection of eight national aquatics organizations during that year's Olympiad in London, FINA now comprises 209 member federations.  These member federations are themselves national umbrella groups involving representatives of the various aquatic-sports disciplines.  The national federations may (and do) delegate sub-group entities to manage the FINA relationship as it pertains to the disciplines.  Thus, the United States' member federation is United States Aquatic Sports, Inc. ("USAS"), which designates USA Swimming, Inc., which is the "national governing body" of swimming in the United States.

38.     FINA is thus technically a collection of national member federations that actually compete horizontally with one another and with FINA itself, in that individual federations and FINA separately organize and promote top-tier international swimming competitions.  But by virtue of its governance structure and the practicalities of its day-to-day operations, FINA's decision-making and enforcement authority fall into the hands of a small group of FINA officials who cannot be easily checked by member federations.

39.     FINA and its 209 member federations are governed primarily by a 25-member Bureau.  The Bureau's day-to-day power, in turn, is vested in an eight-member executive committee.  Bureau decisions and rule interpretations can be—but not always—appealed to the FINA General Congress.  The voting members of that General Congress, which technically under the FINA governing rules is "the highest authority of FINA," comprise two delegates from each member federation to represent its national interests in *all* aquatic sports.  *See* FINA Rule C 15.1; FINA Rule C 15.2.  Thus, for example, China has a population of more than 1.3 billion people and sent 45 swimmers to compete in the 2016 Olympic Games.  It is allowed two representatives in the General Congress.  So, too, is Maldives, an island nation of 436,000 that sent two swimmers to the 2016 Games.

40.    By design and under the FINA Constitution, the General Congress moves slowly. It meets only every two years.  A federation can call for a special session on matters that arise between those biennial meetings.  But doing so requires written request of one third of all 209 members.  Effectively, then, FINA is run by the FINA Bureau.  And between the Bureau's own meetings, its executive committee handles all day-to-day business and accordingly retains the majority of the real decision-making and rules-influencing power over FINA.

41.    Beyond the fact that its governing structure effectively empowers FINA leadership to exercise coercive influence over member federations, such heavy-handedness is cemented in the FINA rules themselves.  Every FINA member must "acknowledge in its national rules that FINA *is the only recognized body in the world*" that may govern international aquatics.  *See* FINA Rule C 7.5 (emphasis added).  FINA's Constitution forbids any member to set rules that conflict with FINA's rules.  FINA Rule 7.3.  And, if and when FINA so requires, members must insert FINA rules into their own governing documents.  FINA Rule 8.2.5.

42.    Among the various rules approved by the General Congress and Bureau is FINA's prohibition against "unauthorised relations."  Thus, no FINA Member can "have *any kind of relationship* with a non-affiliated or suspended body." FINA Rule GR 4.1 (emphasis added). Further, until FINA abruptly reinterpreted the Rule again in apparent response to Plaintiffs' original Complaint, FINA wielded this Rule to prevent members from holding competitions with any non-affiliated body and swimmers from competing in events that FINA has not approved. While FINA members can now participate in competitions staged by independent organizers, FINA will not recognize the results of these competitions absent its pre-approval, and there is nothing to prevent FINA from reversing course and again to bar members from associating with non-affiliated bodies.  FINA bylaws also govern international competition and require any member that hosts, assists with the hosting, or affiliates in any way with the hosting of such a competition to first obtain FINA approval.  *See generally* FINA Rule GR 4.  This extends far beyond the run up to the Olympics and the Olympics Games themselves.

43.    These rules must be obeyed.  Member federations and swimmers alike face severe punishment for violating FINA rules against unauthorized relationships or hosting international

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT
– CASE NO. 3:18-cv-7393-JSC

13

36144\12874754.1

1   competitions that FINA does not bless in advance.  Among other sanctions, FINA wields the

2   power to suspend the member federation or its swimmers, for up to two years, from participating

3   in any FINA events.  *See* FINA Rule GR 4.5.  For swimmers who participate in non-sanctioned

4   competitions, that could mean banishment from the slate of competitions FINA sets as qualifying

5   events for the Olympic Games, and thus a ban from the Olympics itself.

6          44.    Given the structure of FINA's governance and its gatekeeper role in the Olympics,

7   there is practically little that a given member federation—to say nothing of an individual

8   swimmer—can do other than comply with FINA's demands even where, as here, FINA interpreted

9   its rules in bad faith to extend far beyond any legitimate FINA authority.  This gives FINA the

10  ability to harm competition in non-Olympic swimming, and it has exercised that power to cause

11  anti-competitive harm to swimmers, event hosts, swimming competition consumers, and other

12  industry participants.

13         45.    Each of the national member federations primarily is concerned with identifying

14  the athletes who will represent the home country in the Olympic Games and ensuring they have

15  sufficient training and other support to prepare for the Olympics.  Also, when necessary, the

16  member federations are the athletes' representatives regarding issues relating to FINA's qualifying

17  events, the format of such competitions, FINA acceptance of their own planned competitions,

18  technical regulations, and more.  The Olympic Games are, in effect, the sole reason these

19  organizations exist, usually pursuant to a statutory dictate recognized by the law of their country as

20  solely responsible for identifying Olympic athletes in their sport—in the case of the United States,

21  for example, to obtain "the most competent amateur representation possible in each of the

22  Olympic Games, the Paralympic Games, and Pan-American Games."  *See* 36 U.S.C. § 220503(4).

23         46.    Each member federation's chief focus on the Olympic Games necessarily leads to

24  members constantly engaging in multiple ongoing negotiations with FINA over issues pertaining

25  only to the Olympic Games (*e.g.*, timing of the meets that constitute qualifying events, the format

26  of such competitions, FINA acceptance of their own planned competitions).  Moreover, those

27  negotiations with FINA are occurring across all of the aquatic sports disciplines.

28         47.    Member federations (or their specific-sport designees) also frequently host their

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT       14
– CASE NO. 3:18-cv-7393-JSC

36144\12874754.1

1 own events, sometimes including top-tier international competitions.  For example, USA

2 Swimming organized a biennial series called Duel in Pool from 2003 through 2015, a competition

3 that pitted U.S. swimmers against their Australian or European counterparts.  Likewise, the

4 Luxembourg federation organizes the yearly Euro Meet series.  And the Italian federation hosts

5 the yearly Sette Colli Trophy.  FINA allows such events to exist, but the members organize them

6 and, on information and belief, reap all (or most) of the financial benefit from putting them on.

7 The federation-organizers of these and the many other swimming competitions, international or

8 otherwise, must negotiate with FINA over several issues, including scheduling and if or when the

9 meets might constitute qualifying events for FINA's own competitions.  For example, the 21st

10 Euro Meet, which was set for January 25-27, 2019, was a qualifying event for the 2019 FINA

11 World Championships.

12          48.     The fact that member federations frequently disagree among themselves and with

13 FINA on various rules and scheduling relating to the Olympic Games, FINA competitions, and/or

14 member-federations events, combined with FINA's power structure, means that any given

15 member federation—and more particularly any given designee focused on a specific sport (*e.g.*,

16 USA Swimming)—retains limited political capital with which to negotiate with FINA.  And given

17 their legal mandate back home, member federations understandably must choose to expend that

18 capital with FINA on matters pertaining to the Olympic Games.  Other battles, including over

19 FINA dictates that have nothing to do with preparing for or holding the Games, are therefore

20 simply not worth it for the members to fight, or to risk fighting, even though they fall outside of

21 the specific Olympic mandate over which FINA has any actual authority from the IOC or from

22 anyone else.

23          **2.     FINA Leverages Its Market Dominance To Extract And Enjoy—And
               Largely Keep For Itself—Substantial Revenues From The Labor Of
24             The World's Best Swimmers.**

25          49.     By law, FINA is a non-governmental, putatively not-for-profit organization.  In

26 reality it is big business.

27          50.     No longer a small band of idealistic sport enthusiasts who would be stunned by the

28 monolith that today's Olympic Games have become, FINA sits atop one of the world's most

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT
– CASE NO. 3:18-cv-7393-JSC

15

36144\12874754.1

1  popular grouping of sporting events.  Its role as aquatics gate-keeper to the Olympic Games allows

2  it. in effect, control of effectively every major aspect of the development of, and profit from,

3  aquatic sports, in every corner of the globe.

4       51.    It is a lucrative perch.  While numbers deriving specifically from swimming

5  competitions are not yet available to Plaintiffs, FINA overall enjoys a substantial share of IOC

6  revenue from selling broadcasting rights, sponsorships, ticketing, and other income derived from

7  the Olympic Games.  In all, FINA in 2016 and 2017 earned from the 2016 Rio de Janeiro Olympic

8  Games more than $31.9 million above its Games-related expenses.[1]

9       52.    Regardless of any exclusivity that FINA may enjoy over aquatic sports in the

10  Olympics, nothing gives FINA exclusive rights to control non-Olympic swimming for the entire

11  world.  But FINA nonetheless has leveraged its rights to organize Olympic swimming—rights

12  which Plaintiffs do not here challenge—to dictate the terms on which any international swimming

13  competition must be based.

14       53.    FINA earns major revenue from its own non-Olympic events.  It draws scores of

15  millions of dollars per year from member-affiliation fees, event fees from cities that FINA allows

16  to host its FINA-branded competitions, television broadcasting rights, licensing revenues, and

17  sponsorships.  In 2017, for example, and setting aside in-kind contributions, FINA took in more

18  than $57 million from its own events, well over half of that coming from host-city tribute and

19  television rights to FINA-branded events, including: the FINA Swimming World Cup, a year-long

20  series of short-course[2] events held across the globe; the FINA World Swimming Championships

21  (25 meters), a single short-course championship held every even-numbered year; and the FINA

22  World Championships, biennial competitions involving all the aquatics disciplines held every odd-

---

24  [1] FINA reports its finances in Swiss francs, which at the time of this Complaint exchange roughly
25  1:1 with the U.S. dollar.  All FINA financial figures discussed in this Complaint are derived from
FINA's 2017 financial report, available at https://www.fina.org/sites/default/files/audit_report_-
26  _fina_-_2017_-_swiss_co_with_2_signatures-1.pdf.
27  [2] A "short course" event is held in a 25-meter or 25-yard pool, the latter of which is common in
NCAA and U.S. high school competitions. "Long course" events are held in 50-meter pools, the
28  size used for aquatic events during the Olympic Games.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400
FIRST AMENDED CLASS ACTION COMPLAINT   16   36144\12874754.1
– CASE NO. 3:18-cv-7393-JSC

numbered year.  In short, aquatics in general, and swimming in particular, are money-making machines for FINA.

