**REDACTED Version of Document Sought to Be Sealed**

1  Richard M. Heimann (SBN 063607)
   rheimann@lchb.com
2  Eric B. Fastiff (SBN 182260)
   efastiff@lchb.com
3  Caitlin M. Nelson (SBN 335601)
   cnelson@lchb.com
4  LIEFF CABRASER HEIMANN &
   BERNSTEIN, LLP
5  275 Battery Street, 29th Floor
   San Francisco, California 94111
6  Telephone: (415) 956-1000
   Facsimile: (415) 956-1008
7
   Attorneys for Plaintiffs Shields, Andrew,
8  Hosszú, and the Proposed Class

9  *(Additional Counsel listed on signature page)*

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12  THOMAS A. SHIELDS, MICHAEL C.          Case No. 3:18-cv-07393-JSC
    ANDREW, and KATINKA HOSSZÚ, on behalf of
13  themselves and all others similarly situated,    **PLAINTIFFS' NOTICE OF MOTION,**
                                                      **MOTION, AND MEMORANDUM OF**
14                         Plaintiffs,                **POINTS AND AUTHORITIES IN**
                                                      **SUPPORT OF PLAINTIFFS' MOTION**
15           vs.                                      **FOR CLASS CERTIFICATION**

16  FÉDÉRATION INTERNATIONALE DE
    NATATION,                                         Judge:  Hon. Jacqueline Scott Corley
17                                                    Date:   June 10, 2021
                         Defendant.                   Time:   1:30 PM
18                                                    Crtrm.: F – 15th Fl.

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|

I. INTRODUCTION ........................................................................................... 1

II. STATEMENT OF FACTS ................................................................................ 2

    A. The Proposed Class Members are Professional Swimmers, Whose Work is Controlled by FINA, A Predatory Monopolist. ........................................ 2

    B. ISL Learned Early On That FINA Insisted On Maintaining Its Absolute Control. ..................................................................................................... 4

    C. ISL Seeks to Partner With USA Swimming For its Inaugural Events, and FINA Forces their Cancellation. ............................................................... 5

    D. ISL Attempts to Partner with British Swimming to Host its Events in London, Which FINA Again Quashes. ...................................................... 6

    E. Unable to Organize Events in the U.S. or Britain, ISL Tried to Organize a December 2018 Event in Turin–Which FINA Quashed. ............................ 6

        1. FINA Reinterpreted its Rules to Stop the Turin Event. ................. 7

        2. FINA Then Threatened Sanctions and Pressured Federations and Swimmers to Boycott the Turin Event. ........................................ 7

        3. Faced with FINA's Threats, FIN and ISL Canceled the Turin Event. ...... 9

        4. FINA Continued to Threaten USA Swimming to Force It to Ally with FINA and Against the Swimmers. ......................................... 9

    F. FINA's Boycott Collapse Neither Undid the Damage It Caused the Swimmers Nor Eliminated Their Potential Future Harm. ...................... 9

        1. FINA's 2018 Boycott Shrunk ISL's 2019 Season. .................... 10

        2. ISL Was Forced to Scale Back its Original 2019 Plans, Giving Swimmers Fewer Chances to Compete and to Earn Money. ................. 11

        3. FINA Refuses to Recognize ISL's October 2019 Indianapolis Event Because of a Calendar Conflict. .................................................. 12

III. THE COURT SHOULD CERTIFY THE CLASS ........................................ 13

IV. THE CLASS SATISFIES RULE 23 ............................................................. 14

    A. The Proposed Class Satisfies Rule 23(a). ............................................. 14

        1. The Proposed Class is Sufficiently Numerous. ......................... 14

        2. The Proposed Class Members Share Common Questions. ....... 14

        3. Plaintiffs' Claims Are Typical of Absent Class Members. ...... 15

        4. Plaintiffs are Adequate Representatives for the Proposed Class. ........... 16

        5. The Proposed Subclasses Are Ascertainable. ........................... 17

    B. The Proposed Injunctive Relief Class Satisfies Rule 23(b)(2). ............ 17

    C. The Proposed Damages Subclasses Satisfy Rule 23(b)(3). .................. 18

        1. Common Questions Predominate Over Individual Issues. ....... 18

            a. Plaintiffs Have Pled Sherman Act Claims .................. 19

1

**TABLE OF CONTENTS**
**(continued)**

2
Page
3            b.      All Class Members Suffered Impact. ............................................. 19

            c.      Dr. Rascher Developed a Method to Calculate Damages. ............ 22
4
        2.      Common Questions Predominate the Tortious Interference Claim. ......... 24
5
    D.      A Class Action is Superior to Other Methods of Adjudication. .......................... 25
6   V.      CONCLUSION ............................................................................................................. 25

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CASES

*Alcantar v. Hobart Serv.*,
  800 F.3d 1047 (9th Cir. 2015) ........................................................................... 13

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ........................................................................................... 18

*Arnold v. United Artists Theatre Circuit, Inc.*,
  158 F.R.D. 439 (N.D. Cal. 1994) ...................................................................... 18

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013) ....................................................................................... 22

*Cummings v. Connell*,
  316 F.3d 886 (9th Cir.), *cert. denied*, 539 U.S. 927 (2003) .................................. 16

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) ........................................................................................... 19

*Evon v. Law Offices of Sidney Mickell*,
  688 F.3d 1015 (9th Cir. 2012) ........................................................................... 16

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
  No. M 02-1486 PJH, 2006 WL 1530166 (N.D. Cal. June 5, 2006) ...................... 19

*In re High-Tech Emp. Antitrust Litig.*,
  985 F. Supp. 2d 1167 (N.D. Cal. 2013) ............................................................. 14

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008) .............................................................................. 20

*In re Hyundai & Kia Fuel Econ. Litig.*,
  926 F.3d 539 (9th Cir. 2019) ...................................................................... 13, 14

*In re Myford Touch Consumer Litig.*,
  No. 13-CV-03072-EMC, 2016 WL 7734558 (N.D. Cal. Sept. 14, 2016) ............ 25

*In re Qualcomm Antitrust Litig.*,
  328 F.R.D. 280 (N.D. Cal. 2018) ...................................................................... 13

*In re Rubber Chems. Antitrust Litig.*,
  232 F.R.D. 346 (N.D. Cal. 2005) ...................................................................... 13

*In re Yahoo Mail Litig.*,
  308 F.R.D. 577 (N.D. Cal. 2015) ...................................................................... 17

*Jimenez v. Allstate Ins. Co.*,
  765 F.3d 1161 (9th Cir. 2014) ........................................................................... 14

*Jones v. ConAgra Foods, Inc.*,
  No. C 12-01633 CRB, 2014 WL 2702726 (N.D. Cal. June 13, 2014) ................. 22

*Just Film, Inc. v. Buono*,
  847 F.3d 1108 (9th Cir. 2017) .................................................... 18, 22, 23, 25

*Leyva v. Medline Indus, Inc.*,
  716 F.3d 510 (9th Cir. 2013) ............................................................................. 22

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*,
  795 F.3d 1124 (9th Cir. 2015) ........................................................................... 24

*Newton v. Am. Debt Servs., Inc.*,
No. C-11-3228 EMC, 2015 WL 3614197 (N.D. Cal. June 9, 2015) ..................................... 15

*Nitsch v. Dreamworks Animation SKG Inc.*,
315 F.R.D. 270 (N.D. Cal. 2016)................................................................................................. 19

*O'Connor v. Boeing N. Am., Inc.*,
184 F.R.D. 311 (C.D. Cal. 1998) ................................................................................................. 17

*Pecover v. Elec. Arts Inc.*,
No. C 08-2820 VRW, 2010 WL 8742757 (N.D. Cal. Dec. 21, 2010).................................. 15

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979).......................................................................................................................... 13

*Rodriguez v. Hayes*,
591 F.3d 1105 (9th Cir. 2010)...................................................................................................... 17

*Sandoval v. Ali*,
34 F. Supp. 3d 1031 (N.D. Cal. 2014) ....................................................................................... 16

