LATHAM & WATKINS LLP
    Daniel M. Wall (SBN 102580)
    Christopher S. Yates (SBN 161273)
    Aaron T. Chiu (SBN 287788)
    Colleen E. Heyler (SBN 313036)
505 Montgomery Street, Suite 2000
San Francisco, California  94111-6538
Telephone:  415.391.0600
Facsimile:  415.395.8095
Email: Dan.Wall@lw.com
        Chris.Yates@lw.com
        Aaron.Chiu@lw.com
        Colleen.Heyler@lw.com

Attorneys for Defendant
Fédération Internationale de Natation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| INTERNATIONAL SWIMMING LEAGUE, LTD.,<br><br>          Plaintiff,<br><br>   vs.<br><br>FÉDÉRATION INTERNATIONALE DE NATATION,<br><br>          Defendant. | CASE NO. 3:18-cv-07394-JSC<br><br>**FÉDÉRATION INTERNATIONALE DE NATATION'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date:    August 13, 2021<br>Time:   9:00 AM<br>Place:  Videoconference<br>Judge:  The Hon. Jacqueline Scott Corley |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ........................................................................................................ 1

II.    BACKGROUND ...................................................................................................... 3

       A.     The Named Plaintiffs Have Unique Interests in ISL, Which Is
              Funding This Litigation ..................................................................................... 4

       B.     The Extent to Which Any FINA "Threat" Impacted Individual
              Swimmers Is An Individual, Not Common, Issue ............................................ 6

       C.     ISL's Compensation System—the Foundation for Claims of
              Classwide Impact and Damages—Pits Athletes and Teams Against
              One Another in Ways That Guarantee Individualized and
              Antagonistic Damages Claims ........................................................................... 8

       D.     Plaintiffs' Bid for a Damages Class ................................................................ 12

       E.     FINA's January 15, 2019 Announcement and July 2019
              Amendment to Rule GR 4 Mooted Plaintiffs' Injunctive Relief
              Claim ................................................................................................................ 14

III.   LEGAL STANDARD ............................................................................................. 15

IV.    ARGUMENT .......................................................................................................... 16

       A.     The Named Plaintiffs And Their Counsel Are Not Adequate Class
              Representatives Given Their Unique Financial Interests in ISL ..................... 16

       B.     Named Plaintiffs Are Inadequate Representatives Given the
              Inherent Intra-Class Conflicts Underlying Their Antitrust Impact
              and Damages Theory ....................................................................................... 18

       C.     Plaintiffs Fail to Establish That Common Issues Predominate, as
              Required for a Rule 23(b)(3) Damages Class .................................................. 20

              1.     Plaintiffs Ignore the Contemporary Predominance Standard
                     That Applies in Antitrust Class Actions ............................................... 20

              2.     Plaintiffs' Estimates of "But-For" ISL Meets Are
                     Speculative ............................................................................................ 24

              3.     Dr. Rascher's Methodology Improperly Masks
                     Individualized Differences and Imposes Through the Use
                     of Averages Findings That All Class Members Were
                     Injured ................................................................................................... 27

              4.     Dr. Rascher Ignores Individualized Questions as to
                     Whether Swimmers Would Have Competed in Additional
                     ISL Events .............................................................................................. 32

              5.     Conclusions with Respect to Predominance ......................................... 33

          D.    Certification Under Rule 23(b)(2) Should Be Denied Because
                Plaintiffs' Prospective Relief Claim Is Moot........................................................ 34

V.    CONCLUSION........................................................................................................ 35

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**CASES**

*Alpha GRP, Inc. v. Subaru of America, Inc.*,
 No. 18-cv-2133, 2021 WL 1146029 (C.D. Cal. Feb. 8, 2021) ............................................. 26

*American Express Co. v. Italian Colors Restaurant*,
 570 U.S. 228 (2013)........................................................................................ 15, 20, 21

*Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*,
 568 U.S. 455 (2013).................................................................................................... 16

*Antoninetti v. Chipotle Mexican Grill, Inc.*,
 No. 06CV02671 BTM WMC, 2012 WL 3762440 (S.D. Cal. Aug. 28, 2012).................... 35

*Atlantic Richfield Co. v. USA Petroleum Co.*,
 495 U.S. 328 (1990).................................................................................................... 24

*Barnes v. Healy*,
 980 F.2d 572 (9th Cir. 1992) ...................................................................................... 35

*Beijing Tong Ren Tang (USA), Corp. v. TRT USA Corp.*,
 No. C-09-00882 RMW, 2011 WL 13143358 (N.D. Cal. Nov. 23, 2011) .......................... 26

*Bell Atlantic Corp. v. AT&T Corp.*,
 339 F.3d 294 (5th Cir. 2003) ...................................................................................... 33

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
 155 F.3d 331 (4th Cir. 1998) ...................................................................................... 33

*Campbell v. Facebook Inc.*,
 315 F.R.D. 250 (N.D. Cal. 2016).................................................................................. 16

*Chestnut Fleet Rentals, Inc. v. Hertz Corp.*,
 72 F.R.D. 541 (E.D. Pa. 1976)..................................................................................... 20

*Comcast Corp. v. Behrend*,
 569 U.S. 27 (2013)................................................................................................*passim*

*Crutchfield v. Sewerage & Water Board of New Orleans*,
 829 F.3d 370 (5th Cir. 2016) ...................................................................................... 21

*Curtis v. Extra Space Storage, Inc.*,
 No. C 13-00319 WHA, 2013 WL 6073448 (N.D. Cal. Nov. 18, 2013) ............................ 34

*Eisen v. Carlisle & Jacquelin*,
 417 U.S. 156 (1974)...................................................................................................... 4

*Ellis v. Costco Wholesale Corp.*,
 657 F.3d 970 (9th Cir. 2011) ...................................................................................... 22

*Ellis v. J.P. Morgan Chase & Co.*,
   No. 12-cv-03897 YGR, 2015 WL 9178076 (N.D. Cal. Dec. 17, 2015) ............................... 22

*Fleischman v. Albany Medical Center*,
   No. 1:06-CV-765, 2008 WL 2945993 (N.D.N.Y. July 28, 2008) .................................. 24, 27

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ........................................................................... 16

*In re Asacol Antitrust Litigation*,
   907 F.3d 42 (1st Cir. 2018) ................................................................................ 23

*In re Beer Distribution Antitrust Litigation*,
   188 F.R.D. 549 (N.D. Cal. 1998) ........................................................................ 19

*In re Blood Reagents Antitrust Litigation*,
   783 F.3d 183 (3d Cir. 2015) ............................................................................... 22

*In re Graphics Processing Units Antitrust Litigation*,
   253 F.R.D. 478 (N.D. Cal. 2008) ........................................................................ 31

*In re High-Tech Emp. Antitrust Litigation*,
   985 F. Supp. 2d 1167 (N.D. Cal. 2013) ............................................................... 27

*In re Hydrogen Peroxide Antitrust Litigation*,
   552 F.3d 305 (3d Cir. 2009) ............................................................................... 22

*In re Lamictal Direct Purchaser Direct Antitrust Litigation*,
   957 F.3d 184 (3d Cir. 2020) ............................................................................... 31

*In re Modafil Antitrust Litigation*,
   837 F.3d 238 (3d Cir. 2016) ............................................................................... 22

*In re NCAA I-A Walk-On Football Players Litigation*,
   No. C04-1254C, 2006 WL 1207915 (W.D. Wash. May 3, 2006) ...................... 2, 19, 27, 34

*In re Nexium (Esomeprazole) Antitrust Litigation*,
   842 F.3d 34 (1st Cir. 2016) ................................................................................ 23

*In re Processed Egg Products Antitrust Litigation*,
   312 F.R.D. 124 (E.D. Pa. 2015) ......................................................................... 23

*In re Rail Freight Fuel Surcharge Antitrust Litigation*,
   292 F. Supp. 3d 14 (D.D.C. 2017) ...................................................................... 22

*In re Rail Freight Fuel Surcharge Antitrust Litigation*,
   725 F.3d 244 (D.C. Cir. 2013) .......................................................................*passim*

*In re Railway Industry Employee No-Poach Antitrust Litigation*,
   395 F. Supp. 3d 464 (W.D. Pa. 2019) ................................................................. 27

*In re Suboxone Antitrust Litigation*,
   967 F.3d 264 (3d Cir. 2020) ............................................................................... 22

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

FINA'S OPP'N TO PLS.' MOT. FOR CLASS CERTIFICATION
CASE NO. 3:18-CV-07393-JSC

*Interserve, Inc. v. Fusion Garage PTE. Ltd.,*
No. C 09-5812 RS, 2012 WL 1995278 (N.D. Cal. June 4, 2012) .......................... 26

*Kamean v. Local 363, Int'l Broth. of Teamsters, Chauffeurs, Warehousemen, and Helpers of Am.,* 109 F.R.D. 391 (S.D.N.Y. 1986) .......................................... 17, 18

*Kayes v. Pacific Lumber Co.,*
51 F.3d 1449 (9th Cir. 1995) .......................................................... 18

*Koby v. ARS National Services, Inc.,*
846 F.3d 1071 (9th Cir. 2017) ......................................................... 16

*Kottaras v. Whole Foods Market, Inc.,*
281 F.R.D. 16 (D.D.C. 2012) ........................................................... 24

*Lewis v. Casey,*
518 U.S. 343 (1996) ..................................................................... 23

*Leyva v. Medline Industries Inc.,*
716 F.3d 510 (9th Cir. 2013) .......................................................... 33

*Martinez v. Barasch,*
No. 01 Civ. 2289 (MBM), 2004 WL 1367445 (S.D.N.Y. June 16, 2004) ....................... 3, 17

*McLaughlin v. American Tobacco Co.,*
522 F.3d 215 (2d Cir. 2008) ......................................................... 24, 27

*Olean Wholesale Grocery Coop. v. Bumble Bee Foods LLC,*
993 F.3d 774 (9th Cir. 2021) ....................................................*passim*

*Outdoor Media Group, Inc. v. City of Beaumont,*
506 F.3d 895 (9th Cir. 2007) ....................................................... 34, 35

*Radcliffe v. Experian Information Solutions, Inc.,*
715 F.3d 1157 (9th Cir. 2013) ......................................................... 17

*Rock v. National Collegiate Athletic Association,*
No 12-cv-1019-TWP-DKL, 2016 WL 1270087 (S.D. Ind. Mar. 31, 2016) ............... 2, 27, 28

*Slayman v. FedEx Ground Package System, Inc.,*
765 F.3d 1033 (9th Cir. 2014) ......................................................... 35

*Smith v. University of Washington Law School,*
233 F.3d 1188 (9th Cir. 2000) ......................................................... 35

*Tyson Foods, Inc. v. Bouaphakeo,*
577 U.S. 442 (2016) ..............................................................*passim*

*Wal-Mart Stores, Inc. v. Dukes,*
564 U.S. 338 (2011) ............................................................. 1, 15, 21, 22

*White v. National Collegiate Athletic Association,*
No. CV 06-0999-RGK MANX, 2006 WL 8066803 (C.D. Cal. Oct. 19, 2006) ............. 19, 28

*Woods v. Google LLC,*
　　No. 11-cv-01263-EJD, 2018 WL 4030570 (N.D. Cal. Aug. 23, 2018) ................................. 16

*Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.,*
　　162 F.R.D. 471 (E.D. Pa. 1985) ........................................................................................... 20

*Young America's Foundation v. Napolitano,*
　　No. 17-CV-02255-MMC, 2018 WL 1947766 (N.D. Cal. Apr. 25, 2018) ............................ 35


**STATUTES**

15 U.S.C. § 15 ............................................................................................................................ 22, 23


**OTHER AUTHORITIES**

Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev.
　　97 (2009) .............................................................................................................................. 21


**RULES**

Fed. R. Civ. P. 23(a)(4) ................................................................................................................. 17

Fed. R. Civ. P. 23(b)(3) ................................................................................................................. 16

# I.  INTRODUCTION

Class certification in antitrust cases turns on whether individual injury and damages can be fully and fairly adjudicated "in one stroke," using common proof, and without the need for individualized evidence. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); *Olean Wholesale Grocery Coop. v. Bumble Bee Foods LLC*, 993 F.3d 774, 784 (9th Cir. 2021); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  Generally, class certification is appropriate when "representative evidence" such as an economic damages model allows injury and damages to be determined formulaically, and—because the class is relatively homogeneous—a defendant is not prejudiced in its ability to defend the case if it is unable to contest injury and damages plaintiff-by-plaintiff. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 455 (2016).  Class certification is denied whenever the damages model (a) glosses over or ignores "'[d]issimilarities within the proposed class [that] have the potential to impede the generation of common answers'" to the injury and damages questions, *Wal-Mart*, 564 U.S. at 350, (b) could not be used to establish injury in an individual action, *Tyson*, 577 U.S. at 458, or (c) is unreliable, for example generating false positives or senseless damages estimates. *E.g.*, *Olean*, 993 F.3d at 788.

