1

2

3

4              UNITED STATES DISTRICT COURT

5            NORTHERN DISTRICT OF CALIFORNIA

6

7   THOMAS A. SHIELDS, et al.,          Case No.  18-cv-07393-JSC

                 Plaintiffs,
8
                                        **ORDER RE: PLAINTIFFS' MOTION**
9        v.                             **FOR CLASS CERTIFICATION**

10  FEDERATION INTERNATIONALE DE         Re: Dkt. Nos. 191, 193, 219, 231, 246, 261,
    NATATION,
11                                       262, 272, 275, 276, 284
                 Defendant.
12

13        Plaintiffs are professional swimmers who bring federal antitrust claims and a state law tort

14  claim against the Fédération Internationale de Natation ("FINA"), related to FINA's control over

15  international swimming competitions.[1]  (Dkt. No. 83.)[2]  Before the Court is Plaintiffs' motion for

16  class certification, (Dkt. No. 191; *see* Dkt. Nos. 220, 247, 263); motion to appoint class counsel,

17  (Dkt. No. 284; *see* Dkt. Nos. 289, 290); and related motions to file under seal and to file

18  supplemental materials, (Dkt. Nos. 193, 219, 231, 246, 261, 262, 272, 275, 276).  Having carefully

19  considered the parties' submissions, and having had the benefit of oral argument on February 3,

20  2022, the Court GRANTS in part and DENIES in part the motion for class certification; GRANTS

21  the motion to appoint class counsel; and DENIES the motion to file supplemental materials.

22  Plaintiffs' injunctive relief class under Rule 23(b)(2) may proceed, but the proposed damages class

23  under Rule 23(b)(3) is not appropriate for certification.

24

25

26  _____
    [1] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. §
27  636(c).  (Dkt. Nos. 7, 14; *see* Case No. 18-7394, Dkt. Nos. 7, 14.)
    [2] Record citations are to material in the Electronic Case File ("ECF") in Case No. 18-7393, unless
28  otherwise noted; pinpoint citations are to the ECF-generated page numbers at the top of the
    documents.

United States District Court
Northern District of California

**BACKGROUND**

**I.      The Parties**

      **A.      Plaintiffs**

Plaintiffs are three world-class professional swimmers: Thomas A. Shields and Michael C. Andrew, both residents of California, and Katinka Hosszú, a resident of Hungary.  (Dkt. No. 83 ¶¶ 26–28.)

      **B.      FINA**

FINA is a Swiss organization recognized by the International Olympic Committee ("IOC") as the governing body for Olympic swimming, diving, high diving, water polo, artistic swimming, masters and open-water swimming.  (*Id.* ¶¶ 31, 35–36.)  It is one of "dozens" of sport-specific international federations recognized by the IOC and charged with "administer[ing] their respective sports and establish[ing] and organiz[ing] the types and rules of competitions held at the Olympic Games."  (*Id.* ¶ 35.)  Thus, FINA sets the "qualifying criteria" for swimmers to participate in the Olympics and "will recognize only those qualifying times that are met at FINA-approved qualifying events."  (*Id.* ¶ 36.)

FINA "comprises 209 member federations" that "are themselves national umbrella groups involving representatives of the various aquatic-sports disciplines."  (*Id.* ¶ 37.)

> The national federations may (and do) delegate sub-group entities to manage the FINA relationship as it pertains to the disciplines.  Thus, the United States' member federation is United States Aquatic Sports, Inc. ("USAS"), which designates USA Swimming, Inc., which is the "national governing body" of swimming in the United States.

(*Id.*)  The member federations "exist primarily, if not exclusively, to prepare and present swimmers for competition in the Olympic Games."  (*Id.* ¶ 101.)

"FINA and its 209 member federations are governed primarily by a 25-member Bureau. The Bureau's day-to-day power, in turn, is vested in an eight-member executive committee."  (*Id.* ¶ 39.)  Member federations can sometimes appeal Bureau decisions and rule interpretations to the FINA General Congress, which is recognized under FINA's governing rules as "the highest authority of FINA."  (*Id.*)  The General Congress meets every two years and its voting members "comprise two delegates from each member federation."  (*Id.* ¶¶ 39–40.)

Outside of the Olympics, FINA "and other entities that FINA approves organize and promote international competitions featuring the world's top swimmers." (*Id.* ¶ 122.) "FINA grants itself complete authority under its rules to ban a swimmer from participating in events that serve as the Olympic Games qualifying events for no reason other than the swimmer competed in a top-tier international swimming event that FINA did not itself organize or approve." (*Id.* ¶ 131.)

## C.   ISL

Although not a party to this case, the International Swimming League, Ltd. ("ISL") is involved in the facts giving rise to Plaintiffs' claims, and brings its own claims against FINA in a related case. (*See* Case No. 18-cv-07394-JSC, Dkt. No. 100.) ISL seeks to enter both markets in which FINA operates, "as an organizer, innovator, and promoter of top-tier international swimming competitions and as a buyer of the swimmer services necessary to put on such events." (Dkt. No. 83 ¶ 4.)

> [I]n 2019, . . . ISL rolled out its inaugural series of events: seven meets that took place across seven cities around the world, where eight teams, together comprised of more than 200 top-tier swimmers, competed for points and prizes. ISL has plans for, and has taken significant steps toward establishing, a permanent league that would feature similar competitions.

(*Id.* ¶ 5.)

The "team-based competition format" is central to ISL. (*Id.* ¶ 61.) Plaintiff Shields is a member of club team Los Angeles Current, Plaintiff Andrew is a member of club team New York Breakers, and Plaintiff Hosszú is a member of Team Iron. (Dkt. No. 193-70 ¶ 3; Dkt. No. 193-71 ¶ 3; Dkt. No. 193-72 ¶ 3.) In addition, Plaintiff Andrew and his parents own 40% of the New York Breakers, and Plaintiff Hosszú owns 40% of Team Iron. (Dkt. No. 221-3 at 26:21–28:8; Dkt. No. 219-6 at 26:8–27:4.)

## II.   Complaint Allegations

The gravamen of Plaintiffs' complaint is that FINA uses its control over Olympic aquatic sports to determine the terms of compensation and competition for international swimming events outside of the Olympic games and FINA's own competitions. (Dkt. No. 83 ¶ 6.) In doing so, FINA engages in anticompetitive conduct "to maintain its grip on both its monopoly power in the

market for top-tier international swimming competitions and its monopsony power in the market for the supply of top-tier swimmers."  (*Id.* ¶ 12.)  Plaintiffs allege that FINA had or implemented rules that:

> (1) prohibited athletes and member federations from having 'any kind of relationship'—including 'unauthorised relations' with other swimming events and organizers—with any entity FINA does not approve, and
>
> (2) threaten rule-breakers with a ban of up to two years from participation in FINA or FINA-approved events, including events used to qualify for the Olympic Games.

(*Id.* ¶ 6.)  They further allege that FINA used those rules to threaten member federations and swimmers from competing in ISL events.

In 2018, ISL began planning an international competition with USA Swimming to take place in December 2018 in Las Vegas.  (*Id.* ¶ 9.)  FINA pressured USA Swimming to drop out of the partnership and warned other member federations that affiliating with ISL could result in sanctions under FINA's rule against "unauthorized relations," including disqualifying swimmers from the Olympics.  (*Id.*)  As a result, USA Swimming abandoned negotiations with ISL.  (*Id.*)  ISL next negotiated with the British federation, but it too pulled out.  (*Id.* ¶ 10.)

