LATHAM & WATKINS LLP
    Daniel M. Wall (SBN 102580)
    Christopher S. Yates (SBN 161273)
    Aaron T. Chiu (SBN 287788)
505 Montgomery Street, Suite 2000
San Francisco, California  94111-6538
Telephone:  415.391.0600
Email: Dan.Wall@lw.com
      Chris.Yates@lw.com
      Aaron.Chiu@lw.com

Attorneys for Defendant
Fédération Internationale de Natation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| THOMAS A. SHIELDS, ET AL,<br><br>           Plaintiffs,<br><br>vs.<br><br>FÉDÉRATION INTERNATIONALE DE NATATION,<br><br>           Defendant.<br><hr>INTERNATIONAL SWIMMING LEAGUE, LTD.,<br><br>           Plaintiff,<br><br>vs.<br><br>FÉDÉRATION INTERNATIONALE DE NATATION,<br><br>           Defendant. | CASE NO. 3:18-cv-07393-JSC<br>CASE NO. 3:18-cv-07394-JSC<br><br>**FÉDÉRATION INTERNATIONALE DE NATATION'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON SECTION 1 SHERMAN ACT LIABILITY AND INJUNCTIVE RELIEF**<br><br>Date:     October 20, 2022<br>Time:     9:00 AM<br>Place:    Via Videoconference<br>Judge:   The Hon. Jacqueline Scott Corley |

# PUBLIC REDACTED VERSION

1

**<u>TABLE OF CONTENTS</u>**

2

<u>**Page**</u>

3

I.      INTRODUCTION ................................................................................................ 1

4

II.     LEGAL STANDARD......................................................................................... 3

5

III.    ARGUMENT ..................................................................................................... 3

6

   A.     Plaintiffs' Attempts to Invoke *Per Se* Liability and the Quick Look
          Test Are Meritless ................................................................................... 3

7

8

      1.    The Rule of Reason Applies In This Case ................................... 4

9

      2.    Plaintiffs' Arguments for Applying the *Per Se* Rule Are
            Meritless....................................................................................... 5

10

11

      3.    The Quick Look Test Does Not Apply ........................................ 8

12

   B.     Plaintiffs' Section 1 Claims Fail As a Matter of Law.......................... 10

13

      1.    The Undisputed Evidence Confirms There Was No Group
            Boycott ...................................................................................... 10

14

      2.    FINA's Rules Are Not Evidence of Concerted Action............ 16

15

      3.    Plaintiffs Cannot Show Antitrust Injury ................................... 20

16

   C.     Plaintiffs' Injunctive Relief Claims Are Moot..................................... 23

17

IV.    CONCLUSION................................................................................................ 25

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*AD/SAT, Div. of Skylight, Inc. v. Associated Press,*
181 F.3d 216 (2d Cir. 1999) .......................................................................................... 16, 17

*Adaptive Power Solutions, LLC v. Hughes Missile Systems Co.,*
141 F.3d 947 (9th Cir. 1998) ........................................................................................ 21, 22

*American Ad Management, Inc. v. General Telephone Co. of California,*
190 F.3d 1051 (9th Cir. 1999) ............................................................................................. 21

*American Airlines v. Chirstensen,*
967 F.2d 410 (10th Cir. 1992) ............................................................................................ 16

*American Dental Association v. Cigna Corp.,*
605 F.3d 1283 (11th Cir. 2010) .......................................................................................... 16

*American Needle, Inc. v. National Football League,*
538 F.3d 736 (7th Cir. 2008) ................................................................................................ 8

*American Needle, Inc. v. National Football League,*
560 U.S. 183 (2010) ..................................................................................................... 4, 14

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ............................................................................................................ 3

*Arizona v. Maricopa County Medical Society,*
457 U.S. 332 (1982) .......................................................................................................... 18

*Asbestos Disease Awareness Organization v. Wheeler,*
508 F. Supp. 3d 707 (N.D. Cal. 2020), *as amended* (June 7, 2021) ...................................... 3

*Associated Press v. United States,*
326 U.S. 1 (1945) .............................................................................................................. 18

*Atlantic Richfield Co. v. USA Petroleum Co.,*
495 U.S. 328 (1990) .......................................................................................................... 21

*Bell v. Fur Breeders Agricultural Cooperative,*
348 F.3d 1224 (10th Cir. 2003) .......................................................................................... 13

*Blalock v. Ladies Professional Golf Association,*
359 F. Supp. 1260 (N.D. Ga. 1973) ...................................................................................... 6

*Board of Regents of University of Oklahoma v. National Collegiate Athletic
Association,*
707 F.2d 1147 (10th Cir. 1983), *aff'd*, 468 U.S. 85 (1984) ................................................. 17

*Board of Trade of City of Chicago v. United States,*
246 U.S. 231 (1918) .......................................................................................................... 18

1

2
*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*,
    441 U.S. 1 (1979)..................................................................................... 1, 4

3
*Brookins v. International Motor Contest Association*,
    219 F.3d 849 (8th Cir. 2000) ........................................................................ 16

4
*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)..................................................................................... 21

5

6
*Business Electronics Corp. v. Sharp Electronics Corp.*,
    485 U.S. 717 (1988)....................................................................................... 4

7
*Cabo Distributing Co. v. Brady*,
    821 F. Supp. 601 (N.D. Cal. 1992) ................................................................. 3

8

9
*California Dental Association v. Federal Trade Commission*,
    526 U.S. 756 (1999)................................................................................ 4, 18

10
*Chicago Professional Sports Ltd. Partnership v. National Basketball Association*,
    95 F.3d 593 (7th Cir. 1996) ............................................................................ 8

11

12
*Consolidated Metal Products, Inc. v. American Petroleum Institute*,
    846 F.2d 284, 293–94 (5th Cir. 1988) ........................................................... 16

13
*Copperweld Corp. v. Independence Tube Corp.*,
    467 U.S. 752 (1984)..................................................................................... 21

14

15
*Denver Rockets v. All-Pro Management, Inc.*,
    325 F. Supp. 1049 (C.D. Cal. 1971) ................................................................ 6

16
*Deutscher Tennis Bund v. ATP Tour, Inc.*,
    610 F.3d 820 (3d Cir. 2010).................................................................... 5, 8, 9

17

18
*Federal Trade Commission v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ........................................................................ 10

19
*Goldfarb v. Virginia State Bar*,
    421 U.S. 773 (1975)..................................................................................... 18

20
*Gunter Harz Sports, Inc. v. U.S. Tennis Association, Inc.*,
    511 F. Supp. 1103 (D. Neb. 1981), *aff'd*, 665 F.2d 222 (8th Cir. 1981) ................ 5

21

22
*Heldman v. United States Lawn Tennis Association*,
    354 F. Supp. 1241 (S.D.N.Y. 1973)................................................................. 8

23

24
*Howard Hess Dental Laboratories Inc. v. Dentsply International, Inc.*,
    602 F.3d 237 (3d Cir. 2010)......................................................................... 15

25
*In re Electronic Books Antitrust Litigation*,
    859 F. Supp. 2d 671 (S.D.N.Y. 2012)............................................................ 15

26

27
*In re Musical Instruments & Equipment Antitrust Litigation*,
    798 F.3d 1186 (9th Cir. 2015) .................................................................. 6, 11

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

FINA'S OPPOSITION TO PLAINTIFFS' MSJ
CASE NOS. 3:18-CV-07393-JSC & 3:18-CV-07394-JSC

*In re National Football League's Sunday Ticket Antitrust Litigation,*
   933 F.3d 1136 (9th Cir. 2019) ............................................................................... 6

*In re NCAA Student-Athlete Name & Likeness Licensing Litigation,*
   37 F. Supp. 3d 1126 (N.D. Cal. 2014) .................................................................. 10

*Jack Russell Terrier Network of Northern California v. American Kennel Club, Inc.,*
   407 F.3d 1027 (9th Cir. 2005) .............................................................................. 13

*JES Properties, Inc. v. USA Equestrian, Inc.,*
   No. 02 Civ. 1585T24, 2005 WL 1126665 (M.D. Fla. May 9. 2005), *aff'd,* 458
   F.3d 1224 (11th Cir. 2006) ............................................................................ 17, 18

*Justice v. National Collegiate Athletic Association,*
   577 F. Supp. 356 (D. Ariz. 1983) ......................................................................... 23

*Kentucky Speedway, LLC v. National Association of Stock Car Auto Racing,*
   588 F.3d 908 (6th Cir. 2009) .................................................................................. 8

*Law v. National Collegiate Athletic Association,*
   134 F.3d 1010 (10th Cir. 1998) ............................................................................ 10

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.,*
   551 U.S. 877 (2007).................................................................................................. 4

*Los Angeles Mem'l Coliseum v. Nat'l Football League,* 634 F.2d 1197, 1201 (9th
   Cir. 1980) .............................................................................................................. 23

*Los Angeles Memorial Coliseum Commission v. National Football League,*
   726 F.2d 1381 (9th Cir. 1984) ................................................................................ 5

*M & H Tire Co. v. Hoosier Racing Tire Corp.,*
   733 F.2d 973 (1st Cir. 1984).................................................................................... 6

*Major League Baseball Properties, Inc. v. Salvino, Inc.,*
   542 F.3d 290, 334 (2d Cir. 2008)............................................................................ 5

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986)............................................................................................... 15

*Miller v. Glenn Miller Products, Inc.,*
   454 F.3d 975 (9th Cir. 2006) .................................................................................. 3

*Monsanto Co. v. Spray-Rite Service Corp.,*
   465 U.S. 752 (1984).................................................................................. 2, 15, 17, 20

