1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7    THOMAS A. SHIELDS, et al.,                  Case Nos.  18-cv-07393-JSC
                                                            18-cv-07394-JSC
8              Plaintiffs,

9         v.                                     **ORDER RE: MOTIONS FOR
                                                 SUMMARY JUDGMENT**
10   FEDERATION INTERNATIONALE DE
     NATATION,                                   Re: Case No. 18-cv-07393-JSC, Dkt. Nos.
11                                               316, 317, 318, 320, 321, 325, 326, 327, 333,
               Defendant.
12                                               334, 337, 340, 346, 347, 351, 352;
     INTERNATIONAL SWIMMING
13   LEAGUE, LTD,                                Case No. 18-cv-07394-JSC, Dkt. Nos. 355,

14             Plaintiff,                        356, 357, 358, 359, 363, 364, 368, 370, 371,

15        v.                                     377, 383, 384, 387, 390, 393, 399, 408, 409.

16   FEDERATION INTERNATIONALE DE
     NATATION,
17             Defendant.

18

19        Thomas A. Shields, Michael C. Andrew, and Katinka Hosszú (the individual "Plaintiffs")

20   are professional swimmers who bring federal antitrust claims and a state law tort claim against the

21   Fédération Internationale de Natation ("FINA"), related to FINA's control over international

22   swimming competitions.  (Dkt. No. 83.)[1]  Plaintiffs represent a Rule 23(b)(2) injunctive relief

23   class and seek damages on their own behalf.  (Dkt. No. 299.)  In a related case, the International

24   Swimming League, Ltd. ("ISL"), a rival organizer of swimming competitions and buyer of

25   swimmers' services, brings its own federal antitrust claims and state law tort claim against FINA.

26

27   _____

28   [1] Record citations are to material in the Electronic Case File ("ECF") in Case No. 18-cv-07393-
     JSC, unless otherwise noted; pinpoint citations are to the ECF-generated page numbers at the top
     of the documents.

United States District Court
Northern District of California

1   (Case No. 18-cv-07394-JSC, Dkt. No. 100.)

2          Before the Court are FINA's motions for summary judgment against Plaintiffs and ISL,

3   (Dkt. No. 321; Case No. 18-cv-07394-JSC, Dkt. No. 364); Plaintiffs' and ISL's joint motion for

4   summary judgment against FINA, (Dkt. No. 325; Case No. 18-cv-07394-JSC, Dkt. No. 371); and

5   related motions to file under seal, (Dkt. Nos. 317, 318, 320, 326, 327, 333, 334, 337, 340, 346,

6   347, 351, 352; Case No. 18-cv-07394-JSC, Dkt. Nos. 363, 368, 370, 377, 383, 384, 387, 390, 393,

7   399, 400, 408, 409).  Having carefully considered the briefing, and with the benefit of oral

8   argument on October 20, 2022, the Court GRANTS FINA's motions for summary judgment,

9   DENIES Plaintiffs' and ISL's joint motion for summary judgment, and disposes of the sealing

10  motions below.

11                                   **BACKGROUND**

12          FINA is a Swiss organization recognized by the International Olympic Committee as the

13  governing body for international and Olympic aquatic sports: swimming, open water swimming,

14  diving, high diving, water polo, artistic swimming, and masters.  (Dkt. No. 322 ¶¶ 7–8, 11.)  FINA

15  develops rules for aquatic sports, keeps world records, holds and sanctions international

16  competitions, and manages aquatics competitions at the Olympics.  (*Id.* ¶¶ 8–10.)  FINA sets the

17  qualifying criteria for swimmers to participate in the Olympics and recognizes only qualifying

18  times from competitions held or sanctioned by FINA.  (Dkt. No. 329-76 at 23 (By Law ("BL")

19  9.3.6.4); Dkt. No. 329-75 at 3 (General Rule ("GR") 1.1).)

20          FINA's members are 209 national federations.  (Dkt. No. 322 ¶ 12.)  Its governance

21  structure includes the Bureau (25 members), the Executive (8 members), and the General

22  Congress (two voting delegates from each of 209 member federations).  (Dkt. No. 329-3 at 10

23  (Constitution ("C") 13); Dkt. No. 322 ¶¶ 16–19.)  Member federations must comply with FINA

24  rules, ensure their swimmers comply with FINA rules, and enforce penalties levied by FINA

25  against swimmers and other member federations.  (Dkt. No. 329-74 at 4 (C 3.12), 7 (C 8.2.1-6), 10

26  (C 12.5); Dkt. No. 329-75 at 5 (GR 4.5); Dkt. No. 87 ¶ 43; Dkt. No. 322 ¶ 14.)  Member

27  federations may designate "national governing bod[ies]" specific to a sport.  (Dkt. No. 329-3 at 6

28  (C 7.1, 7.2, 7.6).)  For example, United States Aquatic Sports, Inc. is the American member

2

federation and USA Swimming, Inc. is the American governing body for swimming, although USA Swimming has operated as the de facto American member federation.  (Dkt. No. 323 ¶ 5.)

FINA keeps a calendar of international competitions, the asserted purpose of which is to prevent scheduling conflicts, to ensure swimmers have many opportunities to compete, and to apply FINA rules consistently.  (Dkt. No. 322 ¶¶ 20–21.)  FINA holds its own international competitions, which are automatically included on its calendar and conducted according to FINA's rules.  (*Id.* ¶ 25.)  Member federations may also hold international competitions on their own or in partnership with independent organizations.  (*Id.* ¶ 52.)  To do so, they must seek FINA's approval six months in advance.  (Dkt. No. 329-76 at 87 (BL 12.3); Dkt. No. 322 ¶¶ 25–26.)  If FINA approves and sanctions the competition, it is included on FINA's calendar and the results can potentially be used for Olympic qualification.  (Dkt. No. 322 ¶¶ 33, 52.)  FINA has no approval authority over (1) intra-national competitions in which swimmers and clubs do not represent a member federation, or (2) international competitions held by independent organizations without involvement from FINA or its member federations.[2]  (Dkt. No. 329-76 at 87 (BL 12.1, 12.3); Dkt. No. 322 ¶¶ 30, 32; Dkt. No. 323 ¶¶ 18–23.)

In 2017, ISL sought to enter the market for international swimming competitions and compete with FINA.  (Dkt. No. 329-14; Dkt. No. 329-15 at 9–11; Dkt. No. 329-16 at 7–9.)  ISL approached FINA to discuss sanctioning ISL's competitions, but the two did not reach an agreement.  (Dkt. No. 329-15 at 11–14.)

In 2018, ISL began negotiating with member federations, including USA Swimming, British Swimming, and the Italian Swimming Federation, to host international competitions in partnership with ISL.  (Dkt. No. 320-13 at 4; Dkt. No. 320-18 at 3; Dkt. No. 329-22 at 2; Dkt. No. 329-23 at 2; Dkt. No. 329-30 at 3; Dkt. Nos. 329-26, 329-56, 329-57.)  In June 2018, FINA sent a memorandum to all member federations about "a so-called international competition 'International Swimming League,' which FINA does not recognise":

We recommend and require that our National Federations respect and

---

[2] FINA's member federations are also organized into continental and regional organizations.  (*See* Dkt. No. 329-3 at 10 (C 14.1).)  Those groupings are not relevant to this case.

United States District Court
Northern District of California

apply [] FINA Rules, including: . . .

- BL 12.3 "*All Continental and regional Organisations and Member[] Federations shall seek approval from FINA for any International Competition to be organised or sanctioned by them.*[""]

- C 7.5 "*Each Member shall acknowledge in its national rules that FINA is the only recognized body in the world which governs Aquatics internationally*".

- C 8.2.1 "*All members are obliged to support FINA in its efforts to achieve its objectives*".

- GR 4.1 "*No affiliated Member shall have any kind of relationship with a non-affiliated or suspended body*".

. . . For the sake of clarification, [ISL] is neither recognised by nor affiliated to FINA.   Further, FINA has neither sanctioned the competitions organised by this entity, nor approved their sanction by other FINA bodies. . . .

Consequently, the competitions of [ISL] are not FINA sanctioned nor FINA approved.  They are not part of the international calendar.  The results and record achieved in these competitions are not and will not be recognised.