54.     FINA keeps much of the wealth for itself.  In 2016, and across all aquatics events, FINA awarded less than $5 million in prize money to the athletes who make it all possible.  Prizes amounted to about $10 million in 2017, an increase owing at least in part to the blockbuster FINA World Championships.

55.     During the same two-year period, FINA spent nearly the same amount on those swimmer prizes as it did on its 30-40 administrators and employees: payroll charges averaged about $6.2 million each year.  And FINA spent a similar amount on "FINA Family" expenses—mostly meaning travel and per diems for certain FINA-appointed dignitaries.  All the while, FINA kept $18 million bottled up for maintenance on its new, lavish 43,000-square-foot headquarters.  That is just part of the more than $108 million FINA has set aside in dedicated reserves, including for event cancellation.  Another $11.6 million remains in reserve without FINA earmarking it for any purpose.

56.     Further, much of FINA's prize money is spread thinly to the upper-tier of the top-tier competitors.  The 2018 FINA Swimming World Cup is illustrative.  In all, FINA awarded $2.5 million in prizes for athletes' performances over the course of that seven-meet series.  Based on the announced awards and FINA's announced medals table at the end of the series, and excluding swimmer bonuses for setting new world records, about 60 percent of the prize money (roughly $1.5 million) went to only 10 swimmers.  The top two male and top two female swimmers took in a combined $1 million.  In contrast, FINA announced that 385 swimmers participated in the final meet.

57.     In short, and on the backs, legs, arms, and shoulders of the world's aquatic athletes, FINA earned $118 million in 2016 and 2017 revenues, excluding in-kind contributions.  It gave 12.5 percent—less than $15 million of that—back to the athletes in prize money.  This ratio is substantially lower than that enjoyed by athletes who compete in sports with competitive markets.

58.     As described herein, FINA has attempted to prevent anyone but FINA from organizing or controlling top-tier non-Olympic international swimming events, including events

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT
– CASE NO. 3:18-cv-7393-JSC

17

36144\12874754.1

where swimmers are competing only in their individual capacities or on teams that are not part of the swimmers' FINA member national federations.  Nothing gives FINA the right to: (1) dictate the terms of competition or compensation of swimmers who want to compete outside the Olympics as individuals or as part of a team not affiliated with FINA national federations, or (2) prevent others from organizing and profiting from such additional events for which there is lucrative current or potential demand.

## IV.   FINA'S UNLAWFUL COLLUSION TO UNREASONABLY RESTRICT COMPETITION

59.    FINA, in concerted and coerced action with its member federations and other entities, has engaged in unlawful and unreasonable anti-competitive conduct to strangle competition in the market for top-tier international swimming competitions.  FINA's concerted action with member federations and other entities also has unreasonably restrained competition for access to the supply of top-tier swimmers' services (*i.e.*, appearances and participation in swimming competitions).

### A.    ISL Principals And Their Innovative League Idea, In Talks To Host An Event With USA Swimming, Emerge As Threats To FINA Dominance.

60.    ISL's principals have spent nearly a decade organizing international events and honing the ISL club model.  Its chief sponsor and promoter is Konstantin Grigorishin, a Ukrainian businessman who is a leading shareholder of the Energy Standard Group ("ESG").  ESG, which maintains its own swimming club (the "ESG Club"), remains active in supporting ISL and seeking to get the league up and running.  ESG played a central role in planning the Turin Event and entered into key contracts—including with both the Italian Swimming Federation and with many of the top-tier swimmers who were to compete—for that event to go forward.

61.    As a result of Mr. Grigorishin's influence and dedication to the development of the sport across the globe, ESG began sponsoring and hosting swimming competitions in Ukraine, Russia and Italy for junior athletes in 2013.  These events generally applied and developed the team-based competition format that ISL would later adopt for its own planned events and league.

62.    By 2016, ESG was hosting the Energy Standard Cup, which featured events for

1  older athletes.  Many of these athletes have become prize-winners and record-holders at major

2  international swimming competitions beyond those organized by ISL.

3       63.     By 2017, and at substantial expense of energy, time, and money, Mr. Grigorishin

4  and others who would lead ISL had gained extensive experience in organizing and hosting

5  international swimming competitions.  Their efforts enjoyed increased recognition and standing in

6  the international swimming community.

7       64.     For example, in August 2017, ESG hosted its first "Energy for Swim" competition.

8  That event, held in Rome and organized by the Italian Swimming Federation, featured competition

9  between several top-tier swimmers from ESG's Club and athletes from the United States, Italian,

10  and Australian national swimming federations.  ESG provided athletes with about $411,000 in

11  appearance fees and charity contributions based on the athletes' performances.  FINA was aware

12  of ESG's 2017 event, but not yet considering it a threat, FINA limited its response to only token,

13  unofficial opposition.

14       65.     On the heels of that event's success, and with growing support from swimmers,

15  coaches, and others in the competitive-swimming industry, Mr. Grigorishin and ESG began to

16  move forward with their plans for ISL to organize and promote three events in 2018, with the

17  expectation of granting and awarding $842,400 in total appearance fees and prizes.  They also

18  began laying the foundation to organize and promote ISL team-based competitions throughout the

19  late summer and fall of 2019 featuring a dozen teams of 12 men and 12 women each—just under

20  290 swimmers—and more than $3.1 million in total prizes.

21       66.     FINA apparently did not initially consider ESG's Energy for Swim competition in

22  2017 to be a threat.  But that event's success, combined with word that ISL wanted to build on that

23  success, caught FINA's attention.  The nascent plans for what became ISL were now fully on

24  FINA's radar.  By September 2017, ISL-predecessor representatives were meeting with FINA

25  Executive Director Cornel Marculescu to discuss a path forward that would allow them to

26  organize international events featuring top-tier swimmers organized by teams that would compete

27  in short-course events.  After learning of ISL's intentions for future Energy for Swim events,

28  FINA initially expressed general support for ISL moving forward.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT          19
– CASE NO. 3:18-cv-7393-JSC

36144\12874754.1

67.     ISL and FINA spent several weeks negotiating new terms with ISL from late September 2017 through December 2017 over ISL's plans for a 2018 event.  ISL sought at a minimum to secure FINA's agreement to stand aside and not to block ISL from hosting that single event.  Those negotiations, however, broke down.

68.     ISL nonetheless moved forward.  By mid-December 2017, ISL was first reaching out directly to USA Swimming about co-sponsoring a meet in the United States, and FINA was aware of those discussions by no later than February 2018.  FINA understood that USA Swimming was "in the top" of member federations due to its lucrative market and high number of top-tier swimmers, and it thus monitored the ISL-USA Swimming relationship closely.  Indeed, USA Swimming Chief Operating Officer Mike Unger acknowledged that "FINA was watching us [USA Swimming] to make – to see what kind of – how we would react" to the development of ISL.

69.     FINA was internally explicit that it considered ISL's emergence a threat.  FINA's own documents, and particularly Marculescu's and Neuburger's , discuss how competitively "very dangerous" ISL was to FINA and how "ISL cannot exist" alongside it.  FINA viewed competition from ISL as an existential threat; as FINA Vice President Dale Neuburger wrote, "We [FINA] must win, we will win."

70.     FINA, in part through Mr. Marculescu, the top FINA executive and Mr. Unger's main FINA contact, did everything it could to avert the ISL-USA Swimming partnership.  Mr. Unger, Mr. Marculescu, and Mr. Neuburger were "transparent" with one another regarding USA Swimming's partnership with ISL, and information flowed freely between them.  On February 9, 2018, Mr. Marculescu met with Mr. Unger and USA Swimming President Tim Henchy at FINA's Lausanne headquarters to discuss, among other things, USA Swimming's plans to work with ISL.  Mr. Marculescu was clear about his disapproval: "They [USA Swimming] tell me we are going to meet with ISL.  Very good.  Very good.  And we tell them always the same thing: Go with FINA."  USA Swimming nonetheless remained excited about a partnership with ISL, and on the same day, Mr. Unger wrote to FINA that it "looks like we may take part [with ISL]."  Mr. Marculescu replied that any ISL event must comply with FINA rules by being organized either by FINA or a

1  national federation like USA Swimming.  Mr. Marculescu at this meeting explicitly referred to the

2  European Commission Speed Skating Decision that FINA's ice skating counterpart's deployment

3  of its  similar "unauthorised relations"  rule violated the European Union's competition laws (see

4  paragraph 6 above); Marculescu explained during the Lausanne meeting that he did not in effect

5  believe that the European Commission' antitrust Decision would apply in the United States.

6       71.    By spring 2018, it was becoming obvious to FINA that USA Swimming and ISL

7  still desired to partner together to host an event in the United States.  On March 29, 2018, Mr.

8  Neuburger reported to Mr. Marculescu "that they [ISL] seek a site in the USA or Australia," and

9  on April 4, USA Swimming officially told ISL of its intent to host ISL's first competition in the

10  United States and was "excited" about co-hosting the United States event with ISL.  By May

11  2018, USA Swimming and ISL identified Las Vegas as their preferred destination, with Mr. Unger

12  informing a VP at Las Vegas' MGM Resorts, a potential venue for the meet, that "[ISL] really

13  want[s] to come to Las Vegas." On May 11, 2018, Mr. Neuburger – serving simultaneously as a

14  FINA officer and board member with USA Swimming, attended a USA Swimming meeting where

15  Mr. Unger said the December 2018 event would be hosted in either Las Vegas or London. Just

16  four days after Mr. Neuburger's attendance at this meeting, on May 15, 2018, FINA began

17  drafting what would become its June 5 letter that threatened USA Swimming and others with

18  sanctions for affiliating with ISL.

19       72.    Around the same time, ISL worked to obtain the support of FINA's member

20  federations to participate in the December 2018 event.  To that end, and on May 4, 2018, ISL

21  entered into a memorandum of understanding with Ligue Européenne de Natation, the FINA-

22  recognized "continental federation" comprising the European national federations.  ISL also,

23  during a May 23-25, 2018 meeting in Turkey, presented its plans to representatives of the

24  federations from the United States, Australia, United Kingdom, Brazil, France, Russia, and

25  Ukraine, where "Mike [Unger] proposed the event to be organized in Las Vegas," as Marculescu

26  emailed Neuburger

1

**B.      FINA Threatens USA Swimming With Sanctions For Participating in the Las Vegas Event.**

2

3        73.      FINA apparently still doubted that USA Swimming would defy it by partnering

4 with ISL.  On May 25, 2018, Mr. Neuburger wrote to Mr. Marculescu that he had spoken to Mr.