*Shields v. Fed'n Internationale de Natation*,
419 F. Supp. 3d 1188 (N.D. Cal. 2019) ............................................................................. 2, 16

*Sidibe v. Sutter Health*,
333 F.R.D. 463 (N.D. Cal. 2019) ................................................................................................. 18

*Slaven v. BP Am., Inc.*,
190 F.R.D. 649 (C.D. Cal. 2000) ................................................................................................. 14

*Stockwell v. City & Cty. of San Francisco*,
749 F.3d 1107 (9th Cir. 2014)...................................................................................................... 14

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
282 U.S. 555 (1931)........................................................................................................................ 24

*Walters v. Reno*,
145 F.3d 1032 (9th Cir. 1998)...................................................................................................... 13

*White v. Nat'l Collegiate Athletic Ass'n*,
No. CV 06-0999-RGK MANX, 2006 WL 8066803 (C.D. Cal. Oct. 19, 2006) .................... 16

*Wolin v. Jaguar Land Rover N. Am., LLC*,
617 F.3d 1168 (9th Cir. 2010)...................................................................................................... 25

## RULES

Fed. R. Civ. P. 23(b)(2)..................................................................................................................... 13

## TREATISES

1 *Newberg on Class Actions* § 3:75 (5th ed.)............................................................................. 17

# GLOSSARY OF KEY PERSONS

| NAME | TITLE |
| --- | --- |
| Al-Musallam, Husain | Vice President, FINA |
| Andrew, Michael | Proposed class representative |
| Barelli, Paolo | Vice President, FINA; President, FIN |
| Buckner, Jack | Chief Executive Officer, British Swimming |
| di Nino, Andrea | Managing Director, ISL |
| Grigorishin, Konstantin | Founder, ISL |
| Hosszú, Katinka | Proposed class representative |
| Khan, Ali | Chief Executive Officer, ISL |
| Marculescu, Cornel | Former Executive Director, FINA |
| Miller, Cody | Absent class member |
| Neuburger, Dale | Vice President, FINA |
| Pebley, Jacob | Absent class member |
| Rascher, Daniel | Plaintiffs' economic expert |
| Saxlund, Marcela | Deputy Executive Director, FINA |
| Shields, Thomas | Proposed class representative |
| Tsagkarakis, Apostolos | Technical Director, ISL |
| Unger, Mike | Chief Operating Officer, USA Swimming |

# NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on June 10, 2021 at 1:30 PM in Courtroom F before the Honorable Jacqueline Scott Corley, Plaintiffs Thomas Shields, Michael Andrew, and Katinka Hosszú will and hereby respectfully move the Court pursuant to Federal Rule of Civil Procedure 23 for an Order: 1) certifying the proposed classes defined herein; 2) designating Plaintiffs as class representatives; and 3) appointing the undersigned as class counsel.

Plaintiffs' claims merit class certification. The same evidence will be used to prove every class member's claim that FINA's conduct unlawfully reduced their earning potential through ISL. Accordingly, Plaintiffs respectfully move the Court certify the following class under Federal Rule of Civil Procedure 23(b)(2) and (b)(3):

- All swimmers who signed contracts to participate in the International Swimming League from January 1, 2018 through the date of trial.

For the Rule 23(b)(3) class, Plaintiffs propose the following subclasses:

- <u>2018 Damages Subclass:</u> All swimmers who signed contracts to participate in the International Swimming League's December 2018 event set to take place in in Turin, Italy.

- <u>2019 Damages Subclass:</u> All swimmers who signed contracts to participate in the International Swimming League's 2019 season.

- <u>2022 Damages Subclass:</u> All swimmers who sign contracts to participate in the International Swimming League's 2022 season, and any seasons thereafter through the date of trial.

This Motion is based on this submission; the accompanying declarations; oral argument of counsel; and any other materials submitted in connection with this Motion.

Dated: April 6, 2021

Respectfully submitted,

By: _____/s/ Eric B. Fastiff_____

Richard M. Heimann (SBN 063607)
rheimann@lchb.com
Eric B. Fastiff (SBN 182260)
efastiff@lchb.com
Caitlin M. Nelson (SBN 335601)
cnelson@lchb.com
LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

*Attorneys for Plaintiffs Shields, Andrew, Hosszú,
and the Proposed Class*

By:        */s/ Neil A. Goteiner*

Neil A. Goteiner (SBN 083524)
ngoteiner@fbm.com
C. Brandon Wisoff (SBN 121930)
bwisoff@fbm.com
Joshua W. Malone (SBN 301836)
jmalone@fbm.com
Hilary C. Krase (SBN 318762)
hkrase@fbm.com
FARELLA BRAUN + MARTEL LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
Telephone: (415) 954-4400
Facsimile: (415) 954-4480

*Attorneys for Plaintiffs Shields, Andrew, Hosszú,
and the Proposed Class*

**MEMORANDUM AND POINTS OF AUTHORITIES**

## I.  **INTRODUCTION**

When asked why the Italian Swimming Federation cancelled its ISL December 2018 event, U.S. Olympic Gold Medalist and ISL DC Trident team member Cody Miller testified on cross-examination: "My understanding is that FINA essentially threatened the athletes by saying that if you choose to compete in this non-FINA event, then they have the right to take away your Olympic eligibility or your ability to qualify for the Olympics, ***which is pretty messed up***." Nelson Declaration (Decl.),[1] Ex. A (Dep. 161:3–8) (emphasis added).

That's right: FINA, swimming's international governing body, used its absolute monopoly and boycott power to prevent world class swimmers from competing where and when they want—causing them to lose prize money and appearance fees in 2018 and 2019, and which will cause similar losses in 2022 and probably after.  National swimming federations uniformly feared the risk that FINA would bar from the Olympics those swimmers who participated in ISL events. As FINA's VP Dale Neuburger put it to USA Swimming, which had earlier sought to partner with ISL, "Bottom line: USA Swimming will need to make an uncomfortable decision that will make FINA unhappy or ISL/athletes unhappy."  Decl., Ex. B.

And even when FINA relented and announced it withdrew its boycott, FINA continued to injure all swimmer class members.  In 2019, upon learning that ISL planned to hold an event in Indianapolis that would fall on the same weekend as a FINA event, FINA, knowing it has monopoly power, used that power to refuse to recognize world record and Olympic qualifying times swum at ISL's event.  This is not speculation— ████████████████████
████████████████████████████████████████
████████████████████. Decl., Ex. C (*see* 12:10–12 for email text, *infra*).

As there is no guarantee FINA won't stop continuing to abuse its monopoly power, class-wide monetary and injunctive relief is necessary.

Thomas Shields, Michael Andrew, and Katinka Hosszú (Plaintiffs) seek to represent a class of professional swimmers who lost past and future opportunities to earn money at

---

[1] All references to "Decl." refer to the Nelson Declaration, unless otherwise noted.

International Swimming League (ISL) competitions as a result of FINA's anticompetitive conduct. Overwhelming common evidence will prove impact and damages. The evidence demonstrates FINA's intent and success at using its monopoly and monopsony power to control all organizations and all swimmers.

Plaintiffs' expert antitrust economist, Dr. Daniel Rascher, examined the evidence and opines that FINA's conduct impacted class members' earnings. Dr. Rascher's opinion draws upon his substantial experience in sports economics to present a common, formulaic method for determining antitrust impact and damages. Rascher Decl., ¶¶1–3, 5. The Subclasses here are easy to define—those who signed contracts with ISL teams. Similarly, their damages are easy to calculate. For 2018 and 2019, we know what events were supposed to be held and how much the swimmers were not paid. As for the 2022 subclass (2020 and 2021 are not included because of COVID changed ISL's plans), the class members are those who will have signed contracts by the time the Court begins the trial.

Accordingly, this case should proceed as a class action. Class members all complain about the same thing: FINA's anticompetitive behavior. They all assert the same theory of harm: lost opportunity to compete, and thus, lost earnings. Common evidence—documents, testimony, and expert analysis—proves all elements of Plaintiffs' claims. The resolution of these common issues predominates over any issues specific to any particular class member, making a class action superior to hundreds of separate suits. Plaintiffs therefore respectfully request that the Court certify the proposed class, appoint them as class representatives, and appoint the undersigned as class counsel.