From that perspective, Plaintiffs' motion presents a highly unlikely case for class certification.  The putative class is comprised of swimmers *who compete against one another for prize money*, and claim to have lost the opportunity to do so on one or more occasions because of FINA's allegedly anticompetitive behavior.  Whether any one swimmer was impacted and the amount of her damages depend on how many ISL meets (if any) she missed due to FINA's alleged conduct, how many races she would have swum at those meets, who she would have competed against, how she would have performed, how her team would have performed, which teams she would have swum for and against, and how all of that interacts with ISL's compensation scheme— which sometimes results in a swimmer getting nothing at all.  It is unreasonable to suggest that such a highly individualized analysis could be performed "in one stroke" for all swimmers with common proof, and without prejudicing FINA's rights.  In individual trials, swimmers would approach the issues in different ways, predict their but-for performance based on individualized evidence about their likely performance, and FINA would respond in kind with its own

individualized injury and damages arguments. Swimmers would have antagonistic interests, each trying to claim that she would have performed better, and that her team would have performed better, all to try to get the largest piece of the damages pie to the detriment of others. They would compete in the courtroom just as they compete in the pool. One could hardly imagine a less appropriate case for certification.

Plaintiffs' answer to these challenges is to ignore them entirely. Their opening papers walk through the Rule 23(a) and (b)(3) elements superficially and without ever confronting the obvious obstacles to class certification. And their expert's "common proof" of injury and damages— normally the heart of a class certification motion in an antitrust case—is beyond superficial. At its core, it is just a proposal that every swimmer be awarded positive damages (implying an actionable injury) based on either the swimmer's own performance during ISL's 2019 season extrapolated to other years and events, or based on the *average* performance of *all* ISL swimmers during the 2019 season. That is not representative evidence that demonstrates there are not individualized injury or damages issues. It is a proposal to disregard the obvious complexity of predicting how athletes competing for prize money would have fared. Class certification was properly denied in sports antitrust cases involving similar efforts, including by the same expert, to paper over individualized injury and damages issues. *See, e.g.*, *In re NCAA I-A Walk-On Football Players Litig.*, No. C04-1254C, 2006 WL 1207915, at *8, *12 (W.D. Wash. May 3, 2006) (denying certification of athlete class because (1) impact "cannot be proven without considering the facts surrounding each class member, including whether each one of them would have actually been awarded one of the additional scholarships" and (2) athletes had antagonistic interests in seeking "particular piece[s] of the damages pie"); *Rock v. NCAA*, No 12-cv-1019-TWP-DKL, 2016 WL 1270087, at *14 (S.D. Ind. Mar. 31, 2016) (denying certification, in part, because plaintiffs' motion relied on Dr. Rascher's "unsubstantiated" opinions). Plaintiffs' simplistic injury and damages arguments do not come close to satisfying Rule 23(b)(3).

Were that not enough, these plaintiffs cannot possibly be adequate representatives of the proposed class. First, since the swimmers compete against each other and earn varying amounts *depending upon their performance*, each will argue that she would have earned more in the but-

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

for world and that others would have earned less or even nothing. As recognized in *Walk-On Football Players*, 2016 WL 1270087, at *8, such intra-class conflict means that Plaintiffs cannot establish adequacy under Rule 23(a)(4). Second, these named plaintiffs are the hand-picked allies of ISL, whose counsel were selected by and represent ISL, and are clearly compromised as a result. The named plaintiffs may represent a pro-ISL perspective within the broader swimmer community, but a group of "sellers" allied with one "buyer" that started and controls this litigation cannot possibly be fair and adequate representatives of all swimmers. The inherent conflict is confirmed by the fact that the class definition has been substantially narrowed (from "top-tier" swimmers to only those with ISL contracts)—and the swimmers' economist has fully embraced ISL's business plan and its fantastic growth projections ███████████████████████████ as the sole basis for his assumptions about lost swimmer opportunities. These is a case of class representatives who are "little more than pawns in a battle between rival[s]." *Martinez v. Barasch*, No. 01 Civ. 2289 (MBM), 2004 WL 1367445, at *7 (S.D.N.Y. June 16, 2004).

Finally, the swimmers' theory of anticompetitive harm necessarily requires individual inquiries. The causal chain allegedly begins with FINA's "threats" regarding Olympic eligibility, causes swimmers to indicate an unwillingness to participate in the 2018 Turin event, and ultimately leads to that event's cancellation and supposedly fewer ISL events in 2019 and 2022. But FINA itself made no threats to swimmers; statements that FINA made to national federations about its rules were interpreted and relayed to swimmers by different national federations and by ISL, and were received by individual swimmers in different ways. There is an important and highly individualized issue in the middle of the causal chain as to how a swimmer perceived the claimed "threats" and whether they impacted a swimmer's willingness to participate in the Turin event or ISL generally. No one can speak for all swimmers on that issue; it is inherently individualized.

Plaintiffs have not satisfied their heavy burden of establishing that Rule 23's prerequisites are in fact satisfied. *Olean*, 993 F.3d at 784–85. Class certification should be denied.

## II.    BACKGROUND

It is black letter law that the propriety of class certification does not turn on the strength or weakness of the plaintiffs' case on the merits. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156,

178 (1974).  It was therefore unnecessary for Plaintiffs to devote ten pages to a "Statement of Facts" consisting almost entirely of merits arguments that have little to do with class certification.

Needless to say, FINA denies that it is a monopolist in a "market" for "top-tier international swimming competitions."  At the appropriate time, FINA will show that is not the case, given the hundreds of swimming competitions in which top tier swimmers compete every year beyond the few events that FINA does administer.  The characterization is also contradicted by ISL's own view of and approach to swimming competitions as a tiny part of a much larger "sportainment" market (as ISL's founder Konstantin Grigorishin calls it), in which FINA and ISL compete with myriad other sports and entertainment properties for broadcasting and sponsorship dollars.

Likewise, when appropriate, FINA will address ISL's incorrect contention that FINA "controls swimmers" through threats of Olympic or World Championship disqualification.  FINA has never disqualified an athlete for any reason other than doping.  FINA has also never banned or threatened any swimmer with a ban from the World Championships or Olympics for participating in unapproved competitions.  That did not happen in connection with ISL either.

FINA will also show at summary judgment that—indisputably—it was willing to sanction ISL meets.  For reasons that ISL's founder, Mr. Grigorishin, cannot explain, he passed on the opportunity and instead thrust ISL into an internal dispute between the FINA Executive and the Italian Swimming Federation, triggering the chain of events that led to the cancellation of the Turin Event.  FINA did not "quash" the event; ISL's failure to accept the sanction FINA offered led to unnecessary conflict within FINA and the Italian Federation's decision to cancel the event.

These issues, however, are not material to whether a class action is the appropriate way for the swimmers' claims to proceed.  FINA therefore focuses its discussion below on what is relevant.

## A.    The Named Plaintiffs Have Unique Interests in ISL, Which Is Funding This Litigation

The named Plaintiffs supposedly brought this case to expand earning opportunities for all "top tier international swimmers."  But in reality, they are uniquely tied to ISL.  Discovery confirmed what was obvious:  they were recruited by ISL to participate in this lawsuit.  *See, e.g.*,

Ex.[1] A (Hosszú) at 87:2–89:22. ISL's founder is paying the fees of all of the swimmers' counsel.[2] And, Farella Braun + Martel LLP claims to represent *both* ISL and the swimmers.

The named plaintiffs are not just typical swimmers either, without particular ties to ISL. Plaintiffs Hosszú and Andrew are also partial owners of ISL club teams. *See* Ex. C (Andrew) at 201:21–202:1; Ex. A (Hosszú) at 253:20–255:7. Michael Andrew and his parents together own 40% of the New York Breakers, an ISL club team. Ex. C (Andrew) at 202:2–203:8. Mr. Andrew's mother is the team's general manager (*id.* at 204:18–21), and his father was an assistant coach (*id.* at 205:11–16). Katinka Hosszú owns 40% of the Budapest-based ISL team, Team Iron. Ex. A (Hosszú) at 252:19–253:4. So both Andrew and Hosszú stand to make money—beyond just prize money—if ISL were to become profitable. *See id.*; Ex. C (Andrew) at 211:14–22. They both admitted (1) they have a particular interest in seeing ISL succeed and (2) their interests are not shared by other athletes. Ex. C (Andrew) at 210:16–22; 211:14–212:4; Ex. A (Hosszú) at 253:12–18; 254:19–255:7. When Mr. Andrew was asked whether he has "more skin in the game because if ISL succeeds, your ownership stake would be worth something, and that's something a lot of other athletes who participate in ISL don't have," he replied: "Yeah, I'm blessed with a cool opportunity to earn from having ownership in the team, yeah." Ex. C (Andrew) at 211:14–22.

The named Plaintiffs' alliance with ISL undoubtedly has affected their conduct. They filed a copycat complaint and pursue the identical arguments ISL makes. Their damages theory is entirely derivative of ISL's, from arguments about meets ISL failed to hold due to FINA's conduct to fully embracing ISL's contentions about its growth prospects in the but-for world. Plaintiffs even altered their proposed class definition *to cover only swimmers with ISL contracts*. The original definition was "All natural persons who are eligible to compete in swimming world championship and Olympic Game competitions," Am. Compl. ¶ 148, *i.e.*, "top-tier swimmers." *Id.* ¶¶ 135–47. Now, it is "All swimmers who signed contracts to participate in the International Swimming League from January 1, 2018 through the date of trial." Mot. at vi. This supposedly

---

[1] All "Ex" citations are to the exhibits attached to supporting declaration of Aaron T. Chiu.

[2] *See* Ex. A (Hosszu) at 94:12–15 ("Q. Do you know who's funding this lawsuit? A. Yes. Q. Who? A. I believe Konstantin."); Ex. B (Shields) at 134:3–16 (same); Ex. C (Andrew) at 22:17–23 (same); Ex. D (ISL Privilege Log indicating ISL emails regarding a "retainer invoice for $50k for Lieff Cabraser").

independent suit on behalf of swimmers is now entirely by and for ISL and "its" swimmers.