ISL then turned to the Italian federation, which agreed to host the December 2018 competition in Turin.  (*Id.* ¶ 11.)  ISL and the Italian federation entered into participation and appearance-fee agreements with more than 50 swimmers.  (*Id.* ¶ 12.)  In response, FINA urged USA Swimming not to affiliate with the competition and threatened to ban participating swimmers from FINA events, including Olympic qualifying events.  (*Id.*)  Other federations "reluctantly warned their respective swimmers that they risked sanctions by FINA and/or by the federations themselves if the swimmers participated."  (*Id.* ¶ 13.)  As a result, ISL and the Italian federation were forced to cancel the 2018 event.  (*Id.*)

In December 2018, FINA scheduled its own series of "copycat" events for 2019 "that imitated ISL's planned format with increased prize money of almost exactly the same amounts."  (*Id.* ¶¶ 18, 117.)  Plaintiffs filed suit the same month.  (Dkt. No. 1.)  Shortly thereafter, FINA announced that swimmers were free to compete in events staged by organizations other than

1    FINA, without threat of disqualification from the Olympics.  (Dkt. No. 83 ¶ 19.)

2    **III.    Proposed Class**

3           Plaintiffs allege that FINA controls the sellers' market for the promotion and organization

4    of top-tier international swimming competitions as well as the buyers' market for the services of

5    top-tier swimmers.  (*Id.* ¶ 4.)  They allege that FINA's anticompetitive conduct reduced the

6    number of events ISL was able to put on in 2018 and the years that followed, injuring the

7    swimmers who planned to compete in those events.

8           Plaintiffs bring claims for: (1) violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (2)

9    violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; and (3) a state law claim for "tortious

10   interference with prospective economic relations."  (*Id.* ¶¶ 156–179.)  They seek "both injunctive

11   relief against FINA's enforcement of its anti-competitive 'unauthorised relations' [] rules and

12   damages to compensate them for the real financial harm FINA's efforts caused."  (*Id.* ¶ 19.)

13          In the operative First Amended Complaint, Plaintiffs sought to represent the following

14   proposed class:

15                   All natural persons who are eligible to compete in swimming
16                   world championship and Olympic Game competitions.  Excluded
                     from this class are members of the boards of directors, boards of
17                   trustees, boards of governors, and senior executives of FINA and
                     its member federations, and any and all judges and justices, and
18                   chambers' staff, assigned to hear or adjudicate any aspect of this
                     litigation.

19   (*Id.* ¶ 148.)  Plaintiffs now move to certify a narrower class under Federal Rules of Civil

20   Procedure 23(b)(2) and (b)(3): "All swimmers who signed contracts to participate in [ISL] from

21   January 1, 2018 through the date of trial."  (Dkt. No. 193-74 at 8.)  They further propose the

22   following Rule 23(b)(3) subclasses:

23                   2018 Damages Subclass: All swimmers who signed contracts to
24                   participate in [ISL's] December 2018 event set to take place in []
                     Turin, Italy.

25                   2019 Damages Subclass: All swimmers who signed contracts to
26                   participate in [ISL's] 2019 season.

27                   2022 Damages Subclass: All swimmers who sign contracts to
                     participate in [ISL's] 2022 season, and any seasons thereafter through
                     the date of trial.

28

United States District Court
Northern District of California

5

1  (*Id.*)

2  **DISCUSSION**

3      "Federal Rule of Civil Procedure 23 governs the maintenance of class actions in federal

4  court." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 (9th Cir. 2017).  A trial court has

5  broad discretion in making the decision to grant or deny a motion for class certification.  *Bateman*

6  *v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010).  Plaintiffs must satisfy the threshold

7  requirements of Rule 23(a) as well as the requirements under one of the subsections of Rule 23(b).

8  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588–89 (9th Cir. 2012).  Under Rule 23(a), a case

9  is appropriate for certification if:

10          (1)  the class is so numerous that joinder of all members is
              impracticable;
11
          (2)  there are questions of law or fact common to the class;
12
          (3)  the claims or defenses of the representative parties are typical of
13            the claims or defenses of the class; and
14          (4)  the representative parties will fairly and adequately protect the
              interests of the class.
15

16  Fed. R. Civ. P. 23(a).  Beyond the threshold requirements of Rule 23(a), Plaintiffs contend that the

17  putative class satisfies Rule 23(b)(2) with respect to injunctive relief and Rule 23(b)(3) with

18  respect to damages.  "Before certifying a class, the trial court must conduct a rigorous analysis to

19  determine whether the party seeking certification has met the prerequisites of Rule 23." *Mazza*,

20  666 F.3d at 588 (cleaned up).

21  **I.    RULE 23(a)**

22      **A.    Numerosity**

23      The putative class must be "so numerous that joinder of all members is impracticable."

24  Fed. R. Civ. P. 23(a)(1).  "[I]mpracticability does not mean impossibility, but only the difficulty or

25  inconvenience of joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc.*,

26  329 F.2d 909, 913–14 (9th Cir. 1964) (cleaned up).  "While there is no fixed number that satisfies

27  the numerosity requirement, as a general matter, a class greater than forty often satisfies the

28  requirement, while one less than twenty-one does not." *Ries v. Ariz. Beverages USA LLC*, 287

United States District Court
Northern District of California

6

1   F.R.D. 523, 536 (N.D. Cal. 2012).

2       Plaintiffs assert that the proposed class consists of more than 200 swimmers.  (Dkt. No.

3   193-92 ¶ 68 (noting that 65 swimmers contracted to participate in 2018 and 251 participated in

4   2019).)  FINA does not specifically object on grounds of numerosity.  Because it is impracticable

5   to join more than 200 class members, numerosity is satisfied.  *See Ries*, 287 F.R.D. at 536.

6       **B.      Commonality**

7       "[C]ommonality requires that the class members' claims 'depend upon a common

8   contention' such that 'determination of its truth or falsity will resolve an issue that is central to the

9   validity of each [claim] in one stroke.'"  *Mazza*, 666 F.3d at 588 (quoting *Wal-Mart Stores, Inc. v.

10  Dukes*, 564 U.S. 338, 350 (2011)).  "[P]laintiff[s] must demonstrate the capacity of classwide

11  proceedings to generate common answers to common questions of law or fact that are apt to drive

12  the resolution of the litigation."  *Id.* (cleaned up).  "Even a single common question of law or fact

13  that resolves a central issue will be sufficient to satisfy this mandatory requirement for all class

14  actions."  *Castillo v. Bank of Am., NA*, 980 F.3d 723, 728 (9th Cir. 2020).  "The existence of

15  shared legal issues with divergent factual predicates is sufficient, as is a common core of salient

16  facts coupled with disparate legal remedies within the class."  *Meyer v. Portfolio Recovery

17  Assocs., LLC*, 707 F.3d 1036, 1041 (9th Cir. 2012).

18      Plaintiffs satisfy commonality.  "[C]ommonality is usually met in the antitrust context

19  when all class members' claims present common issues including (1) whether the defendant's

20  conduct was actionably anticompetitive under antitrust standards; and (2) whether that conduct

21  produced anticompetitive effects within the relevant product and geographic markets."  *In re

22  NCAA Student–Athlete Name & Likeness Licensing Litig.* ("*Name & Likeness Litig.*"), No. C 09–

23  1967 CW, 2013 WL 5979327, at *4 (N.D. Cal. Nov. 8, 2013) (citation omitted).  Common issues

24  here include: whether FINA's communications and other conduct with member federations

25  constitute a horizontal restraint of trade in violation of the Sherman Act; whether FINA

26  improperly monopolized or attempted to monopolize the markets for purchase of swimmer

27  services and sale of swimming competitions; whether there has been injury to competition; and

28  whether an injunction and/or damages are appropriate remedies.  *See In re Nat'l Collegiate*

United States District Court
Northern District of California

*Athletic Ass'n Athletic Grant-In-Aid Cap Antitrust Litig.* ("*Grant-In-Aid Litig.*"), 311 F.R.D. 532, 539 (N.D. Cal. 2015); *In re NCAA I-A Walk-On Football Players Litig.* ("*Walk-On Litig.*"), No. C04–1254C, 2006 WL 1207915, at *5 (W.D. Wash. May 3, 2006).  These common questions of law and fact satisfy the "limited burden" of commonality.  *Mazza*, 666 F.3d at 589.

### C.    Typicality

"Typicality refers to the nature of the claim or defense of the class representative and not on facts surrounding the claim or defense."  *Hunt v. Check Recovery Sys., Inc.*, 241 F.R.D. 505, 510 (N.D. Cal. 2007) (citing *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1030 (9th Cir. 2012) (cleaned up).  The typicality requirement serves as a "guidepost[] for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Wal-Mart*, 564 U.S. at 349 n.5.