*National Basketball Association v. SDC Basketball Club, Inc.,*
   815 F.2d 562 (9th Cir. 1987) .................................................................................. 5

*National Collegiate Athletic Association v. Alston,*
   141 S. Ct. 2141 (2021).....................................................................................*Passim*

*National Collegiate Athletic Association v. Board of Regents of University of Oklahoma*,
  468 U.S. 85 (1984).................................................................................................*Passim*

*National Society of Professional Engineers v. United States*,
  435 U.S. 679 (1978)............................................................................................ 18

*North American Soccer League, LLC v. U.S. Soccer Federation, Inc.*,
  883 F.3d 32 (2d Cir. 2018)...................................................................................*Passim*

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*,
  472 U.S. 284 (1985)............................................................................................ 10

*NYNEX Corp. v. Discon, Inc.*,
  525 U.S. 128 (1998)............................................................................................ 4, 6

*O'Bannon v. National Collegiate Athletic Association*,
  802 F.3d 1049 (9th Cir. 2015)......................................................................... 5, 18, 19

*Ohio v. American Express Co.*,
  138 S.Ct. 2274 (2018)......................................................................................... 11

*PLS.Com, LLC v. National Association of Realtors*,
  32 F.4th 824 (9th Cir. 2022) ...................................................................... 6, 10, 12, 15

*Pullos v. All. Laundry Systems, LLC*,
  No. 3:07-CV-00169-LRH-RAM, 2009 WL 10708625 (D. Nev. July 29,
  2009), *aff'd*, 424 F. App'x 663 (9th Cir. 2011), and *aff'd*, 424 F. App'x 663
  (9th Cir. 2011).................................................................................................. 22

*Race Tires America, Inc. v. Hoosier Racing Tire Corp.*,
  614 F.3d 57 (3d Cir. 2010).................................................................................... 8

*Rickards v. Canine Eye Registration Foundation, Inc.*,
  704 F.2d 1449 (9th Cir. 1983) ............................................................................ 15

*Robertson v. National Basketball Association*,
  389 F. Supp. 867 (S.D.N.Y. 1975)......................................................................... 6

*SD3, LLC v. Black & Decker (U.S.), Inc.*,
  801 F.3d 412 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015)....................... 17

*State Oil Co. v. Khan*,
  522 U.S. 3 (1997)................................................................................................. 4

*Tanaka v. University of Southern California*,
  252 F.3d 1059 (9th Cir. 2001) .............................................................................. 10

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006)............................................................................................... 1, 4

*Toscano v. PGA Tour, Inc.*,
  201 F. Supp. 2d 1106 (E.D. Cal. 2002)................................................................... 23

*Toscano v. Professional Golfers Association*,
    258 F.3d 978 (9th Cir. 2001) ................................................................. 17, 19, 23

*U.S. Trotting Association v. Chicago Downs Association, Inc.*,
    665 F.2d 781 (7th Cir. 1981) ........................................................................... 5, 8

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015)................................................................................ 15

*United States v. Topco Associates, Inc.*,
    405 U.S. 596 (1972).................................................................................... 1, 18

*Washington State Bowling Proprietors Association. v. Pacific Lanes, Inc.*,
    356 F.2d 371 (9th Cir. 1966) ............................................................................... 6

*WHICH LLC v. NextGen Laboratories, Inc.*,
    No. CV 18-00261 JMS-WRP, 2019 WL 2717769 (D. Haw. June 28, 2019)....................... 22

*Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*,
    513 F. Supp. 1100 (E.D. Pa 1981), *aff'd in part, rev'd in part sub nom. In re*
    *Japanese Elec. Prod. Antitrust Litig.*, 723 F.2d 238 (3d Cir. 1983), *rev'd sub*
    *nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, (1986)................. 25

## RULES

Fed. R. Civ. P. 56(a) ................................................................................................. 8

# I.   INTRODUCTION

Plaintiffs failed to develop the evidence necessary to prove their antitrust claims: evidence of a cognizable relevant market, that FINA has monopoly or monopsony power, that there was a conscious commitment to a common scheme designed to achieve an unlawful objective, or that FINA engaged in any anticompetitive conduct.  So Plaintiffs' new counsel now claim that FINA's Rules themselves should be summarily condemned as unlawful under the Sherman Act.[1] Plaintiffs' motion should be seen for what it is:  an effort to distract and avoid summary judgment being granted to FINA.   There is no support for condemning the rules of an International Federation as unlawful under the *per se* rule or quick look test.  In fact, the Supreme Court has long held that courts must accumulate a substantial history of condemning a practice under the rule of reason before condemning it *per se*.  *See Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.*, 441 U.S. 1, 9 (1979) ("[I]t is only after considerable experience with certain business relationships that courts classify them as per se violations . . . ." (quoting *United States v. Topco Associates, Inc.*, 405 U.S. 596, 607–608 (1972))).  No such history exists here, and in advocating for the *per se* and quick look rules, Plaintiffs further ignore the Supreme Court's admonition that courts are to "presumptively apply" the rule of reason.  *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).  That is especially true in the context of sports leagues and governing bodies.  Just last year, the Supreme Court applied the rule of reason in a sports case involving admitted horizontal price fixing.  *See Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141 (2021).  The Court could deny Plaintiffs' motion on this basis alone.

Plaintiffs' motion, however, is also built on a factual house of cards.  It is  premised on the notion that FINA's rules operate as a boycott of "*any* swimming competition FINA does not sanction." Mot. at 3–4.  That is false.  Hundreds of swimming meets not recognized by FINA or its member National Federations ("NFs") involving top-tier swimmers occur every year.  And, no swimmer has *ever* been punished by FINA for participating in such a swimming competition. Even ISL admits that "[t]o have a professional swimming league you don't need FINA."  Ex. 1 (di Nino) at 168:7–25.

---

[1] The same motion was filed in the *ISL* and *Shields* case.  *Compare* Dkt. 371, *with* Dkt. 325.

Plaintiffs' new "concerted action" theory—premised on the mere existence of FINA's rules—is also wrong as a matter of law and at odds with the evidence. Plaintiffs have apparently abandoned their core allegation that FINA has a monopoly over "top-tier swimming events," and are now all in on the theory that FINA's internal governance rules "standing alone, are enough to satisfy the concerted-action element of a Section 1 violation." Mot. at 16. That is an extraordinary argument, wholly unsupported by the law. If it were correct, any rule of any International Federation, athletic governing body, or association would automatically be subject to condemnation under Section 1 of the Sherman Act, without regard for the actual purpose or effect of those rules. But associational rules, standing alone, do not amount to a conspiracy under Section 1—and certainly not when they do not and cannot operate to limit economic competition between an association's members in their individual businesses, like the FINA rules Plaintiffs challenge here. FINA General Rule ("GR") 4 is intended to protect FINA's NFs from associating with third parties that might harm the development of the sport of swimming, thereby harming the mission of both FINA and its NFs. FINA By-Law ("BL") 12.3 merely requires the submission of an application to FINA for recognition of international swimming competitions sixth months in advance, to ensure that FINA can maintain a coherent international swimming calendar. Neither of these rules—both of which long predate this controversy—reflects a "conscious commitment to a common scheme designed to achieve an unlawful objective" as required for there to be concerted action among FINA and its NFs. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). Nor have Plaintiffs adduced evidence that FINA and its own NFs are actually economic competitors capable of conspiring to violate Section 1, or in fact entered into any conspiratorial agreement to boycott ISL.

Plaintiffs also cannot prove that they suffered antitrust injury. At bottom, this case involves an avoidable governance controversy, which led to the cancellation of a single swim meet in 2018. That is the extent of Plaintiffs' non-speculative "injury," and is limited, at most, to a period of just a few months in 2018. Both ISL and the swimmers admitted as much throughout this case, but they nevertheless maintain that this temporary injury suffices to establish anticompetitive harm. *See* Mot. at 8, 10, 11. The antitrust laws, however, are concerned with enduring market-wide harm

1    to competition, not isolated or temporary injuries localized to a single competitor.  That is not

2    something Plaintiffs can prove.

3         Finally, Plaintiffs' mootness arguments, grounded entirely in constitutional mootness, fail.

4    An antitrust plaintiff must establish an imminent threat of anticompetitive harm to have standing

5    to pursue injunctive relief under Section 16 of the Clayton Act.  As both ISL and the swimmer

6    Plaintiffs have admitted throughout this case, there is no evidence that any FINA conduct after

7    2018 inhibited either ISL's ability to host events or the swimmers' ability to compete in ISL's

8    events.  Plaintiffs' injunctive relief claim is therefore moot.

9         The Court should deny Plaintiffs' motion for summary judgment and, instead, grant

10   FINA's.

11   **II.    LEGAL STANDARD**

12        Plaintiffs seeking summary judgment bear a higher burden than defendants; they must

13   establish that they are entitled to judgment in their favor as a matter of law on *each and every*

14   element of their claims.  Fed. R. Civ. P. 56(a); *Asbestos Disease Awareness Org. v. Wheeler*, 508

15   F. Supp. 3d 707, 734 (N.D. Cal. 2020), *as amended* (June 7, 2021) ("Where a plaintiff moves for

16   summary judgment on claims that it has brought it 'must prove each element essential of the claims

17   . . . by undisputed facts.'" (quoting *Cabo Distrib. Co. v. Brady*, 821 F. Supp. 601, 607 (N.D. Cal.

18   1992))).  The "mere existence of a scintilla of evidence in support of the plaintiff's position [is]

19   insufficient[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Where a plaintiff

20   cannot sustain its burden on even one element of its claims, summary judgment in favor of

21   defendant is warranted.  *See Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).