FINA will assess the development of this matter **and will consider art. GR 4 and BL 12, as and where appropriate.**

We hope this will help all FINA [member federations] to have a clear and mutual understanding of FINA's competence and jurisdiction in respect to international competitions.   It is in the interest of all Members and other organisations of the FINA Family to maintain a proper structure of the sport, securing development at all levels and ensuring safe, proper and equal conditions for the competitors in all FINA aquatic disciplines.

(Dkt. No. 329-35 (emphasis added).)

As reflected in the memo, in 2018 GR 4.1 prohibited member federations from having "any kind of relationship with a non-affiliated or suspended body" unless, as set forth in GR 4.4, FINA authorized the relationship.  (Dkt. No. 329-4 at 5.)  At the same time, GR 4.5 provided that any "individual or group" violating GR 4 "shall" be "suspended by the affiliated Member [federation] for a minimum period of one year, up to a maximum period of two years."  (*Id.*; *see* Dkt. No. 329-38 at 2 (USA Swimming specifically noting GR 4.5 in response to June 2018 memo citing GR 4); Dkt. No. 320-6 at 12–13 (July 2018 FINA Executive meeting noting GR 4.5 in discussion of ISL).)  After FINA's June 2018 memo, several member federations stopped

negotiating with ISL.  (Dkt. No. 320-20 at 2 ("[W]anted to update you on ISL. . . .  British Swimming won[']t be staging an event this year — because of the FINA situation."); Dkt. No. 329-37 at 2 ("before USA Swimming can commit to taking part, we need to get an assurance from ISL and from FINA (in writing) that FINA is on board"); Dkt. No. 329-39 at 2 (British Swimming "can't afford to take risks with our core purpose of delivering medals at the Olympic Games")).)

The Italian Swimming Federation continued negotiating with ISL about a December 2018 event in Turin.  In October 2018, FINA sent another memo to member federations:

> [T]he competition to be held in Torino (Italy) on 20th – 21st December 2018 is not recognised by FINA.
>
> Based on the interpretation of FINA Rule BL 12.3 confirmed by the FINA Bureau, this competition is an International Competition, not a national competition and is therefore subject to approval by FINA.  Its description as a national competition, in contradiction to its clear international nature, is not correct.  This description circumvents the application of the rules applying to international events and more fundamentally the jurisdictional order set forth in the FINA Constitution.
>
> No approval has been sought in accordance with the applicable provisions of BL 12 for this competition, which is consequently not sanctioned nor approved by FINA. . . .
>
> FINA will further assess the development of this matter and will consider consequences in application of art. GR 4 and BL 12, as and where appropriate.

(Dkt. No. 320-22.)  Member federations understood that GR 4.5 could be used to suspend swimmers for participating in the Turin event, and some advised their swimmers of that risk. (Dkt. No. 320-23 at 2; Dkt. No. 320-25 at 2; Dkt. No. 329-10 at 8; Dkt. No. 329-77 at 2; Dkt. No. 329-45 at 2.)  Internally, FINA referred to the situation as "issu[ing] a severe penalty" to the Italian Swimming Federation: "which Federation will step forward in the future to host ISL meets?  NONE!"  (Dkt. No. 320-24; *see* Dkt. No. 320-31; Dkt. No. 320-37 ("The hammer is about to come down on the Torino event.").)  Eventually, the Italian Swimming Federation cancelled the December 2018 event "because it always places paramount importance on the Athletes' status and welfare and it simply cannot take the risk of Athletes . . . receiving sanctions."  (Dkt. No. 329-47 at 2.)

In January 2019, FINA announced it had clarified interpretation of its rules:

> [S]wimmers are free to participate in competitions or events staged by independent organisers, namely entities which are neither members of FINA nor related to it in any way. . . . [S]uch participation shall not be characterised as unauthorised relations in application of FINA General Rules GR4, and shall not give rise to sanctions by FINA.

(Dkt. No. 324-26 at 3.)  And in July 2019, FINA amended GR 4.5 to repeal the suspension provision.  (Dkt. No. 322 ¶ 44; Dkt. No. 322-6 at 5.)  FINA never suspended a swimmer under GR 4.5.  (Dkt. No. 324-84 at 5–7; *see* Dkt. No. 322 ¶ 41.)

ISL hosted seasons in 2019, 2020, and 2021.  (Case No. 18-cv-07394-JSC, Dkt. Nos. 367-42, 367-43, 367-44.)  It sought and obtained FINA's approval for some events in which ISL partnered with member federations.  (Case No. 18-cv-07394-JSC, Dkt. Nos. 367-38 (granting approval), 367-39 (granting and denying approval).)

## RELEVANT PROCEDURAL HISTORY

Plaintiffs bring claims under Sherman Act Sections 1 and 2, as well as a state law claim for tortious interference with contractual relations related to ISL's December 2018 Turin event.  (Dkt. No. 83 ¶¶ 156–79.)  ISL also brings claims under Sherman Act Sections 1 and 2, and a state law claim for tortious interference with prospective economic relations related to the Turin event. (Case No. 18-cv-07394-JSC, Dkt. No. 100 ¶¶ 147–69.)  The Court certified an injunctive relief class of swimmers, but denied certification of a damages class.  (Dkt. No. 299.)

Because it is relevant to the analysis below, the Court notes no party has submitted expert testimony on the merits (liability).  In August 2021, the Court adopted the parties' stipulated case schedule, which set merits expert disclosure deadlines between September and December 2021. (Dkt. No. 230 at 3; *see* Dkt. Nos. 235, 243, 245, 258, 267, 271, 288, 291 (scheduling orders that did not modify merits expert disclosure deadlines).)  Long after those deadlines had passed, and no party had served *any* merits expert reports, the parties notified the Court of a dispute about the deadlines.  FINA wanted to extend the deadlines to allow it—and only it—to serve merits expert reports, while Plaintiffs and ISL wanted new deadlines for all parties.  (Dkt. No. 298.)  As no party had sought an extension of the deadlines before they had passed, and there was no good cause for extending the long-expired deadlines, the Court advised the parties that it would not set new

merits expert discovery deadlines.  (Dkt. No. 310 at 3–12); *see DRK Photo v. McGraw-Hill Glob. Educ. Holdings, LLC*, 870 F.3d 978, 989 (9th Cir. 2017).

Plaintiffs and ISL now move for summary judgment on FINA's liability under Section 1 of the Sherman Act and on FINA's mootness defense to injunctive relief.  FINA moves for summary judgment against Plaintiffs and ISL on all claims.  The Court first addresses FINA's motion.

## DISCUSSION

## I.    SHERMAN ACT SECTION 1

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . , or conspiracy in restraint of trade."  15 U.S.C. § 1.  "The Supreme Court has interpreted this language to prohibit only *unreasonable* restraints of trade."  *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 833 (9th Cir. 2022) (cleaned up), *petition for cert. filed*, (U.S. Sept. 27, 2022) (No. 22-289).  To prevail on a Section 1 claim, a plaintiff must demonstrate:  "(1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce."  *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1062 (9th Cir. 2001) (cleaned up).

Plaintiffs and ISL argue FINA's GR 4—prohibiting member federations from affiliating with organizations not sanctioned by FINA, such as ISL, or risk draconian sanctions against the federation and its swimmers—constitutes an unlawful horizontal group boycott.  (Dkt. No. 340-1 at 15–20; Dkt. No. 352-1 at 7–9.)  FINA contends it is entitled to summary judgment on the Section 1 claim as a matter of law.

### A.    Element 1: Contract, Combination, or Conspiracy

#### 1.    Entities Capable of Conspiring

Section 1 "applies only to *concerted* action" that "joins together independent centers of decisionmaking," or in other words, "separate economic actors pursuing separate economic interests."  *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190, 196, 197 (2010) (cleaned up; emphasis added).  "The crucial question is whether the entities alleged to have conspired maintain an economic unity, and whether the entities were either actual or potential competitors."  *Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*, 407 F.3d 1027,

1034 (9th Cir. 2005) (cleaned up); *see also Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1148 (9th Cir. 2003) ("Where there is substantial common ownership, a fiduciary obligation to act for another entity's economic benefit or an agreement to divide profits and losses, individual firms function as an economic unit and are generally treated as a single entity.").  The inquiry is a functional one that considers "competitive reality," so it is not determinative that the actors "are legally distinct entities" or that such "legally distinct entities have organized themselves under a single umbrella or into a structured joint venture." *Am. Needle*, 560 U.S at 196.