5 Unger and that "USA Swimming will not go against FINA."  Mr. Marculescu nonetheless called

6 Mr. Unger on May 28, 2018 and complained that "he was not happy and was upset that we [USA

7 Swimming] had attended the [ISL Turkey] meeting."  In a report to a USA Swimming colleague,

8 Mr. Unger wrote that the Turkey meeting went well, but that he had just had a half-hour call with

9 Mr. Marculescu, and that "Oh boy . . . this is a tough topic."  Mr. Unger wrote that "the big

10 obstacle still remains the ISL relationship with FINA" and that USA Swimming could not do

11 "anything to upset the FINA relationship."  The same day, Mr. Unger wrote to another colleague

12 that "we are being asked to host in Las Vegas.  But FINA doesn't like it."  FINA's pressure had its

13 intended effect: the next day, on May 29, 2018, Mr. Unger wrote to Mr. Marculescu that "[y]ou

14 have our assurance to support FINA."  Mr. Unger wrote again to FINA later that month that "what

15 FINA thinks about this event matters . . . and we are not going to take part if this is against FINA

16 rules."  Mr. Neuburger responded, "[s]ounds good, and certainly you handled it well."

17        74.      FINA's opposition was the lone obstacle to ISL and USA Swimming proceeding

18 with the Las Vegas event.  According to Mr. Unger's email to MGM Resorts, "the only hold up is

19 some international political wrangling that is currently causing some stress.  It's not the finances."

20 While there were details to work out between ISL and USA Swimming regarding the event, none

21 were "insurmountable."  But as Mr. Unger expressed to his counterparts at the British and

22 Australian federations on June 4, 2018, "FINA is apparently not happy with ISL, and is intent on

23 derailing the ISL efforts."

24        75.      Further, nothing in the FINA rules rendered ISL "unauthorized."  Unger did not

25 consider USA Swimming's affiliation with ISL in either Las Vegas or Turin as "hav[ing] any

26 bearing on the rules."  Mr. Unger never understood, and Mr. Marculescu never explained, why

27 FINA was so opposed to ISL-USA Swimming joint meets.  Mr. Unger agreed that FINA might

28 push a "hyper-technicality" to stop an ISL meet from proceeding.  But the potential consequences

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT       22
– CASE NO. 3:18-cv-7393-JSC

36144\12874754.1

1    to swimmers were severe.  As Mr. Unger wrote to his British and Australian counterparts, FINA

2    was using the "unauthorized relations" rule "as the basis for this challenge" of the Las Vegas

3    event, a violation of which Mr. Unger knew allowed FINA to "issue penalties against the national

4    federation and its athletes, including suspensions."

5           76.    To punctuate its threats to USA Swimming and ISL, on or about June 5, 2018,

6    FINA's Mr. Marculescu circulated a letter to every FINA member designed to cripple ISL's plans.

7    ISL, he noted, "is neither recognised by nor affiliated to [sic] FINA." FINA would monitor the

8    matter closely, he warned, and sanction anyone who violated FINA's rule on unauthorized

9    relations.  In closing, Mr. Marculescu expressed his hope that all who received it would come

10   away from his message with "a clear and mutual understanding of FINA's competence and

11   jurisdiction in respect to international competitions."  No mention was made of any assessment of

12   scheduling conflicts or other excuses later advanced as cover stories for this anti-competitive

13   conduct; that FINA pretext came months later.

14          77.    While FINA sent its June 5, 2018 letter to each of its member federations, the letter

15   was focused squarely on the United States, which FINA viewed as the primary swimming market.

16   Before FINA sent its June 5 letter to its 209 member federations, Mr. Marculescu individually

17   forwarded the content of the letter to Mr. Unger, telling him that it would be sent to the rest of the

18   world later that day.  On information and belief, no other member federation received an advance

19   copy of the June 5 letter.  And with the exception of ISL beginning to look at London as an

20   alternative venue in light of FINA's resistance to Las Vegas, there were no ISL events being

21   planned or under serious consideration as of June 5, 2018 other than in Las Vegas.

22          78.    Mr. Neuburger sent another June 5 email only to the United States, this one to U.S.

23   Aquatic Sports, Inc., the United States' federation for all aquatic sports, including USA

24   Swimming, that underscored the severity of the sanctions threat from Mr. Marculescu's June 5

25   letter.  Mr. Neuburger block quoted FINA's GR 4.5 sanctions rule that Mr. Marculescu  referred to

26   in his June 5 letter and wrote, "[t]his is serious, not just for swimmers, and not just for USA

27   Swimming . . . but for [U.S. Aquatic Sports, Inc.], meaning all five constituent organizations."

28   Neuburger continued: "I have continued to counsel FINA to act with restraint and moderation, as

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT          23
– CASE NO. 3:18-cv-7393-JSC

36144\12874754.1

1    has Rich Young [USA Swimming's outside legal counsel], but this is not a situation to take

2    lightly.  The potential ramifications are severe, and we all need to have our eyes wide open."

3         79.    The threats worked.  Mr. Unger explained to his USA Swimming colleagues that

4    FINA's June 5 letter was "NOT a good sign for [ISL's] existence.  FINA flexing its muscles."

5    Mr. Unger also told ISL that before ISL tried to organize a meet in London, it should consider the

6    fundamental question of whether ISL "can exist alongside FINA" without an agreement with

7    FINA.  By around June 13, 2018, USA Swimming notified ISL via a letter of that date that it

8    could not help ISL organize any competition until it received "assurance . . . that FINA is on board

9    with the concept of the ISL and approves of the concept."  By this point ISL had already begun

10   looking for alternative partners, including British Swimming.  But the USA Swimming

11   representative warned that such a workaround would merely "postpon[e] the important decision of

12   whether the ISL can actually exist alongside FINA."  USA Swimming also expressed its deep

13   concern that a December 2018 event without FINA's direct blessing would put U.S. swimmers "at

14   risk"—especially if "FINA sees this December event as a challenge."  Fearful of how FINA would

15   react, USA Swimming explained that "we want the assurance that FINA is willing to work with

16   ISL before we commit."

17        80.    FINA knew that USA Swimming was a "key" member federation that was

18   uniquely capable of influencing the international swimming community. By brandishing threats on

19   USA Swimming to force its public withdrawal of support for ISL, FINA would be sending a

20   message to other member federations not to team up with ISL.  Thus, within weeks, and in direct

21   response to Mr. Marculescu's June 5 letter, British Swimming likewise distanced itself from

22   hosting ISL's planned December 2018 competition in London.

23        **C.    FINA Offers To Drop Opposition To ISL In Exchange For $50 Million And
              Works To Undermine ISL Promotional Efforts.**

24

25        81.    By mid-summer, ISL returned to FINA, seeking to salvage what it could.  On or

26   around August 17, 2018, ISL CEO Ali Khan wrote to FINA, explaining the details of the

27   competition, disclosing more than $2 million in combined appearance fees and prize money for

28   the swimmers, and promising that ISL would of course hold the meet "according to FINA

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT     24
– CASE NO. 3:18-cv-7393-JSC

36144\12874754.1

1    technical and doping control rules."  Mr. Khan also explained that ISL would work through a

2    federation partner and seek FINA approval for the competition, which would aid in the

3    "development of the sport of swimming to the mutual benefit of all the swimming community."

4         82.    FINA responded about a week later, in a letter sent by its outside counsel.  In that

5    letter, FINA insisted that Mr. Khan's direct request was invalid; the host federation was required

6    to seek FINA approval "for any international event that they intend to organize."  As nothing had

7    yet been submitted by that organization, the matter was effectively closed: "FINA is neither bound

8    nor willing to consider and discuss applications submitted by a sponsor" such as ISL.

9         83.    Mr. Grigorishin of ISL and Mr. Marculescu of FINA resumed direct negotiations

10   over the ensuing weeks.  FINA insisted on unreasonable terms: event ownership and FINA-

11   naming rights, plus payment of $50 million to FINA from ISL over 10 years.  ISL refused to give

12   everything to FINA in exchange for FINA doing nothing more than agreeing to halt its anti-

13   competitive threats.  Negotiations thus ended by mid-October.  By then FINA was complaining to

14   ISL for trying to promote itself to the swimming community, noting in an e-mail by its top officers

15   to Mr. Grigorishin on October 16, 2018, that ISL was releasing promotional videos and explaining

16   that such material, and in particular a video appearing on the website www.SwimSwam.com, a

17   swimming-industry news site, shouldn't be published because "FINA cannot recognize ISL."

18        84.    In fact, and on information and belief, FINA was more than merely disappointed in

19   ISL's promotional video.  FINA, on information and belief, instructed its agent to submit a

20   "takedown notice" to YouTube under the DMCA to have three ISL videos removed from

21   SwimSwam's YouTube channel.  That notice necessarily required FINA's agent to assert that the

22   ISL videos infringed on FINA's copyright.  That was false.  Nonetheless, and pursuant to standard

23   YouTube procedures, YouTube initially removed the three ISL videos from the SwimSwam

24   channel, only to allow them back up after SwimSwam established that the ISL content was not

25   infringing.

26        **D.    ISL And Italian Swimming Federation Develop Plan For December 2018
            <u>Event, and In Response FINA Maintains Its Pressure on USA Swimming.</u>**

27

28        85.    ISL had one final option.  Given ESG's prior experience putting on the April 2018

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT      25
– CASE NO. 3:18-cv-7393-JSC

36144\12874754.1

1   junior meet with the Italian Swimming Federation, ISL again turned to the Italian organization for

2   help coordinating its planned December competition.

3        86.      Thus, on or about October 17, 2018, the Italian Swimming Federation notified

4   FINA that it intended to host the Turin Event, officially named Energy for Swim 2018, shortly

5   before Christmas.

6        87.      As explained to FINA in a letter from the federation dated October 17, 2018, the

7   competition would include swimmers from countries other than Italy.  But, the Italian Federation

8   president explained, under FINA's rules the Turin Event would not constitute the type of

9   "international competition" that required FINA approval because those swimmers would not be

10  formally representing their member federations.  The distinction mattered under FINA's rules.

11  Under the relevant FINA rules, an "international competition" is "any competition organised or

12  sanctioned by FINA, any Continental or Regional Organisation or any Member Federation in

13  which other recognised Federations, clubs or individuals participate."  *See* FINA Rule BL 12.1.

14  Such competitions require six months' minimum notice to FINA and must be approved by FINA.

15  Even if this rule passed muster under antitrust law, the plain language of the FINA rules also

16  provides that an "international competition" organized by a member federation, such as the Italian

17  Swimming Federation, does not need FINA approval if the competition is one "in which foreign

18  clubs or individuals *not representing their Member Federation* participate."  FINA Rule BL 12.3

19  (emphasis added).  Swimmers in the ISL event would not be competing as representatives of their

20  member federation.  Thus, FINA approval was, under the plain terms of FINA's own rules, not

21  necessary.  And, in any event, regardless of how the rule is interpreted, FINA's restriction against

22  any member or swimmer participating in an unauthorized event is anti-competitive, with the intent

23  and effect of eliminating competition.