## II.  STATEMENT OF FACTS[2]

### A.  The Proposed Class Members are Professional Swimmers, Whose Work is Controlled by FINA, A Predatory Monopolist.

The proposed class consists of professional swimmers who dedicate themselves to the pursuit of excellence—with the ultimate goal of competing in and medaling at the Olympic

---

[2] The Court is aware of the basic facts supporting Plaintiffs' allegations. *See Shields v. Fed'n Internationale de Natation*, 419 F. Supp. 3d 1188, 1190–1200 (N.D. Cal. 2019). Plaintiffs supplement that record here with further information learned from discovery.

Games. Their lives revolve around an all-consuming training schedule, requiring physical conditioning in and out of the pool, as well as mental and emotional training to cope with the pressure inherent in world class competition.[3] Although their profession requires substantially more time, energy, and commitment than a traditional job, to the proposed class members, professional swimming is that: a job. And like most professional athletes, professional swimmers can only reasonably expect to make a living from that job for a limited number of years. But unlike other sports with professional leagues, the general public only follows swimming during the Olympics, and has limited interest, if any, in FINA's competitions. *See* Decl., Ex. E (British Swimming CEO: ISL is a means to elevate swimming to the public status of other sports).

The 2018 advent of ISL, a worldwide club-based swimming league, excited swimmers, who saw its additional events as a new way to grow the sport and increase swimmers' financial prospects. Leading national swimming federations saw ISL the same way. *See* Decl., Exs. F (2019 Unger Dep. 10:18–20); E; G. ISL thus met professional swimmers' and the swimming community's aspirations to have as many racing opportunities as possible to earn income through prize money, appearance fees, and global exposure (which leads to sponsorships, a substantial source of income). But when federations, and the swimmers themselves, showed interest in partnering with ISL in mid-2018, FINA ferociously resisted. From the swimmers' perspective, this lawsuit is about their right to choose when and where they race, without interference or intimidation from the organization which tasked itself with the "harmonious worldwide development" of the sport. FINA Home Page, at https://www.fina.org/about (last visited Apr. 6, 2021). *See, e.g.,* Decl., Exs. H (Andrew Dep. 18:15–22) ("Q: … What kind of change … are you seeking to bring about? A: … Change for the swimming community, more opportunities to race, and more potential to earn a good living."); A (Miller Dep. 146:1–3) (same); I (Hosszú Dep. 209:2–6) (same).

Thomas Shields, of Berkeley, California, is a world-champion swimmer and Olympic gold medalist. He planned to swim in the 2018 Energy for Swim event and is a member of ISL

---

[3] *See* Shields Decl., ¶4 (thirty hours of physical work across six or seven days, plus active rehabilitation sessions); Andrew Decl., ¶4 (six high-intensity swim sessions and three dry land sessions across six days, plus active rehabilitation sessions); Hosszú Decl., ¶4 (four eight-hour workouts, two four-hour workouts, and one two-hour workout across seven days).

team LA Current.  Shields Decl., ¶¶2, 3.  Michael Andrew, of Encinitas, California, has been swimming professionally since age 14, when he became the youngest swimmer to turn pro.  He, too, planned to swim in the 2018 Energy for Swim event, and is a member of ISL team NY Breakers.  Andrew Decl., ¶¶2, 3.  Katinka Hosszú, of Budapest, Hungary, is a three-time Olympic gold medalist who has set or holds multiple world records and is a three-time FINA Swimmer of the Year.  Known as the Iron Lady, she planned to swim in the 2018 Energy for Swim and is a member of ISL Team Iron.  Hosszu Decl., ¶¶2, 3.

### B.    ISL Learned Early On That FINA Insisted On Maintaining Its Absolute Control.

ISL's mission is to expand the competitive and financial opportunities for the world's professional swimmers, and to share ISL's profits with the swimmers.  Decl., Exs. J (di Nino Dep. 169:2–20); K (Khan Dep. 97:17–98:5).  Traditionally, FINA completely controlled swimmers' opportunities to make money.  From 2016 through 2018, FINA earned over $180 million in revenues and allocated just over $22 million, or 12%, to the athletes in prize money.[4] Swimmers' ability to earn money outside of FINA's own events has historically been limited; FINA's bylaws require its subjective approval before any of its 209 federations host, assist with hosting, or affiliate with competitions where swimmers officially represent their federations. Decl., Ex. L (FINA Bylaw (BL) 12).  FINA's rules also prohibit any of its federations from having "any kind of relationship with a non-affiliated or suspended body."  Decl., Ex. M (FINA General Rule (GR) 4).  This so-called "unauthorised relations" rule was the primary means by which FINA squelched competition from ISL and other would-be competitors.[5]  Decl., Exs. O; P. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Decl., Ex. Q.  ISL founder Konstantin Grigorishin learned quickly that FINA's approval was required to organize a top-level swimming event.  Decl., Ex. R (Grigorishin Dep. 112:6–19).  "[In] 2017, FINA always emphasize[d] that without [FINA's] permission, swimmers are not allowed to participate in any

---

[4] FINA Home Page, *supra*, at https://www.fina.org/about/fina-financial-reports (2016–18 financial reports).
[5] FINA only wields its monopoly power against certain events. Decl., Ex. N (FINA VP Dale Neuburger stating that certain events need not seek FINA approval).

commercial competition." *Id.* 58:1–7. But those negotiations broke down, leaving ISL to try to

work with national federations to generate support for its pilot event series. Decl., Ex. K (Khan

Dep. 68:16–69:4).

**C.  ISL Seeks to Partner With USA Swimming For its Inaugural Events, and FINA Forces their Cancellation.**

ISL developed plans to organize three events (or matches) in 2018, with the expectation of

awarding swimmers over $2 million in appearance fees and prize money. Decl., Ex. S.

███████████████████████████████████████████. *See, e.g.,* Decl., Ex. T (ISL's

semifinal events to occur on December 19–20, 2018, with finals on December 21–22).

ISL's overwhelming preference was to host its pilot events in the U.S., in partnership with

USA Swimming, with other European locations (chiefly London) as a "backup plan." *See* Decl.,

Ex. U (di Nino Dep. 218:10–219:4); *id.* 222:16–223:3. ███████████████████████

███████████████████████████████████████████. *See, e.g.,*

Decl., Ex. V. USA Swimming, in turn, was excited about ISL's potential to give U.S. swimmers

"another chance to compete" and "potentially raise some revenue for themselves." Decl., Ex. F

(2019 Unger Dep. 10:10–15).

FINA was immediately hostile. Mr. Unger wrote internally on May 28, 2018 that "[w]e

are being asked to host in Las Vegas [and] FINA doesn't like it." Decl., Ex. G. USA Swimming

detailed FINA's pressure campaign in emails with British Swimming and Swimming Australia,

writing on June 4 that "FINA is apparently not happy with ISL, and is intent on derailing the ISL

efforts." Decl., Ex. W; *see also* Exs. F (2019 Unger Dep. 48:3–4) (Marculescu called Unger,

angry that USA Swimming met with ISL); X (Unger states USA Swimming was "considering

hosting in Las Vegas[] . . . until FINA started to weigh in." He summarizes: "ISL pursuing this

league that can bring energy, money and exposure. FINA feeling threatened.").

On June 5, 2018, FINA, after sending an advance copy to ISL, sent a memorandum to all

209 national federations warning that FINA would punish any federation that affiliated with ISL

as a violation of FINA's rule on "unauthorised relations." Decl., Ex. O. FINA's memorandum

noted that ISL "is neither recognised by nor affiliated to [sic] FINA." *Id.* As FINA intended, its

memorandum, combined with Marculescu's pressure on USA Swimming, caused USA Swimming to pull out of negotiations for hosting the Las Vegas event. Decl., Ex. Y. Mr. Unger saw too much "peril" from FINA threatening the swimmers, such that partnering with ISL was "impossible." Decl., Ex. F (2019 Unger Dep. 80:14–24, 146:20–147:18).