### B. The Extent to Which Any FINA "Threat" Impacted Individual Swimmers Is An Individual, Not Common, Issue

Plaintiffs' antitrust theory is that FINA threatened an "Olympics ban" for any swimmer who participated in ISL's events, effectively forcing the cancellation of the pilot event in Turin, Italy, and in some longer-term sense denying the proposed class an opportunity to compete and earn money. To the extent Plaintiffs intend to argue that swimmers felt threatened, or declined to participate in ISL meets because they felt threatened, that clearly creates individualized issues.

There is no "common proof" that FINA ever threatened any swimmers with a ban from the Olympics because they swam in ISL meets. Throughout this case, ISL and Plaintiffs have tried to read a "threat" out of two letters FINA sent to national federations and other affiliated entities regarding ISL, each of which cites Rule GR 4 (in the form that existed previously). Plaintiffs argue these letters are common proof of liability because of their threatening nature. Mot. at 15, 19.

The problem is that the letters did not go to swimmers and do *not* threaten swimmers; no communication by FINA that might arguably qualify as common proof does. The letters (hardly "threatening") concerned the potential consequences for FINA's own national federations of sponsoring unsanctioned competitions, and say *nothing* about swimmers or disqualifying them from FINA competitions. *See* Exs. E; F. In FINA's rules and culture, there is a world of difference between maintaining order among federations and imposing sanctions on swimmers. *Never* in FINA's history has it disqualified an athlete for anything other than doping, and FINA has never banned athletes from the Olympics or the World Championships because they swam in unauthorized competitions. As Husain Al Musallam, FINA's new President, explained during his deposition, "FINA never … ban[n]ed any athletes because of GR4, not in the past, not now, not in the future." Ex. G (Al Musallam) at 74:5–8; 75:19–23 ("We never suspend an athlete due to any violation of GR 4. We never."); *see also* Neuburger ¶ 6.[3] In fact, FINA never even communicated directly with any swimmers regarding this rule. *See* Ex. H (Miller) at 161:25–162:4 ("Q. Nobody from FINA … reached out to you and said that you can't participate in ISL's events? No, like I

---

[3] All "Neuburger" citations are to the declaration of Dale Neuburger filed in support of this opposition.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

was never like contacted by FINA. Like I never got like a letter or an email or anything."); Ex. I (Pebley) at 210:6–16 (similar); Ex. B (Shields) at 148:19–21 (didn't receive FINA's June 5 memorandum); Ex. A (Hosszú) at 109:7–8 (same); Ex. C (Andrew) at 38:16–24 (if he received FINA's June 5 memorandum, "it would have come from USA Swimming").

Because of this, there is no "one stroke" way to prove that swimmers were threatened. Indeed, what the Court sees from Plaintiffs are efforts to show that some swimmers felt threatened, or at least uncomfortable, not because of anything they heard from FINA, but because of what others said about what FINA had said. *See, e.g.*, Mot. at 8 (contending that USA Swimming "told the athletes that participation has serious problems for Olympic and FINA World Championships participation"); Dkt. 191-38 (notes of USA Swimming call with swimmers regarding FINA/ISL situation); Am. Compl. ¶¶ 103–4 (contending that the Swiss Swimming Federation and Russian Olympic Committee told their swimmers that *they* would be forced to ban swimmers who participated in the Turin Event). The Italian Federation told its swimmers that the Turin Event was cancelled without any discussion about any FINA "threat." *See* Ex. J (Barelli) at 188:23–189:19. British Swimming CEO Jack Buckner could not even recall if British Swimming communicated with its swimmers about the Turin Event and FINA's position. *See* Ex. K (Buckner) at 127:5–129:7. An additional complication is that ISL propagated the claimed threat for its own purposes, at one point issuing a press release stating—falsely—that "athletes who compete at Energy for Swim could face bans between one and two years."[4]

Individual swimmers' reactions varied as well. Cody Miller said: "My understanding is that FINA essentially threatened the athletes by saying that if you choose to compete in this non-FINA event, then they have the right to take away your Olympic eligibility or your ability to qualify for the Olympics." Ex. H (Miller) at 161:3–7. Michael Andrew, on the other hand, was only "advised by USA Swimming to be thoughtful because there could be … ramifications." Ex. C (Andrew) at 181:14–182:6. Some swimmers cared less than others about the potential loss of eligibility. Tom Shields still would have participated in the Turin Event though he learned of

---

[4] *See ISL: FINA Delaying Agreement 'Because They Know Time is Critical'* (Nov. 12, 2018), https://isl.global/isl-fina-delaying-agreement-because-they-know-time-is-critical/.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FINA's October 30 memorandum; he signed a contract thereafter in November 2018 to compete in the event, because he was "fine losing FINA rights." Ex. B (Shields) at 190:14–192:25; *see also* Ex. L; *cf* Ex. I (Pebley) at 213:14–215:17. Cody Miller acknowledged that U.S. national team swimmers may have perceived the dispute between ISL and FINA differently (Ex. H at 166:20–167:4), but that he signed with ISL for 2019 because "I was more in favor of participating in new events to grow the sport, like the ISL, and if FINA was going to punish us for it, then I was going to do it anyway." *Id.* at 168:23–169:12.[5]

Any impact from a "threat" by FINA to their Olympic eligibility would have been received by and affected individual swimmers differently. It cannot be established through common proof.

### C. ISL's Compensation System—the Foundation for Claims of Classwide Impact and Damages—Pits Athletes and Teams Against One Another in Ways That Guarantee Individualized and Antagonistic Damages Claims

Plaintiffs seek damages based on money they would have made at ISL competitions, but for FINA's actions. They do *not* seek the normal damages in a monopsony case, which would be damages (to all swimmers in the relevant labor market, not just swimmers contracted to ISL) based on depressed wages. Necessarily, then, the foundation for classwide damages is ISL's compensation system, *i.e.*, how individual swimmers make money in ISL competitions.

Swimmers are compensated by ISL through a combination of *prize money* and (for many but not all swimmers) *appearance fees*. *See* Hubbard ¶ 23.[6] Neither are guaranteed for any swimmer. *Id.* Whether and how much prize money a swimmer earns is a function of her individual performance, her team's overall performance throughout the season, the performance of other teams' swimmers, and also the individual circumstances that affect the number of ISL events in which she competes. *Id.* ¶¶ 24–27. Whether or how much a swimmer receives in appearance fees varies team-by-team and swimmer-by-swimmer. *Id.* The stars understandably command more; others receive nothing other than expense reimbursement (which Plaintiffs implicitly acknowledge

---

[5] Reactions also varied given ISL's offer to compensate swimmers in the event it had to cancel an event. While Jacob Pebley was "concerned" that participating in the Turin Event might jeopardize his Olympic eligibility, he still signed a contract because "we were … told that if you didn't participate in it, you'd still be able to collect the prize money." Ex. I (Pebley) at 210:20–212:23.

[6] All "Hubbard" citations are to the supporting declaration of Dr. Thomas N. Hubbard.

do not generate damages).  Compensation is thus highly uneven: in 2019, which Plaintiffs' expert uses as a baseline, compensation ranged ████████████████████████████████████ ████████████████████████  *See* Rascher Decl., Ex. D; Hubbard ¶ 24 & Ex. 1.

ISL's unique format is described in detail at https://isl.global/isl-2019-technical-information/.  Basically, there is a "season [that] is split into a regular championship and a final." *Id.*  During the regular "championship" season events, called "matches," four ISL teams compete for points, and "[a]fter all of the championship matches, the 4 clubs with the highest number of points advance to the final." *Id.*  "[C]lubs earn points from participating in matches according to the following principle: 4 points for 1st place in the match, 3 for 2nd, 2 for 3rd and 1 for 4th." *Id.*

In 2019, each ISL match lasted two days and was comprised of 37 races, primarily individual races (e.g., the Women's 100m butterfly) but also 5 team relays and two "skin races" (successive freestyle races in a knockout format). *Id.*  Clubs win the match according to how their team members fare in the 37 races.  "Each race consists of 2 representatives from each of the clubs. Points are distributed after the race in the following manner: 9 points for 1st, 7 for 2nd, … 1 for 8th." *Id.*  But there are additional complications.  Swimmers can also *lose* team points if they do not swim faster than the "cut off time" for each match, or if they do not start, finish, or are disqualified. *Id.*  There is also a "jackpot" wherein a first place swimmer who beats the other seven swimmers by a certain time receives all the points for that race. *Id.*  The team with the most points of all 37 races "wins" the match, receiving the 4 points toward the season standings.

From an individual compensation perspective, ISL's format is even more complicated. Points convertible to prize money are awarded to swimmers who place first through fourth only, and prize money is based on a combination of individual points earned and club performance.



LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

FINA'S OPP'N TO PLS.' MOT. FOR CLASS CERTIFICATION
CASE NO. 3:18-CV-07393-JSC

Ex. M.  There is no guaranteed prize money in ISL's system except for ███ for swimmers whose teams make the Final Match.  *See id.*  Four swimmers per race earn no individual points, and therefore earn no prize money for that race.  The system also favors swimmers who compete in numerous matches, e.g., a multi-discipline swimmer like Sarah Sjöström who competes in multiple strokes, as opposed to a swimmer who competes in one stroke and distance.

There is another important respect in which opportunity determines a swimmer's earnings potential.  Each ISL team can have more swimmers on its roster (32) than could attend any one event (28), so not all swimmers on a team actually get to compete at each event.  *See* Hubbard ¶¶ 11, 33–35.  At every match, a number of swimmers under contract to ISL are "benched," and have no opportunity to win prize money (or receive an appearance fee).  ISL rules also provide that only "12 men and 12 women [per club] can swim individual races," which are the main opportunities to earn prize money points.  https://isl.global/isl-2019-technical-information/.  And some swimmers by their own choice contracted only to attend one or a select number of ISL 2019 events, while others contracted with ISL to attend every regular season event.  Hubbard ¶ 34 ███
███████████████████████████████████████████ ¶ 74 ██████████████████████████
████████████████████████████  One cannot assume that swimmers would take advantage of every opportunity to swim in an additional ISL event given their other commitments and priorities.  For example, despite being invited to more events, Jacob Pebley only participated in ISL's 2019 Lewisville event because whether he competed "was pretty much location based at that point, if it was going to interfere with my training."  Ex. I (Pebley) at 38:17–40:11.  Messrs. Pebley and Miller did not swim in certain overseas ISL events due to travel distance and time away from family.  *Id.*; Ex. H (Miller) at 20:8–21:15; 127:20–128:6.

Club performance is also a major determinant of a swimmer's earnings.  Hubbard ¶¶ 23–24.  Only four Clubs make the Finals, leaving those swimmers on Clubs that fail to make the cut substantially fewer opportunities to compete and earn prize money.  *Id.* ¶ 47.  For example, three-time Olympian Hannah Miley of Great Britain was a member of Aqua Centurions in 2019, which finished the season in seventh place.  ████████████████████████████████████████
████████████████████████████████.  Rascher Decl., App'x D.  ISL also awards

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

more prize money at the Finals: $1,000 per swimmer, $1,000 per point (instead of $300), and $1,000 to $10,000 per swimmer based on the club's performance. Ex. M.

These complexities make the distribution of prize money uneven and idiosyncratic. Plaintiffs' expert details the prize money awarded in ISL's 2019 season, which varies from ███ ████████████████████████████████████████. *See* Rascher Decl., Ex. D. Over 30% of all the prize money awarded went to members of the champion Energy Standard team; the average prize money per athlete on this team was $26,420—*two and a half times* the median prize money awarded to all 2019 swimmers (which ISL's expert uses to award damages for 2018). Superstar swimmers ██████████████████████████████████████ than far less accomplished swimmers ███████████████ because they chose to compete less often, they competed in fewer disciplines, or their teams were less successful. *See* Rascher Decl., App'x D.