Plaintiffs' claims are typical because the proposed class shares the same or similar injury from the same course of conduct: allegedly anticompetitive practices by FINA that deprived the class of opportunities to earn prize money and appearance fees.  *See Evon*, 688 F.3d at 1030. While Plaintiffs Andrew and Hosszú are partial owners of ISL club teams, (*see* Dkt. No. 219-4 at 12), the Court finds that issue more directly relevant to the adequacy requirement of Rule 23(a), discussed below, than to typicality.  *See Name & Likeness Litig.*, 2013 WL 5979327, at *4–5 ("In antitrust cases, this uniformity of class members' injuries, claims, and legal theory is typically sufficient to satisfy [typicality]."); *Walk-On Litig.*, 2006 WL 1207915, at *6 & n.10.  Accordingly, the typicality requirement is met.  *See Grant-In-Aid Litig.*, 311 F.R.D. at 539–40.

### D.    Adequacy of Representation

The adequacy requirement ultimately concerns whether the class action device will protect the interests of absent class members.  *Wal-Mart*, 564 U.S. at 349 n.5; Fed. R. Civ. P. 23(a)(4).

United States District Court
Northern District of California

1  Courts ask, "(1) do the named plaintiffs and their counsel have any conflicts of interest with other

2  class members and (2) will the named plaintiffs and their counsel prosecute the actions vigorously

3  on behalf of the class?" *Evon*, 688 F.3d at 1030 (citation omitted); *see* Fed. R. Civ. P. 23(g)(1).

4  Thus, adequacy "depends on the qualifications of counsel for the representatives, an absence of

5  antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that

6  the suit is collusive." *Brown v. Ticor Title Ins.*, 982 F.2d 386, 390 (9th Cir. 1992) (citation

7  omitted).  "Scrutinizing for conflicts is essential to guard the due-process right of absent class

8  members not to be bound to a judgment without adequate representation by the parties

9  participating in the litigation." *Woods v. Google LLC*, No. 11-cv-01263-EJD, 2018 WL 4030570,

10  at *4 (N.D. Cal. Aug. 23, 2018).

11      FINA argues three conflicts bear on the adequacy of both Plaintiffs and class counsel.

12  First, the proposed class is limited to swimmers who contracted to compete in ISL, which has a

13  compensation structure that creates antagonism within the class.  Second, ISL's founder is funding

14  both Plaintiffs' and ISL's related, but separate, cases against FINA, and FINA argues that no firm

15  can adequately represent the proposed class.  Third, Plaintiffs have unique financial interests in

16  ISL that are not shared by the rest of the class.

17      FINA's arguments have different implications with respect to each of Plaintiffs' proposed

18  classes.  Plaintiffs propose to certify "[a]ll swimmers who signed contracts to participate in [ISL]

19  from January 1, 2018 through the date of trial" as both a Rule 23(b)(2) injunctive relief class and a

20  Rule 23(b)(3) damages class.  (Dkt. No. 193-74 at 8.)  The injunctive relief class seeks to enjoin

21  FINA "from unlawfully interfering in any way with the ability of ISL or any other person or entity

22  from organizing or promoting swimming competitions, including but not limited to an injunction

23  prohibiting FINA from unlawfully enforcing any sanctions against either swimmers or FINA

24  member federations who participate in such competitions."  (Dkt. No. 83 at 54 ¶ F; *see id.* ¶¶ 167,

25  173.)  The damages class seeks damages "determined to have been sustained by them as a result of

26  the conduct of [FINA] and its co-conspirators."  (*Id.* at 54 ¶ D.)

27      As set forth below, the Court finds the adequacy issues are thrown into sharp relief in the

28  context of the Rule 23(b)(3) damages class, less so in the context of the Rule 23(b)(2) injunctive

relief class.  Adequacy ultimately concerns the fairness of binding absent class members to a judgment litigated by the named plaintiffs; thus, this requirement depends on the nature of the judgment and relief sought.  *See Gen. Tel. Co. of the Nw., Inc. v. Equal Emp't Opportunity Comm'n*, 446 U.S. 318, 331 (1980) ("[T]he adequate-representation requirement is typically construed to foreclose the class action where there is a conflict of interest between the named plaintiff and the members of the putative class.  In employment discrimination litigation, conflicts might arise, for example, between employees and applicants who were denied employment and who will, *if granted relief*, compete with employees for fringe benefits or seniority." (emphasis added)).  Accordingly, the Court analyzes the adequacy requirement with respect to the damages class, followed by the injunctive relief class.

### 1.     Rule 23(b)(3) Damages Class

#### a.     Intra-Class Antagonism

Plaintiffs propose a damages class of swimmers who signed contracts to participate in ISL, and subclasses based on contracts to participate in particular ISL competitions.  (Dkt. No. 193-74 at 8.)  Thus, ISL's structure of competition and compensation is relevant to the sharing of interests among the class, and FINA argues that it creates antagonistic interests.

FINA cites ISL's website to explain its 2019 competition format; Plaintiffs do not object.  (Dkt. No. 219-4 at 16–17.)  The 2019 season was split into a regular championship and a final, with eight club teams participating.  (*See id.*; Dkt. No. 219-9 at 4.)  In each regular championship match, of which several were held throughout the season, four clubs competed in 37 races over two days.  (*See* Dkt. No. 219-4 at 16.)  ISL suggested a roster of 28 swimmers per club, but clubs were permitted to bring up to 32 swimmers to a match.  (Dkt. No. 219-9 at 4.)  Each of the four clubs selected two swimmers from their roster to compete in each race.  (*Id.* at 5.)  At the end of each race, swimmers were awarded points ("team score points") corresponding to first through eighth place.  (*Id.* at 6; *see id.* at 13 (distinguishing team score points from prize money points).)  However, swimmers lost points if they failed to appear, got disqualified, or swam slower than a benchmark time for the race.  (*Id.* at 8–10.)  At the end of each two-day regular championship match, the four participating clubs were awarded points corresponding to first through fourth

10

1    place, based on the tallied points earned by that club's swimmers.  (*Id.* at 7; *see* Dkt. No. 219-4 at

2    16–17.)  After the regular championship portion of the season, two U.S.-based clubs and two

3    European clubs advanced to the final.  (Dkt. No. 219-9 at 8.)

4            Swimmers had the opportunity to earn compensation through prize money and appearance

5    fees.  Swimmers earned "prize money points" corresponding to first through fourth (not eighth)

6    place in races in which they swam: $300 per point in regular championship matches and $1,000

7    per point in the final.  (*Id.* at 12.)  Swimmers whose club made it to the final earned $1,000 for

8    each match they had attended during the regular championship portion of the season; $10,000 if

9    their club finished first in the final; $5,000 if their club finished second; $3,000 if their club

10   finished third; and $1,000 if their club finished fourth.  (*Id.*)  Thus, a swimmer's prize money, if

11   any, depended on whether her club selected her to compete in a race; her performance; the

12   performance of all the other swimmers in the club throughout the season; and the team score

13   points earned by other clubs and whether those clubs were American or European.  A swimmer

14   who was never selected for a race, or who finished fifth or worse in every race she swam, and

15   whose club did not make it to the final, could not earn any prize money.  As for appearance fees,

16   swimmers negotiated with their club team and/or ISL.  (Dkt. No. 219-6 at 19:22–20:23; Dkt. No.

17   221-2 at 16:11–17:7; Dkt. No. 221-14 at 6:12–7:22.)  Some swimmers earned no appearance fees;

18   some clubs paid equal appearance fees to all their swimmers; and some swimmers negotiated

19   individual appearance fees.  (Dkt. No. 193-95.)

20           In the context of ISL's compensation scheme, Plaintiffs' legal theory means that "the

21   interests and potential remedies" of the proposed class "'tug' at each other" so as to preclude

22   Plaintiffs from adequately representing all of them.  *Pecover v. Elec. Arts Inc.*, No. C 08–2820

23   VRW, 2010 WL 8742757, at *11 (N.D. Cal. Dec. 21, 2010).  In *Walk-On Litigation*, for example,

24   the court denied class certification due to "fundamental intra-class conflicts."  2006 WL 1207915,

25   at *8.  The plaintiffs sought to represent college football players who were not awarded

26   scholarships, allegedly as a result of an anticompetitive National Collegiate Athletic Association

27   ("NCAA") bylaw capping each college's number of scholarships.  *Id.* at *1.  On adequacy, the

28   court determined that even assuming the players had identified a way "of proving some level of

United States District Court
Northern District of California

1    classwide impact and classwide damages," they had "fail[ed] to account for the complex

2    individual questions that will remain," including "each class member's *actual* damages . . . along

3    with the inseparable proof of causation." *Id.* at *8. Because the players' theory was an "absence

4    of dealing" and "amounts of business *not done*," each class member would "have to offer proof

5    that necessarily will involve arguing that a threshold number of other players (class members and

6    non-class members) would *not* have gotten that same scholarship money." *Id.* at *7, 8. "If, for

7    example, the players can prove that each school would have awarded 20 additional scholarships,

8    they then will have to prove *who* would have received those scholarships—and for each to prove

9    that *he* would have been in that group, he will have to prove that others were not." *Id.* at *9.