22   **III.   ARGUMENT**

23        **A.    Plaintiffs' Attempts to Invoke *Per Se* Liability and the Quick Look Test Are
24              Meritless**

25        It is no secret why Plaintiffs now attempt to invoke *per se* liability and the quick look test:

26    they lack the evidence necessary to prove their antitrust claims under the rule of reason.  *See* Dkt.

27   346 (March 3, 2022 CMC Tr.) at 6:9–13 (Counsel for the Shields Plaintiffs admitting that "our

28

side will be handicapped by not having" a liability expert unless the *per se* rule applied).[2]  But there is no support for applying the *per se* rule or quick look test here.  A legion of cases, culminating with the Supreme Court's recent decision in *Alston*, firmly shut the door on everything except the rule of reason when it comes to scrutinizing the rules and conduct of sports governing bodies and leagues under the antitrust laws.  As FINA set forth in its motions for summary judgment, Plaintiffs failed to prove their case under the rule of reason.[3]  Plaintiffs cannot sidestep their failure of proof by now resorting to the *per se* rule or quick look test.

### 1.   The Rule of Reason Applies In This Case

The Supreme Court has held unequivocally that courts should "presumptively appl[y] rule of reason analysis, under which antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful." *Texaco*, 547 U.S. at 5; *see also Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 726 (1988).  The presumption in favor of rule of reason analysis is so strong that the Supreme Court has reversed every lower court *per se* decision that it has reviewed since 1997.  *See, e.g.*, *State Oil Co. v. Khan*, 522 U.S. 3 (1997); *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998); *California Dental Ass'n v. Fed. Trade Comm'n*, 526 U.S. 756 (1999); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007).

In addition, "the per se rule is appropriate only after courts have had considerable experience with the type of restraint at issue." *Leegin*, 551 U.S. at 886 (citing *Broadcast Music*, 441 U.S. at 9).  Experience has taught courts to go the other way when it comes to antitrust cases involving sports governance.  Cases going back decades uniformly recognize that the rule of reason applies. *See, e.g.*, *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 202–04 (2010); *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 86 (1984); *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.* ("*NASL*"), 883 F.3d 32, 41 (2d Cir. 2018);

---

[2] Unless otherwise indicated, all "Dkt." citations are to the docket in *ISL v. FINA*, No. 3:18-cv-07394-JSC.

[3] Plaintiffs attempt to "reserve the right to present evidence of relevant markets and FINA's market power" if the Court denies their motion, Mot. n. 33, but the opportunity to present evidence supporting their alleged relevant markets has passed.  This request underscores that they failed to prove their claims under the rule of reason.

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1063–64 (9th Cir. 2015); *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 831–32 (3d Cir. 2010); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 334 (2d Cir. 2008); *Nat'l Basketball Ass'n v. SDC Basketball Club, Inc.*, 815 F.2d 562, 567–68 (9th Cir. 1987); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1391–92 (9th Cir. 1984); *U.S. Trotting Ass'n v. Chicago Downs Ass'n, Inc.*, 665 F.2d 781, 788–89 (7th Cir. 1981); *Gunter Harz Sports, Inc. v. U.S. Tennis Ass'n, Inc.*, 511 F. Supp. 1103, 1115–16 (D. Neb. 1981), *aff'd*, 665 F.2d 222 (8th Cir. 1981).  This is not controversial.  As the Second Circuit reiterated recently, "[r]egulation of league sports is a textbook example of when the rule of reason applies."  *NASL*, 883 F.3d at 41.  As the Seventh Circuit recognized long ago, "in the context of organized sports and sanctioning organizations, courts should be hesitant to fasten upon tags such as 'group boycott' and 'per se' in order to preclude inquiry into the business necessity for or precise harm occasioned by particular rules or practices."  *U.S. Trotting Ass'n*, 665 F.2d at 790.  That is because sport is an activity that can only be carried out jointly.  *See Bd. of Regents of Univ. of Okla.*, 468 U.S. at 101. So when it comes to the rules and conduct of a sports league or a governing body (like FINA), a "fair evaluation of their competitive character requires consideration of the … justifications for the restraints."  *Id.* at 103.

The Supreme Court eliminated any doubt over whether the rule of reason applies to alleged restraints imposed by sports leagues or governing bodies in *Alston*.  That case involved "admitted *horizontal price fixing* in a market where the defendants exercise monopoly control," 141 S. Ct. at 2154 (emphasis added), yet the Court nevertheless held that, because the NCAA is "[o]rganized primarily as a standard-setting body," *id.* at 2148, "antitrust principles counsel in favor of the rule of reason," *id.* at 2157.  There is no modern support for applying anything beyond the rule of reason in an antitrust challenge to FINA's rules and conduct.

## 2.    Plaintiffs' Arguments for Applying the *Per Se* Rule Are Meritless

*Per se* treatment is reserved for the exceedingly narrow circumstance in which *horizontal* agreements are "so harmful to competition and so rarely prove justified that the antitrust laws do not require proof that an agreement of that kind is, in fact, anticompetitive in the particular

circumstances." *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 833 (9th Cir. 2022) (quoting *NYNEX Corp.*, 525 U.S. at 133). But in the sports context, even horizontal agreements are analyzed under the rule of reason: "[I]n general, horizontal agreements are analyzed under per se rules, while vertical agreements are analyzed under the rule of reason. But … both types of agreements are analyzed under the rule of reason in cases involving league sports." *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1152 (9th Cir. 2019) (first citing *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191–92 (9th Cir. 2015); and then citing *Bd. of Regents of Univ. of Okla.*, 468 U.S. at 101–03); *see also Alston*, 141 S. Ct. at 2157. That does not change even if the rules or conduct by a sports league or governing body are challenged as classic horizontal "group boycotts," as Plaintiffs try to do here. *See, e.g., M & H Tire Co. v. Hoosier Racing Tire Corp.*, 733 F.2d 973, 980 (1st Cir. 1984) ("A further reason for denying per se treatment here is that the single tire rule was promulgated in a sports self-regulation context—an area in which courts have been reluctant to employ a per se analysis when confronted with boycott-like conduct, and instead consider the challenged arrangement under [the] rule of reason.").

In advocating for *per se* liability, Plaintiffs ignore all of this precedent. Instead, they rely on a handful of cases applying the *per se* rule that all predate 1975. *See* Mot. at 18 n. 35.[4] That should tell the Court all it needs to know about the validity of applying the *per se* rule here.

Plaintiffs also ignore all of the undisputed evidence that plainly belies an application of the *per se* rule. They wrongly claim that FINA and its member NFs are horizontal competitors, even though the undisputed evidence confirms that FINA and its NFs are in a *vertical* relationship and

---

[4] Even if these cases were still good law, it is undisputed that FINA approval is not required to put on an international swimming meet. *Infra* Section III.B.2. The FINA rules challenged here therefore did not (and cannot) operate as any kind of "boycott" of ISL's events. That renders them factually inapposite in addition to being antiquated precedent. *Cf. Denver Rockets v. All-Pro Mgmt., Inc*., 325 F. Supp. 1049, 1066 (C.D. Cal. 1971) (restrictions based on age enjoined); *Robertson v. Nat'l Basketball Assoc.*, 389 F. Supp. 867, 890–91 (S.D.N.Y. 1975) (restrictions that blacklisted individual athletes enjoined); *Wash. State Bowling Proprietors Ass'n. v. Pac. Lanes, Inc*., 356 F.2d 371, 376–77 (9th Cir. 1966) (restrictions set by group of bowling proprietors on bowlers disqualified from official tournaments); *Blalock v. Ladies Pro. Golf Ass'n*, 359 F. Supp. 1260, 1265–66 (N.D. Ga. 1973) (restriction on suspended golfer who cheated was unlawful because restriction also prohibited her from participating in any other professional events).

1    neither FINA nor its own NFs are entities are economic competitors.  *See* Dkt. 366 (Unger Decl).

2    ¶¶ 5, 10–13.  They blithely assert that it is "undisputed that FINA and its national federations

3    occupy a dominant competitive position" and that "[n]o market analysis is necessary … because,

4    other than ISL, FINA and its members control all non-Olympic top-tier swimming competitions."

5    Mot. at 19–20.  But they provide no evidentiary support for that claim; rather, it is entirely

6    contradicted by the unequivocal evidence that: (i) FINA and its NFs put on only a fraction of the

7    top-tier swimming events each year, with FINA's share being nowhere near that necessary for

8    inference of market power, much less monopoly power (*see* Mot. for Summ. J. (ISL), Dkt. 364 at

9    Section III.C) and (ii) ISL admittedly competes in a much broader sports and entertainment market

10   in which FINA clearly is not "dominant." *See* Ex. 2 (Grigorishin Dep.) 67:19–68:13 (testifying

11   that ISL competes in the sale of sports media rights "with everyone who has some property who

12   would like to sell it for media companies.  But more particular, we're competing with sport and

13   entertainment business."); Ex. 3 (Grigorishin Ex. 161) (Identifying soccer, basketball, football,

14   tennis and other sports as competing products to ISL's competitions); Ex. 4 (Khan Dep.) 91:5–

15   92:22 (ISL CEO testifying when it comes to media rights and sponsorship dollars, ISL is

16   ██████████████████████████).