At the motion to dismiss stage, the Court held the complaints adequately alleged "FINA and its member federations are distinct entities and at least *potential* competitors.  Thus, they are capable of conspiring under Section 1." *Shields v. Fed'n Internationale de Natation*, 419 F. Supp. 3d 1188, 1220 (N.D. Cal. 2019).[3]  FINA argues it is entitled to judgment because the record does not contain evidence sufficient to support Plaintiffs' allegations.  The Court disagrees.  A reasonable trier of fact could find FINA and its member federations are not a single economic unit and are actual or potential competitors.

First, the record shows FINA hosts competitions in which member federations participate *and* that member federations host their own competitions from which they independently financially benefit.  (*See* Dkt. No. 329-7 at 3 (USA Swimming Form 990 noting it hosted "multiple national events" in 2019); *id.* at 70 (USA Swimming is a 501(c)(3) that is not "a subsidiary in an affiliated group or a parent-subsidiary controlled group"); Dkt. No. 329-74 at 4 (FINA constitution defining "competitions" to include FINA events as well as "events sanctioned by FINA members").)  That FINA sets a worldwide events calendar further supports this conclusion; it must coordinate among independent decision-makers, including its member federations.  (*See* Dkt. No. 329-2 at 13 ("FINA is tasked with creating a competition calendar that protects the health and safety of its swimmers and ensures that certain rules—like anti-doping precautions—are applied consistently across events."); Dkt. No. 365 ¶ 52 ("FINA's own events

---

[3] The Court's Order analyzed the original complaints, but the operative complaints have essentially the same allegations with respect to this issue.  (*See* Dkt. Nos. 1, 83; Case No. 18-cv-07394-JSC, Dkt. Nos. 1, 100.)

United States District Court
Northern District of California

represent a small fraction of the international events that qualify for inclusion in FINA's international events calendar. . . . [T]here are hundreds of other swimming competitions that are staged by FINA's Continental and/or Regional Organizations and FINA Members each year that are recognized by FINA and included on FINA's international competition calendar. There are also numerous independent staged swimming competitions that an independent organizer stages in conjunction with a FINA Member national federation that are also recognized by FINA.").) This evidence is not compatible with FINA and its members being a single economic unit as a matter of undisputed fact. *See Freeman*, 322 F.3d at 1149 ("[W]here firms are not an economic unit and are at least potential competitors, they are usually not a single entity for antitrust purposes.").

Second, the record shows member federations negotiated directly with ISL, without prior approval from FINA and without coordinating as one. (*See* Dkt. No. 320-18 at 3 (FINA executive meeting minutes noting that USA Swimming and Australian Swimming had signed agreements with ISL); Dkt. No. 329-8 at 3–4 (British Swimming CEO felt pressure to succeed in hosting 2019 event with ISL because "other federations bidding for events" would be watching); Dkt. No. 329-22 at 2 (USA Swimming COO: "USA Swimming, like British Swimming and Swimming Australia, is very interested in this project."); Dkt. No. 329-30 at 3 (ISL Managing Director to Swimming Australia CCO: "[W]e have advanced quite a lot with our negotiations with the US and European[] cities, however we still haven't made our final decision. In addition, we are certainly still considering Australia . . . .").) Indeed, the member federations competed with one another for the opportunity. *See Am. Needle*, 560 U.S. at 196–97 (noting NFL teams "compete with one another, not only on the playing field, but to attract fans, for gate receipts, and for contracts with managerial and playing personnel"). Although FINA's rules obligated the member federations to get FINA's approval to host international competitions, the record supports a finding that member federations negotiated with ISL separately from FINA. *See id.* at 191 (noting "concerted action" inquiry requires "a functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate").

FINA argues it is in a "vertical" relationship with the member federations. That may be true as a matter of governance, but it does not defeat a finding that FINA and its member

federations are at the same level of distribution with respect to putting on swimming competitions, and that the member federations are at the same level of distribution with respect to buying swimmers' services. Indeed, there is no evidence to support a reasonable inference the member federations are FINA subsidiaries, that both are owned by the same person, that one is owned by a subset of the other's owners, or that they "pool their capital and share the risk of loss as well as the opportunities for profit." *Freeman*, 322 F.3d at 1147–48. That member federations must abide by FINA rules or seek approval if they want FINA to sanction their events does not collapse them into a single economic unit. *See Am. Needle*, 560 U.S. at 196; *e.g.*, *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1052–53, 1063–64 (9th Cir. 2015) (holding NCAA's amateurism rules binding its "member colleges and universities" constituted horizontal restraint of trade). The record supports a reasonable inference FINA and the member federations put on their own events and negotiated on separate tracks with ISL; so, a reasonable trier of fact could find they are separate entities capable of conspiring.

### 2.    Concerted Action

"[A]n arrangement must embody concerted action in order to be a 'contract, combination . . . , or conspiracy' under § 1." *Am. Needle*, 560 U.S. at 191.

A reasonable trier of fact could also find FINA's written rules constitute concerted action by FINA and its member federations. *Cf. N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 41 (2d Cir. 2018) ("If NASL were challenging the Standards themselves—in totality—as violative of the antitrust laws, then the USSF Board's promulgation of them would constitute direct evidence of § 1 concerted action in that undertaking."). FINA's constitution requires both it and its member federations to follow rules promulgated by FINA's governing bodies. (Dkt. No. 329-74 at 4 (C 3.12), 7 (C 8.2.1-6), 10 (C 12.5); Dkt. No. 329-75 at 5 (GR 4.5); Dkt. No. 87 ¶ 43.) Member federations agree to follow FINA rules as a condition of their applications, and they have a role in voting on those rules. (Dkt. No. 329-74 at 7 (C 8.1.4), 14 (C 15.3), 15–16 (C 5.9-5.10)); *see Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.* ("*Bd. of Regents*"), 468 U.S. 85, 99 (1984) ("By participating in an association which prevents member institutions from competing against each other on the basis of price or kind of television

10

United States District Court
Northern District of California

1  rights that can be offered to broadcasters, the NCAA member institutions have created . . . an

2  agreement among competitors on the way in which they will compete with one another."); *e.g.*,

3  *Hairston v. Pac. 10 Conference*, 101 F.3d 1315, 1319 (9th Cir. 1996) ("The Pac–10 members'

4  agreement to sanction [a member] fulfills the 'contract, combination, or conspiracy' prong.").

5       This case is distinguishable from *Toscano v. Professional Golfers Ass'n*, in which the

6  entities' acceptance of the association's rules "demonstrated only that they agreed to purchase a

7  product[;] . . . [t]hey did not commit to a common scheme to act in restraint of trade." 258 F.3d

8  978, 984 (9th Cir. 2001) ("Their promises . . . show only that the local sponsors accepted the fact

9  that the tournaments would be operated according to the PGA Tour's rules and regulations, not

10 that they agreed to use those rules to restrain trade. . . .  [They] had no involvement in the

11 establishment or enforcement of the allegedly anticompetitive provisions of the contracts.").  Here,

12 in contrast, a reasonable trier of fact could find GR 4 constitutes an agreement among the

13 competitor federations not to do business with a non-FINA approved competitor such as ISL.

14 FINA and the federations' accepting, enforcing, and having a role in establishing GR 4 is

15 sufficient to support a finding of a commitment to a common scheme.  *See, e.g.*, *Fed. Trade*

16 *Comm'n v. Ind. Fed'n of Dentists* ("*Ind. Fed'n*"), 476 U.S. 447, 459 (1986) ("The Federation's

17 policy takes the form of a horizontal agreement among the participating dentists to withhold from

18 their customers a particular service that they desire—the forwarding of x rays to insurance

19 companies along with claim forms."); *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*

20 ("*Sunday Ticket*"), 933 F.3d 1136, 1152 (9th Cir. 2019) ("According to the complaint, the NFL

21 members vote to approve the contract between DirecTV and the NFL.  Therefore, the complaint

22 adequately alleges that the Teams-NFL Agreement is a horizontal restraint—an agreement among

23 competitors that places an artificial limit on the quantity of televised football that is available for

24 sale to broadcasters and consumers." (cleaned up)).

25      Accordingly, the record supports the conclusion that FINA and its member federations

26 took concerted action.  *See Tanaka*, 252 F.3d at 1062.