24       88.      ISL, through its counsel, responded by trying to revive the prior MOU that FINA

25  and ISL were negotiating before FINA's unreasonable demands.  If nothing else, ISL sought a

26  standstill truce so that ISL and the Italian Swimming Federation could carry out the Turin Event

27  and not lose their respective investments in it, with FINA and ISL to resume discussions, after the

28  Turin Event, over future competitions.  FINA refused to enter the standstill arrangement.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT      26
– CASE NO. 3:18-cv-7393-JSC

36144\12874754.1

89.     FINA was incensed that the Italian Federation would try to buck its authority.  As Mr. Neuburger wrote, that "the ba[]d person is [Italian Federation President] Paolo Barelli.  We must remember that and we must kill him . . . suspend him for years, not months, for trying to destroy FINA."

90.     Despite having already scuttled the possibility that ISL would co-host its December 2018 event with USA Swimming in Las Vegas, FINA also continued to apply pressure on USA Swimming to force the cancellation of the ISL Turin Event.  FINA knew that USA Swimming's "point of view" was important to other federations and worked hard to ensure that USA Swimming did not publicly do anything against FINA's wishes – including to maintain public support of ISL.  USA Swimming understood too that other member federations "wanted to know what we [*i.e.*, USA Swimming] was thinking" with respect to ISL, and that without USA Swimming's backing, the Italian Federation – like British Swimming before it – would be unlikely to defy FINA alone.  FINA thus continued to threaten USA Swimming throughout 2018 against associating with ISL anywhere, including in Turin.  And predictably, USA Swimming's eventual withdrawal was the Turin Event's death knell.

91.     The Turin Event was to be held shortly before Christmas.  Despite long being on FINA's radar—ISL had notified FINA of its intent for a late-December 2018 event no later than in a letter to FINA dated August 17, 2018—FINA insisted at the last minute that its approval was nevertheless necessary, knowing that its last-minute demand would make it impossible for ISL to give six months' notice and would therefore allow FINA to threaten athletes, and ban them from future events if necessary, for "unauthorised relations" if they participated in the meet.

**E.     FINA Threatens Swimmers And Compels The Aid Of Member Federations To Boycott The Turin Event And Thereby To Force Its Cancellation.**

92.     That is what happened.  Aware that the letter of its rules did not support its desired outcome, and citing the "urgency of the matter," FINA's top officers on October 26, 2018, circulated via e-mail a letter calling for its 25-member Bureau to vote to reinterpret the FINA rules.  FINA now wanted to interpret the rules to mean that any competition involving international swimmer participation needs FINA approval even if swimmers are competing solely

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT
– CASE NO. 3:18-cv-7393-JSC            27                    36144\12874754.1

1   as individuals or on teams that are not part of their FINA national federations.  That interpretation,

2   of course, effectively makes swimmers, including U.S. swimmers like Plaintiffs, worldwide

3   indentured servants of FINA.  As FINA's captives, swimmers can never compete in any event to

4   earn money for themselves without FINA's advance approval.  FINA's interpretation, given

5   FINA's market power derived from its designation as the sole IOC-recognized international

6   swimming federation, on its face is thus as blatantly anti-competitive as it is astonishingly brazen.

7   The purpose behind FINA's last-minute vote request was unstated in the October 26 e-mail calling

8   for a vote.  But it was unmistakably clear: the rules needed to be revised by FINA's

9   "interpretation" to prevent ISL's event from going forward.

10         93.     Thus, on October 30, the same day that the Bureau purportedly ratified FINA's rule

11  interpretation revision, FINA's Mr. Marculescu circulated a letter to all FINA members, notifying

12  them that the Turin Event "[was] not recognised by FINA."  He also explained that, pursuant to

13  the newly interpreted rules, FINA should have been notified of the competition more than six

14  months in advance.  Of course, FINA had long been on notice of the Turin Event and had been

15  negotiating with ISL over terms for its production, so this six-month notice excuse was a sham.

16  Moreover, even if FINA had been given no notice, which it had, FINA's 11th-hour rule

17  interpretation revision was purposefully designed to make timely notice impossible.  FINA further

18  explained that because no notice was given (which was not true), FINA had not approved the

19  competition.  Mr. Marculescu warned that all of the world's member federations should maintain

20  "a clear and mutual understanding of FINA's competence and jurisdiction in respect to

21  international competitions."  And he warned the dozens of swimmers who had entered contracts to

22  appear in the Turin Event that "FINA will further assess the development of this matter and will

23  consider consequences in application of [FINA punitive sanctions], as and where appropriate."

24         94.     ISL, in a letter sent by its counsel, urged FINA to rescind the vote and return to

25  discussions regarding a standstill truce that would allow the Turin Event to proceed as planned.

26  ISL's counsel  further explained in that letter that FINA's 11th-hour attempt to rewrite its rules

27  was both contrary to the letter and spirit of the FINA rules and, independently,  in obvious

28  violation of U.S. and EU competition law.  At that point there was still time for the Turin Event to

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT          28
– CASE NO. 3:18-cv-7393-JSC

36144\12874754.1

1    proceed.

2        95.    FINA refused to cease its illegal, anti-competitive conduct.  It instead doubled

3    down on its US-honed strategy to block the Turin Event and to destroy ISL.  Mr. Marculescu

4    separately wrote to the Italian Swimming Federation on the same day in an e-mail bearing the

5    subject line: "NON APPROVED EVENT – UNAUTHORISED RELATIONSHIPS."  The Turin

6    Event, he assured the federation, required FINA approval.  He noted also that, given that the

7    competition was set for December 21-22, 2018, and that the FINA rules required six months'

8    advance notice, any request for approval "would be clearly late."

9        96.    Through its clear threats to the world's top-tier swimmers, FINA now stood firmly

10   between member federations supportive of ISL's approach generally, and the Turin Event in

11   particular, and the swimmers seeking to expand their opportunities.

12       97.    FINA did not just leave it to its successful coercion of member federations to

13   convey FINA's threats against swimmers' participation in the ISL event.  FINA also directly

14   confronted top swimmers or their coaches.  During the fifth stage of FINA's World Cup series,

15   held November 2-4, 2018, in Beijing, Mr. Marculescu, accosted world-renowned swimmer

16   Katinka Hosszú's coach while she was warming up before a race.  He warned: if Ms. Hosszú

17   insisted on participating in ISL's event, she would be banned from competing in the upcoming

18   FINA World Swimming Championships.

19       98.    Over the half a dozen years since her first FINA World Cup series win in 2012, Ms.

20   Hosszú had become the exclamation mark in FINA's headline swimming competitions.  By the

21   time Mr. Marculescu threatened her coach in Beijing over ISL, FINA had thrice named Ms.

22   Hosszú "Swimmer of the Year."  In addition to her victory in 2012, Ms. Hosszú had won the

23   2013, 2014, 2015, and 2016 World Cup series and finished second in 2017 (which she went on to

24   do again in 2018).  She had won 12 individual gold medals at FINA's biennial World Swimming

25   Championships, including six in 2016.  Along the way, Ms. Hosszú had become the sport's top

26   prize-earner, the first to break $1 million.

27       99.    But at the prospect of seeing Ms. Hosszú swimming in an "unauthorized" event

28   hosted by a competitor, FINA threatened to cut her off completely and to destroy her career.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT          29                                    36144\12874754.1
– CASE NO. 3:18-cv-7393-JSC

1    100.    Shortly after Mr. Marculescu's poolside pressure, and in light of FINA's despotic

2    command, member federations around the world fell in line.

3    101.    There was no doubt that the federations would support FINA's command and give

4    force to FINA's threat of sanctions.  The national federations exist primarily, if not exclusively, to

5    prepare and present swimmers for competition in the Olympic Games.  Their relationship with

6    FINA is necessarily delicate and subservient to FINA's demands: FINA, through its Bureau, has

7    sole authority to recognize national federations, and it may terminate any member "for significant

8    violation of FINA Rules." *See* FINA Rule C 10.3.  Given FINA's repeated missives against ISL's

9    efforts, there was no mistaking that allowing swimmers to participate would constitute a

10   "significant violation." And, in any event, FINA had just displayed its willingness and ability to

11   re-interpret and revise its rules as it saw fit to keep out any competition and to keep the swimmers

12   in FINA's thrall.

13   102.    So, the federations did what FINA told them to do.

14   103.    On November 6, 2018, the Swiss federation sent out an e-mail in which it

15   "explicitly propose[d]" to its swimmers "**to <u>not</u> participate in the "Energy for Swim" [ISL]**

16   **Event 2018!**" If Swiss swimmers ignored that directive, "the Swiss Swimming Federation, as a

17   FINA member organization, would be forced by FINA, [sic] to ban you for at least 1 year from all

18   competition measures."

19   104.    Likewise, a lawyer for the Russian Olympic Committee advised on November 12,

20   2018, the nation's swimming federation members that in light of the FINA directive, athletes

21   participating in the Turin Event would be disqualified from competing in FINA and federation

22   events for one to two years.  Thus, both the Swiss and Russian federation felt compelled to

23   threaten sanctions beyond banning swimmers from just FINA events and the Olympics.

24   105.    USA Swimming representatives held a conference call with national team members

25   to discuss the December 2018 Event and FINA's threat.  Swimmers were told by those

26   representatives that in light of FINA's power over the sport—and particularly access to the

27   Olympic Games—the national federation was in a difficult position.  Reluctantly, it informed the

28   swimmers that it would have no choice but to comply with any FINA directive to punish

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT        30
– CASE NO. 3:18-cv-7393-JSC

36144\12874754.1

swimmers who participated in the Energy for Swim Turin Event.

106. USA Swimming saw that FINA was expanding its anticompetitive threats from solely the United States to now the entire globe. As Mr. Unger wrote, FINA's strategy "has now [as of November 1, 2018] mushroomed into a challenge for athletes and federations around the world, not just USA." The result of FINA's scheme was that USA Swimming was prevented not only from associating with ISL in Las Vegas but anywhere in the world. And as with Las Vegas, Mr. Unger agreed with Dutch Federation leaders that the ISL-Italian Federation partnership did not break any FINA rules: "ISL seemed to have generally followed the rules, and by inviting the athletes separate from inviting the federations, all seemed in order (BL 12.3). However, FINA's [October 30] letter places all invited athletes (and by connection, their federations) squarely in between ISL and FINA."