      **D.     ISL Attempts to Partner with British Swimming to Host its Events in London, Which FINA Again Quashes.**

FINA—just as it did with USA Swimming—illegally coerced British Swimming to drop its support of ISL's 2018 events. A day before FINA sent its June 5 memorandum, British Swimming had been excited to send its athletes to ISL's event in Las Vegas, writing to its U.S. and Australian counterparts that it was "more and more committed to this [ISL] project and [] thinking of developing a British team around it." Decl., Ex. E. The day after FINA's June 5 memorandum, British Swimming met with ISL and expressed that it "is very much supportive, and happy to take on FINA." Decl., Ex. Z.

But it did not take long for British Swimming to buckle under FINA's pressure. A month later, when ISL asked Mr. Buckner if ISL could release a statement that it had chosen London for its event, he hesitated: "You're aware of the risks to British Swimming around this project linked to FINA. We are strong supporters of ISL but we cannot afford to take risks with our core purpose of delivering medals at the Olympic Games." Decl., Ex. AA. As a result, British Swimming, like USA Swimming, made the decision, "because of the FINA situation," not to host an ISL event. Decl., Ex. BB. Mr. Buckner testified he feared what FINA might to do British Swimming and its swimmers. Decl., Ex. CC (Rough Dep. 36:20–37:4).

      **E.     Unable to Organize Events in the U.S. or Britain, ISL Tried to Organize a December 2018 Event in Turin–Which FINA Quashed.**

ISL, forced to abandon its plans to host the 2018 event in Las Vegas or London, turned its attention to Turin. ISL partnered with FIN, the Italian swimming federation, to invite top-tier swimmers to participate as individuals, not on behalf of their federations, in what it called its "Energy for Swim" event, scheduled for December 2018. Ultimately 65 swimmers signed contracts to participate. Over several months in fall 2018, ISL worked with FIN and its president,

Paolo Barelli, also a FINA VP, to plan the competition, the scope of which ISL had been forced

to reduce from three events to one.  Decl., Ex. DD (Tsagkarakis Dep. 128:18–23).

### 1. FINA Reinterpreted its Rules to Stop the Turin Event.

FINA's intent was clear: it wanted to quash the Turin event and would go to any means to

do so, including reinterpreting its own rules (specifically BL 12.3), despite their plain meaning.

Mr. Unger recounted a call in which Mr. Marculescu "seemed to agree" that there was no BL

12.3 issue, because the athletes were not representing their federations, but "he was so irate with

Barelli, that [Marculescu was] trying to re-examine BL 12.3."  Decl., Ex. EE.

. Decl., Ex. FF.  Nonetheless, ,

Decl., Ex. GG.

And so, on October 26, 2018,

. Decl., Ex. HH.  As written,

*Id.*

(emphasis in original).

*Id.*

. Decl., Exs. II; JJ.

### 2. FINA Then Threatened Sanctions and Pressured Federations and Swimmers to Boycott the Turin Event.

As a result of FINA's rule reinterpretation, it circulated an October 30 memorandum to its

federations threatening sanctions for any participation in the Turin 2018 event.

Decl., Ex. P.

██████████████████████████████████████████████

████████████ Decl., Ex. L.

Immediately following the October 30 FINA memorandum, USA Swimming hosted a call with its swimmers to discuss FINA's threatened ban. Mr. Neuburger wrote to Mr. Marculescu on November 3, 2018:

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████

Decl., Ex. KK (emphasis added). The message resonated loud and clear with both the swimmers and the national federations. Mike Unger wrote in preparation for the call with U.S. swimmers that FINA's strategy "has now [as of November 1] mushroomed into a challenge for athletes and federations around the world. Not just USA . . . ." Decl., Ex. LL. National federations, including the Swiss, British, Italian, and USA Swimming, strongly recommended that swimmers not participate in the Turin event.[6] Cody Miller testified that "the takeaway from the meeting, from the call, was that FINA could and is threatening to [punish athletes for participating in the event], so it's a risk that you are either agreeing to or not." Decl., Ex. A (Dep. 164:19–165:1). Tom Shields testified that "we were explained that . . . if we were to go [to Turin], FINA may choose to enact that GR 4.4 [] to ban swimmers from the Games or keep them from competing at the Games[.]" Decl., Ex. NN (Dep. 128:7–23).

FINA's threat was real to the swimmers. Jacob Pebley, a U.S. Olympian, testified that if there was a ban potential in place, he would not have competed in the Turin event. Decl., Ex. OO (Dep. 220:3–7). As noted above, Mr. Miller thought that FINA's act of threatening swimmers was "pretty messed up." Decl., Ex. A (Dep. 161:3–8).

---

[6] *See, e.g.,* Decl., Ex. MM (Swiss Swimming Federation wrote: "Hello Swimmers . . . In case of a participation in this event, the Swiss Swimming Federation, as a FINA member organization, would be forced by FINA, to ban you for at least 1 year from all competition measures (FINA GR 4) . . . . Therefore I explicitly propose you **to not participate in the 'Energy for Swim' Event 2018!**") (emphasis in original).

### 3. Faced with FINA's Threats, FIN and ISL Canceled the Turin Event.

Under immense pressure from FINA and contemplating an event with no athletes as a result of FINA's threatened sanctions, FIN sent a letter on November 15, 2018 cancelling the event. Decl., Ex. PP ("FIN has been forced to take the decision because . . . it simply cannot take the risk of Athletes . . . receiving sanctions. It is clear from the wording of FINA's Memo of 30 October 2018 that sanctions were being contemplated should the Energy for Swim 2018 exhibition competition go ahead."). ISL, despite the event's cancellation, still paid 50% of each athlete's promised appearance fee. *See, e.g.,* Decl., Ex. QQ.

### 4. FINA Continued to Threaten USA Swimming to Force It to Ally with FINA and Against the Swimmers.

Further, after FINA caused the end of the Turin event, FINA maintained its no-win choice to USA Swimming. As of December 2018, FINA still refused to withdraw its threat to use GR 4 to sanction USA Swimming or U.S. Swimmers if either associated with ISL. Decl., Ex. F (2019 Unger Dep. 72:6–11). When Mr. Unger shared his concerns, Mr. Neuburger replied:



Decl., Ex. B (emphasis added).

### F. FINA's Boycott Collapse Neither Undid the Damage It Caused the Swimmers Nor Eliminated Their Potential Future Harm.

While FINA made an announcement on January 15, 2019 that purportedly halted the boycott, "unfortunately, [this did] not chang[e] the history. . . . the [announcement] was not significant to rebuild the credibility of ISL when you cancel the event in December." Decl., Ex. J (di Nino Dep. 47:3–22). Thus, practically, the announcement did little to dispel the notion among many swimmers and third parties that FINA was still at war with ISL. Indeed, FINA's announcement didn't even mention ISL. *See* Decl., Ex. RR.

## 1. **FINA's 2018 Boycott Shrunk ISL's 2019 Season.**

FINA's 2018 boycott continued to impact ISL and therefore damaged the swimmers in 2019. Fundamentally, ███████████████████████████████████ ██████████. Decl., Exs. SS; TT; UU (multiple ISL documents confirm that ISL planned to host 17 events in 2019). Instead ISL put on seven events. This reduction meant that the class received less appearance fees and prize money in 2019 than the class would have received without the boycott. FINA's scheme caused this schedule reduction in several ways.

First, Mr. di Nino testified that prior to FINA's conduct, "ISL was looking to start earlier and to make a long season, so potentially to double the number of the events." Decl., Ex. VV (Dep. 519:12–20). The first part of 2019 was not "spen[t] to organize our calendar but was spen[t] to convince the swimmers in 2018 we was finally able to organize the event." Decl., Ex. J (Dep. 48:1–11).