Hanging above this all is the fact that prize money is awarded as a result of performances in *sporting competitions*, which are inherently unpredictable. Unexpected outcomes are the norm. Two weeks ago at the U.S. Olympic Trials, two-time defending world champion Simone Manuel failed to advance from the semi-finals in her signature event, the 100m freestyle.[7] Plaintiff Shields, who previously did not care if he lost his Olympic eligibility ████████████████████████ ██████████████████████████ (Ex. L), made the U.S. Olympic Team.[8] It therefore makes little sense to suggest that an economist can formulaically predict how ISL prize money would have been awarded in some but-for world with more events.

Finally, some but not all ISL swimmers receive appearance fees. These are negotiated individually with ISL and/or a team and, like prize money, vary widely. Ex. B (Shields) at 176:11–177:7 (appearance fees paid by ISL vary by swimmer given "people hav[ing] different bids and negotiating skills and values"). Some swimmers—depending on their potential success, notoriety, and other factors—earn thousands of dollars in appearance fees per event. Other swimmers get

---

[7] Henry Bushnell, *Olympic trials stunner: Simone Manuel won't defend her historic gold medal in Tokyo after health struggles*, Yahoo! Sports (June 17, 2021), https://sports.yahoo.com/simone-manuel-us-olympic-trials-005633545.html.

[8] *See* USA Swimming 2020 Olympic Team Roster, https://www.usaswimming.org/docs/default-source/eventsdocuments/rosters/olympics/olympic-games-tokyo-2020-final-media-roster.pdf (last accessed June 28, 2021).

none. ████████████████████████████████████████

████ *See* Rascher Decl., App'x C. ████████████████████████████. *Id.* Of

the 65 swimmers invited to ISL's 2018 event, ██████████████████████████

████████████████████████████████████. *Id.* In 2019, the

award of appearance fees was left to each individual ISL team. Ex. N (Tsagarakis) at 40:12–

41:22. ██████████████████████████. Rascher Decl., App'x D. Some

teams, like the DC Trident, gave each member an equal amount in appearance fees. *See* Ex. H

(Miller) Dep. 114:22–115:13. Others, like Ms. Hosszú's Team Iron, did not, "because some

swimmers are better than the others." Ex. A (Hosszú) at 223:22–224:23; *see also* Ex. B (Shields)

at 197:21–198:11 (ISL team LA Current gave swimmers different appearance fees due to "a mix

between marketability and point-scoring potential for the league").

Appearance fees, therefore, do not set some compensation floor guaranteeing "damages"

for all swimmers. ISL designed an "eat what you kill" compensation system that makes any

evaluation of injury or damages highly individualistic.

### D.    Plaintiffs' Bid for a Damages Class

Plaintiffs seek to certify a Rule 23(b)(2) injunctive relief class consisting of "All swimmers

who signed contracts to participate in the International Swimming League from January 1, 2019

through the date of trial" and three Rule 23(b)(3) damages subclasses consisting of swimmers who

(i) signed contracts to participate in the 2018 Turin Event; (ii) participated in ISL's 2019 season;

and (iii) will sign contracts to participate in ISL's 2022 season.

In proposing their "common proof" of class-wide impact and damages, neither Plaintiffs

nor their expert, Dr. Daniel Rascher, even acknowledge the dynamics of ISL's competition and

team structure that implicate how individual swimmers are compensated. Instead, Dr. Rascher

proposes a methodology for assessing class-wide damages that boils down to a formula of applying

the earnings of the swimmers who participated in ISL's 2019 seven-event season as a proxy to

project: (i) what they would have earned in 2018 had the Turin Event gone forward; and (ii) what

they would have earned in a 2019 ISL season that had 10 more events than the seven held. He

skips over 2020 and 2021 to account for COVID-19, but then uses the same formula to estimate

impact and damages associated with the number of supposedly foregone ISL events for 2022, based either on the earnings of swimmers in ISL's 2021 season if trial occurs before the 2022 season is completed, or the earnings of swimmers in the ISL events that do end up occurring 2022 if trial occurs afterwards. For every swimmer in the 2018 sub-class who did not swim in any 2019 ISL events and therefore earned no money in 2019 to use as a benchmark, Dr. Rascher assigns them damages comprised of the median prize money and appearance fee amount earned by *other* swimmers who did compete in ISL's 2019 season ██████████ He would do the same for swimmers in the 2022 sub-class who do not end up competing in 2021, using the median earnings number for the swimmers who do compete in ISL's 2021 season.

Based on these simplistic (and wholly unrealistic) averages and metrics, Dr. Rascher's estimates a "potential" upward classwide damages figure of $26 million. The alleged damages are potentially that high because Dr. Rascher simply accepts without any analysis or corroboration a 2018 ISL Excel spreadsheet, which—based on wildly unrealistic assumptions—projected the league's future profitability and a corresponding number of events it could host. *See* Hansen ¶¶ 7, 20.[9] Dr. Rascher ignores, and did not even know about, a business plan that ISL prepared *after* FINA eliminated any possible threat of sanctions in 2019, which projects *substantially the same growth*. Ex. CC (Rascher) at 44:17–24. Dr. Rascher assumes foregone prize money and appearance fees associated with the one 2018 Turin Event that did not go forward, 10 foregone ISL events in 2019, and 44 foregone ISL events in 2022. For every foregone event, he takes estimates of the appearance fees and prize money ISL would have offered, and just *allocates* that money among the participating athletes according to averages and other "benchmarks" derived from ISL's 2019 results. There is no analysis of the myriad of reasons why individual athlete and club performance might have varied year-to-year, the effects of changes in club composition, or anything that might allow an individual swimmer, suing individually, to claim more than the average-driven damages estimate. To top it off, Dr. Rascher would award damages to swimmers for *more events* than they could have participated in under ISL's rules. *See* Hubbard ¶¶ 66–69.

---

[9] All "Hansen" citations are to the supporting declaration of John Hansen.

E.    **FINA's January 15, 2019 Announcement and July 2019 Amendment to Rule GR 4 Mooted Plaintiffs' Injunctive Relief Claim**

Plaintiffs also seek certification of an injunctive relief class.  The case is moot to the swimmers—and the fact that it persists is still more evidence that ISL is in charge.

FINA's January 15, 2019 announcement confirmed that swimmers would never be penalized for swimming in independent competitions, including ISL's.  *See* Dkt. 191-44.  Since the loss of Olympic eligibility was the only perceived risk of participating in ISL events, FINA's announcement unequivocally cleared ISL to host its meets.  The same day, ISL confirmed with USA Swimming and British Swimming that FINA's announcement meant ISL could move forward with both federations to plan its 2019 events.  *See* Exs. O; P.[10]

Both ISL and the swimmers acknowledged that FINA's January 2019 announcement resolved the issues here.  ISL's founder, Konstantin Grigorishin, confirmed he is unaware of anything FINA did to hamper ISL's business after that point.  Ex. Q (Grigorishin) at 35:18–36:19; 364:4–365:4.  Plaintiffs all confirmed that FINA's January 15 announcement eliminated any confusion regarding their Olympic eligibility.  Ms. Hosszú admitted that the announcement meant "*they settled and ISL can start*" (Ex. V), and there is no longer any prospect of punishment by FINA for participation in ISL events.  Ex. A (Hosszú) at 94:24–96:6.  Mr. Andrew admitted that FINA's announcement "was a big part in being able to move forward [] knowing that the athletes wouldn't have to be punished," and FINA and ISL have since been able to "co-exist."  Ex. C (Andrew) at 182:15–189:3.  Mr. Shields acknowledged that FINA's "wrongful" conduct was limited to a "couple of times," "specifically the fall of 2018."  Ex. B (Shields) at 137:25–139:3.  Mr. Miller agreed that "from a swimmer's perspective now, [he has] been able to participate in ISL events without any issues from FINA."  Ex. H (Miller) at 172:19–173:1.

In July 2019, FINA's General Congress, comprised of all 209 members, amended Rule GR 4 to eliminate the provision providing that federations could sanction their swimmers for

---

[10] ISL ultimately hosted four events in the United States and three events in Europe in 2019—with three of the four U.S. events receiving FINA's sanction and the one remaining event proceeding independently.  *See* Exs. R, S, T.  ISL did not partner with a FINA member federation to host its 2019 Naples event, so no sanction was sought from FINA.  *See* Ex. U (di Nino) at 137:18–24; *see also* Neuburger ¶¶ 16, 18.

participating in unauthorized events. *See* Neuburger ¶ 7; Ex. W. At the end of 2020, FINA also codified in its By-Laws a set of athlete's rights, which reaffirmed that swimmers have the right to participate in independent events without consequences for their Olympic eligibility. *See* Neuburger ¶¶ 10–12; Ex. X (FINA BL 16). So for nearly two years, FINA has lacked the rules, policies, or power to impose any kind of sanction against a member federation or a swimmer for swimming in ISL events. Swimmers have freely competed in ISL events without repercussion from FINA,[11] and ISL hosted events in 2019 and 2020, and is currently planning its 2021 season.[12]

## III. LEGAL STANDARD

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (citation and quotation marks omitted). Class certification is neither automatic nor presumed; rather, "Rule [23] imposes stringent requirements for certification that in practice exclude most claims." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013). Recent decisions emphasize that to justify certification, classwide litigation must be able to "resolve" (not just raise) common issues, and for everyone—all class members and defendants—without altering anyone's burdens under the law and, critically, without prejudicing a defendant's right to advance individualized defenses. *See Wal-Mart*, 564 U.S. at 367; *Tyson*, 577 U.S. at 459.

Rule 23 is not a "mere pleading standard"; a plaintiff must establish that the Rule's requirements are 'in fact' satisfied. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). This requires a "rigorous analysis" that invariably will "entail some overlap with the merits of the plaintiffs' underlying claim." *Wal-Mart*, 564 U.S. at 351. Aggregate proof—such as the injury and damages methodology Plaintiffs propose—is a principal object of the Court's rigorous

---

[11] *See* Pls.' Supp. Resps. to FINA's 1st Set of Requests for Admission Nos. 1 & 2, Exs. Y, Z, AA.

[12] Plaintiffs' wrongly suggest that FINA has continued to interfere with ISL by refusing to "sanction" (and thereby recognize the times swum at) certain events that conflict with others on FINA's calendar. FINA time recognition is not a barrier to ISL's ability to put on meets. ISL's competitions are not even focused on times. *See* Ex. C (Andrew) 131:20–132:2 ("The ISL concept is … a dual meet style where you score points and you win based off of total number of points."); Ex. BB (ISL: "Time is no longer the main factor."). FINA also approved and recognized the times from all but one of the 2019 ISL events for which approvals were sought. Regardless, every 2019 ISL event went forward. FINA also approved and recognized the times swum at every 2020 ISL event.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

scrutiny. *Comcast* ended the days when a plaintiff could obtain certification simply by proposing "plausible" aggregate proofs. *See* 569 U.S. at 32, 35 (reversing certification given failure to assess whether the damages calculations in plaintiffs' model were "a just and reasonable inference or speculative"). Today, "Rule 23 not only authorizes a hard look at the soundness of statistical models that purport to show predominance—the rule commands it." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 255 (D.C. Cir. 2013); *Olean*, 993 F.3d at 786–87. This entails more than determining what is possible *presuming* classwide adjudication (Dr. Rascher's approach); the proposed aggregate proof must permit a full and fair adjudication of the issues reliably, without sacrificing substantive rights. *Tyson*, 577 U.S. at 458; *Olean*, 993 F.3d at 787.