10   Those dynamics created insurmountable antagonism within the class.

11          Here, the proposed damages class suffers from the same structurally antagonistic interests.

12   The class comprises swimmers who wanted to compete in ISL and now seek damages for the

13   absence of that dealing. Assuming, as the *Walk-On Litigation* court did, that Plaintiffs can prove

14   how much prize money and appearance fee money would have been on the table in a but-for

15   world, they will need to prove who would have taken home that money. *See id.* at *8 ("[T]he

16   question is not *whether* individual damages need to be calculated. Rather, assuming that the mere

17   need to calculate individual damages does not preclude certification, the question here is the

18   *means* that will be required to make such individual damages calculations." (citation omitted)).

19   With respect to prize money, each swimmer would need to prove that she would have been

20   selected to swim and performed well, and that her club would have performed well throughout the

21   season. Such proof would necessarily involve arguing that other swimmers in her club would not

22   have been selected to swim, that she would have beaten the swimmers she raced against, and that

23   other clubs would not have performed as well as her club over the course of the season. Thus,

24   each class member's interest in maximizing her own damages is antagonistic to the same interest

25   on the part of other class members. They would compete for shares of a fixed pot.

26          The issue is not that class members will have different individual damages, *see Just Film,*

27   *Inc. v. Buono*, 847 F.3d 1108, 1120 (9th Cir. 2017), nor that each class member will have to

28   speculate about the but-for world in order to prove her damages, *see Nguyen v. Nissan N. Am.,*

                                                    12

*Inc.*, 932 F.3d 811, 817 (9th Cir. 2019).  Rather, the issue is that Plaintiffs have not offered a method to determine those individual damages in a way that is fair to all class members.  *See id.* ("[U]ncertainty regarding class members' damages does not prevent certification of a class as long as a valid method has been proposed for calculating those damages." (citation omitted)); *Walk-On Litig.*, 2006 WL 1207915, at *8.  These conflicts "go[] to the specific issues in controversy"— antitrust impact and causation—and thus "prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement."  *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 942 (9th Cir. 2015) (cleaned up).

These dynamics distinguish the swimmer class from, for example, the athletes in *White v. Nat'l Collegiate Athletic Ass'n*, No. CV 06–0999–RGK (MANx), 2006 WL 8066803 (C.D. Cal. Oct. 19, 2006).  They challenged the NCAA grant-in-aid rule capping their compensation at tuition, room and board, and books.  They alleged that, absent the cap, colleges would compete to recruit athletes by providing better compensation, up to the full cost of attendance.  *Id.* at *1.  The NCAA argued the named plaintiffs were inadequate because of "an inherent conflict of interest with [] a portion of the putative class."  *Id.* at *3.

> According to the NCAA, if the [grant-in-aid rule] did not limit the amounts of athletics aid then the variation in athletic talent would likely result in the variation of aid amounts.  The result, according to the NCAA, is conflict among class members[.]  Each class member would argue that his athletic talents should translate into larger damages in comparison to other class members.

*Id.*  The court found the argument "logical," but rejected it based on "the specifics of Plaintiffs' damages claim."  *Id.*

> Plaintiffs argue that demand for student-athletes, coupled with the ability of student-athletes to generate substantial revenues for their institutions, demonstrates that all or nearly all of the student athletes in the proposed class would receive far more than the [cost of attendance] if schools had unfettered discretion to award athletics-based financial aid. . . .  If true, then the NCAA's charge of intra-class conflict is impotent.  Each class member would deserve damages based on the difference between his [grant-in-aid] amount and his [cost of attendance].

*Id.*  The class's interests were aligned because they all stood to gain in the same way if the plaintiffs prevailed on their particular legal theory.  Here, by contrast, Plaintiffs' legal theory

1    means that any class member's gain will be to the detriment of others.  Plaintiffs do not claim that

2    FINA has "unfettered discretion" to increase every swimmer's compensation; rather, they claim

3    that every swimmer lost the opportunity to compete with the others for a share of a fixed pot.

4            The court in *Grant-in-Aid Litigation*, which challenged the same rule, rejected similar

5    adequacy arguments.  311 F.R.D. at 540–45.  The defendants asserted two theories of intra-class

6    conflict: a "substitution effects" theory that better compensation would encourage more students to

7    become or remain athletes, creating competition that would reduce compensation for the lesser

8    athletes; and an "economics of superstars" theory that, without the cap, colleges would pay

9    excellent athletes much more than everyone else.  *Id.* at 540–41.  The court rejected these conflicts

10   as speculative; each theory assumed that other NCAA rules structuring the market would change,

11   although the athletes had not challenged those rules and the defendants had other options to

12   choose from.  *Id.* at 540–45.  Thus, the court would have needed to draw several inferences in

13   order to conclude that class members would necessarily compete against one another with respect

14   to the requested relief.  Under the plaintiffs' legal theory, the class members could all benefit in a

15   uniform way.  Here, by contrast, no speculation or inference is required to conclude that the

16   swimmer class will compete among themselves to take home the maximum benefit from the

17   requested relief.  That conclusion flows directly from Plaintiffs' legal theory and the factual

18   context of ISL competitions.

19           *Name & Likeness Litigation* also had different intra-class dynamics than those present

20   here.  2013 WL 5979327, at *5–7.  The plaintiffs challenged NCAA rules prohibiting them from

21   receiving compensation for commercial use of their own names and likenesses.  *Id.* at *1.  The

22   NCAA argued that intra-class conflict existed because, "in an unrestrained market for publicity

23   rights," "star athletes [] would command a higher price for their name, image, and likeness rights

24   than others" and thus "would be entitled to a larger share of damages."  *Id.* at *5.  The court

25   rejected that argument primarily because the plaintiffs alleged harm "to competition within a

26   *group* licensing market," "render[ing] irrelevant any differences in the value of each class

27   member's publicity rights."  *Id.* at *6.  Moreover, any differences in value could be accommodated

28   at the damages calculation stage without undermining the theory of liability.  *Id.* at *6 n.6 (noting

United States District Court
Northern District of California

1    that "the NCAA has attacked an aspect of Plaintiffs' damages model that could be altered without

2    changing their underlying theory of antitrust liability").  Here, the conflict arises well before the

3    damages stage of the litigation, and goes to the heart of Plaintiffs' opportunity-to-compete theory

4    of liability.  *See Nguyen*, 932 F.3d at 817 ("Although uncertain damages calculations do not alone

5    defeat certification, the Supreme Court has emphasized that at the class-certification stage (as at

6    trial), any model supporting a plaintiff's damages case *must be consistent* with its liability case."

7    (cleaned up)).

8            Plaintiffs' expert Dr. Rascher has not offered a way around this intra-class conflict.  For

9    the 2018 season, (*see* Dkt. No. 193-95), the amount of prize money, amount of appearance fees,

10   and number of planned events are known.  (Dkt. No. 193-92 ¶ 53.)  Class members received 50%

11   of their contracted appearance fees, but no prize money because the season's events did not occur.

12   (*Id.* ¶¶ 53–54.)  To allocate the foregone 2018 prize money, Dr. Rascher proposes to prorate it

13   according to class members' performance in the 2019 season, which did occur.  (*Id.* ¶ 55.)  For

14   class members who expected to compete in 2018 but did not compete in 2019, Dr. Rascher

15   proposes a regression framework to determine the foregone 2018 prize money.  (*Id.* & n.36; *see*

16   Dkt. No. 246-4 at 12.)

17           For the 2019 season, (*see* Dkt. No. 193-96), the amount of prize money, amount of

18   appearance fees, and number of events are all unknown.  (Dkt. No. 193-92 ¶¶ 57–58.)  ISL

19   forecasted 17 events, but held only seven.  (Dkt. No. 246-7 ¶ 37.)  Dr. Rascher's methodology

20   "allows the jury to determine the number of foregone ISL events, and then plug in that number."