17        Plaintiffs must also falsely claim that FINA's "horizontal boycott cut off ISL's access to a

18   necessary input for ISL to compete," (Mot. at 19), even though there was never a boycott.  ISL

19   indisputably could have put on events without FINA's approval, and FINA offered to approve

20   ISL's events on terms that ISL admitted would have allowed it to enter and compete.  *See* Ex. 1

21   (di Nino) at 168:7–25; Dkt. 364 (FINA MSJ) at 12–14, 29.  Plaintiffs further contend, wrongly,

22   that FINA's rules lack any procompetitive justification.  But the evidence is that FINA Rule GR 4

23   originated as a means to protect FINA's NFs from associating with entities that might harm the

24   development of aquatic sport (Ex. 5 (Neuburger 2021 Dep.) 62:10–20; Dkt. 365 (Neuburger Decl.)

25   ¶ 35), and FINA BL 12.3 serves to ensure that FINA maintains a coherent calendar of international

26   swimming competitions and therefore supports the mission of both FINA and its NFs (Dkt. 365

27   (Neuburger Decl.) ¶¶ 20–26).  These justifications are precisely the kind that courts recognize as

28   legitimate when it comes to the regulation of sports, and must be assessed under the rule of reason.

1    *See, e.g.*, *Heldman v. United States Lawn Tennis Ass'n*, 354 F. Supp. 1241, 1244, 1251–53

2    (S.D.N.Y. 1973) (finding that the U.S. Lawn Tennis Association's rules providing for a ban of

3    players who compete in unsanctioned events from USLTA tournaments were not "outside the rule

4    of reason" because they are "designed to foster the integrity of competition", assure an "orderly

5    schedule", and promote "tennis competition of high caliber and ethical standards"); *U.S. Trotting*

6    *Ass'n*, 665 F.2d at 785, 788–90 (reversing grant of summary judgment, as a *per se* violation, on a

7    horse racing association's rule prohibiting members from racing horses at meets sponsored by non-

8    association members and remanding for assessment under the rule of reason); *see also Race Tires*

9    *Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83 (3d Cir. 2010) ("[S]ports-related

10   organizations should have the right to determine for themselves the set of rules that they believe

11   best advance their respective sport….").

12         There is simply no basis, in law or fact, for an application of the *per se* rule.

13                    3.    <u>The Quick Look Test Does Not Apply</u>

14         Plaintiffs' alternative attempt to invoke the quick look analysis also fails.  Quick look does

15   not apply when "the contours of the market" "are not 'sufficiently well-known or defined to permit

16   the court to ascertain without the aid of extensive market analysis whether the challenged practice

17   impairs competition.'"  *Deutscher Tennis Bund*, 610 F.3d at 832.  That is indisputably the case

18   here.  Plaintiffs assert FINA's conduct had anticompetitive effects in a market for "top-tier"

19   swimming competitions.   Mot. at 21.   But, ISL's founder and every other ISL witness

20   acknowledged that ISL's swimming competitions compete in a broader sports and entertainment

21   events market.  *See* Dkt. 364 (FINA MSJ) at Section III.C.1; Ex. 2 (Grigorishin Dep.) 67:19–68:5;

22   77:2–20; 103:12–104:1; 106:4–9; Ex. 4 (Khan Dep.) 91:5–14; 92:3–22; Ex. 1 (di Nino Dep.)

23   111:19–23; 112:4–7.  Myriad cases hold that a properly defined relevant market necessarily

24   extends beyond a single sport.  *See, e.g.*, *Am. Needle, Inc. v. Nat'l Football League*, 538 F.3d 736,

25   743 (7th Cir. 2008), *rev'd on other grounds*, 560 U.S. 183 (2010); *Chi. Pro. Sports Ltd. P'ship v.*

26   *Nat'l Basketball Ass'n*, 95 F.3d 593, 597–98 (7th Cir. 1996); *Kentucky Speedway, LLC v. Nat'l*

27   *Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 917 (6th Cir. 2009).  It is also plainly untrue

28   that the effect of FINA's Rules "limit[ed] the total number of swimming competitions [in 2018] to

those sanctioned by FINA." Mot. at 21.  Equally false is the assertion that "FINA and its members control all non-Olympic top-tier swimming competitions. SUF 1." Mot. at 20–21.  The undisputed evidence establishes the opposite—numerous independent promoters organized swimming competitions without the support of FINA or its NFs in 2018 and in all other years.  *See* Dkt. 365 (Neuburger Decl.) ¶¶ 32, 52–53, 67–68.  This is obviously not a circumstance where Plaintiffs can supplant a proper relevant market analysis in favor of a quick look analysis of FINA's rules and conduct.

The quick look test is further inapplicable because FINA has advanced procompetitive justification for the rules Plaintiffs challenge.  Where, as here, a defendant presents plausible procompetitive justifications for the challenged restraint, the rule of reason applies.  *Deutscher Tennis Bund*, 610 F.3d at 833.

FINA GR 4—which Plaintiffs identify as the source of FINA's anticompetitive restraint—long predates this controversy as a means of protecting NFs against "entities that might in some way be injurious to swimming competition."  Ex. 5 (Neuburger 2021 Dep.) 62:10–20.  The rule was enacted long ago to prevent entities from forming relations with FINA's NFs to undermine the NF's promotional and developmental activities in aquatic sports, or otherwise jeopardize that NF's and standing as a FINA Member.  *See* Dkt. 365 (Neuburger Decl.) ¶ 35.  And FINA BL 12.3, which requires FINA's own NFs to submit for FINA's recognition proposed international competitions six months' in advance, promotes a coherent calendar of international events, providing FINA's NFs and their swimmers the optimal opportunity to optimize their training and competition schedules.  Dkt. 365 (Neuburger Decl.) ¶¶ 20, 26; Dkt. 366 (Unger Decl.) ¶ 16 ("A coordinated calendar of international competitions at which athletes can qualify for these FINA competitions are necessary for USA Swimming and other national federations to carry out their mission."); *see also, e.g.*, Ex. 6 (Andrew Dep.) 237:6–13; 71:14–72:2.

FINA has more than satisfied its burden of providing the sort of plausible justifications that render a quick look inapplicable.[5]

---

[5] Contrary to Plaintiffs' suggestion, FINA does not have a "heavy burden" to prove procompetitive effects to avoid quick look analysis.  The cases Plaintiffs cite for this proposition

1                                    *        *        *

2          Neither the *per se* standard or quick look test applies.  As Plaintiffs concede, this is enough

3     for the Court to deny their motion.

4          **B.      Plaintiffs' Section 1 Claims Fail As a Matter of Law**

5                    1.      The Undisputed Evidence Confirms There Was No Group Boycott

6          In support of their *per se* and quick look claims, Plaintiffs advance an argument that FINA

7     and its NFs engaged in a "classic group boycott."  Relying on a pleading case, *PLS.com*, Plaintiffs

8     assert that FINA and its NFs engaged in a "concerted attempt by a group of competitors at one

9     level . . . to deprive would-be competitors of a trade relationship which they need to enter (or

10    survive in) the level wherein the group operates."  *PLS.com, LLC*, 32 F.4th at 834; *see also Nw.*

11    *Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 298 (1985) ("[S]ome

12    showing must be made that the [defendants] possess[] … unique access to a business element

13    necessary for effective competition.").  The undisputed evidence confirms the falsity of Plaintiffs'

14    arguments.  First, FINA and its NFs are not a "group of competitors at one level"; they are, as

15    Plaintiffs acknowledge, in a vertical relationship between FINA and its NFs.  Second, there was

16    never any "group boycott."  FINA was willing to sanction ISL's inaugural event on terms that ISL

17    admitted would have allowed it to compete, and besides, ISL could have always hosted its events

18    entirely outside the FINA system.  Third, there is no evidence of an "agreement" among FINA and

19    its NFs to boycott ISL.  *Cf. Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 988–89 (9th Cir.

20    2020) ("Thus, [t]o establish liability under § 1, a plaintiff must prove (1) the existence of an

21    agreement, and (2) that the agreement was in *unreasonable* restraint of trade.") (quotation marks

22    omitted).

23

24    actually associate any burden with the rule of reason, not the quick look test.  *See Bd. Of Regents*
      *of Univ. of Okla.,* 468 U.S. at 113 ("*Under the Rule of Reason,* these hallmarks of
25    anticompetitive behavior place upon petitioner a heavy burden of establishing an affirmative
      defense . . . .") (emphasis added); *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
26    37 F. Supp. 3d 1126, 1137 (N.D. Cal. 2014) (applying rule of reason rather than quick look
      analysis "[b]ecause courts have found that the NCAA's general restrictions on student-athlete
27    compensation could *conceivably* enhance competition.") (emphasis added); *Tanaka v. Univ. of S.*
      *Cal.*, 252 F.3d 1059, 1062–63 (9th Cir. 2001) (applying rule of reason); *Law v. Nat'l Collegiate*
28    *Athletic Ass'n*, 134 F.3d 1010, 1018, 1021 (10th Cir. 1998) (assessing procompetitive benefits of
      the restraint "[u]nder a rule of reason analysis.").

### a.   FINA and its NFs Are Not Horizontal Competitors

Plaintiffs' boycott claims fail at the starting block because FINA and its NFs are not horizontal competitors.   Certain limited *horizontal* agreements may be unlawful *per se*, but "[v]ertical agreements ... are analyzed under the rule of reason."   *In re Musical Instruments*, 798 F.3d at 1191; *see also Ohio v. Am. Express Co.*, 138 S.Ct. 2274, 2283–84 (2018) ("Typically only 'horizontal' restraints ... qualify as unreasonable *per se*.").