27              **3.**      **Nature of the Restraint**

28      Plaintiffs and ISL frame the challenged restraint as GR 4's rule against unauthorized

relations, enforced (briefly) by the threat of suspending swimmers.  *See Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1140 (9th Cir. 2022) ("The responsibility for framing the case lies with the parties.").  ISL contends the unauthorized relations rule denied it access to the sellers' market for swimming competitions and the buyers' market for swimmers' services, because member federations and swimmers could not do business with ISL unless FINA approved.  (Dkt. No. 83 ¶¶ 3, 59, 157–66; Case No. 18-cv-07394-JSC, Dkt. No. 100 ¶¶ 3, 64, 148–57.)  Plaintiffs contend the suspension rule denied them access to the sellers' market for swimming services, because selling their labor to ISL would suspend them from FINA and jeopardize their Olympic eligibility.  (Dkt. No. 83 ¶¶ 3, 157–66; Case No. 18-cv-07394-JSC, Dkt. No. 100 ¶¶ 3, 148–57.)  Thus, their theory is GR 4 restrained member federations from partnering with ISL and restrained swimmers from entering international competitions organized by ISL.

A reasonable trier of fact could find FINA's rules constituted a horizontal restraint of trade.  *See Ohio v. Am. Express Co.* ("*Amex*"), 138 S. Ct. 2274, 2283–84 (2018) (explaining "horizontal" restraints are "imposed by agreement between competitors" (cleaned up)); *cf. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988) (noting "vertical" restraints are "imposed by agreement between firms at different levels of distribution").  Horizontal restraints include "geographic division of markets," "horizontal price fixing," and other "agreement[s] to allocate a market, such as in time or space, between a select few competitors at the same level of the market."  *California ex rel. Harris v. Safeway, Inc.* ("*Safeway*"), 651 F.3d 1118, 1133 n.11 (9th Cir. 2011); *In re Glumetza Antitrust Litig.*, No. C 19-05822 WHA, 2021 WL 1817092, at *8 (N.D. Cal. May 6, 2021).  The record supports a finding that FINA's member federations, who are at the same level of distribution for putting on international competitions and buying swimmers' services, agreed not to do business with ISL without FINA's approval.

* * *

Based on the undisputed evidence in the record, a reasonable trier of fact could find FINA and its member federations are separate economic actors capable of conspiring and that they actually conspired on a restraint of trade.  As such, a reasonable trier of fact could find Plaintiffs and ISL meet their burden on the first element of their Section 1 claim.  *See Tanaka*, 252 F.3d at

United States District Court
Northern District of California

1062.

## B.      Element 2: Unreasonable Restraint of Trade

Having determined a reasonable trier of fact could find FINA entered into a Section 1 contract, combination, or conspiracy, the next question is whether the trier of fact could find GR 4 unreasonably restrains trade.  *See Am. Needle*, 560 U.S. at 186 ("The question whether an arrangement is a contract, combination, or conspiracy is different from and antecedent to the question whether it unreasonably restrains trade."); *Fed. Trade Comm'n v. Qualcomm Inc.* ("*Qualcomm*"), 969 F.3d 974, 989 (9th Cir. 2020) ("[A] plaintiff must prove (1) the existence of an agreement, and (2) that the agreement was in *unreasonable* restraint of trade.").

### 1.      Antitrust Standards

"The selection of the proper mode of antitrust analysis is a question of law," which the Court may decide at the summary judgment stage.  *Safeway*, 651 F.3d at 1124.  The "presumptive or default standard" for Section 1 analysis is the "rule of reason," which "requires the antitrust plaintiff to demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive."  *Id.* at 1133 (cleaned up).  Under this analysis, there is a threshold requirement "to accurately define the relevant market, which refers to the area of effective competition."  *Qualcomm*, 969 F.3d at 992 (cleaned up).  More rarely, courts may use the "*per se* approach" to analyze practices that are "so harmful to competition and so rarely prove justified that the antitrust laws do not require proof that an agreement of that kind is, in fact, anticompetitive in the particular circumstances."  *PLS.Com*, 32 F.4th at 833 (cleaned up).  Finally, between the rule of reason and the *per se* approach lies the "truncated rule of reason" or "quick look" approach.  *Safeway*, 651 F.3d at 1134.

> [S]ometimes we can determine the competitive effects of a challenged restraint in the twinkling of an eye.  That is true, though, only for restraints at opposite ends of the competitive spectrum. . . .  [S]ome restraints may be so obviously incapable of harming competition that they require little scrutiny. . . .  At the other end, some agreements among competitors so obviously threaten to reduce output and raise prices that they might be condemned as unlawful per se or rejected after only a quick look.

*Nat'l Collegiate Athletic Ass'n v. Alston* ("*Alston*"), 141 S. Ct. 2141, 2155–56 (2021) (cleaned up).

United States District Court
Northern District of California

Plaintiffs and ISL insist the *per se* or quick look approach applies to GR 4 while FINA insists it must be analyzed under the default rule of reason.  The choice matters because if the *per se* or quick look approach applies, the Court assumes the restraint is anticompetitive without inquiry into the particular market context in which it is found; that is, "[a] plaintiff is not required to define a particular market for a *per se* claim."  *PLS.Com*, 32 F.4th at 838 (citing *Bd. of Regents*, 468 U.S. at 100).

### 2.       The *Per Se* and Quick Look Approach does not Apply

Plaintiffs and ISL argue GR 4 is a classic group boycott and therefore the *per se* or quick look approach applies.  *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015).

> The classic group boycott is a concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level.  Typically, the boycotting group combines to deprive would-be competitors of a trade relationship **which they need in order to enter (or survive in) the level wherein the group operate**s.  The group may accomplish its exclusionary purpose by inducing suppliers not to sell to potential competitors, by inducing customers not to buy from them, or, in some cases, by refusing to deal with would-be competitors themselves.  In each instance, however, the hallmark of the group boycott is the effort of competitors to barricade themselves from competition at their own level.

*PLS.Com*, 32 F.4th at 834 (cleaned up and emphasis added; quoting *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1178 (D.C. Cir. 1978)).  Plaintiffs and ISL argue GR 4 constitutes a classic group boycott subject to *per se* analysis because it "deprive[s] ISL and other would-be competitors of the trade relationships with national federations and swimmers they need to enter the market and survive."  (Dkt. No. 320-3 at 25.)

The hole in this argument is that they do not identify any evidence, expert or otherwise, that supports a finding ISL needs to affiliate with member federations to hold its own swimming competitions.  GR 4 does not (and did not in 2018) prevent swimmers from participating in unauthorized events; it prevented and continues to prevent *member federations* from affiliating with ISL and other non-sanctioned entities.  (Dkt. No. 329-4 at 5.)  The swimming competitions Plaintiffs and ISL contend FINA thwarted are all competitions in which a member federation was

14

proposing to affiliate with a non-approved entity.  (*See, e.g.*, Dkt. No. 320-7 at 5–6, Dkt. No. 320-9 at 4 (World Swimming Association partnering with Singapore Swimming Federation); Case No. 18-cv-07394-JSC, Dkt. Nos. 367-21, 367-28 (ISL partnering with Italian Swimming Federation).) It is undisputed that top-tier swimmers are not bound by contract to swim only in FINA-sanctioned competitions.  Indeed, the undisputed evidence is that ISL can and does sponsor top-tier swimming competitions without any affiliation with member federations.  For example, in 2019, ISL hosted a swimming competition in Naples, Italy without affiliating with FINA or any member federation.  (Dkt. No. 335-2 at 17–21.)  And, ISL admits it does not need FINA to conduct its swimming competition business.  (Case No. 18-cv-07394-JSC, Dkt. No. 367-90 at 39–40.)  While FINA's cooperation makes it easier for ISL to organize a swimming competition, it is not necessary.  (Case No. 18-cv-07394-JSC, Dkt. No. 367-89 at 29.)  Further, the number of swimming competitions ISL sponsored increased from 2019 through 2021.  (Case No. 18-cv-07394-JSC, Dkt. Nos. 367-42, 367-43, 367-44.)  So, Plaintiffs' assertion "it is undisputed that FINA's horizontal boycott cut off ISL's access to a necessary input for ISL to compete," (Dkt. No. 320-3 at 26), is wrong.  It is not undisputed; instead, Plaintiffs' assertion is unsupported.  On this particular record, no reasonable trier of fact could find GR 4 deprives "would-be competitors of a trade relationship which they need in order to enter (or survive in) the level wherein the group operates."  *PLS.Com*, 32 F.4th at 834; *see id.* at 835 (noting the Supreme Court has held "a group boycott generally falls into the *per se* category if the boycotting firms . . . cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete" (cleaned up)).