107. FINA knew that USA Swimming was one of, if not the, most important member federation. Indeed, USA Swimming's withdrawal from the Turin Event forced the hand of other federations to do the same. Similar to USA Swimming, federations around the world sent e-mails, letters, and had similar conference calls with their swimmers, underscoring the impossible position that FINA had put them in. *See, e.g.* Julian Linden, *Our golden girls unite for swimmers' rights*, Daily Telegraph, Dec. 4, 2018 (quoting Australian federation chief executive: "[W]e're the meat in the sandwich. . . . We support our athletes but at the same time we are also a part of FINA so we're pretty much in the middle."). Critically, the federations, or at least several of the key federations, specifically discussed the issue with each other before determining and agreeing that FINA left them no choice but to put muscle behind FINA's threats. *See id.* (Australian federation executive: "We've discussed the issue with the US, South Africa, the UK and so on[.]").

108. Given that the national member federations (and/or their designee for the sport of swimming) exist to promote the interests of their athletes, however, there is no legitimate explanation for why they would agree among themselves and with FINA to help enforce FINA's threat to ban swimmers from the Olympics if they participated in the Turin Event. The only logical explanation for their doing so was to help try to ensure that only FINA and its member federations would remain the only entities able to organize and promote top-tier international

swimming competitions and thereby profit from those events.

109.   While plans for the Turin Event crumbled under FINA's pressure, ISL and its allies nonetheless tried again to salvage it.

110.   Although, FINA's last-minute rule reinterpretation was patently unreasonable, USA Swimming, in an e-mail sent on or around November 6, 2018, urged ISL and the Italian Swimming Federation nevertheless to accept FINA's determination that the Turin Event would be an "international competition" and instead seek an "exception" to the six-month notice requirement.  Such exceptions had been granted before, USA Swimming's representative noted. And granting it again would allow ISL to develop its league approach—which USA Swimming "continue[s] to believe is an excellent concept."  Absent FINA mercy, however, the picture was dire, because "USA Swimming is also bound by FINA rules, and we (our athletes and USA Swimming) are caught in a predicament."  FINA's positive reaction "would help solve this immediate challenge for athletes and federations."

111.   But, having so successfully waged its war of intimidation against the federations and swimmers—both personally and through member federations with no real choice but to comply—FINA refused.  Thus, given the real threat to the livelihoods and dreams of the swimmers facing FINA's threat of suspension, the Italian Swimming Federation and ISL canceled the Turin Event on November 15, 2018, under protest.  The Italian Swimming Federation notice, sent out via letter over the federation president's signature, bemoaned "the absence of any explanation or evidence to genuinely justify FINA's actions," concluding "that FINA's true motive is to safeguard its dominant position as the sole and exclusive license holder of aquatics sports."

112.   News of the cancellation at FINA's hands spread across the sports world.  Athletes criticized FINA on social media.  Adam Peaty, an Olympic gold winner and five-time World Champion, reported on Twitter that he was "incredibly disappointed" that the Turin Event was cancelled and suggested that swimmers "need to ask why."  *See Adam Peaty criticises decision to scrap International Swimming League*, BBC, Nov. 15, 2018, https://www.bbc.com/sport/swimming/46224766.  On the other side of the globe, Olympic gold

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT
– CASE NO. 3:18-cv-7393-JSC                    32                          36144\12874754.1

medalist Cate Campbell complained that FINA was clearly "putting swimmers at the bottom of its priority list."  *See* Julian Linden, *Our golden girls unite for swimmers' rights*, Daily Telegraph, Dec. 4, 2018.  She added "I can guarantee that just about any athlete in the world would have said that this ISL is a good thing . . . but FINA's worried that it's going to cut down on its revenue."  *Id.*  News outlets, meanwhile, noted the obvious: the Turin Event evaporated only because of FINA's threat.  *See, e.g.*, Graham Dunbar, *Swim meet canceled after FINA's threat to ban athletes*, Associated Press, Nov. 15, 2018, https://www.washingtonpost.com/sports/swim-meet-canceled-after-world-bodys-threat-to-ban-athletes/2018/11/15/8c4241d4-e8e8-11e8-8449-1ff263609a31_story.html?utm_term=.fb66362c322c.

113.    For its part, having been called out for its failure to justify its anti-competitive squeeze against ISL, FINA created after-the-fact pretexts for its nakedly anti-competitive conduct, dissembling in a November 16, 2018, statement that its conduct was necessary to maintain a "coherent" and "healthy" event calendar consistent with FINA's "long-standing agreements and precedents."  The Turin Event, FINA said, "adds an extra layer of complexity."  *See FINA Statement*, Nov. 16, 2018, at http://www.fina.org/news/fina-statement-2.  What that meant, exactly, remained unexplained.  Neither did FINA provide any further detail or rationale for its anti-competitive conduct in a December 3, 2018, letter to FINA members.  In that letter, sent over Mr. Marculescu's signature, FINA reiterated its vague concern for the "harmonious development of the calendar," and suggested that was the reason it exerted its overwhelming power to crush the Turin Event.  Further, and highlighting the fact that FINA intends to limit competition and keep itself, alone, atop the market, he wrote that "FINA will resist any challenges to its status as the international non-governmental organisation governing the sport of swimming at the world level[.]"

114.    FINA was waging war against ISL on multiple fronts around this time.  By December 2018, ISL had contracted with Los Angeles-based sports marketing company Wasserman in an effort to grow its brand.   Two days after FINA's December 3 letter, Wasserman suddenly severed its ties with ISL.  Casey Wasserman is a Wasserman principal and chairman of the Los Angeles Olympic Committee.  On information and belief, FINA either directly, or through

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT
– CASE NO. 3:18-cv-7393-JSC

33

36144\12874754.1

1  the International Olympic Committee, directed the Wasserman Company to cease its relationship

2  with ISL.

3      **F.      FINA Threatens USA Swimming From Any Future Affiliation With ISL.**

4      115.    Mr. Neuburger knew that, despite FINA having successfully scuttled the Las Vegas

5  event, USA Swimming still desired to work with ISL to organize other events in the United States.

6  Mr. Neuburger continued to repeat FINA's earlier threats when USA Swimming expressed such

7  desires, including in a December 22, 2018 email to Mr. Unger where he warned that continued

8  association with ISL would put "USA Swimming squarely at the center of this situation, not on the

9  sidelines."  FINA would view an ISL-USA Swimming event "as evidence that USA Swimming

10 has taken sides [against FINA] and is collaborating with ISL.  Like or not, fair or not . . . that is the

11 harsh reality."  Mr. Neuburger continued: "Bottom line: USA Swimming will need to make an

12 uncomfortable decision that will make FINA unhappy or ISL/athletes unhappy.  But I don't think

13 you will be able to sit on the fence or be a bystander to the situation."

14     116.    FINA also continued to pressure USA Swimming by refusing to withdraw FINA's

15 threat to use General Rule 4 to sanction USA Swimming or U.S. swimmers if either staged an

16 event with ISL.  According to Mr. Unger, such a threat put U.S. swimmers "at peril" and made

17 any future ISL event "impossible."

18     **G.      FINA, Having Dispatched The ISL Threat, Misappropriates Its Innovations
            With Its Own Imitation Events.**

20     117.    Finally, on December 5, 2018, FINA revealed its true motives.  Having

21 successfully halted ISL's momentum in the United States and globally, FINA then scheduled its

22 own series of events that imitated ISL's planned format with increased prize money of almost

23 exactly the same amounts.  FINA held one such event from May 31-June 1, 2019 in Indianapolis.

24 With ISL out of the way, FINA's move on the lucrative United States market is no surprise; FINA

25 believed that "[i]t was important for a FINA event to be held in the United States for [USA

26 Swimming] to be supportive and active."

27     118.    Mr. Marculescu and Mr. Neuburger both described how they repeatedly

28 "pressured" USA Swimming to host FINA's inaugural, higher-money event in Indianapolis.  As

Mr. Neuburger wrote, "I will continue to put pressure on USA Swimming to help FINA with American stars ready to compete in the three meet series over the next several months.  They cannot sit on the sidelines, or worse, help ISL and not FINA."  The next day Mr. Neuburger wrote to Mr. Marculescu: "My message to Unger is clear: USA Swimming needs to be very active in recruiting American swimmers to the three FINA meets.  We already know that he worked hard with ISL in the past to put together teams . . . now he must work harder for USA Swimming."  FINA's pressure was indeed felt by USA Swimming, as its CEO Tim Hinchey wrote to a Swimming Canada contact, "As I'm sure you've seen, read, or been told, Cornel has announced his version of the ISL format by FINA.  He's putting pressure on us to host and kick off the series."

119.    When FINA announced that it would itself be launching an "innovative" new competition in 2019 to attract "the best athletes" in the sport, FINA again maneuvered that the ISL event was sprung on FINA at the last minute and allegedly could not be approved due to "short notice."  *See* Nick Hope, *Adam Peaty criticism leads to FINA promising to 'modernise,'* BBC, Dec. 5, 2018, https://www.bbc.com/sport/swimming/46449762.  But repeating this misdirection did not make it true.  And FINA could not hide reality: Having  just three weeks before rationalized its crackdown against ISL because the additional ISL meets would unduly disrupt the FINA calendar, FINA now intended to add *its own* contests to the race calendar—and, on information and belief—in a format that will closely follow, if not outright copy, the team-based, short-course innovations that ISL and its affiliates have developed for years.

120.    Meanwhile, ISL, through Mr. Grigorishin's letter to swimmers, including Plaintiffs, vowed to pay the dozens of swimmers who had signed up for the Turin Event with appearance-fee contracts half of their fees even though FINA forced its cancellation.  Despite the setback, he said, ISL will continue to plan similar competitions: "Our ambitious plans for 2019 remain undiminished."  Plaintiffs, and other top-tier swimmers like them, would like to be able to participate in such future events without interference from FINA, and indeed, they did when – after ISL sued FINA herein and FINA reinterpreted its "unauthorized relations" rule again to permit member federations to partner with unapproved entities – ISL kicked off its first events in

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT
– CASE NO. 3:18-cv-7393-JSC                 35                          36144\12874754.1

1  the fall and winter of 2019, including one finally in Las Vegas.  But that ISL is now beginning to

2  regain its foothold in the market in no way excuses FINA's handicapping it in the first place.

3  **V.      FINA'S UNLAWFUL MONOPOLY AND MONOPSONY**

4          **A.      FINA's Unlawful Monopoly Power In The Market For Top-Tier International
                   Swimming Competitions**

5

6                  **1.      The Organization And Promotion Of Top-Tier International
                           Swimming Competition Constitutes The Relevant Product Market.**

7          121.    The relevant product market for Plaintiffs' monopoly claims is the market for the

8  organization and promotion of top-tier international swimming competitions.