Second, federations were reluctant to partner with ISL, requiring more time from ISL to schedule events. For example, USA Swimming was hesitant to publicize its involvement with ISL even in 2019. Decl., Ex. WW (USA Swimming supportive of ISL and willing to work quietly to help). And ISL's relationship with the Italian Federation was so that ISL could not partner with FIN in 2019. Decl., Ex. J (di Nino Dep. 60:13–61:21) (cancelling the Turin event prevented further ISL-FIN cooperation, and Italian swimmers were uncomfortable with ISL).[7]

The Russian Swimming Federation similarly remained uncomfortable with allowing its swimmers to participate in ISL. *Id*. 105:15–23. Asked in September 2019 whether he remained concerned that FINA might hurt USA Swimming and its swimmers, Mr. Unger testified: "I would hope not . . . . I am not sure." Decl., Ex. F (2019 Dep. 130:5–24). Even in 2020, the Singapore Federation, when in talks with ISL about hosting an event, was unable to "shake off" what happened in 2018. Decl., Ex. K (Khan Dep. 103:18–105:18).

---

[7] ISL held a 2019 event in Naples because the mayor maintained his own pool. Decl., Ex. J (di Nino Dep. 134:24–136:1). But holding the event was more difficult: "So if you have a competition and the local federation is totally against yourself, everything to organize the event became incredible difficult and very complicated, very complicated." *Id*. 134:2–136:1. And without FIN, the cost was greater for ISL. *Id*. 133:11–25.

All this federation reluctance was not surprising. Indeed, in November 2018, Mr.

Neuburger, ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████ Decl., Ex. XX. And in December

2018, FINA continued to make clear to federations that it expected absolute fealty—even at the

expense of the swimmers.

Third, FINA's derailing of the 2018 event meant that ISL lacked a platform to show

broadcasters and sponsors ISL's value. Sponsors obviously prefer to see broadcasters in place

before they work with a new sports event series. But as Mr. Grigorishin testified, ISL had to

"start[] from scratch" in 2019 because it "didn't have showcase to show for sponsors and

broadcasters." *See* Decl. Ex. YY (Dep. 366:1–13); *see also* Ex. J (di Nino Dep. 127:12–128:9,

125:8–21). For example, a potential ISL media partner in September 2019 "was quite reluctant

about ISL because of pressure from FINA on the Japanese federation." Decl., Ex. ZZ. As Husain

Al-Musallam, FINA's First VP, stated at a FINA Executive meeting, ████████████████████

████████████████████████████████████████████████████ Decl., Ex.

AAA.

### 2. ISL Was Forced to Scale Back its Original 2019 Plans, Giving Swimmers Fewer Chances to Compete and to Earn Money.

As a result of FINA's 2018 boycott, ISL was unable to hold its full 2019 season, thus

impacting the swimmers' earning potential. Given the chance, swimmers would have competed.

For example, Ms. Hosszú "like[s] to compete as [] often as possible" (Decl., Ex. I (Hosszú Dep.

39:14–15)), and Mr. Miller "would like for there to be more opportunities for professional

swimmers to compete and make money" (Decl., Ex. A (Miller Dep. 145:23–146:3)). Likewise,

Mr. Andrew testified: "I'm always focused on racing. I love to race. So [the] more opportunities

to race, the better." Decl., Ex. H (Dep. 74:15–16).

## 3. FINA Refuses to Recognize ISL's October 2019 Indianapolis Event Because of a Calendar Conflict.

FINA will only recognize results from FINA-sanctioned events for Olympic qualification and world records. While FINA did recognize most ISL 2019 events, in October 2019—months after FINA claims it resolved all problems through its "clarification" in January 2019 of GR 4—FINA continued to recognize and abuse its monopoly power to punish ISL and participating swimmers by refusing to sanction an ISL event held in Indianapolis. Decl., Ex. BBB. When FINA realized that the ISL event conflicted with a FINA World Cup event, FINA Deputy Executive Director Marcela Saxlund emailed Mr. Marculescu:

> If these [ISL] events are now recognized by FINA, **all times and World Record must be recognized. We're not protecting the <u>only</u> thing that remains to us: World Records and <u>exclusive qualifying events</u> for Championships and the Olympic Games.**

Decl., Ex. C (emphasis in original). USA Swimming recognized FINA's justification as a pretext: "[I]t is not the first time that we had a conflicting schedule problem so we didn't think it was that big of a deal." Decl., Ex. CCC (USA Swimming 30(b)(6) at 234:4–235:15). USA Swimming's CEO agreed: "Cornel [Marculescu] is off base with his anger regarding Indy. We were very up front and communicative with the plans." Decl., Ex. DDD.

FINA did not merely refuse to sanction the event—meaning FINA would not recognize the swimmers' times—but FINA also threatened to wield its monopoly power against USA Swimming for the planned partnership. "[USAS] is hereby formally put on notice . . . . FINA hereby reserves all its rights to take any appropriate action without further notice." Decl., Ex. BBB. After the event, FINA responded with more threats. Mr. Neuburger wrote to USA Swimming that "Cornel, joined by the [FINA] Executive, is not happy about the Indianapolis meet . . . . [I]f this goes to the Disciplinary Panel, I cannot predict (or control) the outcome." Decl., Ex. DDD. Mr. Unger noted in early November 2019 that "FINA is still after [USAS] because we allowed the first ISL meet to take place[.]" Decl., Ex. EEE.

FINA's insistence on preserving its events as the only events held on a specific day is an abuse of its monopoly power. *See* Decl., Ex. CCC (2020 Unger Dep. 69:7–14 ("[USA

Swimming was] baffled why—why FINA wouldn't have accepted that one meet…. I don't understand why … a conflict on the calendar means that a time shouldn't count or a meet shouldn't be recognized."). Recognition of times set at legitimate, properly-run events is critically important to the swimmers.[8] FINA's refusal primarily harms the swimmers, to whom time recognition matters most. *See* Decl., Ex. H (Andrew Dep. 248:3–5) ("FINA not recognizing world records is only hurting the athletes from not being able to compete as often or where they choose to.").

## III. <u>THE COURT SHOULD CERTIFY THE CLASS</u>

Antitrust class actions play an important role in enforcing the antitrust laws. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979). Because of this critical enforcement role, "courts resolve doubts in these actions in favor of certifying the class." *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005) (citations omitted). "In determining the propriety of a class action, the question is not whether the plaintiffs have stated a cause of action or will prevail on the merits, but, rather, whether the requirements of Rule 23 are met." *Alcantar v. Hobart Serv.*, 800 F.3d 1047, 1053 (9th Cir. 2015) (citation omitted).

Rule 23(a) is satisfied when:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

In addition to meeting the requirements of Rule 23(a), a proposed class must satisfy the requirements of Rule 23(b)(1), (b)(2), or (b)(3). *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 556 (9th Cir. 2019). Plaintiffs seek certification of both Rule 23(b)(2) and (b)(3) classes. In the Ninth Circuit, courts routinely certify coextensive damages and injunctive classes. *In re Qualcomm Antitrust Litig.*, 328 F.R.D. 280, 319 (N.D. Cal. 2018). Accordingly, Plaintiffs will show that FINA "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief . . . with respect to the class as a whole." *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998) (quoting Fed. R. Civ. P. 23(b)(2)). Plaintiffs will also

---

[8] *See, e.g.,* Decl., Exs. H (Andrew Dep. 131:6–11) ("I think it's obvious that if an athlete breaks a world record, we want it to count."); *id.* 231:8–13; A (Miller Dep. 149:9–15;149:22–150:6).

satisfy the predominance and superiority prongs of Rule 23(b)(3) for the Damages Subclasses. *In re Hyundai*, 926 F.3d at 556.

## IV. THE CLASS SATISFIES RULE 23

The Injunctive Relief and Damages Classes readily meet each of the four requirements of Rule 23(a), as well as the requirements of Rule 23(b) (2) and (b)(3). Indeed, a class action is the only realistic way that the swimmers will have their day in court.