A party seeking class certification must first meet Rule 23(a)'s four requirements: numerosity, commonality, typicality, and adequacy of representation. *Olean*, 993 F.3d at 784. Then, "[t]o obtain certification of a class action for money damages under Rule 23(b)(3)," a putative class must also establish that "the questions of law or fact common to class members predominate over any questions affecting only individual members." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013); *see* Fed. R. Civ. P. 23(b)(3).

## IV.   ARGUMENT

### A.   The Named Plaintiffs And Their Counsel Are Not Adequate Class Representatives Given Their Unique Financial Interests in ISL

This case was filed as a class action by and for ISL for tactical reasons in its war against FINA. That is the first reason class certification is inappropriate. Class representatives are fiduciaries who must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4); *Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071, 1079 (9th Cir. 2017). "Adequacy" therefore requires a determination of "whether 'the named plaintiffs and their counsel have any conflicts of interest with other class members,'" *Woods v. Google LLC*, No. 11-cv-01263-EJD, 2018 WL 4030570, at *4 (N.D. Cal. Aug. 23, 2018) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)), and whether they might be motivated by outside conflicts. *See Campbell v. Facebook Inc.*, 315 F.R.D. 250, 263 (N.D. Cal. 2016); *Kamean v. Local 363, Int'l Broth. of Teamsters, Chauffeurs, Warehousemen, and Helpers of Am.*, 109 F.R.D. 391, 395

(S.D.N.Y. 1986) (declining to infer fair representation "merely from the likelihood of vigorous representation" where named plaintiffs' interests conflicted with the class). If class representatives are motivated by interests distinct from the absent class members, they risk breaching their duty "to consider the advantages of settlement and to negotiate wisely and prudently when settlement is in the long term interest of the class[.]" *Kamean*, 109 F.R.D. at 395; *Cf. Radcliffe v. Experian Info. Sols., Inc.*, 715 F.3d 1157, 1165–67 (9th Cir. 2013) (reversing class action settlement where class representatives "face[d] significantly different financial incentives than the rest of the class because of the conditional incentive awards that [were] built into the structure of the settlement," which undermined their ability to adequately protect the interests of the class).

That is the situation here both with respect to the named plaintiffs and their counsel.

We do not doubt that Plaintiffs Andrew, Hosszú, and Shields care about this case. They are nevertheless inadequate given conflicts arising out of (1) their ownership interests in ISL's club teams; and (2) ISL's funding of and direct influence over this litigation. As team owners, Plaintiffs Andrew and Hosszú's interests are inextricably tied to ISL's profitability and success, well beyond that of all other swimmers. *See supra* Section II.A. Their direct pecuniary interests in ISL creates a non-speculative risk that they will benefit more from serving the interests of ISL in this litigation than the interests of absent class members.[13]

This conflict is amplified by the fact that ISL is funding and driving this litigation. The swimmer's counsel was selected and is paid by ISL. *See supra* Section II.A. The named Plaintiffs were recruited by ISL to be plaintiffs in this lawsuit. *See id.* The swimmers fully understand their role in ISL's war against FINA, a war in which Mr. Pebley testified that ISL wants swimmers on its side. Ex. I (Pebley) at 218:1–220:2. Class representatives who are "little more than pawns in a battle between rival[s]" are clearly inadequate. *Martinez v. Barasch*, No. 01 Civ. 2289 (MBM), 2004 WL 1367445, at *7 (S.D.N.Y. June 16, 2004).

Farella Braun + Martel LLP and Lieff Cabraser Heimann & Bernstein, LLP are tainted by

---

[13] Andrew and Hosszú may contend they are not conflicted by their ISL ownership interests because ███████ *See* Ex. DD ███████████ n ███████████ But the swimmers' proposed damages are derivative of ISL's alleged damages, which extend to ISL's 2022 season. ████████████

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FINA'S OPP'N TO PLS.' MOT. FOR CLASS CERTIFICATION
CASE NO. 3:18-CV-07393-JSC

this conflict. Even "the appearance of divided loyalties" or "potential conflicts" can be disqualifying for class counsel. *Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1465 (9th Cir. 1995). Putative class counsel are being (and have been) guided by the purse strings of ISL's founder, Mr. Grigorishin. Allegiance to a party beyond the class that is a self-described "competitor" to the defendant, is paying the litigation fees, and is ultimately making the decisions in the case, is disqualifying. *See Kamean*, 109 F.R.D. at 396 (holding that the funder of the litigation, a competitor to the defendant, "as holder of the purse strings, will enjoy considerable, inappropriate control over this litigation simply because it is capable of withdrawing financing at any time. This threat, or even the possibility of such a threat, necessarily would compromise the independence of class counsel[.]"). This is a particularly acute conflict in the context of antitrust litigation, as swimmers who "sell" their services should be commercially adverse to *all* "buyers," not hostile to one and in the pocket of another. Instead, what we see is 100% alignment between ISL and the named Plaintiffs, with respect to claims, theories and also settlement positions.

This conflict of interest is not only evident logically, it has already manifested in a complete absence of swimmer independence. How else to explain that the swimmers continue to pursue this case, with the precise liability and damages theories that ISL developed, even though all of them have acknowledged that FINA's January 2019 announcements and subsequent rules changes have fully eliminated any concerns about disqualification? *See infra* Section IV.C. And then there is the new class definition, which explicitly makes this a case about swimmers under contract to ISL, thereby jettisoning every "top-tier" swimmer that does not have an ISL contract. That itself is a breach of plaintiffs' fiduciary duties to the putative class *according to their own pleadings*. It should rightly disqualify these swimmers and their counsel as class representatives.

### B. Named Plaintiffs Are Inadequate Representatives Given the Inherent Intra-Class Conflicts Underlying Their Antitrust Impact and Damages Theory

The fact is that no one can be an adequate class representative in a damage action based on the claims and damages theories present in this case. Because any injury and the extent of damages derive from swimming *competitions*, swimmer interests with respect to damages are not and cannot be aligned. At every "lost" ISL competition, a pool of appearance fee and prize money

would have been available. It is not distributed equally, and outside the Finals there is no guaranteed money for anyone. ISL pays appearance fees only to some swimmers, and in highly varying amounts. And prize money is awarded based on individual and team performance in the pool—and some receive nothing. Any swimmer's damages claim is therefore optimized by arguments that she would have obtained an appearance fee, it would have been large, she would have swum in lots of races and done very well, and her team would have done well, making it to the Finals where once again she and her team would have done well. And because all swimmers would be arguing for the largest possible piece of the available appearance fees and prize moneys, proving individual damages (and even injury) would pit the Plaintiffs and class members *against each other*. For example, every swimmer who could plausibly claim to have won the 100m freestyle would thereby implicitly argue that other swimmers would not have won. Swimmers would all want to argue that their team made the Finals, when only four can. They would all be engaged in a complicated zero sum game, in which optimizing their own damages limits the damages available to others.

That is an intra-class conflict that renders the named Plaintiffs inadequate. *See In re Beer Distribution Antitrust Litig.*, 188 F.R.D. 549, 544 (N.D. Cal. 1998) (Plaintiffs were inadequate representatives of a proposed class of beer distributors, as "competition for the distribution services of beer distributors results in a conflict that goes to the merits of the litigation"). It is similar—though worse—than the dynamics that led the court to deny class certification in *In re NCAA I-A Walk-On Football Players Litig.*, No. C04-1254C, 2006 WL 1207915, at *9 (W.D. Wash. May 3, 2006). Plaintiffs were non-scholarship "walk-on" football players challenging the NCAA's annual limits on the number of football scholarships that a member school may award. They argued that without the NCAA rules, more scholarships would be available, and those would have gone to "walk-on" players. The problem there, as here, is that in the but-for world class members would have competed for the additional opportunities.[14] The "damages pie" was the value of more

---

[14] This critical fact also renders *White v. NCAA*, No. CV 06-0999-RGK MANX, 2006 WL 8066803, at *3 (C.D. Cal. Oct. 19, 2006), upon which Plaintiffs rely, inapposite. In *White*, there was no adequacy problem because all of the proposed class members *were* scholarship recipients and their antitrust theory was that but-for the NCAA's cap on grant-in-aid financial awards, they would all receive a greater financial awards:

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

scholarships, and "[i]n order to prove that he is entitled to a particular piece of the damages pie, each class member will have to offer proof that necessarily will involve arguing that a threshold number of other players (class members and non-class members) would *not* have gotten that same scholarship money."[15] *Id.* This has predominance implications too (as discussed below), but of course without an adequate class representative the Rule 23(b)(3) issues are moot.

**C. Plaintiffs Fail to Establish That Common Issues Predominate, as Required for a Rule 23(b)(3) Damages Class**

1. Plaintiffs Ignore the Contemporary Predominance Standard That Applies in Antitrust Class Actions

Plaintiffs suggest that since they assert antitrust claims, "predominance is readily met" and that there is a "presumption" in favor of certifying a class. Mot. at 18, 13. That may have been true 25 years ago, but it is incorrect today. A series of recent Supreme Court decisions and the Ninth Circuit's latest decision in *Olean*—all antitrust cases—hold otherwise. *See Comcast*, 569 U.S. at 33; *Am. Express*, 570 U.S. at 234. *Olean* explains:

> Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." To police this exception, Rule 23 imposes "stringent requirements" for class certification. * * *
>
> When considering whether to certify a class, it is imperative that district courts "take a close look at whether common questions predominate over individual ones." The Supreme Court has made clear that district courts must perform a "rigorous analysis" to determine whether this exacting burden has been met before certifying a class. This "rigorous analysis" requires "judging the persuasiveness of the evidence presented" for and against certification.

*Olean*, 993 F.3d at 784 (citations omitted). The "court must find by a preponderance of the evidence that the plaintiff has established predominance under Rule 23(b)(3)." *Id.*

"[T]he predominance inquiry envisions 'what a class trial would look like,'" *id.* at 785

---

"[e]ach class member would deserve damages based on the difference between his [grant-in-aid] amount and his [cost-of-attendance]," and so there was no conflict. That is not the case here, where there necessarily is intra-class conflict because no compensation is guaranteed to any one swimmer (like the non-scholarship athletes in *Walk-On*).

[15] *See also Yeager's Fuel, Inc. v. Penn. Power & Light Co.*, 162 F.R.D. 471, 478–80 (E.D. Pa. 1985) (named plaintiffs inadequate where the proposed class "vigorously compete against one another in a limited market for retail fuel oil sales, and for home heating equipment sales, installation, and maintenance," which created "intra-class conflict with respect to each member's ability to demonstrate fact of damage"); *Chestnut Fleet Rentals, Inc. v. Hertz Corp.*, 72 F.R.D. 541, 545 (E.D. Pa. 1976) (named plaintiffs inadequate because they competed with class members for a fixed number of airport rental concessions and their "attempt to maximize their own damages recovery will conflict with the interests of the class").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(quoting *Crutchfield v. Sewerage & Water Bd. of New Orleans*, 829 F.3d 370, 375 (5th Cir. 2016)), and fundamentally asks whether such a trial could fairly be held on the basis of common proofs, without altering anyone's burdens under the governing law and, critically, without prejudicing the defendants' right to advance individualized defenses. *Wal-Mart*, 564 U.S. at 367 ("[A] class cannot be certified on the premise that [defendants] will not be entitled to litigate [their] statutory defenses to individual claims."). Recent Supreme Court decisions emphasize the relationship between Rule 23 and the Rules Enabling Act, which "forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right[.]'" *Id.*; *Tyson*, 577 U.S. at 459; *Am. Express*, 570 U.S. at 234. Assessing predominance therefore requires asking (a) whether it is feasible to try the case without individualized evidence and (b) whether that can be done *without altering any party's rights*—and especially not by conforming the proofs to what would make a classwide trial practical. *See* Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 104 (2009) ("[T]he real concern about aggregate proof in class certification lies in its threat 'to conform the law to the proof.'").