21   (Dkt. No. 246-4 at 12; *see* Dkt. No. 246-7 ¶ 31.)  To determine the foregone 2019 prize money and

22   appearance fees, Dr. Rascher proposes to "apply[] a per-event amount of appearance fees and

23   prize money to the number of events not held[,] adjust[ing] this per-event amount to account for

24   additional swimmers in the but-for world who are not part of the 2019 subclass, and to limit the

25   number of but-for events in which each Class member participates."  (Dkt. No. 246-4 at 12–13;

26   *see* Dkt. No. 193-92 ¶¶ 57–58, 60.)

27           For the 2022 season, (*see* Dkt. No. 193-92 ¶¶ 66–67), the amount of prize money, amount

28   of appearance fees, and number of events are also unknown, and further complicated by the

United States District Court
Northern District of California

15

1   pandacemic.  (*Id.* ¶¶ 63–64; *see* Dkt. No. 246-7 ¶¶ 43–47.)  Dr. Rascher proposes that the trier of

2   fact determine how many events ISL would have held in 2022 but for FINA's alleged conduct,

3   taking into account the impact of the pandemic, and then plug in that number to a formula to

4   determine foregone 2022 prize money and appearance fees.  (Dkt. No. 246-7 ¶¶ 43–47; *see* Dkt.

5   No. 246-4 at 13.)  The formula uses the 2022 per-event prize money and appearance fee amounts

6   that ISL projected in its 2018 business plan, but reduced to 29% of the projection to correspond to

7   the difference between what ISL projected for 2019 and what was actually paid out per-event in

8   2019.  (Dkt. No. 246-7 ¶¶ 50–51.)

9         These methodologies do not mitigate the underlying intra-class antagonism.  Even

10   assuming Dr. Rascher's method of determining the foregone prize money and appearance fees is

11   valid, each swimmer must then prove that she "is entitled to a particular piece of the damages pie."

12   *Walk-On Litig.*, 2006 WL 1207915, at *8.  Take, for example, the issue of allocating the foregone

13   2018 prize money.  Dr. Rascher's proposal uses class members' performance in the 2019 ISL

14   season to determine 2018 prizes in the but-for world.  (Dkt. No. 193-92 ¶ 55.)  That formula will

15   favor class members who did well in the 2019 season and disfavor class members who did not.  A

16   class member who swam poorly in ISL's 2019 events but broke records in other competitions that

17   year would prefer a formula that uses her overall 2019 performance.  A class member who

18   slumped in 2019 would prefer a formula that uses her performance from 2016 through 2020.  Each

19   class member has an interest in trying *her* best formula before a jury.  In an individual lawsuit, she

20   could.  But in a class action, any damages formula will necessarily disfavor some swimmers,

21   abridging their due process rights under Rule 23(a)'s adequacy requirement.  *See Woods*, 2018

22   WL 4030570, at *4.

23         Dr. Rascher responds in detail to the critique that the individual damages amounts are

24   uncertain.  (Dkt. No. 246-7 ¶¶ 3, 63–107.)  But the source of intra-class antagonism is not the

25   uncertainty of damages—which inheres in many kinds of litigation—but the way class members

26   will go about proving those damages.  *See Nguyen*, 932 F.3d at 817.  The class members have

27   structurally conflicting interests in choosing a damages formula to bind all of them.  In putative

28   class actions, the method of proving individual damages does not necessarily turn class members

against one another; in this one, however, it does.  The inherent intra-class conflict precludes a finding that named Plaintiffs can adequately represent the proposed damages class.

### b.    Class Counsel & ISL

Plaintiffs were represented by Farella Braun + Martel LLP, who also represent ISL in the related case, and by Lieff Cabraser Heimann & Bernstein, LLP.  Shortly before class certification briefing was complete, Lieff withdrew from the case.  (Dkt. Nos. 259, 260.)  After the motion was fully briefed, Winston & Strawn LLP filed notices of appearance on behalf of Plaintiffs and a motion for appointment as class counsel.  (Dkt. Nos. 281, 282, 283, 284.)  Most recently, Farella withdrew its appearance and its request for appointment as class counsel.  (Dkt. No. 292.)  Thus, at this juncture, Plaintiffs are represented by Winston, while ISL is represented by Farella in the related case.  Additionally, ISL's founder Konstantin Grigorishin is funding Plaintiffs' litigation, (Dkt. No. 219-6 at 15:12-15; Dkt. No. 221-2 at 9:3-7; Dkt. No. 221-3 at 5:17-23), presenting what FINA characterizes as a risk that ISL will use this case as a proxy war for its own related case against FINA.

"The responsibility of class counsel to absent class members whose control over their attorneys is limited does not permit even the appearance of divided loyalties."  *Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1465 (9th Cir. 1995) (citation omitted) (affirming denial of class certification on adequacy grounds where class counsel concurrently represented a different client, who "had a broader mission than did the class," against the same defendant); *see* Fed. R. Civ. P. 23(g)(1)(B).  "The 'appearance' of divided loyalties refers to differing and potentially conflicting interests and is not limited to instances manifesting such conflict."  *Kayes*, 51 F.3d at 1465. "[U]nder Rule 23(a)(4) counsel must be able to objectively view the litigation in the context of the entire class.  When counsel himself has a special interest in one aspect of the litigation or where counsel has a close relationship with one who has such a special interest, that objectivity no longer exists."  *Lyon v. Arizona*, 80 F.R.D. 665, 668 (D. Ariz. 1978).

Plaintiffs and ISL do not have completely aligned interests with respect to recovering damages from FINA.  Plaintiffs supply the labor that ISL competes with FINA to buy.  However, that presents no problem for the adequacy of counsel because Winston represents only Plaintiffs.

United States District Court
Northern District of California

17

1    *Cf. Lou v. Ma Labs., Inc.*, No. C 12–05409 WHA, 2014 WL 68605, at *2 (N.D. Cal. Jan. 8, 2014)

2    (finding counsel inadequate where they represented a different class with similar claims against

3    the same defendants).  Winston has no connection to ISL whatsoever, (*see* Dkt. No. 284-1 ¶¶ 22–

4    23), and thus does not have even the appearance of divided loyalties.  *See Kayes*, 51 F.3d at 1465.

5    FINA's strained argument that no firm willing to be co-counsel with Farella could adequately

6    represent the class is misplaced now that Farella has withdrawn.[3]  *See Cummings v. Connell*, 316

7    F.3d 886, 896 (9th Cir. 2003) (disfavoring "denial of class certification on the basis of speculative

8    conflicts").

9          By contrast, Mr. Grigorishin's funding of Plaintiffs' case does create the risk of divided

10   loyalties.  "[N]amed plaintiffs are the representatives of the class—fiduciaries of its members—

11   and therefore charged with monitoring . . . class counsel.  There ought therefore to be a genuine

12   arm's-length relationship between class counsel and the named plaintiffs."  *Redman v. RadioShack*

13   *Corp.*, 768 F.3d 622, 638 (7th Cir. 2014) (citation omitted).  Here, the funding arrangement

14   creates a risk that Plaintiffs will be beholden to Mr. Grigorishin and ISL's interests—which are

15   not aligned with the class's interests with respect to damages—and thus, that Plaintiffs will not be

16   effective monitors of class counsel.  The arrangement is not compatible with class counsel's

17   "responsibility . . . to absent class members whose control over their attorneys is limited."  *Kayes*,

18   51 F.3d at 1465.

19         Accordingly, class counsel's funding arrangement does not comport with the "sharing of

20   interests" required by the adequacy component of Rule 23(a).  *Brown*, 982 F.2d at 390.  The

21   arrangement casts doubt on Winston's ability to adequately represent the proposed damages class.

22                           **c.      Plaintiffs & ISL**

23         Plaintiffs Andrew and Hosszú are partial owners of ISL club teams.  Plaintiffs emphasize

24   that other class members have "profit-sharing provisions" in their contracts with ISL, (Dkt. No.