Plaintiffs do not put forth actual evidence supporting their claim that FINA and its NFs "are actual and potential competitors of each other, and of FINA, to put on top-tier swimming events."   Mot. at 3.   Nor could they.   FINA's NFs serve as regional governing bodies of FINA.   *See* Dkt. 365 (Neuburger Decl.) ¶ 12.   Their "primary goal" is to send the strongest teams possible to FINA events "to achieve as many World Championships and Olympics medals as possible."   Dkt. 366 (Unger Decl.) ¶¶ 6, 10.   FINA's NFs put on events that serve as qualifying meets for the swimmers who will represent their respective countries at FINA's competitions.   *See id.* ¶15 (NF events "are complementary, not competitive").   As members of FINA, FINA's NFs are in a vertical relationship with FINA—a point Plaintiffs find themselves acknowledging.   *See* Mot. at 2.   FINA's NFs do not compete with FINA, but rather are obliged "to support FINA in its efforts to achieve its objectives," "to comply with the FINA Rules at all times," "to ensure that their own constitution and rules comply at all times with the FINA Rules and to amend them as may be necessary for this purpose."   Dkt. 365 (Neuburger Decl.) ¶ 14; *see also* Mot. at 2–3; Dkt. 100 (Am. Compl.) ¶ 22 (acknowledging that FINA's rules and regulations "govern[] the conduct of its membership, which includes the national federations").

FINA and its NFs are not horizontal competitors and Plaintiffs' *per se* group boycott theory therefore fails.

### b.   ISL Was Not Deprived of a Trade Relationship or of Goods and Services Necessary for It to Enter or Survive in the Market

It is indisputable that ISL was never foreclosed from holding its inaugural competition within the FINA system or with FINA NF support.   FINA offered terms to ISL that ISL admitted would allow it to compete.   *See* Dkt. 364 (FINA MSJ) at Section II.G.   While Plaintiffs try to

quibble with the terms of the agreement (*see* Mot. at 5–6), it is undisputed that ISL's owner and 30(b)(6) witness, Mr. Grigorishin, reviewed those same terms and agreed that nothing in FINA's last written proposal to ISL during the parties' 2018 negotiations was problematic such that ISL could not accept the terms. Ex. 2 (Grigorishin Dep.) 308:23–309:3; 310:1–311:5.  The only term with the potential to cripple ISL's ability to compete was the financial one:  FINA's $2 million offer to sanction ISL's inaugural event, which FINA derived from ISL's original proposal to pay FINA $50 million over a decade.[6]  Ex. 2 (Grigorishin Dep.) 122:1–16.  But FINA's October 9, 2018 counter-proposal of $2 million was understood by ISL to be "a question of negotiation"— not a barrier to entry. *Id.* 310:1–11.  And ISL's claimed damages (speculative as they are) further confirms the $2 million proposal was not unreasonable.  *See* Ex. 8 (Wagner Reply) Table 1.  The terms that FINA offered, and from which ISL walked away, do not constitute the sort of "unfavorable terms" effectively amounting to a boycott.  *Cf. PLS.com*, 32 F.4th at 836 (holding that plaintiffs adequately alleged defendants engaged in a group boycott only where the restraint impaired plaintiff's ability to compete "on almost any dimension" and "essentially *eliminate[d]* competition" between defendant's affiliated listing services and any rival service).

        In any event, ISL always had the opportunity to host its inaugural event independently, outside of FINA's system and without partnering with a FINA NF.  Every year, numerous independent promoters put on swimming competitions without support or sanction from FINA or its NFs.  *See* Dkt. 365 (Neuburger Decl.) ¶¶ 30–32, 52–53, 67–68.  ISL did just that in 2019 when it hosted a competition in Naples, Italy without FINA's recognition or support from the Italian NF. *See* Ex. 1 (di Nino Dep.) 133:11–137:25.  Even ISL admitted that a partnership with FINA NFs was not essential for it to compete.  *Id.* at 168:7–25; 309:6–310:19.  It was ISL's own decision to eschew a deal with FINA on admittedly reasonable terms and to attempt to partner with a FINA NF, but without FINA's approval, that ultimately triggered a FINA governance dispute and led to the cancellation of its inaugural event. Dkt. 364 (FINA MSJ) Section II.E.  Plaintiffs cannot ignore

---

[6] ISL itself deemed this $50 million arrangement reasonable by "estimat[ing] [ISL's] revenue" and "pay[ing] some percentage from that revenue." Ex. 2 (Grigorishin Dep.) 123:17–24, 127:16–128:22; Ex. 7 (ISL036799 at -800, di Nino Dep. Ex. 155).

1    these undisputed facts, all of which support summary judgment in FINA's favor and not Plaintiffs'

2    on their boycott claim.

3                    c.      There Is No Evidence of an Agreement Amongst and Between
4                            FINA and Its NFs to Boycott ISL or Swimmers

5            Plaintiffs separately cannot establish a "group boycott" because the undisputed evidence

6    demonstrates that FINA and its NFs are incapable of conspiring to violate Section 1.  Nor is there

7    evidence that FINA and its NFs ever agreed to boycott ISL or its swimmers.

8            ***Plaintiffs have not proven that FINA and its NFs are capable of conspiring to violate***

9    ***Section 1.***[7]  A functional inquiry into FINA and its NFs confirms that they share a unity of interests

10   and are not independent economic actors capable of conspiring to violate Section 1.  *See Jack*

11   *Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1034 (9th Cir. 2005)

12   ("[S]eparate entities with a common economic interest and without divergent interests are

13   incapable of conspiring for § 1 purposes….").  FINA is—by definition—an umbrella organization

14   composed of the NFs.  As Plaintiffs admit, together, FINA's NFs constitute the international

15   federation authorized to administer Olympic aquatic sports and related national governing bodies.

16   Mot. at 2; *see* Dkt. 365 (Neuburger Decl.) ¶¶ 8–11; Ex. 9 (Unger 2019 Dep.) 166:10–169:3.  As

17   was the case in the Ninth Circuit's decision in *Jack Russell Terrier*, FINA's NFs operate as

18   regional arms of FINA, which host regional events that qualify some athletes for the FINA World

19   Championships and the Olympics.  *Cf.* 407 F.3d at 1034–35; *see also Bell v. Fur Breeders Agric.*

20   *Co-op.*, 348 F.3d 1224, 1232–35 (10th Cir. 2003) (holding that a mink-ranching cooperative's

21   board members were incapable of conspiring with the member ranches).

22           Many, if not most, NFs are legally obliged by their country's own laws to comply with

23   FINA's rules.  Ex. 9 (Unger 2019 Dep.) 103:5–9, 173:1–8; Dkt. 365 (Neuburger Decl.) ¶ 14; Ex.

24   10 (Buckner Dep.) 192:5–19.  Their *raison d'etre*—to promote swimming in all forms and at all

25   ---

26   [7] To support their claim that FINA's NFs are independent entities that compete amongst
     themselves, Plaintiffs rely on FINA's Interrogatory Response No. 10.  *See* Mot. at 17:5-8; Dkt.
27   371-3 at 13:23-24.  But that response merely shows that FINA NF's acted unilaterally in
     communicating to ISL that they could not host its event "in line with their position and
     requirement to follow FINA rules."  *Id.*  This does not indicate that they are independent
28   economic actors, but instead evinces their unity of interests through their obligation to follow
     FINA's rules.

levels—is intimately aligned with FINA's. *See* Dkt. 366 (Unger Decl.) ¶¶ 6, 10; Dkt. 365 (Neuburger Decl.) ¶ 10. To achieve that goal, FINA and its NFs cooperate on an international swimming calendar to try to minimize scheduling conflicts between FINA events and "top-tier" events put on by a NF. Dkt. 365 (Neuburger Decl.) ¶ 20. Far from being a trade association created to bring together commercial entities that compete horizontally, FINA "determines Olympics eligibility, and sets standards," Mot. at 3, so that the swimmers affiliated and organized by its member NFs may compete. *See* Dkt. 366 (Unger Decl.) ¶ 7 ("The existence of FINA and its member national federations are derived from the Olympic Games and the Olympic Charter.").

The evidence further confirms that FINA and its NFs do not compete in any economic sense.[8] FINA NFs are not competing "teams" or franchises in a professional sports league; the NFs are national governing bodies for the sport of swimming in their respective countries. *See id.* ¶¶ 8–12; Ex. 9 (Unger 2019 Dep.) 166:10–169:3. NFs do not compete with FINA or other NFs for athletes, because swimmers are constrained by nationality to compete for specific FINA NFs. Dkt. 366 (Unger Decl.) ¶ 12. Nor do FINA and its NFs compete in markets for intellectual property rights, media rights, or sponsorship revenues. *See id.* ¶ 13; Dkt. 364 (FINA's MSJ) at 32; *cf. Am. Needle*, 560 U.S. at 196–97 (concerted action found where professional "teams compete in the market for intellectual property" and "to attract fans"). Plaintiffs' suggestion that FINA NFs competed with one another to host swimming events organized by ISL is also factually unsupported. None of FINA's NFs "hosted" ISL events; rather, certain FINA NFs were contracted by ISL to provide support and services to ISL, who at all times hosted its own events. *See, e.g.*, Dkt. 366 (Unger Decl.) ¶ 24.[9]

---

[8] Of course, the Court recognized at the motion to dismiss stage that Plaintiffs successfully pled that these organizations are legally distinct entities that may *potentially* be capable of conspiring under Section 1. Dkt. 86 at 36 ("member federations are distinct entities and at least *potential* competitors") (emphasis in original). But this does not answer the dispositive question whether there is evidence that they are *actual* economic competitors and thus *actually* capable of conspiring. *See id.* at 35; *Am. Needle*, 560 U.S. at 196; *NASL*, 883 F.3d at 39.