Regardless of whether GR 4 qualifies as a horizontal group boycott, "[p]er se treatment is proper only once experience with a particular kind of restraint enables the court to predict with confidence that the rule of reason will condemn it."  *Safeway*, 651 F.3d at 1133 (cleaned up); *cf. PLS.Com*, 32 F.4th at 837 ("Although we hold that PLS has adequately alleged a *per se* group boycott, we leave to the district court to determine in the first instance whether it should apply *per se* analysis or rule of reason analysis at later stages in this litigation.").  As the Supreme Court recently cautioned in a case involving horizontal restraints in a sports league context:

Recognizing the inherent limits on a court's ability to master an entire

United States District Court
Northern District of California

industry—and aware that there are often hard-to-see efficiencies attendant to complex business arrangements—we take special care not to deploy these condemnatory tools until we have amassed considerable experience with the type of restraint at issue and can predict with confidence that it would be invalidated in all or almost all instances.

*Alston*, 141 S. Ct. at 2156 (cleaned up); *see also Safeway*, 651 F.3d at 1134 (explaining courts may use the quick look approach where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets" (cleaned up)).

Courts do not have any experience with the restraint at issue here—the rules of a governing body for international and Olympic sports that sets the qualifying criteria for athletes to participate in the Olympics and is tasked with promoting the global development of particular sports. The Court cannot "predict with confidence" that a rule requiring FINA to approve member federation affiliation with a non-member entity "would be invalidated in all or almost all instances." *Alston*, 141 S. Ct. at 2156 (cleaned up). For example, the record shows that in 2019 FINA declined to approve USA Swimming co-sponsoring a competition with ISL because it conflicted with the dates of a previously scheduled FINA World Cup competition. (Case No. 18-cv-07394-JSC, Dkt. No. 367-39.) Such a restraint is not obviously unreasonable. Also, as explained above, ISL is able to sponsor competitions without cooperation from member federations, and since 2019 competition has increased and swimmers have earned more money from ISL and FINA. So, the Court cannot conclude in the "twinkling of an eye" the restraint is unreasonable. *Alston*, 141 S. Ct. at 2156 (cleaned up).

Further, the Supreme Court has recognized that in certain industries, such as sports leagues, "horizontal restraints on competition are essential if the product is to be available at all" and thus the rule of reason analysis applies. *Bd. of Regents,* 468 U.S. at 101; *see O'Bannon*, 802 F.3d at 1069; *see also Am. Needle*, 560 U.S. at 203 ("When restraints on competition are essential if the product is to be available at all, *per se* rules of illegality are inapplicable, and instead the restraint must be judged according to the flexible Rule of Reason." (cleaned up)). FINA, of course, is not exactly a sports league. But that distinction merely highlights the courts' lack of experience with the restraint at issue and so the inappropriateness of the *per se* or quick look

16

approach.  *Cf. Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1018–19 (10th Cir. 1998) ("*Board of Regents* more generally concluded that because horizontal agreements are necessary for sports competition, all horizontal agreements among NCAA members, even those as egregious as price-fixing, should be subject to a rule of reason analysis.").

For all the above reasons, and drawing all reasonable inferences from the evidence in Plaintiffs' and ISL's favor, the record does not support application of *per se* or quick look analysis; the default rule of reason applies.

### 3.      Applying the Rule of Reason

The rule of reason has a threshold requirement "to accurately define the relevant market, which refers to the area of effective competition."  *Qualcomm*, 969 F.3d at 992 (cleaned up); *see also Flaa v. Hollywood Foreign Press Ass'n*, 55 F.4th 680, 693 (9th Cir. 2022) ("Under the rule of reason, a plaintiff must allege that the defendant has market power within a relevant market.  That is, the plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market" (cleaned up)).  "Courts usually cannot properly apply the rule of reason without an accurate definition of the relevant market.  Otherwise, there is no way to measure the defendant's ability to lessen or destroy competition."  *Qualcomm*, 969 F.3d at 992 (cleaned up); *see also Amex*, 138 S. Ct. at 2285 ("Because legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law, courts usually cannot properly apply the rule of reason without an accurate definition of the relevant market" (cleaned up)).  "A relevant antitrust market is bounded both by geography and product.  An antitrust market is geographically bounded by where sellers operate and where purchasers can predictably turn for supplies."  *Fed. Trade Comm'n v. Qualcomm Inc.*, 411 F. Supp. 3d 658, 683 (N.D. Cal. 2019) (cleaned up).

> The boundaries of an antitrust product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. . . .  Other practical indicia of an antitrust product market include industry or public recognition of the market and the product's peculiar characteristics and uses.

*Id.* at 684 (cleaned up); *see Qualcomm*, 969 F.3d at 992 ("[T]he district court correctly defined the

1    relevant markets . . . .").

2         Once the relevant market is determined, the rule of reason uses a three-step burden-shifting

3    framework:

4         [T]he plaintiff has the initial burden to prove that the challenged
          restraint has a substantial anticompetitive effect that harms consumers
5         in the relevant market.  If the plaintiff carries its burden, then the
          burden shifts to the defendant to show a procompetitive rationale for
6         the restraint.  If the defendant makes this showing, then the burden
          shifts back to the plaintiff to demonstrate that the procompetitive
7         efficiencies could be reasonably achieved through less
          anticompetitive means.

8

9    *PLS.Com*, 32 F.4th at 834 (cleaned up).  "The goal is to distinguish between restraints with

10   anticompetitive effect that are harmful to the consumer and restraints stimulating competition that

11   are in the consumer's best interest."  *Amex*, 138 S. Ct. at 2284 (cleaned up).

12                        **a.    The relevant antitrust market**

13        FINA contends the evidence is insufficient to meet Plaintiffs' and ISL's threshold

14   requirement of defining a relevant market.  *See Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car*

15   *Auto Racing, Inc.*, 588 F.3d 908, 916 (6th Cir. 2009) (noting the plaintiff's burden); *see also*

16   *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000) (explaining

17   a defendant may move for summary judgment on the grounds "that the nonmoving party does not

18   have enough evidence of an essential element to carry its ultimate burden of persuasion at trial").

19   The Court agrees.

20        Plaintiffs and ISL do not have a merits expert.  Therefore, they offer no expert testimony

21   on either the geographic bounds of the market for top-tier international swimming competitions, or

22   the cross-elasticity of demand between that product and its substitutes.  Without expert testimony,

23   the record does not have sufficient evidence from which a reasonable trier of fact could deduce

24   any relevant market.  Are top-tier international swimming competitions interchangeable with

25   NCAA Division I swimming competitions, top-tier international sports, sports more broadly, or

26   entertainment more broadly?  (*See* Dkt. No. 367-89 at 19–20; Dkt. No. 367-90 at 13–14, 36 (ISL

27   executives noting it competes with sports and entertainment generally)); *cf. Sunday Ticket*, 933

28   F.3d at 1155 (noting "professional football games have no substitutes (as fans do not consider

18

1    NFL games to be comparable to other sports or forms of entertainment)").  The record is simply

2    not developed.

3         Plaintiffs and ISL do not seriously dispute their lack of evidence as to the relevant market.

4    Instead, they contend such evidence is not required because they have identified sufficient

5    evidence of the direct anticompetitive effects of FINA's unauthorized relations rule.  Specifically,

6    they insist FINA blocked ISL from holding as many as three events in 2018 and thus there is a

7    genuine dispute as to anticompetitive effects.  The Court is unpersuaded.