9          122.    FINA itself and other entities that FINA approves organize and promote

10  international competitions featuring the world's top swimmers.  These events are held in venues

11  around the world.  The event organizers sell tickets to these events.  These events also generate or

12  are able to generate broadcast rights, merchandise, sponsorships, and collection of royalties or

13  other income derived from FINA, or from event-related intellectual property rights.

14          123.    A commercially successful promotion of a top-tier international swimming

15  competition requires multiple events of different styles and distances.  It necessarily requires the

16  participation of top-tier swimmers.  Such athletes are generally deemed to be swimmers who have

17  reputations for winning international competitions or specific events at such competitions,

18  including but not limited to the Olympic Games, the FINA Swimming World Cup, the FINA

19  World Swimming Championships, and the FINA World Championships.  The top-tier swimmers

20  are often, but not necessarily, athletes who swam for NCAA Division I collegiate teams and/or are

21  members or prior members of their country's national team.  Top-tier swimmers are also those

22  who have either set national or world records in their respective events, or have closely competed

23  with or defeated those swimmers who have.  Such swimmers are well-known in the swimming

24  community and can and do attract a large audience of fans.  These athletes have almost universally

25  trained intensively since they were children.

26          124.    Top-tier swimmers enjoy brief careers.  The youngest are most likely to be in their

27  mid- to late teenage years, and those in their late twenties are generally considered to be in the

28  twilight of their careers.  Thus, even a two-year ban from FINA-approved competitions can cause

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT   36
– CASE NO. 3:18-cv-7393-JSC                    36144\12874754.1

1    top-tier swimmers to lose significant earning potential and brand-development opportunities for a

2    substantial portion—as much as one-fifth or one-quarter—of their careers.  The mere threat of

3    such a ban is sufficient to coerce most or all swimmers not to defy FINA.

4    125.    The organization and promotion of top-tier international swimming competitions is

5    not reasonably interchangeable with the promotion of any other sporting event.  Consumers who

6    attend top-tier international sporting events do so because of their dedication to, and appreciation

7    of, the sport and its best athletes.  Given that dedication and appreciation, as well as the many

8    differences between competitive swimming and other sports, such as soccer, American football,

9    baseball, and the like, other sporting events—including other *aquatic* events, such as high-diving

10   and artistic swimming—are not interchangeable with top-tier international swimming

11   competitions.  For similar reasons, the organization and promotion of top-tier international

12   swimming competitions is not reasonably interchangeable with the promotion of any other form of

13   entertainment.  Similarly, the highly specialized skills required to participate in the market as a

14   supplier of talent—*i.e.*, a swimmer—means that other aquatic events are not substitute uses of

15   swimmers skills and generally cannot serve as a viable competitor for their services.  This means

16   that any firm that is able to exclude other organizers of competitive swimming events effectively

17   has both monopoly control over consumers (as well as ancillary participants in event production)

18   and monopsony control over swimmers.

19   126.    Indeed, if FINA or FINA-approved event organizers were to raise ticket prices,

20   increase sponsorship or host-city fees, and impose other higher costs related to the organization

21   and promotion top-tier international swimming events by a small, but significant amount over a

22   non-transitory period of time, those increases would not decrease the net income or profit that

23   FINA or the FINA-approved organizers enjoy from exploitation of this market.

24   127.    The relevant geographic product market is the entire world.  Top-tier international

25   swimming competitions are held in cities across the globe.  Competitions may be organized, in

26   effect, anywhere a sufficiently sized pool exists or may be installed, which means events can be

27   and are held without regard for climate or topography of any particular location.  Specifically,

28   several FINA events or FINA-approved events featuring top-tier swimmers from multiple

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT       37
– CASE NO. 3:18-cv-7393-JSC

36144\12874754.1

1   countries occur in cities around the world every year.  Further, top-tier international swimming

2   competitions are governed generally by the same technical rules and types of races, regardless of

3   where such competitions are held.  The existing top-tier international swimming competitions also

4   draw audiences and patrons from around the world.

5        128.    Moreover, FINA's conduct has caused obvious and actual anti-competitive effects.

6   Not least of these was  the forced cancellations of the Las Vegas and Turin events, a result that

7   necessarily reduced output of the market by depriving customers of a top-tier international

8   swimming competition—a group that includes fans, broadcasters, media, sponsors, and

9   licensees—the opportunity to attend, view or profit from such competitions.  The blatantly anti-

10   competitive effects are so obvious that the general contours of a market defined as set forth above

11   are more than sufficient to allow the jury to determine the scope and legality of FINA's monopoly

12   power.

13               **2.     FINA Has Unlawfully Monopolized Or Attempted To Monopolize The
                        Market For Top-Tier International Swimming Competitions.**
14

15        129.    FINA's control over and power in the market for top-tier international swimming

16   competitions is so complete that FINA constitutes a monopoly.

17        130.    FINA obtained and maintains that monopoly power over the market through anti-

18   competitive conduct as alleged in this Complaint.  FINA's exclusive ability to control access to

19   the Olympic Games, among other high-profile and potentially lucrative competitions, grants it

20   immense power over the world's swimmers.  Further, FINA's rules against unauthorized

21   relationships serve, intentionally, to restrict competitors' access to the necessary inputs—chiefly,

22   the services of top-tier swimmers—to enter into and compete in the market.

23        131.    Specifically, and as set forth above, FINA grants itself complete authority under its

24   rules to ban a swimmer from participating in events that serve as the Olympic Games qualifying

25   events for no reason other than the swimmer competed in a top-tier international swimming event

26   that FINA did not itself organize or approve.  Whether FINA does or does not actually ban such a

27   swimmer, the threat is real and severe enough to devastate competitive swimming.  Because of the

28   importance of the Olympic Games to participants in the labor market, this threat essentially gives

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT        38
– CASE NO. 3:18-cv-7393-JSC

36144\12874754.1

1  FINA monopsony control over the labor market, which in turn provides its monopoly power over

2  the non-Olympic portion of the output market.

3       132.    As alleged below, FINA's power to so control and restrict access to the Olympic

4  Games constitutes monopsony power over the market for top-tier swimmer services.  That

5  unlawful power grants FINA the means to force all top-tier swimmers to deal exclusively with

6  FINA and thereby to foreclose competition in the market for the organization and promotion of

7  top-tier international swimming competitions.  It is this simple: If FINA tells top-tier swimmers

8  that they cannot compete for the Olympic Games if they provide their services to ISL events, those

9  swimmers are effectively *forced under economic coercion to back out of their contracts* with ISL

10 and/or with ISL-affiliated entities to compete at ISL events.  FINA's anti-competitive strategy thus

11 results in a complete restriction of the supply of top-tier swimmers, without which ISL and others

12 cannot compete in the market for organizing and promoting such competitions.  It also serves to

13 enforce a monopsony of that related labor market, giving FINA a 100 percent share, or nearly a

14 100 percent share, of all world-class swimmers.  The result is that FINA has a 100 percent share,

15 or near 100 percent share, of top-tier international swimming events.

16      133.    FINA's exercise of such power is not merely theoretical.  Among other examples,

17 FINA's suppression of the planned Las Vegas and Turin events constitutes direct evidence of

18 FINA's monopsony power.

19      134.    In the alternative, FINA's conduct as described in this Complaint constitutes

20 attempted monopolization.  Its efforts to prevent ISL from promoting and organizing an

21 independent top-tier international swimming competition and to restrict the ability of top-tier

22 swimmers from competing in ISL events were at a minimum likely to result in the monopolization

23 of the market for promoting and organizing such events.  FINA intended to acquire such power

24 over the market, as evidenced by, among other facts alleged above, its multiple statements

25 regarding ISL's non-recognition and its overt threats to member federations and top-tier swimmers

26 who might have otherwise participated in hosting or competing in ISL events.  FINA's conduct

27 effectively prevented ISL from organizing its events and, if left unchecked, will continue to

28 prevent ISL and others from competing in the market, such that FINA's attempted

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT      39
– CASE NO. 3:18-cv-7393-JSC

36144\12874754.1

1   monopolization—if not already achieved—will be permanently realized.

2   **B.    FINA's Unlawful Monopsony Power In The Market For The Services Of Top-Tier Swimmers**

3   **1.    The Services Of Top-Tier Swimmers Constitutes The Relevant Input Market.**

4

5   135.    The relevant input market for Plaintiffs' monopsony claims is the market for the

6   organization and promotion of top-tier international swimming competitions.

7   136.    As alleged above, top-tier swimmers are generally deemed to be athletes who have

8   won international competitions or specific events at such competitions, including but not limited

9   to the Olympic Games, the FINA Swimming World Cup, the FINA World Swimming

10  Championships, and the FINA World Championships.  The top-tier swimmers are often, but not

11  necessarily, athletes who swam for NCAA Division I collegiate teams and/or are members or prior

12  members of their country's national team.  Top-tier swimmers are also or alternatively those who

13  have either set national or world records in their respective events or have closely competed with

14  or defeated those swimmers who have.  Such swimmers are well-known in the swimming

15  community and can, and do, attract a large audience of fans.  These athletes have almost

16  universally trained intensively since they were children.

17  137.    As noted above, top-tier swimmers enjoy only brief careers that generally end by

18  the time they reach 30 years old.  They accordingly must do what they can to maximize their

19  potential during the limited swimming career they can enjoy.  Even aside from being barred from

20  the Olympic Games, a two-year ban from FINA-approved events can be expected to result in

21  major income loss for a substantial portion of their life as a top-tier swimmer.

22  138.    Top-tier swimmers are compensated in various ways.  Those who are members of

23  their national teams frequently enjoy some level of stipend or other direct financial support.  Up to

24  60 members of the U.S. national team who have exhausted or have agreed to forego their

25  eligibility to swim for collegiate teams, for example, are paid a monthly stipend of up to $3,000

26  per month.  Beyond that, top-tier swimmers earn prize money depending on their level of success

27  at international competitions, sponsorships or endorsements that to a significant extent depend on

28  the swimmers' success in the pool.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT
– CASE NO. 3:18-cv-7393-JSC                40

36144\12874754.1

139.     Athletes who are considered top-tier swimmers cannot reasonably switch to other non-swimming sports and perform at or near the same level.  Top-tier swimmers have generally spent their entire lives training their skill set and preparing their bodies for prowess in the pool. While the level of athleticism that top-tier swimmers inherited and developed is necessary for any crossover success in other, non-swimming sports, it is not sufficient for such crossover endeavors. Top-tier swimmers could not transition to other sports in materially sufficient numbers to prevent a buyer of their services from obtaining and exploiting monopsony power for top-tier swimmer services or to prevent that monopsonist from artificially suppressing the compensation paid to those swimmers by even a large amount for a long period of time.