### A. The Proposed Class Satisfies Rule 23(a).

#### 1. The Proposed Class is Sufficiently Numerous.

The proposed class contains over 200 swimmers.[9] Rule 23(a)(1) requires that "the class is so numerous that joinder of all class members is impracticable. For a class of more than 200, joinder would be impractical and thus the numerosity requirement is satisfied. *See Slaven v. BP Am., Inc.*, 190 F.R.D. 649, 654 (C.D. Cal. 2000) (numerosity generally satisfied when the class exceeds forty members).

#### 2. The Proposed Class Members Share Common Questions.

"Federal Rule of Civil Procedure 23(a)(2) conditions class certification on demonstrating that members of the proposed class share common 'questions of law or fact.'" *Stockwell v. City & Cty. of San Francisco*, 749 F.3d 1107, 1111 (9th Cir. 2014). Commonality "does not turn on the number of common questions, but on their relevance to the factual and legal issues at the core of the purported class' claims." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014); *see also In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013) (antitrust conspiracy is a common question of fact and law).

The resolution of questions about FINA's efforts to thwart ISL from emerging as a competitor, and the subsequent impact on swimmers' earnings, will generate common answers. Here, the events ISL was forced to cancel in 2018 and 2019, and will be unable to hold in 2022, are the classes' harm; FINA's blocking ISL's entry, hobbling its operations, and causing delay to ISL's schedule is common to all class members.

---

[9] The 2018 Subclass consists of 65 swimmers; the 2019 Subclass consists of 251 swimmers; and the size of the 2022 Subclass is not yet known. Rascher Decl., ¶68. The Injunctive Relief Class need contain no more than one class representative, as the relief will benefit that swimmer and all others.

Common questions here include:  whether FINA's conduct violates the Sherman Act by restraining trade, commerce, or competition for professional swimmers; whether Plaintiffs and the proposed class are suffering antitrust injury or have been threatened with injury; the amounts Plaintiffs and the proposed class should have received in appearance fees and prize money, in the absence of the illegal conduct alleged in the First Amended Complaint; whether FINA acted on grounds generally applicable to the proposed class, thereby making final injunctive relief appropriate to the proposed class as a whole; whether injunctive relief is necessary for Plaintiffs and the proposed class to be able to swim in any international competition free from threats by FINA to banish them from other international competitions such as the World Championships and Olympic Games; and the type and measure of damages suffered by Plaintiffs and the proposed class.  Commonality is therefore readily met with respect to Plaintiffs' claims.

### 3.  Plaintiffs' Claims Are Typical of Absent Class Members.

The typicality test is satisfied when the actionable conduct is not unique to Plaintiffs and has caused similar injury to other class members.  *Newton v. Am. Debt Servs., Inc.*, No. C-11-3228 EMC, 2015 WL 3614197, at *7 (N.D. Cal. June 9, 2015).  "In antitrust cases, typicality usually will be established by plaintiffs and all class members alleging the same antitrust violations by defendants."  *Pecover v. Elec. Arts Inc.,* No. C 08-2820 VRW, 2010 WL 8742757, at *11 (N.D. Cal. Dec. 21, 2010) (citation omitted).  Differences in the amount of harm "do not negate a finding of typicality, provided the cause of those injuries arises from a common wrong."  *Id.* (citation omitted).

Here, Plaintiffs' and class members' claims arise from the same actionable conduct:  FINA's successful derailment of the Las Vegas, London, and Turin events;; FINA's conduct in diminishing ISL's post 2018 revenues and planned number of matches; and FINA's successful actions to quash ISL by threatening federations and swimmers who wanted to participate in ISL's events.  This conduct has caused the same type of injury to all class members: they all lost opportunities to participate in and to earn money at ISL competitions.  The amount of economic injury can be calculated using methodologies applicable to the entire class.  *See* § IV.C.1.c, *infra.*

## 4. **Plaintiffs are Adequate Representatives for the Proposed Class.**

The adequacy test of Rule 23(a) asks if the named plaintiffs and their counsel have any conflicts of interest with class members, and will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class? *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1031 (9th Cir. 2012). The answers here are: they have no conflict with class members, and yes, they will vigorously prosecute the case.

The interests of the three Plaintiffs are directly aligned with those of the absent class members as they all share the goal of increasing opportunities for professional swimmers to race in competitions for prize money, preventing future antitrust violations by FINA, and recovering money for races ISL could not and cannot hold. Moreover, Mr. Shields, Mr. Andrew, and Ms. Hosszú have and will continue vigorously to prosecute the action on behalf of the class. Each understands their duties as class representatives, have agreed to consider the interests of absent class members, and have actively participated in discovery and strategy. Shields Decl., ¶¶5–7; Andrew Decl., ¶¶5–7; Hosszú Decl.,¶¶ 5–7. Such involvement is more than sufficient to meet the adequacy requirement of Rule 23(a)(4).

FINA has previously asserted that two Plaintiffs are inadequate representatives because Mr. Andrew and Ms. Hosszú are both part-owners of ISL Clubs and high-earning athletes. *See, e.g., Shields* Dkts. 87 at 32–33, 152 at 2–3. These arguments fail. "[T]his circuit does not favor denial of class certification on the basis of speculative conflicts." *Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir.), *cert. denied*, 539 U.S. 927 (2003). Accepting FINA's claims that differing income levels defeat the Plaintiffs' adequacy would prevent any successful athlete from using a class action to remedy antitrust violations impacting pay. *See White v. Nat'l Collegiate Athletic Ass'n,* No. CV 06-0999-RGK MANX, 2006 WL 8066803, at *3 (C.D. Cal. Oct. 19, 2006) (rejecting adequacy challenge based on differences in athletes). This is particularly relevant here where the Plaintiffs chose to put their careers in jeopardy by suing their governing body.

FINA may also argue that Farella Braun + Martel LLP does not meet the adequacy requirement because it jointly represents ISL and the proposed class. But this presents no actual conflict. *See Sandoval v. Ali*, 34 F. Supp. 3d 1031, 1047 (N.D. Cal. 2014) ("In general, class

counsel may represent multiple sets of litigants—whether in the same action or in a related proceeding—so long as the litigants' interests are not inherently opposed." (quoting 1 *Newberg on Class Actions* § 3:75 (5th ed.)) . ISL and the proposed class have the same claims and the same goal: to stop FINA from limiting swimming competitions and recovering money lost as a result of FINA's actions. Further, Lieff represents only the proposed class. Lieff and Farella, and their counsel, are highly qualified firms with extensive experience in successfully prosecuting high-stakes complex cases and antitrust class actions. *See* Fastiff Decl.; Goteiner Decl. The undersigned counsel have and will continue fairly and adequately to represent the interests of the class.

### 5.    The Proposed Subclasses Are Ascertainable.

Though it is not an explicit requirement, some courts have held that Rule 23(a) implicitly requires that a class be ascertainable. *See, e.g., In re Yahoo Mail Litig.*, 308 F.R.D. 577, 596 (N.D. Cal. 2015). Under such an analysis, a class definition is sufficient if it is "definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member." *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998). Here, the proposed class is identifiable by reference to objective criteria. Each swimmer who participates in ISL signs a contract. Such records allow for the identification of the class members. *See* Rascher Decl., Appendices C, D (listing 2018 and 2019 subclass members).

### B.    The Proposed Injunctive Relief Class Satisfies Rule 23(b)(2).

Rule 23(b)(2) authorizes the Court to certify a class where all the prerequisites of Rule 23(a) have been met, and "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole." Rule 23(b)(2) only requires courts "to look at whether class members seek uniform relief from a practice applicable to all of them." *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010). These requirements are satisfied here.

As discussed above in the Rule 23(a) analysis, Plaintiffs challenge the same conduct: FINA's threat to enforce its anticompetitive GR 4 governing "unauthorised relations" against any swimmer who participates in an ISL event. Although FINA in a January 2019 press release

announced it would not enforce GR 4, FINA may revoke its press release at any time. Decl., Ex. FFF. FINA's use of GR 4 to threaten swimmers who wanted to participate in the Turin event, and resulting harm in reducing the number of ISL events in 2018, 2019, and 2022, affected all class members "in almost precisely the same way because of common distinguishing characteristics shared by all the class members": their status as professional swimmers eligible to participate in both ISL and FINA-sponsored events. *See Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 452 (N.D. Cal. 1994).