Tyson illustrates this in its holding that class certification was appropriate in that case because the proofs at class and individual trials would have been identical, 577 U.S. at 459, in contrast to *Wal-Mart*, in which the Court reversed class certification. *Id.* *Tyson* describes *Wal-Mart* as a case in which dissimilarities amongst class members meant "there would be little or no role for representative evidence" in individual trials, and no plaintiff "could have prevailed in an individual suit" by relying on evidence about how other employees were affected. *Id.* *Tyson* thus means that "[t]o establish predominance, [a plaintiff's] ... representative evidence must be capable of use at trial in individual—not just class action—antitrust cases." *Olean*, 993 F.3d at 788.

Plaintiffs' brief follows a familiar path in antitrust litigation, by trying to "rack up points" towards predominance with an extended discussion of how questions over FINA's behavior are common. That is mostly true—both here and in the great majority of antitrust cases, *including those in which class certification is denied*. The reason plaintiffs do not always prevail is because courts have come to understand that the barrier to predominance in antitrust cases is the statutory element of "impact" or "injury-in-fact." *See* 15 U.S.C. § 15 (requiring proof of injury to one's

"business or property"); *In re Modafil Antitrust Litig.*, 837 F.3d 238, 262 (3d Cir. 2016) ("[I]mpact often is critically important for the purposes of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof."); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 39 (D.D.C. 2017) (predominance in antitrust cases "focuses on whether plaintiffs have shown that the harm—that is, the impact—from the alleged [wrongdoing] is capable of proof at trial through evidence that is common to the class rather than specific to its individual members"). Plaintiffs must therefore "present a 'theory of injury and damages' that is 'provable and measurable by an aggregate model relying on class-wide data.'" *Olean*, 993 F.3d at 789 (quoting *In re Suboxone Antitrust Litig.*, 967 F.3d 264, 272 (3d Cir. 2020)); *see also Comcast*, 569 U.S. at 35 (antitrust plaintiffs must "establish that damages are susceptible of measurement across the entire class").

A plaintiff's injury and damages model is subjected to various tests. If its admissibility is challenged, it must pass *Daubert* scrutiny. *See, e.g.*, *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 188 (3d Cir. 2015).[16] It must correspond to the plaintiff's liability case, and not measure injuries not traceable to the alleged wrong. *Comcast*, 569 U.S. at 36–37. It cannot make predictions that are obviously wrong, such as finding injury where none should exist. *Rail Freight*, 725 F.3d at 253–54. It must provide "just and reasonable" damages estimates, and not be unduly speculative. *Comcast*, 569 U.S. at 35–36. And after *Tyson* and *Olean*, it "must be capable of use at trial in individual … cases," *Olean*, 993 F.3d at 788, meaning a plaintiff must show that the use of a classwide injury and damages model will not homogenize an analysis that, in individual trials, would turn on different, individualized evidence. *See, e.g.*, *Wal-Mart,* 564 U.S. at 367 (rejecting

---

[16] Reliability can be raised within or independent of a *Daubert* motion. Here, Dr. Rascher repeatedly testified during his deposition that ██████████████████████████████████████████. *See* Ex.CC (Rascher) at 32:12–22, 72:3–10, 91:25– 93:13, 98:6–25. For that reason FINA decided not to file a *Daubert* motion. Yet three weeks later, and the day before this brief was due, Plaintiffs disclosed Dr. Rascher as their merits damages expert. His merits approach is similar to what he described in his class certification declaration, but there is at least on important difference ████████████████. FINA does not concede that Dr. Rascher's opinions satisfy Rule 702 (and Rule 23 in any event requires more, *see Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) and *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 323 (3d Cir. 2009)). Nor may Plaintiffs present new evidence with their class certification reply. *See Ellis v. J.P. Morgan Chase & Co.*, No. 12-cv-03897 YGR, 2015 WL 9178076, at *5* (N.D. Cal. Dec. 17, 2015).

a proposed "Trial by Formula" approach that would have altered the rights the parties would have had in individual trial); *Tyson*, 577 U.S. at 458.

Predominance is also lacking where there is reason to believe that not all or nearly all class members were injured. *See Olean*, 993 F.3d at 792 (reversing class certification where the plaintiff's own common proof showed more than a *de minimis* number of uninjured class members). Uninjured class members have no claim for antitrust damages. 15 U.S.C. § 15. So "if there are class members who "in fact suffered no injury," the "need to identify those individuals will predominate" at trial. *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53 (1st Cir. 2018); *Rail Freight*, 725 F.3d at 252. And Article III allows redress only for actual injuries, leaving a court no authority "to presume and remediate harm that has not been established." *Lewis v. Casey,* 518 U.S. 343, 357–58 & 360 n.7 (1996). So, when the evidence indicates (as here) that the defendant's conduct may not have injured all or nearly all class members, class certification is inappropriate. *See Olean*, 993 F.3d at 791 n. 7 ("[W]e are skeptical that Article III permits certification of a class where '[c]ountless unnamed class members lack standing.'"). And, when the plaintiff's *own damages study* shows uninjured class members, that's the proverbial "canary in the coalmine" that the uninjured class member issue is too significant to permit certification. *See id.* at 792–93.

Finally, Plaintiffs cannot bypass showing that "all class members were *in fact injured* by" FINA's actions, *Rail Freight*, 725 F.3d at 252, by *theorizing* some generalized marketwide harm. That appears to be the point of Section IV.C.1.b of Plaintiffs' brief, in which they argue that "impact" can be established independent and irrespective of "damages." That is not true. Rule 23(b)(3) contemplates the certification of a class action seeking money damages. The Clayton Act requires antitrust plaintiffs to prove injury "to business or property," which means proving at least some damages. *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 60 (1st Cir. 2016) ("A private plaintiff seeking monetary relief must show actual, quantifiable damages 'by reason of' the antitrust violation.). Accordingly, numerous cases reject efforts by plaintiffs to claim that non-monetary injuries prove classwide impact.[17]

---

[17] *See, e.g.*, *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 161 (E.D. Pa. 2015) ("Plaintiffs need to demonstrate that common issues predominate for the alleged antitrust violations is that of

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

It is thus unnecessary for the Court to consider Plaintiff's "Direct" and "Indirect" methods of proving classwide impact. We not that both are circular—postulating marketwide harm and concluding that all swimmers ("sellers") must therefore be harmed. Circular reasoning cannot meet Plaintiffs' burden of *establishing* predominance (*Olean*, 993 F.3d at 784), and thus has no place in a Rule 23(b)(3) analysis.

## 2. Plaintiffs' Estimates of "But-For" ISL Meets Are Speculative

Dr. Rascher's injury and damages methodology begins with an assumption that FINA's conduct caused ISL to cancel its December 2018 pilot event, and put on fewer events in 2019 and 2022. This deprives swimmer of opportunities to earn prize money and appearance fees. The first problem with Dr. Rasher's testimony is with these foundational assumptions.

Impact and damages methodologies that rest on speculative projections of a "but-for" world cannot satisfy Rule 23(b)(3). That is because they are incapable of deducing whether the estimated class-wide impact and damages are "the certain result of the wrong." *Comcast*, 569 U.S. at 37. Courts have thus denied certification where, like here, a plaintiffs' common proof of class-wide impact and damages rests upon speculative damages assessments. *See, e.g.*, *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 230 (2d Cir. 2008) (decertifying class where plaintiffs' class-wide "price impact model" would require "engag[ing] in a series of speculative calculations to ascertain whether, and in what amount, plaintiffs suffered a loss"); *Fleischman v. Albany Med. Ctr*, No. 1:06-CV-765, 2008 WL 2945993, at *6 (N.D.N.Y. July 28, 2008) ("[e]specially at the class certification stage, Plaintiffs need 'demonstrate the existence of a reasonable basis on which damages can be determined at trial'"; denying certification where "the proposed assessment of damages [was] too speculative" (citations omitted)).

The speculation here is about *the opportunities swimmers lost*, specifically how many more ISL events there would have been but-for FINA's allegedly unlawful conduct. That number per year determines the *size of the league* ISL would have had, which determines the number of *teams*

---

'measurable damages' on a classwide basis." (citing *Hydrogen Peroxide*, 552 F.3d at 311-12)); *Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16, 22 (D.D.C. 2012) ("Adverse impact, in the context [of predominance], requires a showing of monetary loss attributable to the anti-competitive [conduct.]" (citing *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)).

1 and the number of *swimmers* ISL would have needed, all of which determines the *opportunities*
2 swimmers might have had in the but-for world. The class and damages are large if one assumes,
3 as Dr. Rascher did, far more but-for events than actual events. A smaller league implies both lesser
4 damages and a far more difficult hurdle for a swimmer to prove she would have been selected by
5 ISL, and therefore possibly damaged. There must also be some number of "lost" events, or there
6 aren't any swimmer damages. The class is now ISL swimmers only, so swimmer welfare is
7 ultimately fully derivative of ISL welfare.

8      Dr. Rascher makes it easy on himself by adopting as his but-for world assumptions about
9 the number of foregone ISL meets in a 2018 ISL spreadsheet that contemplated extraordinary
10 growth: ████████████████████████████████████████████████████████
11 ███████████████████████ *See* Exs. EE, FF; Rascher Decl. ¶¶ 60, 61 & n. 43. At that 2022
12 scale, ████████████████████. Ex. FF. ████████████████████████████, ISL and
13 its swimmers allies can argue that FINA's conduct forced the cancellation of many events, leading
14 to higher overall damages and a higher probability that every swimmer suffered some damages.

15      This is all rank speculation. ISL's projections were rejected uniformly by *every* sports
16 marketing agency that ISL consulted in 2018—*before* the cancellation of the Turin Event that
17 supposedly impacted ISL's ability to stage its projected number of events. *See* Hansen ¶¶ 30–42.
18 The Wasserman Media Group evaluated the 2018 ISL spreadsheet and concluded that the
19 projections were completely unrealistic—because they tied projected revenues to receiving media
20 rights fees, which are all but nonexistent from U.S. broadcasters. *See* Ex. GG (Wasserman on
21 ISL's 2018 business plan: "Uh, I don't think so for media rights"); Ex. HH (Holmes) at 386:3–9
22 (Wasserman 30(b)(6): "I can't state why and how [ISL] got these numbers from …. There may
23 have been some secret formula that we weren't aware of that had them believe that this was
24 something that was attainable. But in my team's expert opinion, it was something that was quite
25 aggressive."). ISL's 2018 projection ████████████████████ was similarly rejected by its
26 own expert consultants. A March 2018 budget prepared by Sportcel for ISL ████████████
27 ████████████████████████████████████████████████████████████.
28 *See* Hansen ¶ 81. CSM, another leading sports marketing agency, reported to ISL that ████

1     █████████████████," "████████████████████████████████," and "██████

2 █████████████████████████████." Ex. II. And ISL's own 2019 planning

3 documents ████████████████████████████████████████. *See* Hansen

4 ¶ 82. Projections consistent with what ISL was hearing from its consultants would leave both it

5 and the swimmers without *any* 2019 damages.