25   246-4 at 9), but do not argue that an ownership interest is common among class members, (*id.* at

26   27–28).  (*See* Dkt. No. 219-6 at 27:20–29:7 (indicating that two swimmers other than Plaintiffs

27   _____

28   [3] To the extent this argument appears in the stricken portions of FINA's sur-reply, (Dkt. No. 263),
     the Court does not consider it.  (*See* Dkt. No. 293.)

United States District Court
Northern District of California

1    Andrew and Hosszú have an ownership interest in an ISL club team).)

2          Where there is a concrete financial interest unique to a named plaintiff, not common to the

3    class, that plaintiff may be an inadequate representative for the class as a whole.  In *Radcliffe v.*

4    *Experian Information Solutions, Inc.*, for example, the Ninth Circuit overturned a class action

5    settlement on adequacy grounds.  715 F.3d 1157 (9th Cir. 2013).  There, the settlement proposed

6    to award the named plaintiffs $5,000 for supporting the settlement.  *Id.* at 1164.

7                  [T]he conditional incentive awards changed the motivations for the
                   class representatives.  Instead of being solely concerned about the
8                  adequacy of the settlement for the absent class members, the class
                   representatives now had a $5,000 incentive to support the settlement
9                  regardless of its fairness and a promise of no reward if they opposed
                   the settlement.  The conditional incentive awards removed a
10                 critical check on the fairness of the class-action settlement, which rests on the
                   unbiased judgment of class representatives similarly situated to
11                 absent class members.

12   *Id.* at 1165.  Here, Plaintiffs Andrew and Hosszú have an analogous difference in incentive from

13   the class they seek to represent.  While all swimmers in the class have a connection to ISL insofar

14   as they supply the labor for ISL's competitions, Plaintiffs Andrew and Hosszú are unique in that

15   they also purchase that labor as club owners.  Plaintiffs Andrew and Hosszú have an incentive to

16   litigate the case in a different manner than other swimmers, because they are buyers in the market

17   for reasonably priced swimming services.  *Cf. Woods*, 2018 WL 4030570, at *6 (identifying

18   named plaintiff's unique interest "in securing large attorney's fees . . . in order to maintain [a]

19   positive working relationship").  Thus, in litigating this case for damages, Plaintiffs Andrew and

20   Hosszú will not be solely concerned about how the case benefits swimmers who supply labor.

21   Their unique financial considerations will incentivize them to litigate in a way that is not

22   detrimental to their interests as club owners and buyers of swimmer labor.  *See Radcliffe*, 715 F.3d

23   at 1165.

24         For his part, Plaintiff Shields is not a club owner and is therefore "similarly situated to

25   absent class member[]" swimmers.  *Id.*  "The adequacy-of-representation requirement is satisfied

26   as long as one of the class representatives is an adequate class representative."  *Rodriguez v. W.*

27   *Publ'g Corp.*, 563 F.3d 948, 961 (9th Cir. 2009) (holding that named plaintiffs were adequate,

28   where five of seven had problematic incentive agreement but two did not); *see Woods*, 2018 WL

United States District Court
Northern District of California

1    4030570, at *8–10 (concluding that named plaintiff was inadequate, but granting leave to amend

2    to name a second plaintiff).

3          Accordingly, while Plaintiffs Andrew and Hosszú's financial stake in ISL raises adequacy

4    concerns, it is insufficient to disqualify the three named Plaintiffs from together representing the

5    proposed damages class.

6                                        * * *

7          Plaintiffs' bid to certify a damages class raises a number of adequacy concerns. Most

8    importantly, there is no apparent way to determine individual damages (and causation) without

9    putting class members fundamentally at odds with one another, a conflict that "go[es] to the heart

10   of the litigation." *Online DVD-Rental Antitrust Litig.*, 779 F.3d at 942. Furthermore, Mr.

11   Grigorishin's funding of Plaintiffs case creates a risk that Plaintiffs will not adequately monitor

12   class counsel on behalf of the absent class members. *See Woods*, 2018 WL 4030570, at *4

13   ("[O]ne of the class representative's functions is to monitor class counsel so as to ensure that

14   counsel does not accept a relatively weak class recovery . . . Without such a structure in place, the

15   class loses one check on counsel's capacity to sell out the class's claims." (cleaned up)). That risk

16   does not help to mitigate Plaintiffs Andrew and Hosszú's financial stake in ISL. *See Radcliffe*,

17   715 F.3d at 1167.

18         Accordingly, Plaintiffs have not met their burden to establish that they, and class counsel,

19   can adequately represent the proposed Rule 23(b)(3) damages class. *Brown*, 982 F.2d at 390; *see*

20   *Parsons v. Ryan*, 754 F.3d 657, 674 (9th Cir. 2014).

21              **2.    Rule 23(b)(2) Injunctive Relief Class**

22         As to the injunctive relief class, however, Plaintiffs have met their burden on adequacy.

23   First, there is no intra-class antagonism with respect to injunctive relief. The antagonism

24   discussed above stems from ISL's compensation structure, which has nothing to do with whether

25   FINA unlawfully interferes with or sanctions outside swimming competitions. Class members

26   will not compete with one another to secure the benefits of the requested injunction; it will benefit

27   all in one fell swoop. *See Grant-in-Aid Litig.*, 311 F.R.D. at 540–45.

28         Second, the ISL-connected funding arrangement does not create an appearance of divided

United States District Court
Northern District of California

20

loyalties because ISL does not have a broader mission than the class with respect to injunctive relief. *See Kayes*, 51 F.3d at 1465; *Moreno v. AutoZone, Inc.*, 251 F.R.D. 417, 423–25 (N.D. Cal. 2008) ("[B]oth [plaintiff] and prospective class members have the same interest in this case: an optimal result," *id.* at 424), *vacated*, No. CV 05–4432 CRB, 2009 WL 3320489 (N.D. Cal. Oct. 9, 2009) (determining after class certification that plaintiff was not injured and did not have standing to pursue class-wide relief). The requested injunction will equally affect ISL and the proposed class, and their interests are aligned. (*See* Dkt. No. 83 at 54 ¶ F.)

Finally, Plaintiffs Andrew and Hosszú's financial stake in ISL club teams do not meaningfully differentiate their interest in injunctive relief from the class's interest as a whole. The requested injunction will affect them only in their capacity as swimmers, not partial owners. Thus, they do not stand to gain anything more or less than other class members if the Court grants the requested injunctive relief. And Plaintiff Shields mitigates the other named Plaintiffs' financial interests in any event.

In sum, Plaintiffs have no conflicts with the proposed injunctive relief class. Winston counsel are experienced in sports-related antitrust class actions and competent to vigorously prosecute this case, (*see* Dkt. Nos. 284-1, 284-2, 284-3). Fed. R. Civ. P. 23(g)(1)(A). Accordingly, Plaintiffs have met their burden to establish that they and their counsel can adequately represent the proposed Rule 23(b)(2) class.

## II.      RULE 23(b)(3)

Although the Court concludes that Plaintiffs have not met the threshold requirements of Rule 23(a) with respect to the damages class, it will proceed to the Rule 23(b)(3) analysis to create a thorough record. *See Walk-On Litig.*, No. C04–1254C, 2006 WL 1207915, at *9 (W.D. Wash. May 3, 2006) (proceeding to test plaintiffs' proposed class under Rule 23(b) despite finding it inadequate under Rule 23(a)). Certification under Rule 23(b)(3) requires the Court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### A.    Predominance

"The focus of the predominance inquiry is whether a proposed class is sufficiently cohesive to warrant adjudication by representation.  But the rule does not require a plaintiff seeking class certification to prove that each element of their claim is susceptible to classwide proof, so long as one or more common questions predominate." *Castillo v. Bank of Am., NA*, 980 F.3d 723, 730 (9th Cir. 2020) (cleaned up) (citing *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013)).  "Considering whether 'questions of law or fact common to the class predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).  "[T]he Court identifies the substantive issues related to plaintiff's claims . . . ; then considers the proof necessary to establish each element of the claim or defense; and considers how these issues would be tried." *Gaudin v. Saxon Mortg. Servs., Inc.*, 297 F.R.D. 417, 426 (N.D. Cal. 2013).  Class certification "analysis will frequently entail overlap with the merits of the plaintiff's underlying claim . . . because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33–34 (2013) (cleaned up).