[9] Plaintiffs mischaracterize Mr. Buckner's testimony, which speaks for itself. *See* Mot. at 3 n.6. Mr. Buckner's testimony merely indicated that the success or failure of ISL's first ever event— which was hosted by British Swimming in London—might impact whether other federations would support ISL events in the future. *See* Ex. 10 (Buckner Dep.) 159:1-161:4. He did not testify that British Swimming was, in fact, competing with other federations to host ISL's events.

1    Plaintiffs have not and cannot prove that FINA and the NFs are horizontal economic

2    competitors capable of conspiring to violate Section 1, much less that they are at "one level" with

3    one another.  *See PLS.com,* 32 F.4th at 834 ("The classic 'group boycott' is a concerted attempt

4    by a group of competitors at one level to protect themselves from competition from non-group

5    members who seek to compete at that level.").[10]  This dooms their boycott claim.

6    ***There is no evidence of an agreement between FINA and its NFs to boycott ISL or***

7    ***swimmers.***  A boycott claim under Section 1 also requires "evidence that reasonably tends to prove

8    that the [defendant] and others had a conscious commitment to a common scheme designed to

9    achieve an unlawful objective."  *Monsanto*, 465 U.S. at 764 (quotation marks omitted); *see*

10   *Rickards v. Canine Eye Registration Found., Inc.*, 704 F.2d 1449, 1454 (9th Cir. 1983) ("A claim

11   of concerted refusal to deal obviously cannot stand without evidence of concert.").  There must be

12   direct evidence of the conspiracy or circumstantial evidence that tends to exclude the possibility

13   that the defendants acted unilaterally.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

14   U.S. 574, 588 (1986); *Monsanto*, 465 U.S. at 768.  Indeed, because Plaintiffs are seeking summary

15   judgment, not just resisting it, Plaintiffs must go further and show that no reasonable jury could

16   find that FINA and the NFs acted of their own volition.

17   Plaintiffs have produced zero evidence that FINA and its NFs came to some agreement not

18   to work with ISL in 2018.  Instead, FINA NFs communicated to ISL unilaterally—ahead of the

19   June 5, 2018 FINA memorandum—that they would not work with ISL absent FINA's approval.

20   *See, e.g.*, Ex. 9 (Unger 2019 Dep.) 175:11–24.  USA Swimming's decision not to partner with ISL

21   on the 2018 inaugural event, for example, was the result of ISL's failure to obtain FINA's approval,

22   not some "agreement" between USA Swimming, FINA, and any other NF to boycott ISL.  British

23   Swimming also came to the decision to not work with ISL on its inaugural event independent of

24   any "agreement."  Ex. 10 (Buckner Dep.) at 212:9–20; 224:21–225:10.

25

26   [10] Nor have Plaintiffs articulated a so-called "hub-and-spoke" theory. A hub-and-spoke conspiracy requires: (1) a hub; (2) entities that enter into vertical agreements with the hub, known as the spokes; and (3) the connecting agreements among the horizontal competitors,

27   known as the rim of the wheel.  *United States v. Apple, Inc.*, 791 F.3d 290, 314 (2d Cir. 2015); *Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010); *In re*

28   *Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 690 (S.D.N.Y. 2012).  Plaintiffs fail to adduce evidence of anything approaching a rim to the asserted wheel.

1    There is also no evidence that FINA is a vehicle through which NFs conspired to adopt

2    GR4.  It is not enough that FINA's NFs, as members, must abide by FINA's rules.  *Am. Airlines*

3    *v. Chirstensen*, 967 F.2d 410, 413–14 (10th Cir. 1992) ("[T]he mere fact that . . . members accepted

4    those terms does not generate the kind of concerted action needed to violate Section 1.").  And

5    Plaintiffs have not identified any evidence of a common scheme amongst FINA and its NFs to

6    adopt GR 4.  That is fatal.  *See Brookins v. Int'l Motor Contest Ass'n*, 219 F.3d 849, 855 (8th Cir.

7    2000) (affirming dismissal of conspiracy claims against auto racing sanctioning body where

8    plaintiffs failed to present evidence that sanctioning body's rule changes were the result of

9    concerted action).

10                    2.    FINA's Rules Are Not Evidence of Concerted Action

11    Because Plaintiffs cannot prove that there was a boycott given the undisputed evidence that

12    FINA did not refuse to deal with ISL, Plaintiffs now switch theories.  They are all in on the

13    contention that "FINA's published Rules, standing alone, are enough to prove the concerted-action

14    element of a Section 1 violation."  Mot. at 16.  This is meritless both as a matter of law and fact.

15                    a.    The Mere Existence of Associational Rules, Without More, Do
16                          Not Amount to Concerted Action under Section 1

17    Courts have long recognized that associations and membership organizations—even those

18    consisting of horizontal economic competitors—are not walking conspiracies such that every rule

19    or action by organization amounts to "concerted action."    *See AD/SAT, Div. of Skylight, Inc. v.*

20    *Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999) (a "finding of concerted action based on the

21    defendants' status as members of [a membership organization] would seriously undermine the

22    standards articulated by the Supreme Court"); *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283,

23    1295–96 (11th Cir. 2010); *Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 293–

24    94 (5th Cir. 1988) ("[A] trade association is not by its nature a 'walking conspiracy,' its every

25    denial of some benefit amounting to an unreasonable restraint of trade.").  "[O]rganizational

26    decisions do not inherently constitute § 1 concerted action."  *NASL*, 883 F.3d at 40.  And routine

27    organizational activities—such as rule-making, enforcement of an organization's own rules, and

28    compliance by a member with an organization's rules—without more, do not amount to concerted

1    action.  *See Bd. of Regents of Univ. of Okla. v. Nat'l Collegiate Athletic Ass'n*, 707 F.2d 1147,

2    1161 (10th Cir. 1983), *aff'd*, 468 U.S. 85 (1984) ("In the context of associational activities, the

3    existence of an expulsion sanction does not by itself constitute a boycott."); *SD3, LLC v. Black &*

4    *Decker (U.S.), Inc.*, 801 F.3d 412, 435–36 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29,

5    2015) ("In the usual case, neither the standard setting organization nor its participants will run

6    afoul of antitrust law when they use ordinary process to adopt unexceptional standards.").  Instead,

7    there must be evidence of a "conscious commitment to a common scheme designed to achieve an

8    unlawful objective."  *Toscano v. Pro. Golfers Ass'n*, 258 F.3d 978, 983 (9th Cir. 2001) (quoting

9    *Monsanto*, 465 U.S. at 764).

10          Consistent with this principle, courts consistently reject attempts to morph organizational

11    rules, standing alone, into concerted action.  For example, in *Toscano*, the Ninth Circuit held that

12    the PGA's restrictive eligibility and scheduling rules governing PGA Tour golf events and the

13    contracts between the PGA and local sponsors obligating them to comply with those rules were

14    not evidence of concerted action.  *See* 258 F.3d at 984.  They did not reflect a "commit[ment]" to

15    a common scheme to act in restraint of trade," but just that "the PGA Tour independently set the

16    terms of the contracts, and the local sponsors merely accepted them."  *Id.*  Similarly, in *North*

17    *American Soccer League, LLC v. United States Soccer Federation, Inc.*, the Second Circuit held

18    that the promulgation of standards designating divisional levels by the U.S. Soccer Board, without

19    more, was not direct evidence of concerted action to exclude an upstart men's professional soccer

20    league from obtaining top divisional status.  883 F.3d at 40–41.  The plaintiff needed to proffer

21    evidence that would "'tend[] to show that association members, in their individual capacities,

22    consciously committed themselves to a common scheme *designed to achieve an unlawful*

23    *objective*.'"  *Id.* at 40 (quoting *AD/SAT*, 181 F.3d at 234) (emphasis in original).  And in *JES*

24    *Properties, Inc. v. USA Equestrian, Inc.*, the court held that U.S. Equestrian Federation's

25    sanctioning rules governing "recognized competitions" and the corresponding rules requiring the

26    Federation's members to comply with the competition sanctioning rules were not evidence of

27    concerted action between the association and its members.  No. 02 Civ. 1585T24, 2005 WL

28    1126665, at *2, *12–13 (M.D. Fla. May 9. 2005), *aff'd*, 458 F.3d 1224 (11th Cir. 2006).  "The

1    conduct of the [USEF] amounts to little more than enforcing its own rules and minimizing

2    scheduling conflicts as it is required to do." *Id.* at *13.

3              To be sure, certain organizational rules can reflect concerted action. Where a challenged

4    rule expressly operates to restrain *horizontal competition* in a market in which the individual

5    businesses of an association's members would otherwise compete, the rule can amount to an

6    agreement for purposes of Section 1. That is the defining feature of the rules at issue in the cases

7    cited by Plaintiffs.[11] It is also the distinguishing feature of the cases involving the NCAA, as it is

8    an organization comprised of universities and conferences that unquestionably compete

9    horizontally and economically off the field—for athletes, fans, media rights, and for sponsors. *See,*

10   *e.g.*, *O'Bannon*, 802 F.3d at 1070 ("Nor does [the NCAA] appear to dispute the district court's

11   conclusion that the compensation rules restrain the NCAA's member schools from competing with

12   each other within that [college education] market[.]"); *Bd. of Regents of Univ. of Okla.*, 468 U.S.