8         First, their argument is premised on their mantra that FINA's rules prohibited top-tier

9    swimmers from participating in any unsanctioned swimming event.  Not so.  As discussed in the

10   context of the proper antitrust analysis, FINA's rules prohibited its member federations from

11   affiliating with an unapproved entity, and a trier of fact could find that, for a brief time, FINA

12   threatened suspension of any swimmer who participated in an unsanctioned event *involving a*

13   *FINA member federation*.  There is no rule (and never was) that allows FINA to penalize a

14   swimmer who participates in a competition that is not affiliated with a member federation, and no

15   evidence that FINA ever did, or even threatened to do so.  To the contrary, ISL sponsored such a

16   competition in 2019 in Naples, Italy with "top-tier swimmers" participating, and ISL admits it

17   does not require FINA approval or federation affiliation to put on international swimming

18   competitions.  As there is no evidence that in 2018 ISL even attempted to put on a swimming

19   competition without affiliating with a FINA-member federation, let alone evidence FINA stopped

20   it from doing so, the record does not support a finding that FINA's refusal in 2018 to approve

21   ISL's affiliation with a FINA-member federation so obviously had anticompetitive effects that

22   Plaintiffs and ISL have no need to define the relevant market.

23        Plaintiffs and ISL's reliance on their damages expert, Dr. Rascher, is misplaced.  They

24   contend his testimony supports an inference ISL would have put on more events in 2019 but for

25   FINA's interference.  Putting aside that he is a damages rather than merits expert, he

26   (unsurprisingly) provides no testimony that disputes the evidence ISL did not need FINA to

27   sponsor top-tier international swimming competitions.

28        Second, identifying the relevant market is critical to determining anticompetitive effects

United States District Court
Northern District of California

under the first step of the rule of reason.  *See Qualcomm*, 969 F.3d at 992 ("Furthermore, in assessing alleged antitrust injuries, courts must focus on anticompetitive effects in the market where competition is allegedly being restrained." (cleaned up)).  The direct evidence to which Plaintiffs and ISL refer must "include[] proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality *in the relevant market*."[4]  *Id.* at 989 (cleaned up; emphasis added); *see PLS.Com*, 32 F.4th at 834 ("To prove a substantial anticompetitive effect directly, the plaintiff must provide proof of actual detrimental effects . . . *in the relevant market*. When a plaintiff does so, no inquiry into market definition and market power is required." (cleaned up; emphasis added)); *see also Intel Corp. v. Fortress Inv. Grp. LLC*, 511 F. Supp. 3d 1006, 1014 (N.D. Cal. 2021) ("Market power is essentially a surrogate for detrimental effects.  If a plaintiff can make a showing of actual anticompetitive effects, then a full-blown market analysis is not necessary." (cleaned up)).

It is true that a horizontal restraint, like GR 4, may require a less precise definition of the relevant market than another restraint.  In *Amex*, the Supreme Court explained that defining the relevant market is a requirement when the restraint at issue is vertical.  138 S. Ct. at 2285 n.7.  It distinguished *Indiana Federation*, 476 U.S. 447, and *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643 (1980) (per curiam), on the basis that because the restraints at issue were horizontal, the court "did not need to precisely define the relevant market to conclude that these agreements were anticompetitive."  138 S. Ct. at 2285 n.7.  In *Indiana Federation*, the court found that although the FTC "fail[ed] to engage in detailed market analysis," there was evidence that:

> in two localities in the State of Indiana (the Anderson and Lafayette areas), Federation dentists constituted heavy majorities of the practicing dentists and that as a result of the efforts of the Federation, insurers in those areas were, over a period of years, actually unable to obtain compliance with their requests for submission of x rays. . . . [W]e conclude that the finding of actual, sustained adverse effects on competition in those areas where IFD dentists predominated, viewed in light of the reality that markets for dental services tend to be

---

[4] The alternative, indirect evidence, "involves proof of market power plus some evidence that the challenged restraint harms competition."  *Qualcomm*, 969 F.3d at 989 (cleaned up); *see Amex*, 138 S. Ct. at 2284.  "Market power" also considers the "relevant market" as a threshold issue.  *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1112 (9th Cir. 2021).

United States District Court
Northern District of California

relatively localized, is legally sufficient to support a finding that the challenged restraint was unreasonable even in the absence of elaborate market analysis.

476 U.S. at 460–61. Thus, in applying the rule of reason to a horizontal restraint, *Indiana Federation* relied on evidence the conspiring entities were the majority of suppliers in two local areas and that the product market was localized. Drawing all inferences in Plaintiffs' and ISL's favor, they have not adduced enough evidence to meet that lesser burden here.

The Court acknowledges the record is replete with evidence of FINA's concern about competition from ISL. But, so what? The antitrust laws do not require one competitor to help another compete with it; instead, they prohibit only unreasonable restraints of trade. *Cf. Qualcomm*, 969 F.3d at 1005 ("Anticompetitive behavior is illegal under federal antitrust law. Hypercompetitive behavior is not.").

Because Plaintiffs and ISL have insufficient evidence to prove the relevant market, no reasonable trier of fact could find FINA's unauthorized relations rule violated the rule of reason. *See id.* at 992. The Court need not analyze the third element of a Section 1 claim—the restraint's effect on interstate commerce—because there is insufficient evidence in the record to support the second element. *See Tanaka*, 252 F.3d at 1062.

\* \* \*

A reasonable trier of fact could find a contract, combination, or conspiracy existed among FINA and its member federations. The trier of fact could also find that GR 4, the unauthorized relations rule, was a horizontal restraint of trade. However, under the rule of reason, and based on the record before the Court, no reasonable trier of fact could find the restraint was unreasonable because Plaintiffs and ISL have not offered enough evidence to define the relevant market and thus show the required anticompetitive effects. Accordingly, FINA is entitled to summary judgment on Plaintiffs' and ISL's Section 1 claims. *See id.*

## II.  SHERMAN ACT SECTION 2

"Whereas § 1 of the Sherman Act targets *concerted* anticompetitive conduct, § 2 targets *independent* anticompetitive conduct." *Qualcomm*, 969 F.3d at 989–90. Section 2 "makes it illegal to 'monopolize . . . any part of the trade or commerce among the several States.'" *Id.* at

United States District Court
Northern District of California

990.  "To establish liability under § 2, a plaintiff must show: (a) the possession of monopoly [or monopsony] power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury."  *Id.* (cleaned up); *see Weyerhaeuser Co. v. Ross–Simmons Hardwood Lumber Co., Inc.*, 549 U.S. 312, 321–22 (2007) (noting similarities between monopoly and monopsony).  FINA moves for summary judgment on Plaintiffs' and ISL's Section 2 claims.

### A.      Monopoly & Monopsony Power

The first element requires proof of power "in the relevant market."  *Qualcomm*, 969 F.3d at 990.  Thus, "[a]s the language of the first element makes clear, defining the relevant market is indispensable to a monopolization claim."  *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1373 (9th Cir. 1989) (cleaned up); *see Dreamstime.com*, 54 F.4th at 1137.  "Monopoly power is the ability to control prices and exclude competition in a given market.  If a firm can profitably raise prices without causing competing firms to expand output and drive down prices, that firm has monopoly power."  *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007).

As analyzed above, drawing all inferences in Plaintiffs' and ISL's favor, there is insufficient evidence from which a reasonable trier of fact could deduce the bounds of a relevant market.  And there is insufficient evidence from which to draw a reasonable inference about which products are interchangeable with FINA's product, international swimming competitions.  *Cf. United States v. Microsoft Corp.* ("*Microsoft*"), 253 F.3d 34, 51–54 (D.C. Cir. 2001) (concluding, on first element of Section 2 analysis, that the district properly defined the relevant market as "the licensing of all Intel-compatible PC operating systems worldwide").

Plaintiffs and ISL again contend no relevant market definition is required if they have direct evidence of monopoly power.  *See Broadcom*, 501 F.3d at 307 n.3; *Microsoft*, 253 F.3d at 51.  That may not be a correct statement of current Ninth Circuit law.  *See Dreamstime.com*, 54 F.4th at 1137 ("A Section 2 claim includes two elements: (1) the defendant has monopoly power in the relevant market, and (2) the defendant has willfully acquired or maintained monopoly power in that market.  Both elements are required. . . .  To meet the first element of a Section 2 claim, a plaintiff generally must (1) define the relevant market, (2) establish that the defendant possesses

market share in that market sufficient to constitute monopoly power, and (3) show that there are significant barriers to entering that market." (cleaned up)).  But the Court need not resolve that legal question because Plaintiffs and ISL do not offer sufficient direct evidence of monopoly power.  Direct evidence of monopoly power is "restricted output and supracompetitive prices." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (citing *Ind. Fed'n*, 476 U.S. at 460–61)).  The former refers to the defendant's power to restrict its own output in a way that "restrict[s] marketwide output and, hence, increase[s] marketwide prices."  *Id.*  The latter refers to the defendant's power to "raise prices without causing competing firms to expand output and drive down prices."  *Broadcom*, 501 F.3d at 307.  Plaintiffs' and ISL's evidence that FINA's conduct restricted *ISL's* output is not proper direct evidence of monopoly power.  And Plaintiffs and ISL do not offer any evidence about FINA's power to raise prices with respect to international swimming competitions.  Therefore, as a matter of law there is insufficient direct evidence of monopoly power, and Plaintiffs and ISL retain the burden of defining the relevant market.