140.     The relevant geographic market for the services of top-tier swimmers is the entire world.  There are only a few hundred such swimmers across the entire world, and while large proportions of these swimmers reside in a few countries (*e.g.*, the United States), top-tier swimmers can compete and earn reasonable compensation for their services only in a market that allows them to compete with the best swimmers, wherever they may reside.  Necessarily, top-tier international swimming competitions that rely on the swimmers' services include swimmers from multiple nations and are held throughout the world.

141.     Moreover, FINA's conduct has caused obvious and actual anti-competitive effects. Not least of these is the complete restriction on swimmers' participation in the Las Vegas and Turin events.  The anti-competitive effects of FINA's restriction of the input market are so obvious that the general contours of the input market defined as set forth above are more than sufficient to allow the jury to determine the scope and legality of FINA's monopsony power.

**2.     FINA Has Unlawfully Monopsonized Or Attempted To Monopsonize The Market For The Services Of Top-Tier Swimmers.**

142.     FINA's control over and power in the market for the services of top-tier swimmers is so complete that it constitutes a monopsony.  FINA obtained and maintains, or attempts to obtain and maintain, that power over the market through the anti-competitive conduct alleged in this Complaint.  FINA's exclusive ability to control access to the Olympic Games, among other high-profile and potentially lucrative competitions, grants it immense power and control over the

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT      41
– CASE NO. 3:18-cv-7393-JSC

36144\12874754.1

1   world's swimmers.  Further, FINA's rules against unauthorized relationships serve, intentionally,

2   to prevent top-tier swimmers from offering their services to organizers and promoters of top-tier

3   international swimming competitions that are not FINA-approved.

4           143.    Specifically, and as set forth above, FINA enjoys complete authority under its

5   rules—as set, interpreted, and enforced by FINA and its member federations—to ban a swimmer

6   from participating in events that serve as the Olympic Games qualifying events for no reason other

7   than the swimmer competed in a top-tier international swimming event that FINA did not itself

8   organize or approve.  Whether FINA does or does not actually ban such a swimmer, the threat is

9   real and severe enough to prevent swimmers from participating in non-FINA events on the

10  swimmers' hope that FINA will not enforce its rules and will not follow through with its ban

11  threat.  The threat is also sufficiently credible that countries' federations warn swimmers not to

12  participate in non-FINA events on pain of being banned, as alleged above.

13          144.    FINA's power and control grants it the means to foreclose top-tier swimmers'

14  ability to service non-FINA competitions, and specifically ISL, and to suppress the non-FINA

15  demand for those swimmers' services.  FINA's exercise of such power is not merely theoretical.

16  Among other examples, FINA's crackdown against the December 2018 Event unlawfully

17  prevented top-tier swimmers *who already had contracts to participate* from proceeding in that

18  event.  FINA thus with its boycott unlawfully deprived ISL of the opportunity to pay top-tier

19  swimmers for their services.

20          145.    In direct response to the Turin Event, and on the heels of forcing its cancellation

21  by leveraging its monopsony power to restrict the supply of top-tier swimmers available to

22  compete in that event, FINA on November 6, 2018, announced that it would increase the total

23  prize money available at the FINA World Swimming Championships, set for December 11-16,

24  2018.  Just days before announcing that increase, FINA had confirmed that prizes for its

25  championship competition would remain at just below $1.2 million.  But it had since sabotaged

26  the Turin Event, drawing criticism from swimmers and fans around the world.  In a sop to

27  swimmers, FINA now increased the total prize money from about $1.2 million to about $2

28  million.  Even in raising prize money, FINA demonstrated its market power: the ability to control

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT        42
– CASE NO. 3:18-cv-7393-JSC

36144\12874754.1

1  price, independent of any changes in market conditions.  This is a textbook definition of market

2  power.

3        146.    Moreover, FINA's conduct as described in this Complaint constitutes attempted

4  monopsonization of the market for the services of top-tier swimmers.  Its rules and efforts to

5  prevent top-tier swimmers from competing in ISL events—or in any other unauthorized event—

6  are at a minimum likely to result in the monopolization of this market.  FINA has intended to

7  acquire such power over the market, as evidenced by, among other facts alleged above, its

8  unambiguous market-restricting rules, its multiple statements regarding ISL's non-recognition,

9  and its overt threats to member federations and top-tier swimmers who might have otherwise

10  hosted or competed in ISL events.  FINA's conduct precluded dozens of top-tier swimmers from

11  participating in the Las Vegas and Turin events.  If left unchecked, FINA will continue to prevent

12  top-tier swimmers from offering their services to competing buyers in the market, such that

13  FINA's attempted monopsonization—if not already achieved—will be permanently realized.

14        147.    As a result of FINA's unlawful monopsony over the input market, swimmers see

15  lower compensation levels than they would earn in a competitive market.  They also suffer a

16  reduction in opportunities to compete.  Further, it diminishes the sport generally by dynamically

17  lowering the incentive for future top-tier swimmers to dedicate the significant energy and

18  resources into becoming the best and entering the market, an outcome that, by the fact of reduced

19  competition, makes it less likely that records will be broken or threatened by more swimmers,

20  which in turn lowers interest in the sport.

21                      **CLASS ALLEGATIONS**

22        148.    Plaintiffs bring this action on behalf of themselves and all others similarly situated

23  (the "Proposed Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).

24  The Proposed Class is defined as:

25          All natural persons who are eligible to compete in swimming
        world championship and Olympic Game competitions. Excluded

26          from this class are members of the boards of directors, boards of
        trustees, boards of governors, and senior executives of FINA and

27          its member federations, and any and all judges and justices, and
        chambers' staff, assigned to hear or adjudicate any aspect of this

28          litigation.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT
– CASE NO. 3:18-cv-7393-JSC        43                            36144\12874754.1

1

      **A.**      <u>**Numerosity**</u>

2

      149.     Plaintiffs do not, as yet, know the exact size of the Proposed Class, because such

3

information is in the exclusive control of FINA and its co-conspirators. Upon information and

4

belief, based upon the nature of the trade and commerce involved, there are hundreds of members

5

of the Proposed Class residing in multiple countries. Joinder of all members of the Proposed Class,

6

therefore, is not practicable.

7

      **B.**      <u>**Commonality**</u>

8

      150.     The questions of law or fact common to the Proposed Class include but are not

9

limited to:

10

            a.      whether FINA's conduct violates the Sherman Act;

11

            b.      whether FINA's conspiracy and associated agreements restrains

12

                    trade, commerce, or competition for elite swimmers;

13

            c.      whether Plaintiffs and the Proposed Class are suffering antitrust injury

14

                    or have been threatened with injury;

15

            d.      whether injunctive relief is necessary for Plaintiffs and the Proposed

16

                    Class to be able to swim in any international competition free from

17

                    FINA's threats of banishment from other international competitions,

18

                    including the FINA World Championships and the Olympic Games;

19

            e.      whether FINA and its co-conspirators have acted or are acting on grounds

20

                    generally applicable to the Proposed Class, thereby making final

21

                    injunctive relief appropriate with respect to the Proposed Class as a

22

                    whole;

23

            f.      the difference between the compensation Plaintiffs and the Proposed Class

24

                    receive from FINA and its co-conspirators, and the potential compensation

25

                    Plaintiffs and the Class would receive from FINA and its co-conspirators

26

                    in the absence of the illegal acts, contracts, combinations, and conspiracy

27

                    alleged herein;

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT    44
– CASE NO. 3:18-cv-7393-JSC

36144\12874754.1

g.      whether FINA and its co-conspirators has engaged or is engaging in a combination and conspiracy among themselves to agree to prevent Plaintiffs and the Proposed Class from swimming in competitions of their choice in the United States and around the world;

h.      whether FINA and its co-conspirators has engaged or is engaging in a combination and conspiracy among themselves to agree to threaten to ban Plaintiffs and the Proposed Class from swimming in FINA World Championships and the Olympic Games if they participated in swimming competitions in the United States and around the world that FINA had not approved; and

i.      the type and measure of damages suffered by Plaintiffs and the Proposed Class.

151.    These and other questions of law and fact are common to the Proposed Class, and predominate over any questions affecting only individual members of the Proposed Class.

**C.      Typicality**

152.    Plaintiffs' claims are typical of the claims of the Proposed Class. Like all members of the Proposed Class, Plaintiffs have been harmed by FINA's unlawful conduct in that FINA has prevented and continues to prevent them from participating in ISL events, or other top-tier international swimming competitions that FINA does not formally approve, by threatening to ban them from future FINA events. Likewise, like all members of the Proposed Class, Plaintiffs have been harmed by FINA's unlawful conduct in that FINA effectively forced the cancellation of the Turin Event, thereby depriving them (and all members of the Proposed Class) from competing in that event. Further, Plaintiffs' damages, in the form of unrealized appearance fees, are typical of those suffered by all of the Proposed Class members. The factual bases for the claims of the Proposed Class are common to all members, and their claims arise from a common course of unlawful conduct.

**D.      Adequacy of Representation**

153.    Plaintiffs will fairly and adequately represent the interests of the Proposed Class

1    and have no conflict with the interests of the Proposed Class.

2        154.    Plaintiffs have retained counsel experienced in antitrust and class action litigation

3    to represent themselves and the Proposed Class.

4        **E.**    **Superiority**

5        155.    This class action is superior to the alternatives, if any, for the fair and efficient

6    adjudication of this controversy. Prosecution as a class action will eliminate the possibility of

7    repetitive litigation. There will be no material difficulty in the management of this action as a class

8    action. By contrast, prosecution of separate actions by individual members of the Proposed Class

9    would create the risk of inconsistent or varying adjudications, and be inefficient and burdensome

10   to the parties and the Court.

11                           **FIRST CAUSE OF ACTION**

12            **Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**

13       156.    Plaintiffs incorporate and re-allege the foregoing allegations as if set forth fully in

14   this paragraph.

15       157.    FINA successfully compelled the support of multiple national federations to agree

16   among themselves and with FINA to carry out FINA's conduct described above.  Those national

17   federations are economic actors independent from each other and from FINA.  Because the

18   member federations and FINA are competitors in the market for the promotion and organization of

19   top-tier international swimming competitions, the resulting agreements to act as described above

20   constitute a horizontal agreement.  In the alternative, and as the result of its framework as set forth

21   above, FINA is the instrumentality of its member federations and its conduct therefore is

22   necessarily the result of a horizontal agreement.

23       158.    Those national federations, through promulgation and interpretation of FINA rules

24   and FINA's threats to those federations, have entered into a continuing agreement, combination, or

25   conspiracy in restraint of trade.

26       159.    The agreement, combination, or conspiracy is driven by the intent to restrain, and it

27   certainly has the effect of restraining, competition in the market for both the supply of labor of

28   world-class swimmers and the prices which those swimmers can command at international

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT        46        36144\12874754.1
– CASE NO. 3:18-cv-7393-JSC

1    competitions.