Consequently, Plaintiffs request that the Court certify a Rule 23(b)(2) Class to enjoin FINA from unlawfully interfering with the ability of ISL or any other independent organizer to host swimming competitions, and from unlawfully enforcing sanctions against athletes or FINA federations who participate in or associate with such competitions. This constitutes final injunctive relief that is appropriate with respect to the class as a whole. *See, e.g., Sidibe v. Sutter Health*, 333 F.R.D. 463, 499 (N.D. Cal. 2019) (certifying 23(b)(2) class); *In re Qualcomm*, 328 F.R.D. at 319 (same).

### C. The Proposed Damages Subclasses Satisfy Rule 23(b)(3).

Rule 23(b)(3) authorizes the Court to certify a class action if "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Again, both requirements are satisfied here as to the proposed Damages Class.

### 1. Common Questions Predominate Over Individual Issues.

The Rule 23(b)(3) "predominance" inquiry "focuses on 'the relationship between the common and individual issues' in the case, and 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120 (9th Cir. 2017) (citation omitted). It is more efficient to try the same issues of fact and law once, violations of Sherman Act sections 1 and 2 and tortious interference, rather than hundreds of times; predominance is thus "readily met." *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). The predominance inquiry "begins, of course, with the elements of the underlying

cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).  In this case, Plaintiffs allege violations of sections 1 and 2 of the Sherman Act and tortious interference with contractual relations.  *See* Amended Complaint, *Shields* Dkt. 83, ¶¶156–179.

### a. Plaintiffs Have Pled Sherman Act Claims

To succeed on an antitrust claim, Plaintiffs must prove: "(1) a violation of antitrust laws, (2) an injury they suffered as a result of that violation, and (3) an estimated measure of damages." *Nitsch v. Dreamworks Animation SKG Inc*., 315 F.R.D. 270, 288 (N.D. Cal. 2016) (citation omitted).

Plaintiffs allege that FINA conspired to suppress competition for professional swimming competitions, reducing swimmers' ability to earn money.  Proving the existence of these violations will be the primary issue at trial for all class members' claims and will be established through common evidence.  That common evidence includes, but is not limited to the evidence explained above, leading to the threat to swimmers and federations, the derailing of the Las Vegas and London events, the cancelling of the Turin event, and the effects limiting the number of ISL's 2019 and 2022 events.  *See supra,* § II.B–F.  Plaintiffs' common proof of FINA's antitrust violations will also include evidence that these events, in conjunction with FINA's continued campaign against ISL, had a serious negative impact on ISL's ability to grow and succeed in providing more opportunities for swimmers to race, to earn, and to develop their professional reputations.  *See, e.g.* § II.F, *supra.*  None of this evidence raises individual issues for specific class members.  On the contrary, each swimmer's claims will rely on this same record to prove FINA's liability.  Accordingly, common questions clearly predominate as to FINA's antitrust violations and tortious interference.

### b. All Class Members Suffered Impact.

Antitrust impact, or antitrust injury, "is the 'fact of damage' that results from a violation of the antitrust laws." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486 PJH, 2006 WL 1530166, at *7 (N.D. Cal. June 5, 2006).  "It is the casual link between the antitrust violation and the damages sought by plaintiffs." *Dreamworks Animation*, 315 F.R.D. at 292 (citation omitted).  At this stage, Plaintiffs are not required to actually prove impact and

need only demonstrate that "antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311-12 (3d Cir. 2008). Evidence produced in discovery, along with Dr. Rascher's expert opinion and economic analyses relying on this evidence, establish that common issues will predominate over individual issues in proving antitrust impact.

The manner in which FINA's antitrust violations impacted the class is straightforward: FINA delayed ISL's launch, and hindered its subsequent success, reducing the number of events class members were able to enter. Dr. Rascher explains that impact can be shown either through the "Direct Effects" method or the "Indirect Effects" method. Rascher Decl., ¶12. Applied here, either methodology will be common to all class members and not require individualized inquiries.

The relevant market for the proposed class is the input market for the services of top-tier swimmers. *Id.* ¶24. As Dr. Rascher states, "the very nature of [determining whether this constitutes a valid economic market in which FINA has market power] is inherently common to all class members." *Id.* ¶14. He continues: "[B]y nature of FINA's power to deny ISL access to the critical input of professional swimmers [through event sanctioning and time recognition], FINA directly demonstrated that it has substantial market power – indeed full monopoly power." *Id.* ¶16. To prove market power through either the Direct Effects or Indirect Effects method, "the ultimate question is thus whether FINA's power to erect these barriers to entry was sufficient to reduce competition." *Id.* ¶18. Dr. Rascher concludes that it was, and further that the steps to show this are common to all class members. *Id.*

Under the Direct Effects method, the question is whether "the restraint in suit constrained the marketplace." *Id.* ¶19. Dr. Rascher explains that there is no doubt that the conduct was successful, as FINA "succeeded in shutting down the Las Vegas, London, and finally the Turin event by pressuring the various national governing bodies to pull their support for the event and threatened the swimmers with exclusion from the Olympics and world championships." *Id.* And more importantly for class certification purposes, "the steps by which that successful imposition of a restraint will be shown at the merits phase of this case are clearly common to all class members." *Id.* This is because FINA's threat to deny swimmers access to the Olympics and

World Championships "cannot possibly have led to the successful exercise of market power to shut down the Las Vegas, London, and Turin events for some class members, but not all. Either ISL was denied access to enough elite swimmers to stage these events (by virtue of the threat of being denied Olympic access), or it was not, and that denial either did, or did not, make it impossible for ISL to enter the alleged relevant output market (for events) as well as the alleged relevant input market (for swimmers)." *Id.* ¶20.

An Indirect Effects analysis, while more complex, similarly avoids individualized inquiries. The relevant output market is the market for the organization of top-tier swimming competitions. *Id.* ¶23. FINA's ability to withhold Olympic eligibility for a proposed class member allows FINA to control which actors in the market can acquire the critical input: swimmer talent. To determine whether actors compete in a relevant input market, Dr. Rascher explains, the test is a hypothetical Monopsonist/SSNDP (Small but Significant Non-Transitory Decrease in Prices), where a monopsonist is the buyer's equivalent of a monopolist, and a SSNDP represents a small *decrease* in the price the buyer offers in the market. *Id.* ¶29. This test asks: if a hypothetical monopsonist in the swimming competition market sought to decrease prize and appearance money by a small but significant amount, would the class members provide their services to actors producing something other than swimming competitions? Because the answer is no (the class members have specialized skills relevant to this market only), the proposed relevant input market passes the hypothetical monopsonist test. *Id.* This process to define the market is common amongst all class members.

Next, to determine FINA's market power, Dr. Rascher suggests using the Herfindahl-Hirschman Index (HHI), a common measure of market concentration. Applying this method, Dr. Rascher concludes that, based on the allocation of prize money, FINA's HHI is over 7,150—an extremely high concentration. *Id.* ¶34. Finally, Dr. Rascher explains how FINA erected a barrier to entry: "[I]t is clear that FINA's role as the sole sanctioning body gave it the power to erect strong barriers to entry to new entry into the product and input markets." *Id.* ¶39. This is also an obvious common issue. *Id.*

### c. Dr. Rascher Developed a Method to Calculate Damages.

To satisfy Rule 23(b)(3), Plaintiffs must also "establish[] that damages are capable of measurement on a class-wide basis," using a model consistent with the asserted theories of liability. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013); *see also Leyva v. Medline Indus, Inc.*, 716 F.3d 510, 514 (9th Cir. 2013). Though Plaintiffs must present a "likely" method for determining class damages, "it is not necessary to show that his method will work with certainty" at the class certification stage. *Jones v. ConAgra Foods, Inc.*, No. C 12-01633 CRB, 2014 WL 2702726, at *19 (N.D. Cal. June 13, 2014) (citation omitted); *see also Just Film*, 847 F.3d at 1121 (same).