6     ISL also repeated its pie-in-the-sky projections in a 2019 business plan, prepared *after*

7 FINA's confirmation in January 2019 that it would never penalize a swimmer for participating in

8 ISL's events. *Id.* ¶¶ 18–19. ISL's 2019 projections ████████████████████████████

9 ██████████████████████████. *Id.* ¶ 18. If one accepts that perspective—

10 believing ISL's projections no matter how unrealistic—it undermines any contention that FINA is

11 the cause ██████████████████████.

12     Dr. Rascher did not consider *any* of this evidence. He adopted ISL's 2018 spreadsheet

13 wholesale and accepted that ISL could have held all of these additional events, simply because ISL

14 said so. *See* Ex. CC (Rascher) at 43:17–44:24, 189:7–22. He did not even know that ISL's 2019

15 projections ████████████████. *See id.* at 44:17–24. And notwithstanding the COVID-19

16 pandemic, which crippled many of the world's most successful and profitable sports leagues in

17 2020, Dr. Rascher went right along with ISL's contentions that it would have fully recovered from

18 COVID-19 in 2022, but not from what FINA allegedly did in 2018. *See* Hansen ¶¶ 97–102.

19     Damages estimates premised on such audacious, untested—and disproven—business

20 projections by new ventures are universally rejected as speculative. *See, e.g.*, *Beijing Tong Ren*

21 *Tang (USA), Corp. v. TRT USA Corp.*, No. C-09-00882 RMW, 2011 WL 13143358, at *3 (N.D.

22 Cal. Nov. 23, 2011) (rejecting lost profits projection "made on the basis of a speculative, grandiose

23 business plan"); *Interserve, Inc. v. Fusion Garage PTE. Ltd.*, No. C 09-5812 RS, 2012 WL

24 1995278, at *2 (N.D. Cal. June 4, 2012) ("[I]t is simply too speculative to base a damages claim

25 on … the parties' earlier hopes and dreams"); *Alpha GRP, Inc. v. Subaru of Am., Inc.*, No. 18-cv-

26 2133, 2021 WL 1146029, at * 11 (C.D. Cal. Feb. 8, 2021) (finding damages estimates speculative

27 where based on "unsubstantiated assumptions" that plaintiff's "market share would have increased

28

spectacularly over time to levels far above anything it had ever reached").[18]  They cannot be accepted here as the foundation for a classwide damages study, especially without any effort to validate the projections.  *See Comcast*, 569 U.S. at 36 (rejecting the "logic [that] at the class certification stage, *any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be"); *McLaughlin*, 522 F.3d at 229; *Fleischman*, 2008 WL 2945993, at *6.

> ### 3. Dr. Rascher's Methodology Improperly Masks Individualized Differences and Imposes Through the Use of Averages Findings That All Class Members Were Injured

As far as FINA can tell, a damages class has never been certified in any case comparable to this one, in which the putative class members claim to have lost opportunities to *compete with one another for money*.  Classes have been certified in sports cases, and in other labor market cases, but only when "there is evidence that the class members' wages were correlated and the defendant-employers emphasized internal or external equality, which ensured 'individuals performing similar jobs are compensated on a similar level.'"  *In re Railway Industry Employee No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 556 (W.D. Pa. 2019) (collecting cases; citations omitted); *cf. In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167 (N.D. Cal. 2013).  FINA is unaware of any court that has certified a class where *competition with other class members* determines compensation (and thus damages), giving class members the clearly opposing and antagonistic damages claims they have here.  To the contrary, in *Walk-On Football Players*, 2006 WL 1207915, at *12, the court denied class certification on both adequacy and predominance grounds because "[t]he nexus between the number of scholarships available in the 'but for' world and the members of the purported class (*i.e.*, matching scholarships with real players) requires individualized proof."  Likewise, in *Rock v. NCAA*, 2016 WL 1270087, at *14, the court denied

---

[18] The burden of proffering a non-speculative damages methodology is even higher for new businesses like ISL.  *See IceMOS Tech. Corp. v. Omron Corp.*, No. CV-17-02575-PHX-JAT, 2019 WL 5960069, at *11 (D. Ariz. Nov. 13, 2019) (noting a "stricter standard" that "requires a new business to 'meet a higher evidentiary burden' than an established business" to demonstrate lost profits with reasonable certainty (quoting *Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp. N.V.*, 28 F. Supp. 2d 126, 131 (S.D.N.Y. 1998); *Washington v. Kellwood Co.*, No. 05CV10034 MHD, 2015 WL 6437456, at *24 (S.D.N.Y. Oct. 14, 2015) ("Whether a business is a 'new venture' or an ongoing operation of course will affect the quantity and quality of evidence relied upon by plaintiff to prove lost future profits with 'reasonable certainty.'").

certification of a class of athletes challenging NCAA rules that govern the number and duration of Grant-in-Aid scholarships ("GIAs"), where "antitrust injury as to each member of the class cannot be proven without considering the facts surrounding each class member, including whether each member would have actually received a multi-year GIA." Notably, in *Rock* the court rejected Dr. Rascher's testimony in that case as "unsubstantiated." *Id.*[19]

The same is obviously true here: whether swimmers would have participated in any additional meets, how they would have performed, and whether under ISL's compensation system they would have won more money requires individual proof. Indeed, it is clear from Dr. Rascher's summary of 2019 compensation that even over an entire season 27 swimmers earned nothing from participating in ISL meets. *See* Hubbard ¶ 24 & Ex. 1. That strongly indicates the presence of uninjured class members, which is fatal to class certification. *Rail Freight*, 725 F.3d at 252; *Olean*, 993 F.3d at 791.

As he did in *Rock*, Dr. Rascher just ignores the complexity. He starts out by making the same basic argument the *Rock* court rejected: that ███████████████████████████ because ███████████████████████████████████████████. *Compare* Ex. CC (Rascher) at 47:13–21; 57:7–15 ("████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████."), *with Rock*, 2016 WL 1270087, at *13. That approach is wrong as a matter of law, for the reasons discussed earlier.

Then Dr. Rascher reduces the complexity and unpredictability of athletic competitions into absurdly simplistic rules. These are not rules "capable of use at trial in individual—not just class action—antitrust cases." *Olean*, 993 F.3d at 788. For the most part, neither individual swimmer plaintiffs nor FINA would embrace proofs anything like what Dr. Rascher proposes.

---

[19] Beyond adequacy (as discussed at *supra* n. 17), Plaintiffs' reliance on *White*, 2006 WL 8066803, also fails in the context of predominance given that it predates *Comcast*, *Wal-Mart*, and circuit authorities following those Supreme Court decisions (like *Olean*) which make clear that the showing in *White* would not satisfy predominance today. Indeed, the court in *White* even recognized the "tenuous and theoretical nature of Plaintiffs' methodologies," and left the NCAA the option to moving to decertify the class after discovery. *See* 2006 WL 8066803, at *6.

**2018**:  For the 65 swimmers in the 2018 sub-class (those who would have competed in the Turin meet), Rascher estimates lost prize money in two ways:  (a) swimmers who swam in ISL's 2019 season are presumed to perform in 2018 exactly as they did in the 2019 season, relative to one another, and (b) swimmers who did not swim in ISL's 2019 season are presumed to perform based on the median average of all 2019 swimmers.  This technique effectively ensures that all swimmers in the 2018 sub-class were "injured," even though in ISL's 2019 season, 27 swimmers received nothing by way of appearance fees or prize money.  For example, Dr. Rascher would award swimmers Katie Mieli, Andrey Minakov and Cameron van der Burgh ▮▮▮ each even though ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for the 2018 Turin event, and none of the three swam in ISL's 2019 season.  Regardless, they are each *presumed* to have won 2018 prize money based on the median performance of *other* 2019 ISL swimmers.

This methodology is entirely unrealistic and *nothing* like what would happen in individual trials.  No superstar swimmer would use Dr. Rascher's methodology to prove individual damages.  Cameron van der Burgh surely would not; he gets the median of ▮▮▮ despite winning gold medals in the 50m and 100m breaststroke at the 2018 FINA Short Course World Championship in December 2018.  Hubbard ¶ 45.  Dr. Rascher's formula awards named Plaintiff Michael Andrew a ▮▮▮ share of prize money for the foregone 2018 Turin Event than Mr. van der Burgh despite the fact that Mr. van der Burgh easily defeated Mr. Andrew in the same events at the FINA Short Course Championships—days before the 2018 Turin Event would have taken place.  *See id.*

Simone Manuel surely would not use Rascher's model either, since it suggests she too would have just won the median prize money amount of ▮▮▮ at the Turin Event.  *Id.* Why would anyone expect that Ms. Manuel would accept the median?  She won two gold and two silver medals at the 2016 Rio Olympics, and won the most medals a female has ever won at the FINA World Championships.  This pedigree is likely why she was given ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮.  The most highly valued athlete should not be getting a median damages award.

We could go on with other examples, but the flip side of this is that FINA could and would offer individualized defenses were anyone to use Dr. Rascher's model.  For example, ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ Emma McKeon, a swimmer who enjoyed great success in freestyle

events during ISL's 2019 season. In Turin, however, Ms. McKeon would have had to swim against Simone Manuel, who did not swim in 2019. One cannot say Ms. McKeon would have fared as well swimming against Ms. Manuel as she did in her absence. Also, from a team perspective, the damages estimates for everyone on the 2019 Champion Energy Standard club are not typical; they are ████████████ because of the club's success, which cannot be assumed for 2018.

*2019*: For 2019, Dr. Rascher's methodology takes the number of events each swimmer competed in during ISL's seven event season in 2019 and scales them up proportionally to a 17-event season in the but-for world. So for Plaintiff Shields, who swam in 4 of the 7 ISL events in 2019 (57%), Dr. Rascher assumes he would have likewise swum in 57% of a 17-event 2019 ISL season, or 9.7 of the 17 events. *See* Hubbard ¶ 67. Per this metric, Dr. Rascher predicts that all swimmers like Mr. Shields who swam in 4 ISL events in 2019 were injured by the lost opportunity to compete in and earn prize money and/or appearance fees at 5.7 extra events. *Id.* For the majority of other swimmers who swam at 3 of the 7 ISL events in 2019 (42%), Dr. Rascher's methodology assumes they would have swum at 7.2 events in a 17-event season, and thereby lost out on the opportunity to compete at 4.2 more ISL events in 2019. *Id.* In all cases they do proportionately as well in the 17-event season as they did in the shorter actual season, no better and no worse.

Beyond that implausibility, the critical problem is that ISL's own planning documents—which Dr. Rascher relied upon as the foundation for Plaintiffs' but-for worlds—make clear that *no swimmer could compete in more than 7 events in a 17-event season*. *See* Ex. PP. ISL contemplated that a 17-event 2019 season would have had 12 regular season and 5 playoff matches. *Id.* Teams that made the finals could compete in a maximum of 7 events, so swimmers could at most earn prize money and appearance fees for 7 events. *Id.* Dr. Rascher's methodology predicts that 186 swimmers in the 2019 subclass, or *74% of the proposed 2019 sub-class*, suffered an impossible injury.[20] *See* Hubbard ¶¶ 67–68. Dr. Rascher admitted ████████████

---

[20] In addition to overestimating the injury suffered by 74% of the 2019 class, Dr. Rascher also overinflates the prize money that ISL actually budgeted for a 17 event season in 2019. ████████████
████████████ Ex. FF (ISL053966).