### 1.    Sherman Act Violations

To prevail on their claims under the Sherman Act, Plaintiffs must establish the following elements: "(1) a violation of antitrust laws, (2) an injury they suffered as a result of that violation, and (3) an estimated measure of damages." *Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 288 (N.D. Cal. 2016) (cleaned up).  The second element, antitrust impact or injury, is a necessary element of liability, "independent of proof of a violation and independent of the matter of individual damages." *Walk-On Litig.*, 2006 WL 1207915, at *10 (citation omitted).  For that reason, the predominance inquiry subjects the second element (antitrust impact) to the same rigors as the first element (antitrust violation).  By contrast, common questions need not predominate with respect to the third element, individual damages.  *See id.* at *9 (citing 6 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 18:27 (4th ed. 2002)), *11 ("[T]he contours of the third element require the least scrutiny.").

22

1    Common questions predominate with respect to the first element.  Antitrust violation will

2    be resolved by questions of law and fact common to the entire class, including whether FINA's

3    communications and other conduct with member federations constitute a horizontal restraint of

4    trade in violation of the Sherman Act, and whether FINA improperly monopolized or attempted to

5    monopolize the markets for purchase of swimmer services and sale of swimming competitions.

6    As to the second element, common questions exist and it is a close question whether they

7    predominate.  Antitrust impact "is the fact of damage that results from a violation of the antitrust

8    laws.  It is the causal link between the antitrust violation and the damages sought by plaintiffs."

9    *Nitsch*, 315 F.R.D. at 292 (cleaned up).  Thus, antitrust impact is distinct from "damage

10    calculations," which assume the fact of damage and which "alone cannot defeat certification."

11    *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013).  Here, a core common question

12    regarding the fact of damage is whether ISL would have held more events and distributed more

13    prize money and appearance fees but for FINA's allegedly anticompetitive conduct.  The answer

14    to that question applies class-wide.  Additionally, Dr. Rascher's proposed methodology shows that

15    a large percentage of class members earned less than they would have but for FINA's allegedly

16    anticompetitive conduct.  (*See* Dkt. No. 193-96; Dkt. No. 246-4 at 25–26.)  The presence of a

17    small number of swimmers who were exposed to the challenged conduct but not ultimately

18    damaged does not defeat predominance.  *See Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125,

19    1136–37 (9th Cir. 2016).  On the other hand, the fact of damage cannot be proven without

20    establishing which class members would have received that money in the but-for world.  *See*

21    *Leyva*, 716 F.3d at 514 ("[P]laintiffs must be able to show that their damages stemmed from the

22    defendant's actions that created the legal liability."); *Walk-On Litig.*, 2006 WL 1207915, at *12.

23    That requires resolving a host of individual questions as to each class member's performance in

24    the but-for world, as discussed above.

25    As to the third element, common questions predominate.  As in *Walk-On Litigation*, "proof

26    of injury likely will provide a foundation for proof of damages for each player.  Thus, rather than

27    being a severable issue, proof of damages is wrapped up in proof of liability itself."  2006 WL

28    1207915, at *13.

23

**2.      Tortious Interference with Contract**

To prevail on their state claim of tortious interference with contract, Plaintiffs must establish: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts designed to induce breach or disruption of the contract; (4) actual breach or disruption; and (5) resulting damage." *Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1133 (9th Cir. 2015) (citation omitted).

Common questions predominate on the first, second, and third elements: whether the swimmers' contracts with ISL were valid, whether FINA knew of the contracts, and whether FINA took intentional acts designed to induce breach can be resolved on a class-wide basis.  As to the fourth and fifth elements, Dr. Rascher's opinion that a large percentage of class members earned less than they would have but for FINA's conduct supports predominance.  But those elements also require resolving many individual and antagonistic questions about how much each class member would have earned.

**B.      Superiority**

The "purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy."  *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010).  Relevant factors include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3).  "This list is not exhaustive and other factors may be considered."  *Wolin*, 617 F.3d at 1175.

Here, as explained above, liability is entwined with each class member's injury—the fact of damage.  *Cf. id.* at 1176 (finding superiority requirement met because plaintiffs' products liability theory "allege[d] that their injury results . . . from a single, defective alignment geometry").  That creates intra-class antagonism which, coupled with the fairly large amount of damages at stake, gives each absent class member "a strong interest in individually prosecuting an

action should the member so choose." *In re Pac. Fertility Ctr. Litig.*, No. 18-cv-01586-JSC, 2020

WL 3432689, at *7 (N.D. Cal. June 23, 2020); *see In re N. Dist. of Cal., Dalkon Shield IUD*

*Prods. Liab. Litig.* ("*Dalkon Shield*"), 693 F.2d 847, 856 (9th Cir. 1982). Additionally, there is no

apparent efficiency gain from certifying this case as a class action because a determination on

liability cannot be applied with simplicity to the class. *See Dalkon Shield*, 693 F.2d at 856

(finding superiority requirement not met and noting that "[m]anagement is made difficult by the

complexity and multiplicity of issues").

* * *

All of Plaintiffs' claims present common questions of law and fact, but it is a close

question whether they predominate. Regardless, Plaintiffs have not met their burden to

demonstrate that the class action device is superior here. The lack of superiority is an additional

reason the proposed damages class under Rule 23(b)(3) is not appropriate for certification.

## III.     RULE 23(b)(2)

With respect to their proposed injunctive relief class, Plaintiffs meet the threshold

requirements under Rule 23(a). They must also establish that "the party opposing the class has

acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or

corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P.

23(b)(2). The requirements of Rule 23(b)(2) "are unquestionably satisfied when members of a

putative class seek uniform injunctive or declaratory relief from policies or practices that are

generally applicable to the class as a whole." *Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014).

"That inquiry does not require an examination of the viability or bases of the class members'

claims for relief, does not require that the issues common to the class satisfy a Rule 23(b)(3)-like

predominance test, and does not require a finding that all members of the class have suffered

identical injuries." *Id.*

So it is here. Plaintiffs seek uniform injunctive relief from anticompetitive conduct by

FINA, including an injunction preventing FINA from sanctioning swimmers or member

federations for participating in non-FINA competitions. Plaintiffs have established that "a single

injunction or declaratory judgment would provide relief to each member of the class." *B.K. ex rel.*

25

United States District Court
Northern District of California

1    *Tinsley v. Snyder*, 922 F.3d 957, 971 (9th Cir. 2019); *see Grant-in-Aid Litig.*, 311 F.R.D. 532,

2    545–46 (N.D. Cal. 2015).  The individualized questions relevant to the Rule 23(b)(3) analysis

3    present no problem under Rule 23(b)(2).  *See Senne v. Kan. City Royals Baseball Corp.*, 934 F.3d

4    918, 937–38 (9th Cir. 2019) (rejecting predominance-like "cohesiveness" requirement under Rule

5    23(b)(2)).  And to the extent Plaintiffs' request for injunctive relief may be moot, as FINA argues,

6    that is a common and predominant question of law.

7           Accordingly, an injunctive relief class is certifiable under Rule 23(b)(2).

8    **IV.    ADMINISTRATIVE ISSUES**

9           **A.    Motion to File Supplemental Materials**

10          After FINA had filed its opposition to class certification but before Plaintiffs filed their

11   reply, FINA sought leave to file supplemental materials in opposition.  (Dkt. No. 231.)  FINA

12   presents new factual issues that "would have featured in FINA's opposition had they been

13   available at the time of filing," including issues relating to ISL's 2021 season and swimming

14   events at the 2021 Olympic Games.  (*Id.* at 3.)  Supplemental materials may be helpful where new

15   facts are produced in discovery, *e.g.*, *Shenzhenshi Haitiecheng Sci. & Tech. Co., Ltd. v. Rearden*

16   *LLC*, No. 15-cv-00797-JST, 2019 WL 1560449, at *1–2 (N.D. Cal. Apr. 10, 2019), but less so

17   where the facts come from ongoing events in the real world—just two and a half months after

18   FINA filed its opposition.  The Court is not persuaded that the proposed supplemental materials

19   will help resolve the issues presented at this stage.  Accordingly, FINA's motion is DENIED.