13   at 99 ("The NCAA is an association of schools which compete against each other to attract

14   television revenues, not to mention fans and athletes."). In these cases, not only was the horizontal

15   economic competition between the university-members of the NCAA undisputed, the rules

16   challenged involved the unequivocal fixing of prices and/or student-athlete compensation. *Alston*,

17   141 S. Ct. at 2151 ("The NCAA did not 'contest evidence showing' that it and its members have

18   agreed to compensation limits on student-athletes[.]"); *O'Bannon*, 802 F.3d at 1057 ("The rules

19   prohibiting compensation for the use of student-athletes' NILs are thus a price-fixing

20

---

21   [11] *See Cal. Dental Ass'n*, 526 U.S. at 773 (rule restricting member dentists' "ability to advertise
     prices"); *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459 (1986) (federation policy required
22   "dentists to withhold from their customers a particular service that they desire—the forwarding
     of x rays to insurance companies along with claim forms"); *Arizona v. Maricopa Cnty. Med.*
23   *Soc'y*, 457 U.S. 332, 356–57 (1982) (rule limiting physician-member competition on prices);
     *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 692 (1978) ("In this case we are
24   presented with an agreement among competitors to refuse to discuss prices with potential
     customers until after negotiations have resulted in the initial selection of an engineer."); *Goldfarb*
25   *v. Va. State Bar*, 421 U.S. 773, 781–83 (1975) (members of the Fairfax County Bar Association
     agreed to a price floor among themselves); *United States v. Topco Assocs., Inc.*, 405 U.S. 596,
26   598 (1972) (cooperative association allocated the sales territories of its competing grocery chain
     members); *Associated Press v. United States*, 326 U.S. 1, 17–19 (1945) (AP rule limited
27   competing newspaper-members' sales); *Bd. of Trade of City of Chi. v. United States*, 246 U.S.
     231, 239 (1918) (commodities-exchange rule "requir[ing] members to desist from further price-
28   making after the close of the call until 9:30 a.m. the next business day.").

1  agreement[.]"); *Bd. of Regents of Univ. of Okla.*, 468 U.S. at 106 (NCAA rule "fix[ed] a price for

2  television rights to all games").[12]

3        Ultimately, these authorities reflect that one cannot just point to an associational rule as

4  evidence of concerted action as Plaintiffs try do here.  There must be a substantive evaluation of

5  the purpose and effect of the rule—and particularly, whether it actually operates to limit horizontal

6  economic competition amongst the members' otherwise independent businesses.  Only in such a

7  situation can the rule itself constitute concerted action amongst an organization's members.

8  Otherwise, it does not, and there must be some further evidence of an actual horizontal

9  agreement—i.e., a "conscious commitment to a common scheme designed to achieve an unlawful

10  objective." *Toscano*, 258 F.3d at 983.

11
12                          b.      None of the FINA Rules Challenged Here Amount to an
                                    Agreement in Restraint of Trade

13        Here, contrary to Plaintiffs' contention, the FINA rules at issue in no way implicate the

14  ability of FINA's NFs "to compete in terms of price or output."  Mot. at 21.  This is initially belied

15  by the fact that FINA is not even an association comprised of horizontal economic competitors.

16  *See* Dkt. 366 (Unger Decl.) ¶ 7 ("The existence of FINA and its member national federations are

17  derived from the Olympic Games and the Olympic Charter."); *supra* Section 1.c.  Neither of the

18  FINA rules raised by Plaintiffs, therefore, have anything to do with limiting economic competition

19  between FINA's NFs.

20        GR4, FINA's unauthorized relations rule, places conditions on the cooperation between

21  FINA's NFs with *non-members*, limiting such cooperation to entities that are recognized by FINA.

22  *See, e.g.*, Mot. at 4 ("GR 4.1 No affiliated Member shall have any kind of relationship with a non-

23  affiliated or suspended body.").  Nothing in GR4 addresses, let alone restrains, inter-member

24  _____

25  [12] Moreover, in those cases the NCAA **conceded** it has monopolies over **defined** markets.  *See, Alston*, 141 S. Ct. at 2154 ("The parties do not challenge the district court's definition of the
26  relevant market. They do not contest that the NCAA enjoys monopoly…control in that labor market."); *O'Bannon*, 802 F.3d at 1070 ("By and large, the NCAA does not challenge the district
27  court's findings. It does not take issue with the way that the district court defined the college education market."); *Bd. of Regents of Univ. of Okla.*, 468 U.S at 112 (no argument presented
28  that NCAA lacks monopoly over relevant market of live college football television).  The evidence confirms that FINA has no such control in any labor or other alleged market.

relations in any way.   GR4 cannot be—and never was—used to sanction a swimmer for participating in non-FINA authorized event.  *See* Ex. 11 (ISL045364); Ex. 12 (ISL013027); Ex. 6 (Andrew Dep.) 183:3–12; 185:18–186:2; Ex. 13 (Andrew Dep. Ex. 19); Ex. 14 (Hosszú Dep.) 96:1–6; Ex. 15 (Miller Dep.) 172:19–173:1.  GR4, in short, does not and cannot operate to restrain prices or output nor block any essential inputs to compete in the market.

BL 12.3—the other FINA rule implicated here—is merely a calendaring rule requiring FINA's own NFs to submit advance requests for approval of any international competition a NF seeks to stage.  Nothing about it can be said to restrain competition among FINA's NFs.  It falls entirely within the bailiwick of FINA's core organizational purpose as an international sports federation—maintaining a coherent calendar to optimize the number of FINA-recognized international swimming events at which athletes of FINA's NFs can compete to qualify for FINA World Championships and the Olympic Games.  *See* Dkt. 365 (Neuburger Decl.) ¶¶ 20, 26; Dkt. 366 (Unger Decl.) ¶ 16 ("A coordinated calendar of international competitions at which athletes can qualify for these FINA competitions are necessary for USA Swimming and other national federations to carry out their mission."); *see also* Ex. 6 (Andrew Dep.) 237:6–13; 71:14–72:2.

Neither of these rules—on their face or in operation—are "agreement[s] not to compete in terms of price or output." Mot. at 21.  And since both were enacted long before the events in this case, their existence surely does not "show that association members, in their individual capacities, consciously committed themselves to a common scheme *designed to achieve an unlawful objective*." *NASL*, 883 F.3d at 40 (emphasis in original) (holding that US Soccer's Professional League Standards, which predated the controversy and the existence of the plaintiff upstart league, were not "direct evidence" or a conspiracy); *see Monsanto*, 465 U.S. at 764.

*     *     *

Because Plaintiffs cannot establish that any of the FINA Rules implicated in this case suffice to prove concerted action, its Section 1 claim fails.

### 3.   Plaintiffs Cannot Show Antitrust Injury

Plaintiffs' Section 1 claim also fails because Plaintiffs cannot prove that they suffered antitrust injury, "which is to say injury of the type the antitrust laws were intended to prevent and

that flows from that which makes defendants' acts unlawful.'" *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999) (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)).  As Plaintiffs' confirm repeatedly in their motion, their alleged injury results from the loss of a single event in 2018, nothing more.  Mot. at 8.  As a matter of law, this is insufficient to establish antitrust injury.  Antitrust injury requires proof of enduring market-wide harm to competition, not just temporary harm to a single competitor.  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) ("The antitrust laws … were enacted for 'the protection of competition not competitors.'") (citation omitted); *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767–68 (1984) (the Sherman Act is concerned with conduct that exhibits "long-run anticompetitive effects"); *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998) (A "temporary decline in the number of competitors is not a significant restraint of trade, n[or] is a related temporary decline in quantity, quality, or efficiency.").

Plaintiffs concede in their motion that FINA's conduct at most temporarily injured them in 2018.  *See* Mot. at 8.  Plaintiffs agree—as FINA noted in its own summary judgment motion— that output in both the alleged market for top-tier swimming competitions and the alleged market for swimming services increased in 2019.  *See id.* at 9–10; Dkt. 364 (FINA MSJ) at Section III.F. The introduction of ISL's full season in 2019 as well as FINA's introduction of the Champions Swim Series that same year enhanced competition in both of Plaintiffs' proposed markets, and even improved the quality of competition by increasing the prize money available to swimmers.[13]

---

[13] It is unsurprising that Plaintiffs reserve for trial any "evidence" that FINA's conduct caused a reduction in output of ISL swimmer events and swimmer compensation in the years after 2018 (Mot. at 9 n.25); the record is replete of evidence showing any such conduct or reduction of output.  Plaintiffs also provide no evidentiary support for that claim that in 2019 ISL was able to enter market, "although not without difficulty due to FINA's continued efforts to block it[.]"  *Id.* at 9.  Plaintiffs themselves agreed that they have no evidence of FINA engaging in any anticompetitive conduct after 2019.  *See* Ex. 2 (Grigorishin Dep.) at 364:5–365:4; 35:18–36:19 ("A. … After 15 of January 2019, I don't have information about it.  Q. Okay.  You're not aware of anything that was done after that date to hamper ISL's business; correct?  A. No.  Yes."); Ex. 16 (ISL Suppl. Resps. to RFAs (1st Set) Nos. 35, 36); Ex. 6 (Andrew Dep.) 183:3–12; 185:18– 186:2; Ex. 14 (Hosszú Dep.) 96:1–6; Ex. 15 (Miller Dep.) 172:19-173:1 (agreeing that "from a swimmer's perspective now, [he is] able to participate in ISL events without any issues from FINA").

1   Dkt. 364 (FINA MSJ) at Section III.F.  Plaintiffs' injury, therefore, was restricted to a period of

2   only a few months in 2018.  Such a temporary and trivial restraint is insufficient to establish

3   antitrust injury. *See Adaptive Power*, 141 F.3d at 951–52 (holding that a four to ten month restraint

4   on competition was too short as a matter of law to constitute anticompetitive effect); *WHIC LLC*

5   *v. NextGen Lab'ys, Inc.*, No. CV 18-00261 JMS-WRP, 2019 WL 2717769, at *5 (D. Haw. June

6   28, 2019) (plaintiff could not establish antitrust injury where it "was sidelined by Defendants for

7   a period of few months at most"); *Pullos v. All. Laundry Sys., LLC*, No. 3:07-CV-00169-LRH-

8   RAM, 2009 WL 10708625 at *8 (D. Nev. July 29, 2009), *aff'd*, 424 F. App'x 663 (9th Cir. 2011),

9   and *aff'd*, 424 F. App'x 663 (9th Cir. 2011).