Because there is insufficient evidence from which a reasonable trier of fact could define the relevant market, no reasonable trier of fact could find in Plaintiffs' and ISL's favor on the monopoly and monopsony power element of their Section 2 claims.  *See Qualcomm*, 969 F.3d at 990.  Accordingly, FINA is entitled to summary judgment on the Section 2 claims.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

\* \* \*

The Court need not address antitrust injury, a matter of statutory standing for Section 1 and 2 claims, because Plaintiffs' and ISL's claims fail on other grounds.  *See PLS.Com*, 32 F.4th at 833 (explaining elements of antitrust injury and noting "[w]ithout a violation of the antitrust laws, there can be no antitrust injury" (cleaned up)); *Hairston*, 101 F.3d at 1318.

## III.    TORT CLAIMS

ISL makes a claim under California law for tortious interference with prospective economic relations, while the named Plaintiff swimmers bring a California law claim for tortious interference with contractual relations.  FINA moves for summary judgment on both.

//

**A.    ISL's Claim**

ISL's claim for tortious interference with prospective economic relations requires it to prove: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship"; (3) "intentional *wrongful* acts on the part of the defendant designed to disrupt the relationship"; "(4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 950–51 (Cal. 2003) (cleaned up).  The third element refers to acts that are "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Id.* at 954; *see also id.* at 953 ("[W]hile intentionally interfering with an existing contract is a wrong in and of itself, intentionally interfering with a plaintiff's prospective economic advantage is not.  To establish a claim for interference with prospective economic advantage, therefore, a plaintiff must plead that the defendant engaged in an independently wrongful act." (cleaned up)).

ISL uses its antitrust claims against FINA as the basis for the third element.  That is, it alleges FINA's acts were wrong because they are proscribed by the Sherman Act.  As explained above, FINA is entitled to summary judgment on ISL's Sherman Act claims in light of application of the rule of reason and ISL's failure to offer sufficient evidence on the relevant market and related elements.  Thus, those claims do not provide a basis for the third element of ISL's tort claim.  FINA is entitled to judgment on this claim.

**B.    Plaintiffs' Claims**

Plaintiffs Shields, Andrew, and Hosszú make a claim under California law for intentional interference with contractual relations arising from FINA's interference with ISL's planned Turin event with the Italian Swimming Federation.  (Dkt. No. 83 ¶ 175.)  FINA argues the Court does not have personal jurisdiction of this claim.  The Court agrees.

At the motion to dismiss stage, the Court held Plaintiffs and ISL had made a prima facie showing of nationwide specific personal jurisdiction over FINA as to their antitrust claims. *Shields*, 419 F. Supp. 3d at 1201–13.  FINA does not dispute that holding for purposes of its summary judgment motion; instead, FINA contends the swimmers cannot meet their burden of

1    proving personal jurisdiction over FINA for their intentional inference claim.  *See Picot v. Weston*,

2    780 F.3d 1206, 1211 (9th Cir. 2015) ("When a plaintiff relies on specific jurisdiction, he must

3    establish that jurisdiction is proper for each claim asserted against a defendant." (cleaned up)).

4        Plaintiffs must satisfy three requirements to show specific personal jurisdiction of this

5    claim: (1) FINA purposefully directed its activities toward the forum or purposefully availed itself

6    of the privileges of conducting activities in the forum; (2) Plaintiffs' interference with contract

7    claim arises out of or relates to FINA's forum-related activities; and (3) the Court's exercise of

8    personal jurisdiction satisfies due process.  *See Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d

9    1064, 1068 (9th Cir. 2017).

10       When, as here, the claim sounds in tort, courts use the purposeful direction test to decide

11   personal jurisdiction.  Under that test, the plaintiff must make a prima face showing the defendant

12   "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the

13   defendant knows is likely to be suffered in the forum state."  *Id.* at 1069 (cleaned up).  As the issue

14   is presented on summary judgment, the Court will employ the same standard as governed the Rule

15   12(b)(2) motion following jurisdictional discovery: Plaintiffs must make a prima face showing of

16   personal jurisdiction and all reasonable inferences from the evidence in the record must be

17   resolved in Plaintiffs' favor.  *See Shields*, 419 F. Supp. 3d at 1201–02.

18       Drawing all reasonable inferences in Plaintiffs' favor, the record supports a finding FINA

19   committed an intentional act by sending the October 2018 memo to all federation members.

20   Plaintiffs contend the memo interfered with their contracts to swim in the Turin competition

21   because it warned the member federations that ISL's planned Turin event co-sponsored by the

22   Italian Swimming Federation in December 2018 was an international swimming competition,

23   FINA had not approved it, and that FINA would therefore consider the consequences flowing

24   from GR 4 (unauthorized relations).

25       The next question is whether Plaintiffs have shown FINA's intentional acts were aimed at

26   the forum.  Although Plaintiffs' claim is brought under California law, FINA's motion assumes,

27   without explanation, the "forum" in this analysis is the United States.  (Dkt. No. 326-2 at 22–23;

28   Dkt. No. 347-2 at 37–38.)  While personal jurisdiction under the Sherman Act extends to

United States District Court
Northern District of California

25

1    nationwide contacts, *see Go-Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406, 1417 (9th Cir. 1989),

2    the Court is not aware of any caselaw suggesting a California common law tort claim likewise has

3    such broad reach.  *See Mehr v. Féderation Internationale de Football Ass'n*, 115 F. Supp. 3d

4    1035, 1049–53 (N.D. Cal. 2015) (holding the plaintiffs had not shown sufficient contacts with

5    California to establish specific jurisdiction for tort claims against an international soccer

6    association in California federal court).  But given that is how FINA framed its motion, the Court

7    will evaluate whether Plaintiffs have established FINA's intentional acts were aimed at the United

8    States.  They have not.

9          First, Plaintiffs' reliance on the Court's earlier personal jurisdiction ruling is misplaced.

10    That Order considered Plaintiffs' and ISL's antitrust claims and concluded they had made a prima

11    facie showing of jurisdiction in the United States because of the evidence regarding FINA's

12    concern about USA Swimming partnering with ISL to host an event in the United States.  *Shields*,

13    419 F. Supp. 3d at 1203–06.  While the evidence the Court cited in that Order might be admissible

14    on Plaintiffs' interference with contract claim, it does not constitute the intentional acts upon

15    which the claim is based.

16          Second, Plaintiffs have not identified any other acts aimed at the United States designed to

17    scuttle the Turin event.  They argue: "FINA ignores the evidence that its intentional campaign to

18    interfere with the swimmer plaintiffs' contract with ISL began at least in early 2018."  (Dkt. No.

19    340-1 at 53.)  Plaintiffs, however, do not cite any contracts they had with ISL in early 2018;

20    indeed, the contracts they allege FINA interfered with were executed in October 2018 at the

21    earliest and were limited to the Turin event, not some free-standing agreement with ISL.  (Dkt.

22    Nos. 327-5, 327-9.)  So, they have not made a prima face showing of purposeful direction at the

23    United States for this claim.

24          And, even if the Court considers the conduct aimed at the United States upon which the

25    Court relied in its earlier Order as satisfying Plaintiffs' purposeful direction burden, the claims for

26    interference with the Turin-event contracts do not arise out of those contacts.  At bottom, Plaintiffs

27    allege a Swiss entity interfered with their contracts with another Swiss entity to participate in a

28    swimming competition in Italy organized by the Italian Swimming Federation.  That USA

United States District Court
Northern District of California

1    Swimming was one of over 200 federations to receive the October 2018 memo threatening

2    sanctions if a federation's swimmers participated in the event does not come close to showing that

3    each swimmer's claim arises from FINA's contacts with the United States.  Drawing all

4    reasonable inferences in Plaintiffs' favor, their contracts were interfered with because the Italian

5    Swimming Federation cancelled the event due to—according to Plaintiffs—FINA's pressure.

6    This conduct is not connected to the United States.  Plaintiffs have not met their burden to show

7    the Court has personal jurisdiction of the intentional interference with contract claim.