2         160.    As a result of the FINA-compelled agreement, combination, or conspiracy between

3    itself and its economically independent member federations, FINA enjoys exclusive control over

4    top-tier international swimming competitions.  FINA either hosts such events itself or requires

5    entities seeking to host such competitions to obtain FINA approval before those events may

6    effectively be held.

7         161.    The FINA-driven agreement, combination, or conspiracy and in particular the

8    conduct that resulted in the cancellation of the Las Vegas and Turin events, had the specific intent

9    of suppressing ISL's efforts to enter the market and to broaden the opportunities for the world's

10   top swimmers.  FINA and its conspirators control the market for international swimming

11   competitions completely, and the successful plan to block ISL from entering the market is a naked

12   attempt to maintain that control and deprive swimmers of additional opportunities, thereby

13   depressing the prices the swimmers may command for their participation and successes in

14   international competitions.  Further, the concerted refusal to deal with ISL absent ISL's total

15   capitulation to FINA's demand for tribute, directly prevented ISL and the world's top swimmers

16   from forming relationships or, in some cases, to see the relationships that have been formed, from

17   bearing commercial fruit.  As such, the FINA-driven agreement, combination, or conspiracy

18   constitutes an unlawful boycott against ISL that effectively deprived ISL of the supply of labor

19   from the world's best swimmers.  The anti-competitive nature of this conduct is manifest. And

20   FINA cannot provide any plausible pro-competitive or other justification.  As such, the conduct

21   constitutes a *per se* violation of Section 1 of the Sherman Act.

22        162.    Further, the FINA-driven agreement, combination, or conspiracy has resulted in an

23   agreement, understanding, or concerted action between and among FINA and FINA's co-

24   conspirators that results in competitive and economic advantages to FINA over all other non-

25   FINA entities that are located in the United States or, like ISL, that intend to organize for

26   commercial purposes international competitions in the United States.

27        163.    The FINA-driven agreement, combination, or conspiracy has resulted in an

28   agreement, understanding, or concerted action between and among FINA and FINA's co-

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT          47
– CASE NO. 3:18-cv-7393-JSC

36144\12874754.1

1    conspirators that results in FINA having firm, anti-competitive control over the prices that the

2    world's top swimmers may command for their services.  Such control reduces compensation and

3    the number of opportunities to compete.

4         164.    The FINA-driven agreement, combination, or conspiracy is facially anti-

5    competitive and inherently suspect.  In particular, it is the result of concerted action that denies

6    ISL and other entities the ability to organize international swimming competitions featuring the

7    world's best swimmers unless they first obtain FINA approval under FINA's onerous,

8    extortionate, and anti-competitive terms.  The anti-competitive nature of the FINA-driven

9    agreement, combination, or conspiracy is obvious.  Anyone can see it without resort to an in-depth

10   analysis of the industry.  So, FINA's conduct should be found to constitute a *per se* violation of

11   Section 1 of the Sherman Act.

12        165.    Moreover, even if FINA were allowed to try to justify the conduct described in this

13   Complaint, FINA would fail.  There remain reasonably less-restrictive means to promote any such

14   conceivable alleged purpose behind FINA's conduct.  Accordingly, even under a rule-of-reason

15   analysis, the FINA-driven agreement, combination, or conspiracy violates Section 1 of the

16   Sherman Act.

17        166.    The FINA-driven agreement, combination, or conspiracy occurred in and

18   reasonably restrained interstate commerce.  It has prevented ISL already from holding a planned

19   event in the United States, as well as in Europe.  It has already deprived the top-tier swimmers

20   who contracted with ISL for the Turin Event, or would have contracted with ISL for the Las Vegas

21   event, from realizing the full amount of their appearance fees and benefitting from the market

22   exposure that their participation would engender.  And the continuing nature of the FINA-driven

23   collusive conduct means that these U.S. swimmers—and others—will continue to be deprived of

24   the ability to maximize their commercial value.  Further, the challenged conduct deprives millions

25   of U.S. fans of swimming competition the ability to enjoy an expanded competition calendar.  All

26   of these injuries to competition will continue until FINA is enjoined from further engaging in that

27   activity.

28        167.    Pursuant to section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs and the

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT     48
– CASE NO. 3:18-cv-7393-JSC

36144\12874754.1

1 | Proposed Class seek the issuance of an injunction against FINA, preventing and restraining the

2 | violations alleged herein.

3 | <div align="center">**SECOND CAUSE OF ACTION**</div>

4 | <div align="center">**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**</div>

5 | 168.     Plaintiffs incorporate and re-allege the foregoing allegations as if set forth fully in

6 | this paragraph.

7 | 169.     FINA, either acting alone or with its co-conspirators as set forth above, has

8 | obtained for FINA: (1) a monopoly in the market for top-tier international swimming competitions

9 | and (2) a monopsony in the market for the supply of the services of top-tier swimmers.  FINA has

10 | willfully maintained that power by the anti-competitive conduct set forth above, not least by

11 | shutting out ISL from the market for hosting international swimming competitions and by

12 | destroying ISL as a potential competitor to FINA-sponsored or FINA-sanctioned international

13 | competitions.

14 | 170.     In the alternative, FINA, either acting alone or with its co-conspirators as set forth

15 | above, specifically intended to and tried to obtain for FINA the monopoly and monopsony power

16 | by engaging in the conduct described above.  Such conduct is likely to result in the

17 | monopolization and/or monopsonization of the relevant markets alleged in this Complaint.  If not

18 | stopped, FINA's goal of monopoly and monopsony power will be achieved, to the detriment of

19 | swimmers, competing event organizers, and consumers of top-tier international swimming

20 | competitions (including fans, broadcasters, media outlets, sponsors and licensees).

21 | 171.     FINA's conduct, whether alone or with its co-conspirators as set forth above,

22 | occurred in, and unreasonably restrained, interstate commerce.

23 | 172.     Further, FINA's efforts, whether alone or with its co-conspirators as set forth

24 | above, to obtain and maintain its monopoly power has harmed Plaintiffs and competition in the

25 | relevant market as set forth above and will continue to do so until FINA is enjoined from further

26 | engaging in conduct to preserve and protect its monopoly power.

27 | 173.     Pursuant to section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs and the

28 | Proposed Class seek the issuance of an injunction against FINA, preventing and restraining the

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT       49       36144\12874754.1
– CASE NO. 3:18-cv-7393-JSC

1   violations alleged herein.

2   ## THIRD CAUSE OF ACTION

3   ### Tortious Interference With Contractual Relations

4   174.   Plaintiffs incorporate and re-allege the foregoing allegations as if set forth fully in

5   this paragraph.

6   175.   Members of the Proposed Class each had a contract under which they were to

7   receive compensation for their participation in the Turin Event.

8   176.   FINA knew about the existence of these contracts and the nature of their terms. It

9   accordingly knew that the members of the Proposed Class stood to benefit from their respective

10  appearances at the Turin Event.

11  177.   Nonetheless, and as described above, FINA rendered it impossible for the Proposed

12  Class to perform their obligations to ISL and/or the ISL-affiliated clubs.

13  178.   As set forth above, FINA had every intention to prevent the members of the

14  Proposed Class from participating in the Turin Event and took measures necessary to fulfill that

15  intention—in particular by threatening to ban the members of the Proposed Class from

16  participation in future FINA events, up to and including the Olympic Games.

17  179.   As a result of FINA's interference, the members of the Proposed Class could not

18  recover half of their guaranteed appearance fees. But for FINA's intentional efforts to prevent the

19  December 2018 Event from proceeding, the class members would have enjoyed the full payment

20  promised in their respective appearance-fee contracts.

21  ## PRAYER FOR RELIEF

22  Plaintiffs pray that this Court enter judgment on their behalves and that of the

23  Proposed Class by adjudging and decreeing that:

24  A.   This action may be maintained as a class action, with Plaintiffs as the

25  designated Class representatives and their counsel as Class counsel;

26  B.   Defendant and its co-conspirators have engaged in a trust, contract, combination, or

27  conspiracy in violation of Sections 1 and 2 of the Sherman Act, and that Plaintiffs and the

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT
– CASE NO. 3:18-cv-7393-JSC          50          36144\12874754.1

1  members of the Proposed Class have been damaged and injured in their business and property as a

2  result of this violation;

3          C.       The alleged combinations and conspiracy be adjudged and decreed to be *per*

4  *se* violations of the Sherman Act;

5          D.       Plaintiffs and the members of the Proposed Class they represent recover threefold

6  the damages determined to have been sustained by them as a result of the conduct of Defendant

7  and its co-conspirators, complained of herein, and that judgment be entered against Defendant

8  FINA for the amount so determined;

9          E.       For prejudgment and post-judgment interest;

10         F.       For injunctive relief, enjoining FINA from unlawfully interfering in any way

11  with the ability of ISL or any other person or entity from organizing or promoting swimming

12  competitions, including but not limited to an injunction prohibiting FINA from unlawfully

13  enforcing any sanctions against either swimmers or FINA member federations who participate

14  in such competitions;

15         G.       For equitable relief, including a judicial determination of the rights

16  and responsibilities of the parties;

17         H.       For attorneys' fees;

18         I.       For costs of suit; and

19         J.       For such other and further relief as the Court may deem just and proper.

20

21

22

23

24

25

26

27

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT     51
– CASE NO. 3:18-cv-7393-JSC

36144\12874754.1

1

2   Dated:  January 17, 2020

3

4

5

6

7

8   Dated:  January 17, 2020

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FARELLA BRAUN + MARTEL LLP

By:  _____*/s/ Neil A. Goteiner*_____
        Neil A. Goteiner

Attorneys for Plaintiffs and the Proposed Class

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

By:  _____*/s/ Eric B. Fastiff*_____
        Eric B. Fastiff

Attorneys for Plaintiffs and the Proposed Class

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

FIRST AMENDED CLASS ACTION COMPLAINT          52
– CASE NO. 3:18-cv-7393-JSC

36144\12874754.1

1

## <u>JURY DEMAND</u>

2          Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all

3     claims and issues so triable.

4

5

6

7     Dated:  January 17, 2020              FARELLA BRAUN + MARTEL LLP

8                                          By:    _/s/ Neil A. Goteiner_
                                                 Neil A. Goteiner
9
                                           Attorneys for Plaintiffs and the Proposed Class
10

11

12

13    Dated:  January 17, 2020              LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

14                                         By:    _/s/ Eric B. Fastiff_
                                                 Eric B. Fastiff
15
16                                         Attorneys for Plaintiffs and the Proposed Class

17

18

19

20

21

22

23

24

25

26

27

28