Dr. Rascher presents a common, formulaic method for calculating damages. While Dr. Rascher's report presents only an estimate of damages, it confirms what Plaintiffs must prove at this stage: that "class-wide damages can be calculated by means of common formula." Rascher Decl., ¶52. Dr. Rascher lays out such a formula for each Damages Subclass: participants in ISL's 2018 season; participants in ISL's 2019 season; and participants in ISL's 2022 and subsequent seasons before the time of trial. Table 5 of Dr. Rascher's report reflects that total damages resulting from FINA's anticompetitive conduct for 2018–22 amounts to nearly $26 million.

### *2018 Damages Subclass*

Damages for the 2018 Subclass flow directly from the forced cancellation of the December 2018 Turin event. Swimmers in in this subclass signed contracts to participate in the event and were paid half of their appearance fees despite the cancellation. Dr. Rascher applies a straightforward formula to show that class members would have received an additional $910,942 absent FINA's unlawful conduct. *Id.* ¶53. This number represents the amount ISL had allocated for appearance fees and prize money ($137,085 and $842,400 respectively), minus the amount given to swimmers despite the cancellation ($68,542). To allocate this sum amongst class members, Dr. Rascher explains that the foregone appearance money can be determined by simply looking to the athletes' contracts, which reflect what each swimmer was promised. *Id.* ¶54. For the foregone prize money, Dr. Rascher suggests allocating damages based on the athlete's proportion of ISL's prize money awarded in the league's 2019 season. *See id.* Appendix C

(swimmer-by-swimmer outcome applying this calculation). In short, calculating damages for the 2018 Subclass "can be determined without excessive difficulty and attributed to [Plaintiffs'] theory of liability." *Just Film*, 847 F.3d at 1121.

### *2019 Damages Subclass*

Plaintiffs allege that, but for FINA's conduct forcing cancellation of the 2018 Energy for Swim event, ISL would have had a stronger launch, with an additional ten events in its 2019 season. Thus, to calculate damages for the 2019 Subclass, Dr. Rascher sums the appearance and prize money actually awarded in ISL's 2019 season ($1,090,046 and $2,580,400 respectively), and dividing by the number of events (seven) to determine a per-event amount of $308,829 in prize money and $155,721 in appearance fees. To then determine each swimmer's damages, Dr. Rascher opines that appearance fees are his/her share of the actual appearance fees paid, and that prize money be distributed in proportion to actual prize money awarded. *See id.* Appendix D (swimmer-by-swimmer outcome applying this calculation). Though the number of events that ISL would have hosted in 2019 absent FINA's misconduct will be a question for the jury, Dr. Rascher concludes that if the answer is ten additional events, the total pool for subclass members' damages would be as high as $4.65 million. *Id.* ¶60. Consequently, damages for the 2019 Subclass are both substantial and calculable applying a straightforward, common formula.

### *2022 Damages Subclass*

Finally, Dr. Rascher opines on a method to calculate damages for swimmers participating in ISL between 2022 and the time of trial.[10] As he explains, "ISL's 2022 season is likely to have fewer events (as well as less lucrative sponsorships) than a healthier ISL would have staged had it launched in 2018 rather than 2019 and had two seasons, rather than one, under its belt prior to the COVID-19 interruption." *Id.* ¶63. Setting aside what additional revenues the athletes would have earned in sponsorships or increased prize money payouts from ISL in its first full post-pandemic season, Dr. Rascher states that damages for this Subclass could be calculated in a manner similar

---

[10] Dr. Rascher did not estimate damages for 2020 or 2021, because COVID-19's impact on sports competitions was so significant that it is possible ISL would not have been able to stage any more events than it actually did regardless of FINA's misconduct. In contrast, because swimming competitions will likely resume their normal structure in 2022, damages for the 2022 Subclass are reasonably calculable.

to damages for the 2019 Subclass: summing the appearance and prize money actually awarded in ISL's 2022 season, and dividing the number of events held to determine a per-event amount for prize money and appearance fees. *Id.* ¶67. To determine class members' damages, Dr. Rascher again suggests that class members' portions of this sum be allocated in proportion to prize money and appearance fees actually awarded in the events that did previously occur. *Id.* This is a reasonable estimation method. *See Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562–66 (1931) (defendant cannot argue antitrust damages are fatally uncertain when defendant's conduct itself made damages difficult to prove).

### 2. Common Questions Predominate the Tortious Interference Claim.

To succeed on a tortious interference with contract claim, Plaintiffs must prove: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts designed to induce breach or disruption of the contract; (4) actual breach or disruption; and (5) resulting damage." *Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1133 (9th Cir. 2015) (citation omitted).

As with Plaintiffs' Sherman Act claims, common questions predominate as to Plaintiffs' tortious interference claim: the class members each had a contract to receive compensation for their participation in the Turin event; FINA knew of the existence of these contracts; FINA's intentional conduct—including threatening to ban members of the proposed class from participating in the World Championships and Olympic Games—rendered it impossible for the athletes to perform their obligations to ISL under the contracts; and as a result, members of the proposed class could not recover portions of their appearance fees or any prize money. But for FINA's wrongful conduct, the proposed class members would have enjoyed the full payment promised under their respective appearance-fee contracts. Accordingly, the facts required to prove each element of a tortious interference claim are the same for each proposed class member, and predominate over any minor differences, such as the amount of each class member's damages.

**D.** **A Class Action is Superior to Other Methods of Adjudication.**

Clearly, proceeding here as a class action is superior to more than 200 individual actions. "A class action is considered 'superior to other methods of adjudication' if 'classwide litigation of common issues will reduce litigation costs and promote greater efficiency.'" *In re Myford Touch Consumer Litig.*, No. 13-CV-03072-EMC, 2016 WL 7734558, at *28 (N.D. Cal. Sept. 14, 2016) (citation omitted). Rule 23(b)(3) asks whether proceeding as a class is "superior to other available methods for fairly and efficiently adjudicating the controversy." Class actions are typically superior when the "'risks, small recovery, and relatively high costs of litigation' make it unlikely that plaintiffs would individually pursue their claims." *Just Film*, 847 F.3d at 1123 (citation omitted).

Here, the damages are substantial and meaningful to the class members—professional athletes whose livelihoods depend on their ability to compete for prize money and earn appearance fees. But the involvement of individuals located all around the world, high costs required to litigate the case, and the intimidation factor inherent in direct suits by professional athletes against the gatekeeper to the Olympics and the World Championships, make individual litigation impractical, inefficient, and inferior. It would impose unnecessary costs and professional burdens on the aggrieved athletes, and thus would deter redress rather than misconduct. *See Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1176 (9th Cir. 2010). The class is objectively defined, can be easily identified and noticed, and the case can be managed and tried efficiently.

**V.** **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court: 1) certify the proposed classes as defined above; 2) designate them as class representatives; and 3) appoint the undersigned as class counsel.

Dated: April 6, 2021

Respectfully submitted,

By: _/s/ Eric B. Fastiff_

Richard M. Heimann (SBN 063607)
rheimann@lchb.com
Eric B. Fastiff (SBN 182260)
efastiff@lchb.com
Caitlin M. Nelson (SBN 335601)
cnelson@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

*Attorneys for Plaintiffs Shields, Andrew, Hosszú, and the Proposed Class*

By:     /s/ Neil A. Goteiner

Neil A. Goteiner (SBN 083524)
ngoteiner@fbm.com
C. Brandon Wisoff (SBN 121930)
bwisoff@fbm.com
Joshua W. Malone (SBN 301836)
jmalone@fbm.com
Hilary C. Krase (SBN 318762)
hkrase@fbm.com
FARELLA BRAUN + MARTEL LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
Telephone: (415) 954-4400
Facsimile: (415) 954-4480

*Attorneys for Plaintiffs Shields, Andrew, Hosszú, and the Proposed Class*

2132366.11

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
3:18-CV-07393-JSC