_placeholder

██████████████████████████████████████████████████████████. Ex. CC

(Rascher) at 204:9–14.  This is not reliable, or acceptable, by any standard.  To the contrary, when

a classwide damages model generates those kinds of false positives (findings of injury where there

can be none) it "shreds" the case for certification.  *See Rail Freight*, 725 F.3d at 252–53.

**2022**:  Dr. Rascher offers more of the same with regard to allegedly lost future competitions

in 2022: the same methodology based on averages and extrapolations, with numbers based on

ISL's 2021 season if trial occurs before 2022, or numbers from a 2022 season if ISL ends up

hosting less than its projected 62 events in 2022.  Swimmers' prize money and appearance fees

scale up in proportion with the number of foregone events, with swimmers again swimming in an

impossible number of events (up to 31) according to Dr. Rascher.  *See* Hubbard ¶¶ 15, 85–86.

\*        \*        \*

Dr. Rascher's methodology would not and cannot be relied upon by any swimmer in an

individual case.  Nor does it provide any justification for limiting FINA's right to advance

individualized defenses.  Establishing a class member's foregone prize money and appearance fee

amounts would require—and at least justify—individualized proof about both the swimmer and

her team.  As Dr. Rascher admitted, his is not the only "benchmark" that a swimmer might use to

predict his or her performance, and simple self-interest would cause different swimmers to select

benchmarks that favor them rather than all swimmers "on average."  FINA would answer in kind.

Arguments would be advanced around the swimmer's recent performances, the strength of the

competition, the strength of the swimmer's team, and so on—all replicating the dynamics of

Fantasy Football or Baseball, where the same performance data (far more than Dr. Rascher

considers) leads millions of players to millions of different predictions of athlete performance.

Dr. Rascher's methodology is nothing more than a crude allocation scheme for presumed

prize money and appearance fees at hypothetical ISL events.  That cannot satisfy Plaintiff's Rule

23 burdens.  *See In re Lamictal Direct Purchaser Direct Antitrust Litig.*, 957 F.3d 184, 192 (3d

Cir. 2020) (model relying on average prices could not show class-wide impact in the form of

inflated drug prices when the "market [was] characterized by individual negotiations"); *In re*

*Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 496 (N.D. Cal. 2008) (denying

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

certification where "plaintiffs have fundamentally failed to show that the many factors influencing pricing … were systematic and are now controllable").

4. Dr. Rascher Ignores Individualized Questions as to Whether Swimmers Would Have Competed in Additional ISL Events

Dr. Rascher also blithely assumes that all swimmers in Plaintiffs' proposed sub-classes would have, or even could have, competed at additional ISL events and were thereby commonly injured. In fact, swimmer decisions regarding what events to attend are highly individualized, and depend on factors such as their personal training schedules, the travel involved, the proximity of a competition to a subsequent event or other major events at which the swimmer wants to compete, the financial incentives offered by a particular event, family obligations, and sponsorship commitments. *See* Ex. I (Pebley) at 22:4–23:23, 26:14–27:17, 38:17–39:24, 40:12–41:15; Ex. B (Shields) at 24:20–26:12, 165:8–166:8; Ex. H (Miller) at 16:3–24:2, 34:22–35:17, 44:10–47:18 127:20–128:6; Ex. A (Hosszú) at 22:21–27:22; Ex. JJ (Unger) at 277:4–278:1; Ex. C (Andrew) at 78:17–82:20; Ex. K (Buckner) at 94:10–95:4. Some swimmers, like Plaintiff Andrew, maximize competitions as part of their training. Ex. C (Andrew) at 60:13–62:15, 78:17–22, 82:15–20. Others, like Jacob Pebley, prefer less competitions in a given year. Ex. I (Pebley) at 183:9–185:3. And certain swimmers, such as those affiliated with British Swimming, are limited in the number of events at which they can compete by their national federation, to ensure that they peak for the major swimming championships prioritized by the federation. Ex. K (Buckner) at 92:16–93:9. So while Plaintiff Andrew's individual situation suggests he might have embraced the opportunity to compete in more ISL events, there is no indication that a swimmer like Mr. Pebley—who in 2019 competed in the TYR Pro Swim Series, FINA World Cups, the USA Winter National Championships, and the FINA World Championships—would have opted to participate a 2019 ISL season with more than seven events. Nor is there any basis to assume that British swimmer Adam Peaty would have been able to swim in any additional ISL events in 2019 given his obligations to British Swimming.

The individual swimmer contracts with ISL attest to this diversity of interest in competing at ISL events. ██████████████████████████████████████████████████ ███████████████████████████████████████████████████. Exs. KK, LL.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

████████████████████████████████████████████████████████.” Ex. MM. ████████

████████████████████████████████████████. Ex. NN. ████████████

███████████████████████████████████████████. Ex. OO.

Even if a swimmer shows up at an additional ISL event, there is no guarantee that she will actually compete, or walk away with prize money or an appearance fee.  Dr. Rascher ignores how the team-based structure of ISL implicates whether an individual swimmer would necessarily compete in any additional ISL events.  Ex. CC (Rascher) at 107:18-112:2; Hubbard ¶¶ 11, 47–52. Each club has more swimmers (32) than slots for competition at an ISL event (28, with only 12 men and 12 women swimming in individual events).  Which swimmers on an ISL team actually compete in a particular event is determined by the club's coach and the other swimmers' availability.  Hubbard ¶ 11.  So for certain swimmers who performed poorly, such as Alba Vazquez—who only attended her ISL club's first event in 2019, earned $0 prize money, and did not compete at any subsequent events—there is no guarantee that her club would have selected her to compete in any additional ISL events.  *Id.* ¶ 34.  Even if she did, her prior performance suggests likely would not have earned additional prize money.

### 5.    Conclusions with Respect to Predominance

Individual injury and damages calculations here are not something that can be deduced to a formulaic approach, and certainly not in the way Dr. Rascher's methodology does.  There are very likely fully uninjured swimmers, and at least strong arguments that FINA could make to that effect in individual trials.  That is determinative.  *See Olean*, 993 F.3d at 791; *Rail Freight*, 725 F.3d at 252.  Furthermore, while FINA appreciates that differences amongst class members with respect to the amount of damages do not *alone* preclude class certification, *see, e.g.*, *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013), antitrust cases have long recognized that "where the issue of damages does not lend itself to ... mechanical calculation, but requires separate mini-trial[s] of an overwhelmingly large number of individual claims, the need to calculate individual damages will defeat predominance." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003) (simplified); *see also Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 342–343 (4th Cir. 1998) (if the claims of a putative antitrust class are "inherently

individualized," "the need for individual proof of damages" will bar certification); *Curtis v. Extra Space Storage, Inc.*, No. C 13-00319 WHA, 2013 WL 6073448, at *4 (N.D. Cal. Nov. 18, 2013) (denying certification since plaintiff failed "to demonstrate a reliable method to compute damages class-wide").

*Walk-On Football Players* illustrates this. There, the court found that "the issues of antitrust injury and damages will be intertwined to such a degree that individual issues are not simply about damages." 2006 WL 1207915, at *14. So it is here. The entire analysis of how FINA's conduct allegedly affected individual swimmers is highly dependent on how they likely would have performed in additional ISL events, accounting for their own personal circumstances, performance benchmarks, and other conditions personal to them. That *is* a predominance issue sufficient to defeat class certification. *See Curtis*, 2013 WL 6073448, at * 4 (distinguishing between "variations in the amount of damages [in the class]," which "do not necessarily preclude class certification" and where the plaintiff had "not offered a workable method for tying the class-wide harm to a specific method of calculating damages," which failed to satisfy Rule 23(b)(3)).

### D. Certification Under Rule 23(b)(2) Should Be Denied Because Plaintiffs' Prospective Relief Claim Is Moot

There is no basis to certify Plaintiffs' proposed Rule 23(b)(2) class because their injunctive relief claim has been moot for over two years. Plaintiffs seek to enjoin FINA's ability to use "its anticompetitive GR 4 [rule] governing 'unauthorized relations'" to "unlawfully enforce[e] sanctions against athletes or FINA federations who participate in [the events of] or associate with [ISL or any other independent organizer]." Mot. at 17–18. That provision in GR 4, however, *no longer exists*, as FINA amended the rule at its General Congress in July 2019. Beyond FINA's January 2019 press release, which both Plaintiffs and ISL admitted mooted their claims, FINA's subsequent elimination of the rule means there is no longer anything to enjoin.

The repeal by a defendant of a rule or practice challenged as unlawful generally moots an injunctive relief claim. *See, e.g.*, *Outdoor Media Grp., Inc. v. City of Beaumont*, 506 F.3d 895, 901 (9th Cir. 2007) ("[T]he district court correctly determined that the city's repeal of the sign ordinance moots [plaintiff's] claims for declaratory and injunctive relief."); *Young Am.'s Found.*

*v. Napolitano*, No. 17-CV-02255-MMC, 2018 WL 1947766, at *5 (N.D. Cal. Apr. 25, 2018) (injunctive relief claim moot following a university's revision to a challenged provision in the final version of its major events policy); *Antoninetti v. Chipotle Mexican Grill, Inc.*, No. 06CV02671 BTM WMC, 2012 WL 3762440, at *4 (S.D. Cal. Aug. 28, 2012) (putative class injunctive relief claim moot where Chipotle eliminated all high counter walls in violation of the ADA). That is the case here: FINA has repealed the very rule that Plaintiffs challenge as anticompetitive. FINA no longer has the authority to require its federations to sanction swimmers from World Championship or Olympic competition for competing in ISL, or any other independently organized events.

Plaintiffs continue to ignore that the rule they challenge no longer exists by suggesting that FINA can "revoke its [January 2019] press release at any time." Mot. at 18. The rule had never been enforced and never would have been enforced anyway. *See supra* Section II.B.; Neuburger ¶ 6. And re-instituting the rule would also require a majority vote of the FINA Congress, which only sits every two years and is comprised of its 209 member federations.[21] Any effects have also been "irrevocably eradicated," since ISL has, for over two years now, staged its events successfully and swimmers have participated, with FINA even recognizing the times swum at nearly all of them. *See Barnes v. Healy*, 980 F.2d 572, 580 (9th Cir. 1992) (the voluntary cessation of challenged conduct will moot injunctive relief claims if "(1) there is no reasonable expectation that the wrong will be repeated, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation"). "[W]here, as here, [a] plaintiff's claim [for prospective relief] becomes moot before the district court certifies the class, the class action normally also becomes moot." *Slayman v. FedEx Ground Package Sys., Inc.*, 765 F.3d 1033, 1048 (9th Cir. 2014) (citations omitted). The request to certify a Rule 23(b)(2) class should be denied.

## V. CONCLUSION

Plaintiffs' motion for class certification should be denied.

---

[21] Plaintiffs may suggest that FINA's elimination of the rule was in response to this lawsuit. That is incorrect as a matter of fact (*see* Neuburger ¶ 8), but also inconsequential as a matter of law. *See Outdoor Media Grp.*, 506 F.3d at 901 ("The fact that the lawsuit may have prompted the city's action does not alone show the city's intent to later re-enact the challenged ordinance."). Since there is no indication of an intent by FINA to reinstate a rule or policy (*see* Neuburger ¶ 9), courts "will not assume that [the defendant] will. We also will not assume bad faith." *Smith v. Univ. of Washington Law School*, 233 F.3d 1188, 1194 (9th Cir. 2000).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Dated: June 29, 2021

Respectfully submitted,

LATHAM & WATKINS LLP
    Daniel M. Wall
    Christopher S. Yates
    Aaron T. Chiu
    Colleen E. Heyler

By _____
    Daniel M. Wall
    Attorneys for Defendant
    Fédération Internationale de Natation