20          **B.    Administrative Motions to File Under Seal**

21          There is a presumption of public access to judicial records and documents.  *Nixon v.*

22   *Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978).  Courts generally apply a "compelling

23   reasons" standard when considering motions to seal, recognizing that "a strong presumption in

24   favor of access is the starting point."  *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178

25   (9th Cir. 2006) (cleaned up).  Courts have found compelling reasons to seal information about a

26   litigant or non-party's personal finances or a business's budget and development planning.  *See*

27   *Brown v. Brown*, NO. CV 13-03318 SI, 2013 WL 12400041, at *1 (N.D. Cal. Dec. 30, 2013);

28   *Space Data Corp. v. X*, No. 16-cv-03260-BLF, 2017 WL 11503233, at *2 (N.D. Cal. Sept. 25,

2017).  "The mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records."  *Kamakana*, 447 F.3d at 1179.

Civil Local Rule 79-5 supplements the "compelling reasons" standard.  *Exeltis USA Inc. v. First Databank, Inc.*, No. 17-cv-04810-HSG, 2020 WL 2838812, at *1 (N.D. Cal. June 1, 2020).  "Reference to a stipulation or protective order that allows a party to designate certain documents as confidential is not sufficient to establish that a document, or portions thereof, are sealable."  N.D. Cal. Civ. L.R. 79-5(c).

> For any document a party ("Filing Party") seeks to seal because that document has been designated as confidential by another party or non-party (the "Designating Party"), the Filing Party must, instead of filing an Administrative Motion to File Under Seal, file an Administrative Motion to Consider Whether Another Party's Material Should Be Sealed.
> . . .
> (3) Within 7 days of the motion's filing, the Designating Party must file a statement and/or declaration . . . .  A failure to file a statement or declaration may result in the unsealing of the provisionally sealed document without further notice to the Designating Party.

*Id.* at 79-5(f).

Applying those principles, the Court GRANTS in part and DENIES in part the parties' administrative motions to file under seal, (Dkt. Nos. 193, 219, 246, 261, 262, 272, 275, 276), as follows:

| Document | Disposition | Reason |
|---|---|---|
| Dkt. No. 193-79. | Not sealable. | Confidentiality designation was withdrawn.  (Dkt. No. 199 ¶ 9.) |
| Dkt. Nos. 193-78, 193-80, 193-87, 193-88, 193-89. | Sealable.[4] | Contains information about contract negotiations, projected revenues, and business plans. |
| Dkt. Nos. 193-75, 193-76, 193-77, 193-81, 193-82, 193-83, 193-84, 193-85, 193-86, 193-90, 193-91. | Not sealable. | FINA did not submit the statement or declaration required by N.D. Cal. Civ. L.R. 79-5(f). |
| Dkt. No. 193-92. | Redacted portions reflected in Dkt. No. | Contains compensation information. |

---

[4] ISL is cautioned that, if Plaintiffs' case or ISL's case against FINA proceeds to trial, documents containing information about ISL's business may not be sealable.

| | 200 are sealable.[5] | |
|---|---|---|
| Dkt. Nos. 193-93, 193-94. | Not sealable. | Confidentiality designations were withdrawn. (Dkt. No. 200-5 ¶ 5 n.1.) |
| Dkt. Nos. 193-95, 193-96. | Sealable. | Contains compensation information. |
| Dkt. Nos. 219-5, 219-6. | Highlighted portions are sealable. | Contains personal financial information. |
| Dkt. No. 219-7. | Sealable. | Privilege log. |
| Dkt. No. 219-8. | Not sealable. | Confidentiality designation was withdrawn. (Dkt. No. 223 ¶ 4.) |
| Dkt. Nos. 219-11, 219-12, 219-13. | Not sealable. | FINA asserts privacy obligations under Swiss and European Union law, (Dkt. No. 219 at 2–3), but has not made a complete showing of compelling reasons to seal the particular documents at issue. |
| Dkt. No. 219-14. | Sealable. | Contains compensation information. |
| Dkt. Nos. 219-16, 219-17, 219-19, 219-20, 219-21, 219-22, 219-24. | Sealable. | Contains information about projected revenues, business plans, and contract negotiations. |
| Dkt. No. 219-23. | Sealable. | Contains personal financial information. |
| Dkt. Nos. 219-9, 219-10, 219-15, 219-18. | Not sealable. | No party submitted the statement or declaration required by L.R. 79-5(f). |
| Dkt. No. 246-7. | Dr. Rascher's reply report and appendices are not sealable in their entirety as Plaintiffs request; indeed, Plaintiffs seek to seal information that was included in the unredacted portions of Dr. Rascher's original report and appendices. | Contains a plethora of unsealable information, (*see, e.g.*, Dkt. No. 246-7 ¶¶ 3, 4). Plaintiffs' submission violates L.R. 79-5 and is inconsistent with how they presented Dr. Rascher's original report. |
| Dkt. Nos. 246-8, 246-10, 246-12, 246-14, 246-16, 246-18, 246-20, 246-38, 246-40, 246-43. | Not sealable. | FINA did not submit the statement or declaration required by L.R. 79-5(f). |
| Dkt. Nos. 246-22, 246-24, 246-26, 246-28, 246-30, 246-32, 246-34. | Sealable. | Contains compensation information. |
| Dkt. No. 246-36. | Dr. Rascher's | Contains a plethora of obviously |

---

[5] Plaintiffs are cautioned that, if their case against FINA proceeds to trial, documents containing information about Plaintiffs' or other swimmers' compensation may not be sealable.

| | damages report is not sealable in its entirety as Plaintiffs request; indeed, Plaintiffs seek to seal information that was included in the unredacted portions of Dr. Rascher's original report. | unsealable information.  Plaintiffs' submission violates L.R. 79-5 and is inconsistent with how they presented Dr. Rascher's original report. |
|---|---|---|
| Dkt. Nos. 261-3, 263-5. | Sealable. | Contains compensation information. |
| Dkt. No. 272-3. | Not sealable. | Confidentiality designation was withdrawn.  (Dkt. No. 279 ¶ 4.) |
| Dkt. No. 275-4. | Highlighted portions are sealable. | Contains confidential settlement communications. |
| Dkt. Nos. 276-6, 276-7. | Not sealable. | FINA did not submit the statement or declaration required by L.R. 79-5(f). |

Portions of motion papers that quote or reference the material determined sealable above are also sealable.  This includes without limitation portions of Plaintiffs' motion for class certification, (Dkt. No. 191), FINA's opposition and expert reports, (Dkt. Nos. 220, 220-1, 220-2), Plaintiffs' reply, (Dkt. No. 249), FINA's sur-reply, (Dkt. No. 261-2, including without limitation at 13:17-22, 16 nn.10-11), and Plaintiffs' reply in support of their motion to strike, (Dkt. No. 275-4).

With respect to the material determined not sealable, unless the designating party files a renewed motion to seal within **5 days** of the date of this order the Court will unlock the prior docket entries so that the material previously filed under seal is available on the public docket. *See* N.D. Cal. L.R. 79-5(f), 79-5(g)(2).

A party may file a notice on the docket if the disposition above omits any document for which an administrative motion to seal was filed.

## CONCLUSION

For the reasons explained above, the Court GRANTS Plaintiffs' motion to certify a class under Rule 23(b)(2) but DENIES the motion to certify a class under Rule 23(b)(3).  Winston & Strawn LLP are appointed as class counsel to represent the Rule 23(b)(2) injunctive relief class.

The Court DENIES FINA's motion to file supplemental materials and GRANTS in part and DENIES in part the parties' administrative motions to file under seal.

United States District Court
Northern District of California

United States District Court
Northern District of California

The Court will hold a further Case Management Conference in this case and the related case on **March 3, 2022** at 1:30 p.m. by Zoom videoconference.  An updated joint case management conference statement, including a proposed schedule through trial, is due February 24, 2022.  The Court will refer to the arguments regarding Plaintiffs' merit expert reports, (Dkt. No. 298), so the parties need not repeat them in the case management conference statement.

This Order disposes of Docket Nos. 191, 193, 219, 231, 246, 261, 262, 272, 275, 276, 284.

**IT IS SO ORDERED.**

Dated: February 11, 2022

_Jacqueline Scott Corley_
JACQUELINE SCOTT CORLEY
United States Magistrate Judge