10   Plaintiffs further mislead the Court by asserting that FINA's conduct caused the

11   cancellation of not one, but three separate events in 2018. *See* Mot. at 8.  While ISL may have

12   considered at different times hosting its inaugural event in the United States, the United Kingdom,

13   and Italy, it was ISL's intention all along to host only a single event in 2018. *See* Ex. 17 (Khan

14   Ex. 112 (ISL002487 at -502)); Ex. 4 (Khan Dep.) 129:1–10 (testifying that as of June of 2018,

15   ISL's plans were to host a single event in 2018), 490:21–24 ▓▓▓▓▓▓▓▓

16   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

17   ▓▓▓▓▓▓▓. FINA's conduct at most eliminated a single swimming event in

18   2018, which is insufficient to prove antitrust injury. *See Adaptive Power*, 141 F.3d at 951–52.[14]

19   Additionally, the swimmer Plaintiffs do not even have standing to claim they were injured

20   by the cancellation of ISL's 2018 event. *See* FINA's Mot. for Summ. J., *Shields* Dkt. 321 at

21   Section III.A.  "A plaintiff who complains of an injury that is too remote from the alleged restraint

22   or that is derivative of an injury suffered by a third party absent from the suit is generally unable

23   to establish antitrust standing." *Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1116–17 (E.D.

24

25   [14] Plaintiffs also mislead the Court by claiming that FINA's expert, Thomas Hubbard,
    "acknowledge[ed] that every swimmer who was to race a canceled ISL event, lost an economic
26   opportunity which constitutes antitrust injury." *See* Mot. at 8; Dkt. 371-49 (Hubbard Dep.)
    113:3–13, 125:6–15.  Dr. Hubbard's testimony certainly does not concede that any swimmers
27   lost an economic opportunity as a result of the canceled Turin event. *See id.*  Moreover, as FINA
    explained previously, there is no guarantee that a swimmer's opportunity to compete had a
28   positive value that, if lost, would constitute antitrust injury. *See* Dkt. 263 (Sur-Reply ISO Opp'n
    to Pls.'Mot. for Class Certification) at 9.

1    Cal. 2002) (holding that plaintiff lacked antitrust standing to claim he was injured by eligibility

2    rules that excluded, and more directly injured, would-be competing senior professional golf tours).

3    Because the swimmers' injuries are derivative of those injuries allegedly suffered by ISL,

4    those injuries cannot confer standing upon the swimmers.  Swimmers are neither buyers nor sellers

5    in the market for the promotion of swimming events; therefore they suffer an indirect injury where

6    the market provides them fewer opportunities to sell their services.  The swimmers' injuries are

7    "entirely dependent on an injury to third parties closer in the chain of causation to the alleged

8    market restraint." *Id.* at 1117.  This "diminishes the justification for allowing a more removed

9    party" like the swimmers to bring their own suit. *Id.* at 1118.  For that reason, they do not have

10   standing, and cannot establish antitrust injury sufficient to support their Section 1 claims.

11   **C.    Plaintiffs' Injunctive Relief Claims Are Moot**

12   As FINA argues in its summary judgment motions in the *ISL* and *Shields* cases, Plaintiffs'

13   injunctive relief claims have been moot since January 2019.  *See* FINA's Mot. for Summ. J., *ISL*

14   Dkt. 364 at Section III.I;  FINA's Mot. for Summ. J., *Shields* Dkt. 321 at Section III.F.  Plaintiffs'

15   arguments to the contrary are unavailing.  Plaintiffs ground their argument in constitutional

16   mootness doctrine. *See* Mot. at 25–26.  But because their injunctive relief claims are brought under

17   Section 16 of the Clayton Act (Am. Comp. (ISL), Dkt. 100 ¶ 158; Am. Comp. (Shields), Dkt. 83

18   ¶ 167), they must also establish a significant, imminent threat of injury from an impending

19   violation of the antitrust laws. *See Los Angeles Mem'l Coliseum*, 634 F.2d at 1201; *see also Justice*

20   *v. Nat'; Collegiate Athletic Ass'n*, 577 F. Supp. 356, 376 (D. Ariz. 1983).  Plaintiffs cannot meet

21   their burden of establishing a significant, imminent threat of injury.

22   Plaintiffs' claim that FINA GR 4.1–4.3 continue to have anticompetitive implications is

23   without merit. *See* Mot. at 14.  Plaintiffs have no evidence that FINA has leveraged these rules in

24   any way since 2018 to prevent ISL or any other non-affiliated organization from hosting

25   competitions, or to prevent swimmers from participating.[15]  And arguments about which portions

26

27   [15] To support their claim that these rules continue to have anticompetitive implications for ISL
     and other potential competitors, Plaintiffs only cite to a single document containing hearsay from
     Daisuke Hikita, a former Managing Director of a marketing and media rights firm, MP SILVA.
28   *See* Mot. at 14; Dkt. 371-102 (ISL093270).  This is not only inadmissible hearsay, but there is no

1    of GR 4 can or might be enforced is beside the point.  The bottom line is that both ISL and the

2    swimmers have admitted that ever since January 2019, there has been absolutely no threat to ISL's

3    business or swimmers' opportunities to compete in ISL.  *See* Ex. 2 (Grigorishin Dep.) at 364:5–

4    365:4; 35:18–36:19 ("A. … After 15 of January 2019, I don't have information about it.  Q. Okay.

5    You're not aware of anything that was done after that date to hamper ISL's business; correct?  A.

6    No.  Yes."); Ex. 16 (ISL Suppl. Resps. to RFAs (1st Set) Nos. 35, 36); Ex. 6 (Andrew Dep.) 183:3–

7    12; 185:18–186:2; Ex. 14 (Hosszú Dep.) 96:1–6; Ex. 15 (Miller Dep.) 172:19–173:1 ("[F]rom a

8    swimmer's perspective now, [I have] been able to participate in ISL events without any issues

9    from FINA.").  That as a matter of law precludes standing to seek injunction under Section 16.

10   *See* Dkt. 364 (FINA MSJ) at Section III.I.

11          The evidence also shows that FINA's NFs freely hosted events with ISL after 2018, even

12   where hosting those events, under Plaintiffs' misinterpretation, would have violated GR 4.1–4.3.

13   Plaintiffs wrongly claim that those rules "*still* prohibit national federations from holding events or

14   'exchang[ing] competitors' with 'non-affiliated' organizations, or from participating in events that

15   overlap in time with FINA events."  Mot. at 13–14.  But misinterpretation aside, ISL hosted

16   numerous events in 2019 with the support of FINA NFs—and in one case without FINA

17   approval—with swimmers affiliated with various FINA NFs competing.  Ex. 1 (di Nino Dep.)

18   70:3–73:23.  One of those events, in Indianapolis, was hosted by USA Swimming, a FINA NF,

19   and overlapped in time with FINA's World Cup event.  *Id.* at 103:3–104:15.  And while Plaintiffs

20   claim that USA Swimming's assistance and swimmers' participation in that event would violate

21   GR 4.1–4.3, the event still went forward, swimmers participated, and no one was punished.

22          Ultimately, FINA's amendment of GR 4.5 stripped it of any actual or apparent authority to

23   punish swimmers or member federations for competing in events held by unauthorized entities.

24   Of course, FINA never once punished a swimmer for participating in an unauthorized event in its

25   history.  Dkt. 365 (Neuburger Decl.) ¶ 39–44.  But by repealing GR 4.5, the FINA Congress

26   assured that FINA no longer had the authority—real or apparent—to require its own member

27

28   ───────────────────
     other evidence to suggest that Mr. Hikita had any knowledge of the Japanese swimming
     association's position *after* FINA issued its January 15, 2019 press release.

1   federations to punish swimmers from World Championship or Olympic competition for competing

2   in ISL, or any other independent events. *Id.* ¶ 44. And the enactment of BL 16.1.10 in 2020,

3   which provides that "FINA will not undertake disciplinary action for Aquatics Athletes who

4   choose to participate in events that are not FINA sanctioned events," underscored the guarantee

5   that swimmers have the right to participate in independent events without consequences for their

6   Olympic eligibility. *Id.* ¶¶ 45–46. Both ISL and Plaintiffs' injunctive claims are moot. *Zenith*

7   *Radio Corp. v. Matsushita Elec. Indus. Co.*, 513 F. Supp. 1100, 1159 n.71 (E.D. Pa 1981), *aff'd in*

8   *part, rev'd in part sub nom. In re Japanese Elec. Prod. Antitrust Litig.*, 723 F.2d 238 (3d Cir.

9   1983), *rev'd sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, (1986)

10  (mooting § 16 injunctive relief claim related to agreements and rules "no longer in effect.").

11  **IV.    CONCLUSION**

12          Plaintiffs have not come close to proving each element of the claim by undisputed facts

13  and for these reasons their motion for summary judgment on Section 1 liability should be denied.

14

15  Dated:  August 5, 2022                          Respectfully submitted,

16                                                  LATHAM & WATKINS LLP
                                                       Daniel M. Wall
17                                                     Christopher S. Yates
                                                       Aaron T. Chiu
18

19                                                  By _____
20                                                     Christopher S. Yates
                                                       Attorneys for Defendant
21                                                     Fédération Internationale de Natation

22

23

24

25

26

27

28