8                                              * * *

9           Accordingly, FINA is entitled to summary judgment on the California tort claims.

10   **IV.    SEALING**

11          There is a presumption of public access to judicial records and documents.  *Nixon v.*

12   *Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978).  Courts generally apply a "compelling

13   reasons" standard when considering motions to seal, recognizing that "a strong presumption in

14   favor of access is the starting point."  *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178

15   (9th Cir. 2006) (cleaned up).  Courts have found compelling reasons to seal information about a

16   party or non-party's personal finances or a business's budget and development planning.  *See*

17   *Brown v. Brown*, No. CV 13-03318 SI, 2013 WL 12400041, at *1 (N.D. Cal. Dec. 30, 2013);

18   *Space Data Corp. v. X*, No. 16-cv-03260-BLF, 2017 WL 11503233, at *2 (N.D. Cal. Sept. 25,

19   2017).  But "[t]he mere fact that the production of records may lead to a litigant's embarrassment,

20   incrimination, or exposure to further litigation will not, without more, compel the court to seal its

21   records."  *Kamakana*, 447 F.3d at 1179.

22          Civil Local Rule 79-5 supplements the "compelling reasons" standard.  *Exeltis USA Inc. v.*

23   *First Databank, Inc.*, No. 17-cv-04810-HSG, 2020 WL 2838812, at *1 (N.D. Cal. June 1, 2020).

24   "Reference to a stipulation or protective order that allows a party to designate certain documents

25   as confidential is not sufficient to establish that a document, or portions thereof, are sealable."

26   N.D. Cal. Civ. L.R. 79-5(c).

27                 For any document a party ("Filing Party") seeks to seal because that
                   document has been designated as confidential by another party or
28                 non-party (the "Designating Party"), the Filing Party must, instead of

filing an Administrative Motion to File Under Seal, file an
Administrative Motion to Consider Whether Another Party's Material
Should Be Sealed.
. . .
(3) Within 7 days of the motion's filing, the Designating Party must
file a statement and/or declaration . . . .  A failure to file a statement
or declaration may result in the unsealing of the provisionally sealed
document without further notice to the Designating Party.

*Id.* at 79-5(f).

Applying those principles, the Court DENIES in part the parties' administrative motions to

file under seal, (Dkt. Nos. 317, 318, 320, 326, 327, 333, 334, 337, 340, 346, 347, 351, 352; Case

No. 18-cv-07394-JSC, Dkt. Nos. 360, 361, 363, 368, 370, 377, 383, 384, 387, 390, 393, 399, 400,

408, 409), as follows:

| Document | Disposition | Reason |
|---|---|---|
| Dkt. No. 317. | Not sealable. | ISL did not submit the statement or declaration required by N.D. Cal. Civ. L.R. 79-5(f). |
| Dkt. No. 318. | Not sealable. | Plaintiffs did not submit the statement or declaration required by Civ. L.R. 79-5(f). |
| Dkt. No. 320. | Not sealable. | FINA and USA Swimming did not submit the statement or declaration required by Civ. L.R. 79-5(f). |
| Dkt. No. 326. | Not sealable. | ISL did not submit the statement or declaration required by Civ. L.R. 79-5(f). |
| Dkt. No. 327. | Not sealable. | Plaintiffs did not submit the statement or declaration required by Civ. L.R. 79-5(f). |
| Dkt. No. 333. | Not sealable. | Plaintiffs did not submit the statement or declaration required by Civ. L.R. 79-5(f). |
| Dkt. No. 334. | Not sealable. | ISL did not submit the statement or declaration required by Civ. L.R. 79-5(f). |
| Dkt. No. 337. | Not sealable. | FINA did not submit the statement or declaration required by Civ. L.R. 79-5(f). |
| Dkt. No. 340. | Not sealable. | FINA, USA Swimming, and Wasserman did not submit the statement or declaration required by Civ. L.R. 79-5(f). |
| Dkt. No. 346. | Not sealable. | ISL did not submit the statement or declaration required by Civ. L.R. 79- |

| | | 5(f). |
|---|---|---|
| Dkt. No. 347. | Not sealable. | Plaintiffs did not submit the statement or declaration required by Civ. L.R. 79-5(f). |
| Dkt. No. 351. | Not sealable. | FINA did not submit the statement or declaration required by Civ. L.R. 79-5(f). |
| Dkt. No. 352. | Not sealable. | USA Swimming did not submit the statement or declaration required by Civ. L.R. 79-5(f). |
| Case No. 18-cv-07394-JSC, Dkt. Nos. 360, 361. | Pending further submission by ISL. | ISL submitted a statement at Case No. 18-cv-07394-JSC, Dkt. No. 372. **Within 5 days of this Order, ISL shall submit an updated version of the statement that cites to the ECF Docket Nos. of the documents it wishes to seal** on the basis that they contain sponsorship agreements with third parties. |
| Case No. 18-cv-07394-JSC, Dkt. No. 363. | Not sealable. | Plaintiffs did not submit the statement or declaration required by Civ. L.R. 79-5(f). |
| Case No. 18-cv-07394-JSC, Dkt. No. 368. | Not sealable. | ISL does not object.  (Case No. 18-cv-07394-JSC, Dkt. No. 372 at 3.) |
| Case No. 18-cv-07394-JSC, Dkt. No. 370. | Not sealable. | FINA and USA Swimming did not submit the statement or declaration required by Civ. L.R. 79-5(f). |
| Case No. 18-cv-07394-JSC, Dkt. No. 377. | Not sealable. | FINA and USA Swimming did not submit the statement or declaration required by Civ. L.R. 79-5(f). |
| Case No. 18-cv-07394-JSC, Dkt. No. 383. | Not sealable. | ISL did not submit the statement or declaration required by Civ. L.R. 79-5(f). |
| Case No. 18-cv-07394-JSC, Dkt. No. 384. | Not sealable. | Plaintiffs did not submit the statement or declaration required by Civ. L.R. 79-5(f). |
| Case No. 18-cv-07394-JSC, Dkt. No. 387. | Not sealable. | FINA did not submit the statement or declaration required by Civ. L.R. 79-5(f). |
| Case No. 18-cv-07394-JSC, Dkt. No. 390. | Not sealable. | FINA did not submit the statement or declaration required by Civ. L.R. 79-5(f). |
| Case No. 18-cv-07394-JSC, Dkt. No. 393. | Not sealable. | FINA, USA Swimming, and Wasserman did not submit the statement or declaration required by Civ. L.R. 79-5(f). |
| Case No. 18-cv-07394-JSC, Dkt. No. 399. | Not sealable. | ISL did not submit the statement or declaration required by Civ. L.R. 79- |

United States District Court
Northern District of California

| | | 5(f). |
|---|---|---|
| Case No. 18-cv-07394-JSC, Dkt. No. 400. | Not sealable. | Plaintiffs did not submit the statement or declaration required by Civ. L.R. 79-5(f). |
| Case No. 18-cv-07394-JSC, Dkt. No. 408. | Not sealable. | USA Swimming did not submit the statement or declaration required by Civ. L.R. 79-5(f). |
| Case No. 18-cv-07394-JSC, Dkt. No. 409. | Not sealable. | FINA did not submit the statement or declaration required by Civ. L.R. 79-5(f). |

With respect to the material determined not sealable, unless the designating party files a renewed motion to seal within **5 days** of the date of this Order the Court will unlock the prior docket entries so the material previously filed under seal is available on the public docket.  *See* N.D. Cal. Civ. L.R. 79-5(f), 79-5(g)(2).  A party may file a notice on the docket if the disposition above omits any document for which an administrative motion to seal was filed.

## CONCLUSION

FINA's motions for summary judgment are GRANTED.  Plaintiffs' and ISL's joint motion for summary judgment is accordingly DENIED.  FINA's Daubert motions and motion to strike are DENIED as moot.

This Order disposes of Docket Nos. 316, 317, 318, 320, 321, 325, 326, 327, 333, 334, 337, 340, 346, 347, 351, 352 in Case No. 18-cv-07393-JSC and Docket Nos. 355, 356, 357, 358, 359, 363, 364, 368, 370, 371, 377, 383, 384, 387, 390, 393, 399, 408, 409 in Case No. 18-cv-07394-JSC.

**IT IS SO ORDERED.**

Dated: January 6, 2023

JACQUELINE SCOTT CORLEY
United States District Judge